**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

In Re INTELLIGROUP SECURITIES LITIGATION

Civil Action No. 04-4980 (GEB)

**OPINION**

RECEIVED
DEC 2 0 2006
AT 8:30____M
WILLIAM T. WALSH
CLERK

**APPEARANCES:**

JOSEPH J. DEPALMA, Esq.,
LITE, DEPALMA, GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102,
and
GARY S. GRAIFMAN, Esq.,
KANTROWITZ, GOLDHAMER & GRAIFMAN, ESQS.
210 Summit Avenue
Montvale, New Jersey 07645,
and
LISA J. RODRIGUEZ, Esq.,
TRUJILLO, RODRIGUEZ & RICHARDS, LLP
8 Kings Highway West
Haddonfield, New Jersey 08033,
and
JEAN-MARC ZIMMERMAN, Esq.,
ZIMMERMAN, LEVI & KORSINSKY LLP
226 St. Paul Street
Westfield, New Jersey 07090,
and
STEVEN J. TOLL, Esq., DANIEL S. SOMMERS, Esq.,
JOSEPH HELM, Esq., and MATTHEW K. HANDLEY, Esq.,
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
Suite 500 West
1100 New York Avenue, NW
Washington, DC 20005,
Attorneys for Plaintiffs LYDIA GARCIA, SENTHILNATHAN NARAYANAN, ROBERT FARBER and the class of all others similarly situated, as well as Consolidated Plaintiffs VIJAYAN BHADRAKSHAN, RON G. PECUNIA, JOSEPH ACKERMAN, RUDINA I. SIHWEIL, GEORGE E. AMOS, ISA S. SIHWEIL and the class of all others similarly situated.

DENNIS J. DRASCO, Esq. and KEVIN J. O'CONNOR, Esq.,
LUM, DANZIS, DRASCO & POSITAN, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068,
and
DARRYL W. SIMPKINS, Esq. and VICTORIA CURTIS BRAMSON, Esq.,
SIMPKINS & SIMPKINS, LLC
Mountain View Plaza
856 Route 206, Building B
Hillsborough, New Jersey 08844,
and
DONALD A. ROBINSON, Esq.,
ROBINSON & LIVELLI, ESQS.
Two Penn Plaza East
Suite 1100
Newark, New Jersey 07105,
and
J. ALLEN MAINES, Esq., SUMMER B. JOSEPH, Esq., and ALBERT M. MYERS, Esq.,
PAUL, HASTINGS, JANOFSKY & WALKER, LLP
600 Peachtree Street NE
Suite 2400
Atlanta, Georgia 30308,
and
GRANT FONDO, Esq., WILLIAM S. FREEMAN, Esq., and RICHARD D. NORTH, Esq.,
COOLEY GODWARD KRONISH, LLP
Five Palo Square
3000 El Camino Real
Palo Alto, California 94306,
Attorneys for Defendants INTELLIGROUP, INC., ARJUN VALLURIPALLI (also known as ARJUN VALLURI), NICHOLAS VISCO, EDWARD CARR and DAVID J. DISTEL.

**BROWN, Chief Judge**

This matter is before the Court on Defendants' motions (collectively "Motions") to dismiss the Plaintiffs' Second Amended Consolidated Class Action Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4, et seq. For the reasons discussed below, Defendants' Motions are GRANTED, and Plaintiffs' Complaint is DISMISSED without prejudice.

## PROCEDURAL BACKGROUND

Plaintiffs, investors who purchased the common stock of Defendant Intelligroup ("Intelligroup" or "Company," or "Issuer") during forty months between May 1, 2001, through and including September 24, 2004 ("Class Period"), brought this securities fraud class action alleging that Defendants defrauded them by artificially inflating the value of the stock through false and misleading statements disseminated into the investing community. See Compl. at 1.

The litigation was initiated on October 12, 2004, see Docket Entry No. 1, when the first of six class action complaints was filed with the Court. On August 10, 2005, all six actions were consolidated into the instant action. See Docket Entry No. 24. On October 10, 2005, Plaintiffs filed their joint Amended Complaint ("Original Complaint") against the Issuer and four former officers of the Issuer, two of whom were Defendants Valluripalli and Visco. See Docket Entry No. 31. On December 5, 2005, certain Defendants filed their motion to dismiss Plaintiffs' Original Complaint. See Docket Entry No. 3. On February 10, 2006, the instant Complaint was filed against the Issuer and Defendants Valluripalli and Visco; with all claims against the other two officers being dismissed. See Docket Entry No. 39. On March 27, 2006, Defendants filed their instant Motions, see Docket Entries Nos. 40 and 42, and Plaintiffs filed their brief in opposition ("Opposition") to the Motions on May 11, 2006. See Docket Entry No. 43. Defendants filed their reply ("Reply") on June 9, 2006. See Docket Entry No. 44.

This matter was transferred to the undersigned on November 2, 2006. See Docket Entry No. 50. Except for the instant Motions, no other applications are currently pending in this action.

## LEGAL FRAMEWORK

### I. Elements of a 10b-5 Claim

Congress passed the Securities Exchange Act of 1934 ("'34 Act"), 15 U.S.C. §§ 78a-78kk (1994 & Supp. IV 1998), assuring the disclosure of full and fair information to the investing public. See H.R. Rep. No. 73-1383, at 1-2 (1934) (describing the legislation's purposes). In relevant part, Section 10(b) of the '34 Act proscribed the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The ensuing Rule 10b-5, 17 C.F.R. § 240.10b-5, emerged in 1943 as a small legislative acorn that ultimately developed into a full-blown judicial oak.[1] See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975) (where Justice Rehnquist presented this well-known metaphor). Like Section10(b), Rule 10b-5 prohibits "any act . . . which operates or would operate as a fraud or deceit upon any person" and makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Under this Rule, "the basic elements [of a private federal securities fraud action] include: (1) a material misrepresentation . . . ; (2) scienter, i.e., [defendant's] wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . .

---

[1] The SEC hastily promulgated Rule 10b-5 in 1942, following Commissioner Pike's unremarkable observation, "Well . . . we are against fraud, aren't we?" made after the SEC learned that a certain Boston executive had been spreading untrue bad news about his company to induce stockholders into selling their stock to him at an artificially low price. See Milton V. Freeman, Conference on Codification of the Federal Securities Laws, 22 Bus. Law. 793, 922 (1967); see also John C. Coffee, Jr. & Joel Seligman, Securities Regulation 1044-45 (9th ed. 2003).

as 'transaction causation'; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo ("Dura"), 544 U.S. 336, 341 (2005) (citing 15 U.S.C. § 78u-4(b)(4); Basic Inc. v. Levinson, 485 U.S. 224, 231-232, 248-249 (1988); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 199 (1976); Blue Chip Stamps, 421 U.S. at 730-731; Thomas Lee Hazen, Law of Securities Regulation, ¶¶ 12.11[1], [3] (5th ed. 2002)).

## II. Pleading Requirements of a 10b-5 Claim

Plaintiff's pleading requirements are different with respect to different elements of a 10b-5 claim. The general standard of review triggered by defendant's motion to dismiss under Rule 12(b)(6) is well-settled, i.e., the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.[2] See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000). Therefore, dismissal is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of plaintiff's claim which would entitle him to relief. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (3d Cir. 2001) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

### A. *Heightened Pleading Requirements*

2

Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. See Burlington Coat Fact. Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997). Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

The Rule 12(b)(6) standard of review is, however, altered by Rule 9(b), which imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "This particularity requirement has been rigorously applied in securities fraud cases." Burlington Coat Fact. Sec. Litig., 114 F.3d at 1417 (citations omitted). Therefore, a plaintiff averring securities fraud claims must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

The Third Circuit clarified:

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d at 577). Moreover, a "stringent" reading of the requirements set forth in Rule 9(b) is expressly applicable to two elements of a securities fraud claim, i.e., scienter and material misrepresentation, because of the analogous heightened pleading requirements contained in the Reform Act.[3] See 15 U.S.C. § 78u-4(b)(1) and (b)(2).

---

[3] "The purpose of the [Reform] Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." Advanta Corp. Sec. Litig., 180 F.3d at 531 (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748). Consequently, the PSLRA imposed heightened pleading requirements on securities fraud claims under the '34 Act consistent with a "stringent" reading of Rule 9(b) of the Federal Rules of Civil Procedure. See H.R.

Therefore, when stating "falsity," i.e., "material misrepresentation" element of his/her 10b-5 claim, a securities fraud plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[4] 15 U.S.C. § 78u-4(b)(1), (2). Similarly, with respect to the scienter element of his/her 10b-5 claim, the Reform Act requires that "the complaint shall . . . state with particularity [all] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In sum, the Reform Act modified the traditional Rule 12(b)(6) analysis for the purposes of pleading "material misrepresentation" and "scienter." See Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) ("The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6)"); Rockefeller Ctr. Props. Secs. Litig., 311 F.3d at 224 (noting that "'whereas under Rule 12(b)(6), [the court] must assume all factual allegations in the complaint are true, . . . under the Reform Act, [the court would] disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute," quoting

---

Rep. No. 104-369, at 41 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 740.

4

The concept of materiality cannot be distilled into a bright-line test. See Basic, 485 U.S. 224, see also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992); Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000). Materiality is determined in context. See Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) (deficiencies found by FDA inspectors at one of many business locations were not material); Wilensky v. Digital Equip. Corp., 903 F. Supp. 173 (D. Mass. 1995), aff'd in part, rev'd in part on other grounds, 82 F.3d 1194 (1st Cir. 1996) (a new marketing strategy was found immaterial); accord Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) (intermediary's conflict of interest was deemed immaterial); Carter-Wallace, Inc. v. Hoyt, 150 F.3d 153 (2d Cir. 1998) (departure from the generally accepted accounting principles cannot qualify as a material element for the purposes of securities fraud action).

Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)); Advanta, 180 F.3d at 531 (stating that plaintiff's failure to meet the heightened pleading requirements results in dismissal of the complaint); accord Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss").

**B. *Rule 8 Pleading Requirements***

It appears, however, that the heightened pleading requirements of PSLRA might be inapplicable to the remaining elements of a 10b-5 claim. See Dura, 544 U.S. at 346 ("[The Court] assume[s], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss"). Indeed, since only the first two Subsections of 15 U.S.C. § 78u-4(b) require investors to specify falsity and plead facts supporting a strong inference of scienter, while the following Subsections apply *only after* the heightened pleading standards of 15 U.S.C. § 78u-4(b)(1) and (2) have been met, it is fair to infer that the remaining elements of any 10b-5 claim are subject to ordinary notice-pleading standards set forth in Rule 8. See 15 U.S.C. 78u-4(b)(3); accord Dura, 544 U.S. at 346 ("[T]he Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief'") (quoting Fed. R. Civ. P. 8(a)(2)).

> But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). [The Court recognizes] that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. [See] Swierkiewicz v. Sorema N. A., 534 U.S. 506, 513-15 (2002). But it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the [facts] that the plaintiff has in mind. . . . [A]llowing a plaintiff to forgo giving any indication of the [facts] that the plaintiff has in mind would bring about harm of the very sort the [Reform Act] seek[s] to avoid. Cf. H. R. Conf. Rep. No. 104-369, p 31 (1995) (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only

> a faint hope that the discovery process might lead eventually to some plausible cause of action"). It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." Blue Chip Stamps, 421 U.S. at 741. Such a rule would tend to transform a private securities action into a partial downside insurance policy. See H. R. Conf. Rep. No. 104-369, at 31; see also Basic, 485 U.S. at 252 . . . .

Dura, 544 U.S. at 588-89.

## FACTUAL BACKGROUND

While the factual matters pertaining to potential proof of legal elements of Plaintiffs' claim are as interminable as they are complex, the key facts of this case appear to be both simple and straightforward. Adversarial vocabulary and technical terms aside, these facts are set forth identically in Plaintiffs' Complaint and Defendants' Motions, with the following exception.

Plaintiffs appear to assert that this Court's factual inquiry has to be limited solely to the facts set forth in Plaintiffs' Complaint. See Opposition at 17, n.10. Although Plaintiffs expressly made this claim only with respect to the fact that the SEC conducted a formal investigation into the events leading to the Announcement and terminated the investigation without filing any charges against the Company, see id., Defendants apparently presumed that Plaintiffs wished to make the same assertion with respect to any fact not set forth in the Complaint. See Defendants' Request for Judicial Notice ("Request"), Docket Entry No. 40 (seeking judicial notice of Intelligroup's (1) Form 10-K filed with the SEC on March 30, 2004; (2) Press Release of September 24, 2004 ("Press Release"); (3) stock chart compiled by Market Watch ("Stock Chart"); and (4) transcript of October 5, 2004, conference).

> Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1)

> generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (finding that a judicial notice was properly taken with respect to "three different categories of documents [which] included: (1) documents relied upon in the Complaint ([including] Company['s] press releases); (2) documents filed with the [United States Securities and Exchange Commission ("]SEC[")]; and (3) stock price data compiled by [a reliable financial] news service").

Therefore, for the purposes of the instant Opinion and accompanying Order, this Court takes judicial notice of the Stock Chart and the Press Release. The Stock Chart is a table of historical prices compiled by a reliable financial news service that specifies, to the penny, the adjusted closing prices of Intelligroup's stock over the week following the Press Release. Moreover, Plaintiffs own Exhibit C is a line graph of historical prices which is identical, information-wise, to the Stock Chart, short of the fact that the graphical image of Intelligroup's stock price fluctuation contained in Plaintiffs' Exhibit C prevents this Court from reading the values to the penny. Hence, this Court takes notice of the Stock Chart, see Issuer's Brief, Ex. F, as a document enhancing the information contained in Plaintiffs' Exhibit C.

The situation, however, appears somewhat different with respect to the Press Release. See Issuer's Brief, Ex. A. The allegations made in Plaintiff's Complaint, while containing indirect references to the Press Release i.e., a document filed by Intelligroup with the SEC (and even quoting certain language contained in the Press Release), see Compl. ¶ 8, create the impression that there was *only one* announcement in the Press Release about erroneous accounting practices. However, the

Press Release contained *three* different announcements, each equally important to the inquiry at hand from the financial point of view. Since it would be contrary to the express guidance of the Third Circuit to exclude the part of the Press Release overlooked by Plaintiffs, this Court takes judicial notice of the entire content of the Press Release. See NAHC, 306 F.3d at 1331.

The Court now turns to the uncontested facts of the case. Intelligroup is a publicly traded company incorporated in the State of New Jersey and keeping its principal office at 499 Thornall Street, Edison, New Jersey. See Compl. ¶¶ 1, 21; Issuer's Brief at 4. Intelligroup has subsidiary operations in India, Japan, United Kingdom and Denmark. The Company develops and supports information technology programs for multinational and local businesses. See Compl. ¶ 2; Intelligroup's Brief in Support of Motion ("Issuer's Brief") at 4. "Much of Intelligroup's work is done by sending the work offshore to the Company's subsidiary in India." Compl. ¶ 2. Intelligroup's stock was traded on the National Association of Securities Dealers Automated Quotation System ("NASDAQ"). See Compl. ¶ 6, Issuer's Brief at 5.

Defendant Valluripalli served as Company's CEO, President and Chairman of the Board during the Class Period, see Compl. ¶ 22, Issuer's Brief at 4, and Defendant Visco served as Company's CFO from November of 2000 to November of 2003. See id.

On September 24, 2004, Intelligroup issued the Press Release making an announcement ("First Announcement") that it expected to restate its financial statements issued and filed with the United States Securities and Exchange Commission ("SEC") during 2001, 2002, 2003 and the first quarter of 2004 ("Statements"). See Compl. ¶ 5; Issuer's Brief at 5; Press Release. In the very same Press Release, the Company made two other announcements, one about Intelligroup's anticipated

private placement ("Second Announcement"),[5] and another about Intelligroup's default on--and loss of--revolving credit ("Third Announcement"). See Press Release. On September 24, 2004, the last trading day before these three Announcements, Issuer's common stock closed at $1.65. See Compl.¶ 6 and Ex. C; Issuer's Brief at 5-6. On September 27, 2004, the first day after the Announcements, the stock opened at $1.58 and fell to $1.13 per share, under heavy trading. See id.; see also Stock Chart. Within the next five days, however, Intelligroup's stock kept steadily rising from $1.13 to $1.15, then $1.20, then $1.42, finally climbing to $1.60, that is, two cents above the opening price on the Press-Release day. See Stock Chart.

The restatement of the Company's financials ("Restatement") was made on October 24, 2005, more than one year after the issuance of the Press Release. See Compl. ¶ 8. Although the Restatement revealed that the Company's Statements required corrections so "extensive [that they] affected virtually every line item" of the Statements, the market displayed no reaction to the Restatement. See Compl., Ex. C.

Plaintiffs now assert that Defendants' issuance of the Statements containing a host of accounting errors amounted to a violation of Section 10(b) of '34 Act and the ensuing Rule 10b-5. Plaintiffs maintain that Defendants' accounting errors were so systematic and endemic as to render the Statements false, and to inflate the market value of Intelligroup securities. Compl.¶ 14. In addition, Plaintiffs maintain that the fact that "Defendants repeatedly signed, filed, and published certifications that Intelligroup's internal controls were adequate when . . . Intelligroup's internal

---

5

Although neither Plaintiffs nor Defendants clarify the nature of the private placement, it appears that the private placement was contemplated under 17 C.F.R. § 230.506, which allows sale of securities for an unlimited dollar value. See 17 C.F.R. § 230.506, compare 17 C.F.R. 230.504 (setting $1,000,000 ceiling) and 17 C.F.R. § 230.505 (setting $5,000,000 ceiling).

controls were [in fact,] weak or non-existent" establishes Defendants' liability under Rule 10b-5 and, in addition, signifies that Defendants Valluripalli and Visco were liable for Plaintiffs' injuries as controlling persons, since these Defendants "knew [about] or recklessly disregarded" the falsity of Intelligroup's accounting data contained in the Statements.[6] Id. ¶¶ 12-14; Opposition at 32-36 and notes 19, 20 (citing to Compl. ¶¶ 70-75, referring, in turn, to Section 906 of the Sarbanes-Oxley Act) (brackets omitted).

With respect to the causation element of their 10b-5 claim, Plaintiffs assert that causation is established by the fact that "Intelligroup's common stock traded in an open, well-developed and efficient market, [and] the market for Intelligroup securities promptly digested . . . all publicly-available [information] and reflected such information in Intelligroup's stock price. Under these circumstances, [Plaintiffs] suffered [an] injury through their purchase of Intelligroup securities at artificially inflated prices." Compl. ¶¶ 105-06. Finally, setting forth the economic loss element of their claim, Plaintiffs allege that: "Plaintiffs . . . suffer[ed] actual economic loss when the false and misleading nature of Defendants' [S]tatements [was] disclosed to the market, causing the inflation to be removed from the company's stock price." Id. ¶ 108.

---

6

Section 20(a) of the '34 Act, 15 U.S.C. § 78(a), states that "[e]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws. See Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005); Digital Island Sec. Litig., 357 F.3d at 337; Shapiro, 964 F.2d at 279. To establish a prima facie case that the defendant was a controlling person within the meaning of Section 20(a), the plaintiff must show that: (1) the defendant had actual power or influence over the controlled person; and (2) the defendant actually participated in the alleged illegal activity. See Kersh v. General Council of the Assemblies of God, 804 F.2d 546, 548 (9th Cir. 1986); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d Cir. 1975); MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998).

## DISCUSSION

### I. Loss Causation Element of a 10b-5 Claim

A Rule 10b-5 plaintiff must plead and prove both "transaction causation" and "loss causation," where the latter represents a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) (so defining the element of loss causation). Granted the lenient requirements of Rule 8, it is relatively easy to allege facts sufficient to satisfy the transaction causation element, since the plaintiff need only assert that the plaintiff relied on defendant's false or misleading statement to purchase the stock in question. See Emergent Capital, 343 F.3d at 197. Easier still, if the case qualifies for the "fraud-on-the-market" presumption endorsed by the Supreme Court in Basic, 485 U.S. at 241-47 (1988), the plaintiff may simply allege that (s)he relied on the "integrity of the market," and will then be entitled to the presumption that the price of the stock (s)he bought was affected by all "available material information" concerning the company, including any publicly-disseminated misleading statements (even if the plaintiff never read them).[7]

However, the plaintiff is also required to plead that the decline in the stock price was caused, at least in part, by the alleged fraud, i.e., the loss causation element. See Emergent Capital, 343 F.3d

---

7

The presumption reflected judicial recognition of the hardships associated with proving reliance in view of the nature of modern securities markets; it developed from the Efficient Capital Market Hypothesis, i.e., the premise that, if the market is efficient, the information disclosed by issuers (or issuers' agents and analysts) is both available to and swiftly absorbed by the investors. See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992). A case involving a security traded at NASDAQ, such as Intelligroup's common stock, qualifies for the fraud-on-the-market presumption. See Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), appeal dismissed, 993 F.2d 875 (3d Cir. 1993) (detailing the market features necessary to give rise to the presumption).

189; Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000); Bastian v. Petren Res. Corp., 892 F.2d 680 (7th Cir. 1990); Robbins v. Kroger Properties, Inc., 116 F.3d 1441 (11th Cir. 1997). Notably, a "purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement," because such an allegation "amounts to nothing more than a paraphrased allegation of transaction causation," which may explain why the plaintiff bought (or bought at a particular price), "but not why [the plaintiff] lost money on the purchase, the very question that the loss causation allegation must answer."[8] Emergent Capital, 343 F.3d at 198.

This proposition was expressly upheld by the Supreme Court in Dura. See Dura, 544 U.S. 336. Reversing the Ninth Circuit's holding that an inflated purchase price by itself sufficiently establishes loss causation, see Broudo v. Dura Pharm., Inc., 339 F.3d 933, 937 (9th Cir. 2003), the Supreme Court ruled that defrauded investors must plead--and prove--that the *very misrepresentation at issue* proximately caused them an economic loss. See Dura, 544 U.S. at 345.

In Dura, investors that purchased Dura Pharmaceuticals ("Dura") securities during the ten months of class period ("Dura Period") filed a suit alleging that Dura made misleading statements

---

8

Judge Posner of the Seventh Circuit noted that "what securities lawyers call 'loss causation' is the standard common law fraud rule . . . merely borrowed for use in federal securities fraud cases." Bastian, 892 F.2d at 683 (citation omitted) (emphasis removed). The common law rule referred to by Judge Posner was first articulated in Pasley v. Freeman, 100 Eng. Rep. 450, 457 (K.B. 1789), the case stating that an action for "deceit lies when a man does any deceit to the damage of another." Thus, in cases of fraud, if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action." Id. The holding of Pasley was expressly cited by the Supreme Court as the origin of the modern private securities fraud action. See Dura, 544 U.S. at 343-44 (citing, inter alia, L. Loss & J. Seligman, Fundamentals of Securities Regulation, 910-918 (5th ed. 2004), W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts ("Prosser and Keeton on Torts") ¶ 110 (5th ed. 1984) (stating that plaintiff "must have suffered *substantial* damage," not simply *nominal* damages, before "the cause of action can arise") and Restatement (Second) of Torts ¶ 525 (1977)).

that fraudulently inflated the market value of Dura securities purchased by plaintiffs during the Dura Period. See Dura, 544 U.S. at 339. According to Dura plaintiffs, the statements were to the effect that Dura was developing a new key product which was highly likely to be approved for sale by the relevant government agency, and expected sales of this key product would yield enormous earnings. See id. Dura plaintiffs further alleged that, when Dura finally announced that a government agency refused approval of Dura's new key product, Dura's share price suffered a sharp decline (but almost fully recovered within one week). See id. Since the pleadings of Dura plaintiffs were void of any factual allegations that plaintiffs suffered any economic loss as a result of Dura's misrepresentations, the presiding district court dismissed plaintiffs' complaint holding that plaintiffs had not sufficiently pled loss causation and economic loss despite plaintiff's pleading of decline in Dura's stock price.[9] See In re Dura Pharms., Inc. Secs. Litig., 2000 U.S. Dist. LEXIS 15258 (S.D. Cal. July 11, 2000). After plaintiffs appealed, the Ninth Circuit reversed by finding that loss causation should have been deemed established "at the time of the transaction [since it] is at this time that damages are to be measured" by comparing the market price the investor paid in actuality to the hypothetical market price that would have existed had the truth been known at the time of the purchase. Broudo, 339 F.3d at 938. The Supreme Court granted a certiorari and reversed the Ninth Circuit decision explaining as follows:

> [A]n inflated purchase price [does] not . . . constitute or proximately cause the relevant economic loss.

---

9

"[I]mportantly, the complaint sa[id] the following (and nothing significantly more than the following) about economic losses attributable to the . . . misstatement[s]: 'In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby." Dura, 544 U.S. at 339-40 (emphasis removed).

. . .

> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. [So,] if . . . the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. [Moreover, if] the purchaser sells . . . after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so [since] that lower price [at the time of sale] may reflect not [the result of truth leaking out about] the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . *Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.*

. . .

> Given the tangle of factors affecting price, . . . the higher purchase price . . . may prove to be a necessary condition of [an economic] loss, . . . but, even if . . . so, it is [not sufficient in and by itself since it is] not [the] cause [of the economic] loss. [T]he Ninth Circuit's approach overlooks an important securities law objective. The securities statute[] . . . make[s private] actions available not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually* cause. . . . The statute . . . permit[s] . . . recovery where, but only where, plaintiffs *adequately allege and prove the traditional elements of causation and loss.* [Where] plaintiffs' lengthy complaint contains only one statement that . . . can [be] fairly read as describing the loss [and that] statement says that the plaintiffs "paid artificially inflated prices for [the issuer's] securities" and suffered "damages," [the] complaint contains nothing that suggests [either a loss causation or an actual economic loss].

Dura, 544 U.S. at 343-48 (emphasis supplied, citations omitted, original brackets removed).[10]

---

10

The Third Circuit has always followed an approach largely similar to that spelled out by the Supreme Court in Dura. See Dura, 544 U.S. at 340 (citing Semerenko, 223 F.3d 165). According to the Third Circuit, a necessary corollary of the fraud-on-the-market theory is that the inflation associated with an alleged misrepresentation will be incorporated into the value of a security, not only at the time of purchase, but until the truth is disclosed. See Semerenko, 223 F.3d at 185.

Hence, the holding of Dura makes it clear that, in order "[t]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission *concealed something from the market that, when disclosed, negatively affected the value of the security*."[11] Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.), 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006) (discussing Dura and quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (quoting, in turn, Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis supplied). If the price of a security declines after the purchase for reasons unrelated to the fraud, or if the circumstances of the decline are such that the investor's economic loss is bound to be speculative, the investor has no right to recovery. See H.R. Conf. Rep. No. 104-369, at 31 (1995) (noting that plaintiff's failure to trace a *measurable* loss to defendant's wrongful conduct should allow the defendant to obtain dismissal of claims that rest on speculative theories); Dura, 544 U.S. at 346; see also Huddleston v. Herman & MacLean, 640 F.2d 534, 549 n.25 (5th Cir. 1981).

---

11

The truth may be revealed to the investing public through means other than defendant's corrective disclosure. See Dura, 544 U.S. at 343 (speaking in terms of "truth leaking out"). For instance, in addition to formal disclosure by a defendant, "the market may learn of possible fraud [from] a number of sources: e.g., from whisteblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." In re Enron Corp. Sec. Derivative & "ERISA" Litig., 2005 U.S. Dist. LEXIS 41240, at *16 (S.D. Tex. Dec. 22, 2005) (citation omitted); In re Electronic Data Sys. Corp. Sec. & "ERISA" Litig., 298 F. Supp. 2d 544, 560-61 (E.D. Tx. 2004) (noting that defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion, since "defendants cannot escape liability for fraud simply by not admitting the fraud").

## II. Plaintiffs Failed to Plead Inflated Prices as to Certain Parts of the Class Period

The Supreme Court stated that "the higher purchase price [is] a necessary condition of [establishing an economic] loss." See Dura, 544 U.S. at 343. In the case at bar, Plaintiffs maintain that "Defendants' materially false and misleading statements . . . caused . . . Plaintiffs . . . to purchase Intelligroup common stock during the Class Period at artificially inflated prices." Id. ¶ 107; see also id. ¶ 119; Opposition at 14, 16. However, the facts supplied by Plaintiffs provide support for Plaintiffs' claim only with respect to five-thirteenths of the Class Period, at best.

The factual part of Plaintiffs' allegations with respect to Defendants' materially false and misleading statements is condensed into a table included in Plaintiffs' Complaint ("Table"). See Compl. at 8. The Table, offered in support of Plaintiffs' allegation that "Defendants' [false and misleading statements were made through dissemination of incorrect] financial [S]tatements [during] nearly three and one-half years . . . spanning thirteen . . . fiscal quarters," id. ¶ 14, is titled "Analysis of Intelligroup's Restated Class Period Financial Statements." Id. at 8. The Table consists of twelve blocks, with each block purporting to represent a fiscal reporting period.[12] See id. at 1, 8. However, while the Class Period spans forty months from May 1, 2001, to September 24, 2004, the twelve blocks of the Table (titled "FY01," "1Q02," "2Q02," "3Q02," "4Q02," "FY02," "1Q03," "2Q03," "3Q03," "4Q03," "FY03," "1Q04") assert facts pertaining *only* to Plaintiffs' allegations with respect

---

12 For the purposes of financial accounting, a reporting period is either a "fiscal year" or a quarter of such year. A new company or business must select the date on which its fiscal year begins. See, e.g., Craig A. Peterson and Norman W. Hawker, Does Corporate Law Matter? Legal Capital Restrictions on Stock Distributions, 31 Akron L. Rev. 175 (1997). Since Plaintiffs' Complaint uses the term "fiscal quarter" without specifying whether Intelligroup's fiscal year coincided with calendar year, see, e.g., Compl. ¶ 14, the Court presumes that Intelligroup's fiscal yearly and quarterly periods coincided with calendar ones.

to Intelligroup's yearly reports issued at the ends of 2001, 2002 and 2003, plus quarterly reports issued during 2002 and 2003, and for the first fiscal quarter of 2004. See id. at 8. Plaintiffs' Complaint is silent as to any facts with respect to alleged misrepresentations prior to Defendants' filing of 2001 yearly report, see id., and Plaintiffs expressly acknowledge that Intelligroup's financial statements for the second and third quarter of 2004 (the last two quarters of the Class Period) were not filed--or otherwise disseminated into the market--during the Class Period.[13] See id. ¶¶ 4, 5.

Each of the twelve blocks comprising Plaintiffs' Table is subdivided into six rows and four columns. See id. at 8. The first three columns of each block are titled "Originally Reported [accounting figures]," "Restated [accounting figures]" and "Variance," while the last column of each block is left untitled and contains percentage numbers (obtained, apparently, from comparing the "Variance" figures to corresponding "Originally Reported" ones).[14] The six rows in each block are titled "Total Assets," "Total Liabilities" "Accumulated Deficit," "Shareholder Equity," "Revenues"

---

13

Plaintiffs do not specify the dates on which the Statements containing incorrect data were *actually* filed with the SEC or otherwise disseminated into the market. If this Court is to presume that the Statements were filed on the last day of each fiscal quarter (or each fiscal year), the allegations set forth in the Table: (1) present *twelve* sets of data disseminated into the market on the following *ten* dates: December 31, 2001, March 31, 2002, June 30, 2002, September 31, 2002, December 31, 2002, March 31, 2003, June 30, 2003, September 31, 2003, December 31, 2003, and March 31, 2004; and (2) cover the period from December 31, 2001, to March 31, 2004 ("Table Period").

14

The "Variance" figures appear to represent the *difference* between the "Originally Reported [accounting figures]" and "Restated [accounting figures]." Although it is not entirely clear to this Court what degree of factual certainty Plaintiffs tried to convey by choosing the title "Variance" (since variance, by definition, is not a precise figure but a measure of statistical dispersion indicating the span over which possible values are spread, see, e.g., Jay Devore & Roxy Peck, Statistics: The Exploration and Analysis of Data 209-11 (3d ed. 1997)), the Court presumes, for the purposes of this Opinion, that Plaintiffs intended to assert specific figures rather than spans of values.

and "Net Income (loss)."[15] See id. According to Plaintiffs, Defendants incorrectly stated Intelligroup's "Net Income (loss)" in each Statement filed during the Table Period. See id. Using, in accordance with accounting practices, a parenthetical in order to designate a negative figure, Plaintiffs allege that Defendants misstated Intelligroup's "Net Income (loss)" as follows:

| *Fiscal period:* | *Original $:* | *Restated $:* | *Variance $:* | *Percentage:* |
|---|---|---|---|---|
| FY01 | (12,593,000) | (16,1666,000) | (3,573,000) | 28.4% |
| 1Q02 | 11,000 | 384,000 | 373,000 | 3390.9% |
| 2Q02 | (8,561,000) | 912,000 | 9,473,000 | -110.7% |
| 3Q02 | 13,000 | (1,766,000) | (1,779,000) | -13,684.6% |
| 4Q02 | 54,000 | (916,000) | (970,000) | -1,796.3% |
| FY02 | (8,483,000) | (1,386,000) | 7,097,000 | -83.7% |
| 1Q03 | (7,351,000) | (1,080,000) | 6,271,000 | -85.3% |
| 2Q03 | (493,000) | (1,043,000) | (550,000) | 111.6% |
| 3Q03 | 17,000 | 1,128,000 | 1,111,000 | 6,535.3% |
| 4Q03 | 1,442,000 | (46,000) | (1,488,000) | -103.2% |
| FY03 | (6,385,000) | (1,041,000) | 5,344,000 | -83.7% |
| 1Q04 | 279,000 | 378,000 | 99,000 | 35.5% |

See id. Plaintiffs also provide Plaintiffs' "[i]nterpretation of %'s [indicating that] Negative % = Overstatement; Positive % = Understatement." Id.

15

Plaintiffs' "Revenue" figures, both "Originally Reported" and "Restated" ones, are of no financial consequence. "Revenue" is the amount of money that a company earns from its activities (during a given period) from sales of goods and/or services to customers. See Charles Horngren, Gary Sundem, John Elliott, Introduction to Financial Accounting ("Introduction") 134 (8th ed. 2002). By contrast, "net profit" is the revenue amount less such costs as wages of rank-and-file employees, salaries of administrative personnel, managerial expenses, rent, utilities, fuel, raw materials, research and development, etc. See id. at 149. A related accounting concept of "operating profit" means company's earnings from ongoing operations before the deduction of interest payments and income taxes, i.e., "net profit" plus these deductions. See id. at 150. Therefore, revenue figures are irrelevant to assessment of company's operations and financial prospects since a larger revenue might result in losses (if the costs necessary to obtain such revenue exceed the revenue figure), while a smaller revenue may yield a profit if the costs associated with it are lower than the revenue amount.

Plaintiffs' Table and the above-quoted interpretation, however, omit to clarify that an understatement of a positive figure (i.e., an understatement of profit), as with an overstatement of a negative figure (i.e., an overstatement of loss), would indicate that Intelligroup's *actual* net income situation was *better* than that officially reported.[16] A careful examination of Plaintiffs' Table shows that Intelligroup's actual net income situation was *better* than that officially reported during the following fiscal periods: 1Q02 (by $373,000), 2Q02 (by $9,473,000), FY02 (by $7,097,000), 1Q03 (by $6,271,000), 3Q03 (by $1,111,000), FY03 (by $1,488,000) and 1Q04 (by $99,000). If so, Intelligroup's stock could have traded at inflated prices only during five non-consecutive quarterly periods which followed Intelligroup's filing of FY01, 3Q02, 4Q02, 2Q03, and 4Q03, since

16

Plaintiffs make a similar omission with respect to the figures reflecting Intelligroup's "Accumulated Deficit." See Compl. at 8. Specifically, with respect to financial Statements 1Q02, 2Q02, 4Q02, FY02, 1Q03, 2Q03, 3Q03 and 4Q03, the Table indicates that Intelligroup's "Accumulated Deficit" was: (1) originally reported in negative figures (meaning that Intelligroup achieved "budget surplus," i.e., the opposite to "accumulated deficit"); and (2) restated in negative figures exceeding the originally reported one in their absolute values, meaning that Intelligroup's actual budget surplus during these periods was *larger* than that originally reported. See id. Moreover, according to Plaintiffs, Intelligroup's *budget surplus* amounted: (1) by the end of the first fiscal quarter of 2003, to $26,519,000 (or, as restated, to the surplus of $32,629,000); (2) by the end of the second fiscal quarter of 2003, to $27,012,000 (or, as restated, to $33,672,000); (3) by the end of the third fiscal quarter of 2003, to $26,994,000 (or, as restated, to $32,534,000); and (4) by the end of the fourth and last fiscal quarter of 2003, to$25,553,000 (or, as restated, to $32,589,000). See Compl. at 8. Since Intelligroup's budget surplus for the entire 2003 had to be the same as it was at the end of the last quarter of that year, see id. (correctly stating identical figures for the last quarter and the year of 2002), Intelligroup's budget surplus for 2003 had to be $25,553,000 (or, as restated, $32,589,000). Plaintiffs, however, assert that Intelligroup's $25,553,000 *budget surplus* for 2003 somehow transformed into *accumulated deficit* of $25,553,000 (i.e., the figure identical to budget surplus in its absolute value) for the reasons inexplicable by any accounting practices. Moreover, it appears that this inexplicable transformation was not an unfortunate typo (i.e., an omission of a parenthetical indicating a budget surplus), since Plaintiffs assert that, during the first fiscal quarter of 2004, Intelligroup continued to suffer accounting deficit in the amount of $25,274,000 (or, as restated, $32,212,000). In view of these logically irreconcilable contentions, this Court does not address any of Plaintiffs' statements related to Intelligroup's accumulated deficit account.

Intelligroup's actual net income situation was *worse* than that officially reported only during these periods. The reason for such conclusion is that the valuation at issue involves a publicly traded common stock. Unlike most goods and services distributed by the economy, stocks have no intrinsic value. See S. Keane, Stock Market Efficiency: Theory, Evidence and Implications 6 (1983). Stocks are nothing but instruments representing other, possibly valuable, rights.[17] See id.

Financial theorists developed two scenarios for calculation of share value: (1) liquidation scenario employed in bankruptcy or reorganization proceedings and, hence, determining the "terminal" value per share; and (2) going-concern scenario applicable to shares of corporations traded on the market. The corporate finance theory unvaryingly holds that the going-concern stock price reflects the market's estimation of the future stream of dividends, discounted back to its present value. See Lynn A. Stout, The Unimportance of Being Efficient: An Economic Analysis of Stock Market Pricing and Securities Regulation, 87 Mich. L. Rev. 613, 616 n.11 (1988) ("Efficient market prices which reflect all available information relevant to the value of the stock are thought to measure rationally the 'worth' of stocks as financial instruments in terms of the present value of their expected future earnings, discounted for nondiversifiable risk"); see also Richard Brealey & Stewart Myers, Capital Investment and Valuation ("Brealey & Myers") 53, 77 (2003) ("The value of a stock is equal to the stream of cash payments discounted at the rate of return that investors expect to

---

17 At the very outset of a corporation's life, the value of shares are directly related to the value of equity because, when the corporation first sells to investors, it uses the monies to buy machinery, physical plants and other "real" goods or resources. See Smith, Investment Banking and the Capital Acquisition Process, 15 J. Fin. Econ. 3 (1986). But, once issued, stock can neither depreciate nor be consumed. Instead, it is sold and resold. These subsequent sales are nothing more than the market's expectations for the corporation's prosperity since these sales do not add a penny to the corporation's coffers and do not affect the value of equity. See Fox, Shelf Registration, Integrated Disclosure, and Underwriter Due Diligence, 70 Va. L. Rev. 1005, 1010 (1984).

receive on comparable securities"); De Bondt & Thaler, Anomalies: A Mean-Reverting Walk Down Wall Street, J. Econ. Persp, at 189 (Winter 1989) (equating the intrinsic value of a stock with a "rational forecast of the present value of future dividend payments"); Jacobs & Levy, On the Value of "Value," Fin. Analysts J., at 47-48 (July-Aug. 1988) (using the present discounted value of dividends to represent the "fair" or "intrinsic" value of a share of common stock); Burton G. Malkiel, Is the Stock Market Efficient? 243 S.C.L. 1313, 1316 (1989) (describing the standard "rational" model of share pricing as one of determining the present discounted value of the future stream of dividends); W. Sharpe, Investments 366-71 (2d ed. 1981); accord Chris-Craft Indus. v. Piper Aircraft Corp., 384 F. Supp. 507, 515-16 (S.D.N.Y. 1974), aff'd in part, rev'd in part, 516 F.2d 172 (2d Cir. 1975), rev'd, 430 U.S. 1 (1977); Simon v. New Haven & Carton Co., 393 F. Supp. 139, 144-50 (D. Conn. 1974), aff'd, 516 F.2d 303 (2d Cir. 1975); cf. Onti, Inc. v. Integra Bank, 751 A.2d 904, 917 (Del. Ch. 1999); In re Radiology Assocs., 611 A.2d 485, 490 (Del. Ch. 1991); Cede & Co. v. Technicolor, Inc., 1990 WL 161084, at *7 (Del. Ch. Oct. 17, 1990); Neal v. Alabama By-Products Corp., 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990), aff'd, 588 A.2d 255 (Del. 1991) (noting that the present value of future dividend payments analysis is the "preeminent valuation methodology").

Moreover, "[a] conceptual relationship can be developed between the latest accounting earnings and the price of common stocks by introducing three critical links: (1) a link between security price and future dividends, (2) a link between future dividends and future earnings, and (3) a link between future earnings and *current earnings*."[18] William Beaver, Financial Reporting: an

---

[18] Brealey and Myers, however, caution that:

> It is not correct to say that the value of a share is equal to the sum of the discounted stream of [corporation's] earnings per share. Earnings are generally larger than

Accounting Revolution 69 (3d ed. 1998) (emphasis supplied); see also George Foster, Financial Statement Analysis, 220-24 (2d ed. 1986) ("A common assumption is that there is a mechanistic relation between reported accounting earnings and stock prices") (emphasis removed); J. Ohlson, Earnings, Books Values, and Dividends In Equity Valuation ("Earnings"), Contemp. Acct. Res., 661, 661-87 (1995) (describing relationships between current earnings, future earnings and firm values). Therefore, the latest accounting statement of corporate *earnings* is the principal indicator of future dividends and, consequently, the key basis for stock pricing.[19] See Levmore, Efficient Markets and Puzzling Intermediaries, 70 Va. L. Rev. 651 (1984) (noting that, under the Efficient Market Hypothesis, stock prices reflect investors' best estimates of future dividends, with the latter being a derivative function of expected earnings).

---

> dividends because part of those earnings is reinvested in new plant, equipment, and working capital. . . . The correct formulation states [only] that share value is equal to the discounted stream of dividends per share.

Brealey & Myers at 53. A derivative indicator of share value is the rate of return on common equity ("ROE"), since the rate focuses on the profitability of company's operations. See Introduction at 482. To determine company's ROE (usually, for the fiscal year), preferred dividends declared during the year are subtracted from the yearly net income, and the result is then divided by the average of the beginning-of-the-year and ending-of-the-year common equity balances. See id.

19

While Plaintiffs also assert discrepancies in Defendants' Statements with respect to such items as assets and liabilities, Plaintiffs set forth no allegations suggesting that these discrepancies could affect Intelligroup's future dividends, and the Court is aware of no established financial theory correlating these matters. Moreover, Defendants' errors with respect to assets and liabilities were minor: the reported assets fluctuated between $36,808,000 and $46,390,000 (while the actual ones fluctuated between $35,184,000 and $41,438,000), and reported liabilities fluctuated between $20,022,000 and $30,072,000 (while the actual ones fluctuated between $23,970,000 and $32,385,000 ). See Compl. at 8. (Furthermore, had the market known the truth that Intelligroup was invariably achieving its net income on the basis of slightly *lesser* assets, while being burdened with slightly *larger* liabilities, Intelligroup's operational performance and future projects were likely to look more impressive and cause higher pricing of its stock.) Finally, Plaintiffs' allegations about Defendants' discrepancies with respect to *existing* shareholders equity do not appear relevant to the inquiry at bar since Intelligroup was not facing a liquidation scenario. See Brealey & Myers 291.

In view of these financial principles, Plaintiffs fail to assert that Intelligroup's shares were invariably sold to Plaintiffs at inflated prices during all thirteen fiscal quarters comprising the Class Period. Specifically, with respect to the phase spanning from May 1, 2001, i.e., the first date of the Class Period, to December 31, 2001 ("Initial Phase"), Plaintiffs' Complaint does not allege any specific information as to Intelligroup's earnings (or net income).[20] See generally Compl. While there appears to be no dispute as to the fact that Defendants' eventually restated their financial Statements covering the Initial Phase, see id. ¶ 8, this sole fact of Restatement does not indicate that the earnings figures in Intelligroup's original Statements exceeded the earning figures actually achieved. Therefore, Plaintiffs failed to plead any facts indicating that the market had a reason to overestimate the expected stream of Intelligroup's dividends during the Initial Phase. See Burlington Coat Fact. Sec. Litig., 114 F.3d at1429.

According to the facts pled by Plaintiffs, the first day when Plaintiffs could have purchased Intelligroup's stock at an inflated price was the date of Intelligroup's filing of FY01 (subject to filing on or after December 31, 2001), which incorrectly asserted that the Company suffered yearly loss of $12,593,000, while the loss actually suffered during 2001 was $16,1666,000. See Compl. at 8. However, the period of artificially inflated prices started on the date of Intelligroup's filing of FY01 expired on the date of Intelligroup's filing of its 1Q02 Statement (subject to filing on or after March

20 While the first block of Plaintiffs' Table titled FY01 indicates the Defendants overstated Intelligroup's yearly income in the Statement filed on or after December 31, 2001, by $3,573,000, Plaintiffs provide no indication as to how the market could have been affected *during* 2001, since the Table contains no information about 2001 quarterly reports. See Compl. at 8. The fact that the yearly income was overstated is not indicative of market during 2001 behavior because the overstatement of net income could have taken place over a single quarter of 2001 and even before the Class Period began.

31, 2002) since, in the 1Q02 Statement, Intelligroup incorrectly *understated* its net income as $11,000, while the real net income was $384,000. See id. Consequently, on the date of Intelligroup's filing of 1Q02 Statement, the investment market reassessed Company's potential stream of future dividends on the basis of the terms *less* favorable than the true ones, hence pricing Intelligroup's stock *below* its actual value. This "deflation" of share value continued when Intelligroup filed its next 2Q02 Statement (subject to filing on or after June 30, 2002) since, in its 2Q02 Statement, the Company again *understated* its net income by claiming $8,561,000 loss, while actually achieving $912,000 profit. See Compl. at 8.

This "deflation" streak, however, ended--and an artificial inflation became possible--when the Company filed its 3Q02 Statement (subject to filing on or after September 31, 2002) incorrectly asserting $13,000 profit, while actually yielding $1,766,000 loss. See id. Moreover, this Court presumes that the artificial inflation might have continued after Intelligroup's filing of its 4Q02 Statement until the date of Intelligroup's filing of its 1Q03 Statement, since (1) the pricing tendencies ensuing from the 4Q02 statement contradict those ensuing from the FY02 one; and (2) the Court is obligated to draw all reasonable factual inferences in favor of Plaintiffs when determining Defendants' Motion.[21] See Scheuer, 416 U.S. at 236. Upon Company's filing of its

---

21

The pricing tendencies of Intelligroup's stock during the period following Intelligroup's filing of the 4Q02 Statement ("Uncertain Period I") are unclear. Since Company's 4Q02 Statement *overstated* the net income figure, see Compl. at 8, the market should have *overpriced* the stock on the basis of this incorrect information. However, the ROE analysis ensuing from FY02 Statement (filed, presumably, together with 4Q02 Statement) suggests that Intelligroup's stock could have continued being *underpriced* during the Uncertain Period I. Accord supra this Opinion, note 18. Factoring preferred dividends out as a fixed variable, the ROE based on the *incorrect* information contained in FY02 Statement equals to -0.372 (i.e., 2002 net loss of $8,483,000, divided by the average between the equity values at the beginning and at the end of 2002, that is, $26,782,000 and $18,726,000). See id. Had the *true* information been known, the ROE would equal to -0.014 (the

1Q03 Statement (subject to filing on or after March 31, 2003), Intelligroup's stock again became *underpriced* since the $7,351,000 net loss reported substantially exceeded the actually experienced loss of $1,080,000. See id. This period of underpricing continued until the date of Intelligroup's filing of 2Q03 Statement (subject to filing on or after June 30, 2003, which provided the net loss figure of $493,000, while the actual loss was $1,043,000). See id. However, the pricing tendencies flipped again upon Company's filing of its next 3Q03 Statement (subject to filing on or after September 31, 2003) that asserted net income of $17,000, even though the actual net income reached $1,128,000, thus causing underpricing. See id. The Court presumes that underpricing ceased when Intelligroup filed its 4Q03 and FY03 Statements (subject to filing on or after December 31, 2003), since 4Q03 Statement included an *overstatement* of Intelligroup's net income, while FY03 included an *understatement* of it.[22] See id. (indicating that 4Q03 showed profit of $1,442,000 while

---

actual net loss of $1,386,000, divided by the average between $10,360,000 and $8,794,000), the figure (1) almost thirty times more favorable to Intelligroup than -0.372 ensuing from the incorrect information, and (2) suggesting that Intelligroup's stock could have been *underpriced* during the Uncertain Period I. However, since this Court is obligated to draw all reasonable factual inferences in favor of Plaintiffs, see supra this Opinion at 8 (discussing Rule 8), the Court is reluctant to downplay the importance of Defendants' 4Q02 Statement, which provided the market with reasons to *overprice* Intelligroup's stock during the Uncertain Period I and, thus, concludes that, for the purposes of pleading requirements, Plaintiffs met their burden with respect to the period following Defendants' filing of 4Q02 and FY02 Statements. See Fed. R. Civ. P 12(b)(6).

22

This inconsistency sent two opposite signals to the market creating another period of unclear pricing tendencies and spanning from the date of filing of these 4Q03 and FY03 Statements until the date of Intelligroup's filing of its 1Q04 Statement ("Uncertain Period II"). As with respect to the Uncertain Period I, the ROE ensuing from the figures originally set in FY03 was -0.386 (loss of $6,385,000, divided by the average of $14,416,000 and $18,728,000), the number *less* favorable to Intelligroup than the actual -0.116 (loss of $1,041,000, divided by the average of $9,053000 and $8,794,000) ensuing from the restated figures. However, the Court makes a presumption in favor of Plaintiffs and concludes that they sufficiently pled purchasing Intelligroup's stock at inflated prices during the Uncertain Period II. See supra this Opinion, note 21; accord Scheuer, 416 U.S. at 236.

Intelligroup actually suffered loss of $46,000, while FY03 alleged loss of $6,385,000, even though the actual loss was a notably smaller amount of $1,041,000).

The last Statement filed by Defendants during the Class Period was 1Q04 Statement (subject to filing on or after March 31, 2004) which provided grounds for underpricing tendencies that lasted from the date of its filing and throughout the remainder of the Class Period, since the Statement alleged that Intelligroup's net income was $279,000, while the actual income was $378,000. See id.

In view of the foregoing, Plaintiffs' claim that Defendants' misrepresentations caused Plaintiffs to purchase Intelligroup's stock at inflated prices during the entire Class Period is not supported by facts alleged by Plaintiffs.[23] As drafted, Plaintiffs' Complaint indicates that Plaintiffs could purchase Intelligroup's common stock at inflated prices only during the following four phases: (1) from the date of Intelligroup's filing of its FY01 to filing of 1Q02 ("Phase I"); (2) from filing of 3Q02 to filing of 1Q03 ("Phase II"); (3) from filing of 2Q03 to filing of 3Q03 ("Phase III"); and (4) from filing of 4Q03 to filing of 1Q04 ("Phase IV"). With respect to the remainder of the Class Period (equal to at least eight fiscal quarters out of the total of thirteen), Plaintiffs either provide bald assertions unsupported by any facts, or set forth the facts indicating that Plaintiffs purchase

23 In addition to the matters detailed supra, Plaintiffs' Complaint asserts that Defendants "failed to properly account for" the stages of completion of Intelligroup's fixed-price contracts, manner of revenue recognition, recordation of time entries by Intelligroup's consultants, inter-company depreciation, accrual of vacation time and collectability of a promissory note issued by one of Intelligroup's subsidiaries. Compl. ¶¶ 9, 35-47, 60-69, 96-101. The Complaint, however, is silent as to (1) how misstatement of these items could negatively affect the figures provided to the investing public in Intelligroup's Statements except by adjusting the net income and accumulated deficit results, the subjects discussed by the Court; and (2) if other adjustments of Intelligroup's Statements were caused by these misstatements, how these adjustments could negatively affect the market's pricing of Intelligroup's stream of future dividends. See id.

Intelligroup's securities at deflated prices.[24]

Such factual allegations, however, are insufficient to satisfy Plaintiffs' pleading requirements. See Burlington Coat Fact. Sec. Litig., 114 F.3d at1429. Therefore, Plaintiffs' Complaint will be dismissed with respect to all claim based on purchases made during periods other than Phases I, II, III and IV.

---

24

It would be contrary to the guidance of established financial theories to presume that the market's tendency to *overprice* Intelligroup's shares based on a statement that overstated the Company's net income residually remained after Intelligroup's filing of the next statement that provided financial basis for *underpricing* of Intelligroup's common stock by understating the net income, and vice-versa, since introduction of indefinite residual overpricing or underpricing effects undermines the Efficient Market Hypothesis presumption of the market's prompt absorption and reaction to the *latest* news disseminated. See Basic, 485 U.S. at 240-41; accord this Opinion at 24-25 (discussing the authorities stating that the valuation process is based on the latest information).

Moreover, even if the Court were to hypothesize that residual effects played part in the market's pricing, an examination of Plaintiffs' facts indicates that the residual effect during the nine fiscal quarters included in the Table would invariably cause underpricing since: (1) after 1Q02, the first quarter in the Table, Intelligroup *understated* its net income by $373,000; (2) after the second quarter, Intelligroup *understated* its net income by $9,473,000, thus, yielding the average *understatement* of $4,923,000 ($373,000 + $9,473,000, divided by two); (3) the third quarterly filing *overstated* net income by $1,779,000 yielding the average *understatement* of $2,689,000 (373,000 + 9,473,000 - 1,779,000, divided by three); (4) the fourth quarterly filing yielded the average *understatement* of $1,774,250 (373,000 + 9,473,000 -1,779,000 - 970,000, divided by four); (5) the fifth quarter yielded the average *understatement* of $2,637,600, the sixth yielded the *understatement* of $2,136,333, the seventh yielded *understatement* of $1,989,857, the eighth yielded the *understatement* of $1,555,125, and the ninth yielded the *understatement* of $1,393,333. Since the average cumulative result of misstatements contained in Defendants' Statements resulted in running understatement of Intelligroup's average net income, the residual effect would invariably cause, to a different degree, underpricing of the Company's securities. (Plaintiffs' Table, if read in terms of *weighted* average, with regressive percentile allocated to each preceding quarterly period, similarly results in the residual effect that invariably understates Intelligroup's net income and, thus, causes the stock to be underpriced. See Lee J. Krajewski and Larry P. Ritzman, Operations Management 459-86 (3d ed. 1992) (discussing the methodology for determining the correlation coefficient, standard error of the estimate and construction of a linear regression).

## III. Plaintiffs Failed to Plead Causation with Respect to the Disclosure of Alleged Fraud

Even if Plaintiffs' Complaint contained valid pleadings as to Plaintiffs' purchases of Intelligroup's stock at inflated prices during the entire Class Period rather than just Phases I, II, III and IV, Plaintiffs' Complaint would still have to be dismissed since Plaintiffs failed to assert any facts indicating that disclosure of the truth about Defendants' Statements was the cause of Plaintiffs' economic loss. Plaintiffs plead the causation element as follows: "Plaintiffs . . . suffer[ed] actual economic loss when the false and misleading nature of Defendants' [S]tatements [was] disclosed to the market, causing the inflation to be removed from the company's stock price." Compl. ¶ 108.

The Supreme Court, however, expressly pointed out that

> a lower price [obtained] may reflect[] not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower pric[ing]. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely the other factors caused the loss.

Dura, 544 U.S. at 341.

Loss causation has been analogized to the tort law concept of proximate cause in the sense that the injury sustained by a securities plaintiff must be at least a proximate result of the disclosure about defendant's previous material misrepresentation. See id. at 339; see also Emergent Capital, 343 F.3d at 197 (quoting Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001)). Therefore, in order to set forth a viable 10b-5 claim, the plaintiff must plead that defendant's misrepresentation "concealed something from the market that, *when disclosed*, negatively affected the value of the security." Lentell, 396 F.3d at 173 (emphasis supplied); see also Dura, 544 U.S. at 341. While a significant stock price decline immediately following a public airing of the alleged fraud might be plead as an indicator of the causal connection between the loss and the disclosure,

see D.E. & J. Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719, 748-49 (E.D. Mich. 2003), aff'd, 133 Fed. Appx. 994 (6th Cir. 2005)); see also In re Worldcom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005), existence of a causal connection cannot be made solely on the basis of temporal proximity where the stock price decline might be attributable to other forces, events or announcements that took place prior to or contemporaneously with the public airing of the alleged fraud but had nothing to do with the challenged conduct by the defendant. See Dura, 544 U.S. at 341; Huddleston, 640 F.2d at 556; Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 49 (2d Cir. 1978). In such scenario, the plaintiff must plead at least some facts indicating presence of an *actual* relationship between the challenged conduct and the decline in stock price, since the law of securities does not envision compensation for losses caused by anything other than the alleged fraud. See The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities, 26 Stan. L. Rev. 371 (1974); see also Schwert, Using Financial Data to Measure Effects of Regulation, 24 J. L. & Econ. 121 (1981) (discussing the legal and financial flaws inherent to the "gross loss" theory which assesses price declines without examining whether the declines were caused by factors other than the alleged wrongdoing).

The "net loss" theory, corresponding to the observations made by the Supreme Court in Dura, excludes from the recovery all losses unrelated to the alleged fraud, see Dura, 544 U.S. at 341; see also Rolf, 637 F.2d at 81 (excluding losses stemming from market forces); Oleck v. Fischer, 1979 U.S. Dist. LEXIS 11785 (S.D.N.Y. 1979) (excluding losses unrelated to fraud), aff'd on other grounds, 623 F.2d 791 (2d Cir. 1980); Rubenstein v. Republic Nat'l Life Ins. Co., 74 F.R.D. 337, 346 (N.D. Tex. 1976) (same); Entin v. Barg, 412 F. Supp. 508, 514 (E.D. Pa. 1976) (same), and

implements the "event study" approach commonly utilized in securities fraud cases.[25] See, e.g., DeMarco v. Lehman Bros., Inc., 222 F.R.D. 243, 247, 249 (S.D.N.Y. 2004); In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 299 n.42 (S.D.N.Y. 2003); In re Gaming Lottery Sec. Litig., 2000 WL 193125, at *1 (S.D.N.Y. Feb. 16, 2000) (citing Fama et al., The Adjustment of Stock Prices to New Information, 10 Int'l Econ. Rev. 1 (1969)); In re Executive Telecard, Ltd. Securities Litigation, 979 F. Supp. 1021 (S.D.N.Y. 1997); see also Mark Mitchell & Jeffrey Netter, The Role of Financial Economics in Securities Fraud Cases, 49 Bus. Law. 545 (1994) (discussing a range of cases); accord John C. Coffee Jr., Security Analyst Litigation, N.Y. L.J. 5 (Sept. 20, 2001). A rigorous application of the net loss theory stems from the parallels between the implied private cause of action under Rule 10b-5 and the statutory remedy provided by Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(e) (1976), for similar offenses (made in connection with initial offering rather than with resale of securities) which *expressly* excludes all losses not caused by defendant's wrongful conduct.[26] See

[25] The "event study" approach first assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock, see, e.g., RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000), and then determines whether those abnormal returns are due to fraud or non-fraud related factors. See Bradford Cornell & R. Gregory Morgan, Using Finance Theory to Measure Damages in Fraud Market Cases, 37 UCLA L. Rev. 883, 899-900 (1990); accord Dura, 544 U.S. at 341. Moreover, the event study methodology is actually used by financial economists as a tool to measure and predict the effect on market prices from all types of new information relevant to a company's stock valuation. See John M. Bizjak & Jeffrey L. Coles, The Effect of Private Antitrust Litigation on the Stock Market Valuation of the Firm, 85 Am. Econ. Rev. 436 (1995); Michael I. Muoghalu et al., Hazardous Waste Lawsuits, Stockholder Returns, and Deterrence, 57 S. Econ. J. 357 (1990); David Prince & Paul Rubin, The Effects of Product Liability Litigation on the Value of Firms, 4 Am. L. & Econ. Rev. 44 (2002); W. K. Viscusi & J. Hersch, The Market Response to Product Safety Litigation, 2 J. Reg. Econ. 215 (1990).

[26] Alternatively, a defendant's reliance on the positive effects of over-disclosure may prevent the plaintiff from recovering his/her losses if defendant's statements contain information about positive contemporaneous occurrences unrelated to defendant's fraud. See In re CIGNA Corp. Sec.

Entin, 412 F. Supp. At 514 (applying Section 11 standard to a Rule 10b-5 claim); see also Federal Securities Code §202(19), com. 6(a) (1981) (American Law Institute's endorsement of the approach). Therefore, in order to survive defendant's motion to dismiss, plaintiff's complaint should plead facts indicating the presence of an *actual and quantifiable* relationship between the alleged fraud and the decline of the stock price. The pleading of such causal relationship cannot be based on the effects caused by economic circumstances, industry- or firm-specific facts, or events other than the alleged fraud. See id.; see also Dura, 544 U.S. at 341.

Moreover, the plaintiff cannot rely on the negative market effects caused by defendant's "over-disclosure." An over-disclosure occurs when defendant's corrective statement contains (1) a proper disclosure constituting a curative component, i.e., a public airing of correct information, and (2) an improper over-disclosure constituting a fraudulent component, i.e., a disclosure of incorrect information. Since the market's reaction to the fraudulent component is qualitatively identical to the market's reaction to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" unrelated to the fraud disclosed in the curative component, accord Dura, 544 U.S. at 341, plaintiff's causal allegations should be limited solely to the relationship between the curative component and the corresponding part of the market's reaction. See id.; cf. Flamm v. Everstadt, 814 F.2d 1169, 1180 (7th Cir.), cert. denied, 484 U.S. 853 (1987). This preclusionary rule ensues from the established precedent stating that the market's reaction to the fraud contained in one (in this case, fraudulent) statement is immaterial for

---

Litig., 2006 U.S. Dist. LEXIS 59915 (E.D. Pa. Aug. 18, 2006) (examining such scenario); Beissinger v. Rockwood Computer Corp., 529 F. Supp. 770, 789-90 (E.D. Pa. 1981). Just as the plaintiff may not recover losses not caused by defendant's fraud, the defendant should not be able to reduce or avoid liability simply because defendant's fraud occurred during a rising market. See id.

the purposes of plaintiff's 10b-5 claim, if that 10b-5 claim is based on the fraud corrected by *another* (in this case, curative) statement.[27] See, e.g., Basic, 485 U.S. at 227.

### A. *Plaintiffs' Reliance on Temporal Proximity Is Insufficient to Plead Causation*

In the case at bar, Plaintiffs' allegations with respect to the causal connection between Plaintiffs' losses and the disclosure of errors contained in Defendants' Statements are insufficient since the allegations are limited to a mere assertion of temporal proximity between the airing of the Press Release and the following decline in Intelligroup's stock price. See Compl. ¶¶ 105-08. Relying on the fact that the stock dropped 52 cents on September 27, 2004, and remained around $1.25 from late December of 2003 to late June of 2004, Plaintiffs maintain that they "suffered actual economic losses when [and because] the false . . . nature of Defendants' [S]tatement [was] disclosed." Id. ¶ 108.

---

27 The following hypothetical situation illustrates the concept. A certain Company A, after reporting $50,0000 in operating income, detects certain errors in the report and issues a press release reading, "Company A conducted a review of its report and detected an error. Company A's operating income is actually $100,000 loss." However, a review of the errors in the report reveals that Company A actually made $100,000 in operating income rather than suffered a loss. In that event, the true first sentence of Company A's press release qualifies as a curative component, while the second sentence qualifies as an erroneous one. If, in response to the press release, the stock of Company A plummets, it is reasonable to presume that the drop in price was causally connected to the airing of the erroneous component. Therefore, the plaintiff should seek a remedy for the injuries caused by the erroneous component, provided that the plaintiff can duly plead all elements of his/her 10b-5 claim with respect to this erroneous information. Cf. Marsden v. Select Med. Corp., 2006 U.S. Dist. LEXIS 16795, *41 (E.D. Pa. April 6, 2006) (examining a similar scenario). In contrast, if the review of the errors reveals that Company A suffered $90,000 loss (rather than $100,000), the press release is unlikely to have an erroneous component since a prediction of $90,000 loss would cause a market effect analogous to that ensuing from $100,000 loss. Accord Basic, 458 U.S. at 239 (discussing the distinction between phases of merger negotiations and a consummated merger).

Plaintiffs' Exhibit C graph, however, indicates that the decline in Intelligroup's stock price started long before the airing of the Press Release. See Compl. Ex. C. According to the Exhibit, Intelligroup's stock highest price was about $5.25 ("Maximum Price"); the stock was traded at this rice around the beginning of July 2004, about three months prior to the issuance of the Press Release. See id. From that point on, the stock kept plummeting until late August of 2004 ("Initial Fall Period"), dropping to about $1.65 and losing about 69% of its Maximum Price, with an average weekly loss of $0.58, i.e., 11% loss of the Maximum Price per week. See id. During September 2004, after going up about 60 cents over the first week and then losing these 60 cents over the second one (i.e., repeating the 11% loss of the Maximum Price per week), the stock hovered at about $1.65 for a week or so until the airing of the Press Release that allegedly triggered the $0.52 drop challenged in the instant action ("Post-Release Drop," equal to 10% loss of the Maximum Price) and the following recovery within the next five days back to $1.60 ("Recovery"). See id.

Over the next six weeks, during October and early November of 2003, the stock underwent another see-saw movement, dropping from $1.60 to about $1.00 (average weekly loss of $0.15, or 3% loss of the Maximum Price) and then climbing back to about $1.60. The last leg of the graph starts at the end of 2003 and depicts a gradual decline from $1.60 to about $1.25 where the stock remained for about six months (collectively, "Low Period") until the beginning of July of 2005, when it swiftly soared to about $2.50. See id. Ignoring the three months of the steep 11%-per-week plunge during the Initial Fall Period, which caused Intelligroup's stock to lose 69% of the Maximum Price, and labeling the Recovery as an insignificant "short-lived rebound," Plaintiffs (1) assert that a causal connection between Plaintiffs' losses and Defendants' Statements ensues from the temporal proximity between Defendants' airing of the Press Release and the Post-Release Drop, see Compl.

¶ 6; Opposition at 59; and (2) maintain that the sole fact of occurrence of the Low Period supports Plaintiffs' causal claim in view of PSLRA's "90-day look-back" provision. See Opposition at 60.

Plaintiffs' bare temporal proximity claim, is, however, insufficient to allege a causal connection in view of the Initial Fall Period, which unambiguously indicated that certain economic forces ("Pre-existing Forces") unrelated to the Press Release were consistently driving Intelligroup's stock price down prior to the disclosure at issue. See Dura, 544 U.S. at 341 ("a lower price . . . may reflect[ ] not the earlier misrepresentation, but . . . other events, which . . . account for . . . that lower pric[ing]"); Huddleston, 640 F.2d at 549. Therefore, Plaintiffs failed to plead facts indicating the presence of an *actual and quantifiable* relationship between their losses and the alleged fraud by Defendants. Accord In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561, 588-89 (D. Md. 2005) (finding lack of causal connection where the three-and-a-half month long pre-disclosure decline reduced the stock value by 94%, while the brief post-disclosure decline was only 3% a day).

Moreover, Plaintiffs' assertion that the disclosure contained in the Press Release was the cause of the long depression of Intelligroup's stock price (until it soared to $2.50 in the beginning of July 2005) unduly ignores the presence of the Recovery period. Plaintiffs, effectively, maintain that the Recovery period was but a market "fluke," indicating nothing but the general fact that "Intelligroup's stock price was quite volatile." Opposition at 59. Plaintiffs assert that such conclusion is warranted in view of the fact that, after the Recovery climb, the stock did not remain at $1.60 for an extensive period of time. See id.

Plaintiffs err. The Efficient Market Hypothesis, upon which Plaintiffs rely, see Compl. ¶¶ 105-06, is premised on the belief that individuals are rational, self-governing actors who are able to process the information wisely, and they do so promptly. See Basic, 485 U.S. at 231-33; see also

Anne C. Dailey, Striving for Rationality, 86 Va. L. Rev. 349, 351 (2000); Donald C. Langevoort, Selling Hope, Selling Risk: Some Lessons for Law from Behavioral Economics About Stockbrokers and Sophisticated Customers, 84 Cal. L. Rev. 627, 699 (1996); compare Thomas Lee Hazen, The Short-term/Long-term Dichotomy and Investment Theory: Implications for Securities Market Regulation and Corporate Law ("The random walk theory . . . defines market efficiency as the lack of dependence between successive price movements. . . . Not surprisingly, this theory does not have a wide following in the professional investment community"). Since Plaintiffs rely on the Efficient Market Hypothesis in order to establish transactional causation, see Compl. ¶¶ 105-06, and the Hypothesis assumes that investors are rational risk calculators who consistently weigh the costs and benefits of alternatives and select the best option, thus causing the market's immediate reaction to any financially-important news, see Christine Jolls et al., A Behavioral Approach to Law and Economics, 50 Stan. L. Rev. 1471, 1477 (1998), Plaintiffs' allegation that the Recovery was a "fluke" that could not reflect the investors' assessment of Intelligroup's financial conditions directly contradicts Plaintiffs' claim that the Post-Release Drop was a result of the Press Release. Plaintiffs simply cannot have it both ways, i.e., rejecting all upward movements of Intelligroup's stock as inconsequential signs of volatility, while simultaneously maintaining a direct causal connection between the downward movements (specifically, the Post-Release Drop and the Low Period) and Defendants' alleged fraud. Claiming a temporal-proximity-based causal connection between the latter, Plaintiffs cannot avoid admitting the same with respect to the former.[28]

---

[28] Plaintiffs' Complaint is silent as to any intervening event that could have caused the Recovery and, therefore, potentially sever the temporal-proximity-based causal connection between the Recovery and the airing of the Press Release. See generally, Compl.

Finally, Plaintiffs' reliance on the "90-day look-back" provision, Section 21D(e) of PSLRA, codified as 15 U.S.C. § 78u-4(e), is similarly misplaced, since the provision supplies a model for calculating plaintiff's damages rather than a presumption of a causal connection. Section 21D(e) provides, in relevant part, as follows:

> In any private action. . . in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received . . . by the plaintiff . . . and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement . . . is disseminated to the market.

15 U.S.C. § 78u-4(e)(1).

Nothing in the language or history of the provision indicates that Section 21D(e) was intended to create a presumption of a causal connection between the alleged fraud and the decline in stock price.[29] The purely calculative model provided by the Section assists the courts in computing of plaintiff's damages after--and only if--the plaintiff properly pleads and proves all

---

29

Contrary to Plaintiffs' claim, the provision limits rather than enlarges Plaintiffs' rights. The Conference Committee, attempting to create a bill palatable to both the Senate and the House, sought to address the problem of "windfall" damages by providing a "look back" period, see H.R. Conf. Rep. No. 104-369, at 38, 42, capping plaintiff's damages through a reference to the "mean trading price," i.e., the mean price of the security over the ninety-day period following the dissemination of the corrective information. See Pub. L. No. 104-67, sec. 101(b), 21D(e)(3), 109 Stat. 737, 748-49 (codified at 15 U.S.C. § 78u-4(e)(1) (1998)). The record of legislative debates associated with the enactment of the Law is silent as to any presumption about a causal connection between the losses and the alleged fraud. See generally, H.R. Conf. Rep. No. 104-369. Notably, the Supreme Court in Dura was requested to consider an argument similar to that set forth by Plaintiffs (the argument was alleging a connection between the "90-day look-back" provision and plaintiff's pleading burden with respect to the element of causation, see Brief for Amici Curiæ Nat. Ass'n of Shareholder and Consumer Attorneys, AARP, and the Consumer Fed. of America in Support of Respondents at 25, Dura Pharm. v. Broudo, 544 U.S. 336 (Nov. 12, 2004)) but elected not to address the matter at all, hence, indicating the irrelevance of 15 U.S.C. § 78u-4(e) to plaintiff's pleading requirements. See generally, Dura, 544 U.S. 336.

elements of plaintiff's 10b-5 claim, including the presence of a causal connection between the alleged fraud and plaintiff's losses. Any finding otherwise would automatically supply the causation element to all securities plaintiffs, eliminating all pleading requirements with respect to the element of loss causation in a blatant violation of the Supreme Court's guidance in Dura which expressly sanctioned a judicial inquiry into the sufficiency of plaintiff's causal pleading and unambiguously explained that the courts should be mindful of the fact that "a lower price [suffered by the plaintiff] may reflect[] . . . events" other than the alleged fraud. Dura, 544 U.S. at 341. Therefore, Plaintiffs' Complaint must also be dismissed for insufficient pleading of the loss causation element.

### B. *Plaintiffs Unduly Ignore that the First Announcement Was an Over-disclosure*

Moreover, even if Plaintiffs' pleadings of the causal connection element have not been rendered insufficient by Plaintiffs' sole reliance on the temporal proximity between the airing of the Press Release and the following decline in Intelligroup's stock price in flagrant ignorance of both the Pre-Existing Forces and the Recovery period, Plaintiffs' Complaint would have to be dismissed since Plaintiffs failed to plead that the Press Release disclosed any negative information about the Statements that was true. The First Announcement part of the Press Release reads as follows:

> [T]he Company has been undertaking a comprehensive review of its 2004 second quarter results [which] resulted in a number of accounting adjustments to prior period[s and the] financial statements [issued during 2001, 2002 and 2003]. . . . Adjustments identified to date are expected to reduce . . . net income by approximately $0.9 million (or $0.05 per share) for the year ended December 31, 2003. In addition, there are certain historical intercompany adjustments totaling approximately $1.2 million that affect periods prior to 2001. . . . There is also a remaining unreconciled difference of approximately $0.6 million in the Company's intercompany accounting records that has yet to be fully investigated, which may result in additional adjustments. . . .

Press Release.

Plaintiffs assert that "the market . . . promptly digested" the information contained in the First Announcement, and the market's reaction caused Plaintiffs to "suffer [an] actual economic loss [since, upon the First Announcement,] the inflation [was] removed from the company's stock price." Compl. ¶¶ 105-06,108. A careful reading of the First Announcement suggests that it included a generic statement that Intelligroup was reviewing its current accounting data, and that review necessitated a number of accounting adjustments to Company's previous financial statements, plus three specific comments: (1) one about the upcoming *intercompany* adjustments to the reports prepared prior to 2001, that is, *prior to the Class Period* ("Item One"); (2) another one about the upcoming reconciliation of *intercompany* accounting records ("Item Two"); and (3) the last one made about the upcoming Restatement of Intelligroup's financial Statements issued during 2001, 2002 and 2003, challenged in the instant action. See Press Release.

Items One and Two, however, have no relationship to Plaintiffs' instant action since the incorrect statements requiring the adjustments mentioned in the Item One fell outside the Class Period and, in addition, these adjustments, as with the reconciliation measures mentioned in the Item Two, involved solely the matters of *intercompany* accounting, thus, having no effects on Intelligroup's total net income figures released to the market in the Statements and serving as basis for the market's pricing of Intelligroup's stock.[30] See, e.g., Andrew J. Dubroff, Basic Intercompany Transactions, ALI-ABA Course of Study Materials (Oct. 2006) ("Regardless of the particular approach to intercompany accounting, adjustments necessarily distort the separate income of each

30 Plaintiffs' Complaint asserts neither that any Intelligroup's subsidiary was a publicly traded company nor that any Plaintiff was a holder of the stock of Intelligroup's subsidiary negatively affected by these intercompany adjustments. See generally, Compl.

member in order to clearly reflect the income of the group as a whole. . . . The assets, liabilities, revenues, and expenses of each controlled subsidiary . . . thereby lose their identity in the consolidated statements. . . . [O]perations of subsidiaries are included in one set of consolidated financial statements as though the parent and subsidiar[ies] operated as a single entity. The purpose of adjusting intercompany transactions is to . . . reflect the taxable income . . . of the group as a whole") (citing Financial Accounting Standard Board's Statement of Financial Accounting Standards No. 94; Consolidation of All Majority-Owned Subsidiaries at P2; SEC Regulation S-X, Rule 3A-02) (quotations omitted); see also Richard P. Swanson, PCAOB Auditing Standard No. 2: An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of Financial Statements, American Law Institute - American Bar Association's Study Materials (Feb. 2006).

Moreover, except for FY03, i.e., 2003 yearly report, the First Announcement was *silent* as to whether the accounting adjustments contemplated by Intelligroup would yield a negative or a positive effect on Intelligroup's financial results: the only information disseminated into the market was a *neutral* announcement that such accounting adjustments would be undertaken. See Press Release. Furthermore, even if this Court were to hypothesize that the market, somehow, read an unquantifiable subconscious note of pessimism into Defendants' announcement that pre-FY03 Statements ("Archived Statements") would have to be restated, the obscure marginal effect of such pessimistic note is immaterial because (1) it reflected the doubts about Intelligroup's financial conditions existing *many months or even years before* the First Announcement; and (2) "[s]tale information is immaterial as a matter of law." In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 413 (S.D.N.Y. 1998); see Garcia v. Cordova, 930 F.2d 826, 831 (10th Cir. 1991); Delta Holdings v. National Distillers & Chem. Corp., 945 F.2d 1226, 1240 (2d Cir. 1991); see also Dura, 544 U.S.

at 341 ("the longer the time between purchase and sale, . . . the more likely the other factors caused the loss"); Marissa P. Viccaro, Can Regulation Fair Disclosure Survive the Aftermath of Enron?, 40 Duq. L. Rev. 695, 714 (2002) ("[Corporate] information issued periodically quickly becomes stale") (citing Neal Lipschutz, Fast Disclosures by Corporations Sought by SEC, Wall St. J. at 104 (Dec. 17, 2001)); J. Robert Brown, Jr., Corporate Communications and the Federal Securities Laws, 53 Geo. Wash. L. Rev. 741 (1985) (noting that only the timeliness of corporate reports ensures that the information will not be stale when disclosed); accord Basic, 485 U.S. at 250 ("Materiality . . . depends on the probability that the [disclosure] will [have an effect on the value of the securities.] Materiality depends on the facts").

Unlike Dura, a case addressing a disclosure of misrepresentation that was virtually guaranteed to affect the market's pricing tendencies (because the subject of the disclosure involved negative news about an anticipated key product, upon the sale of which Dura's *future* earnings directly depended, see Dura, 544 U.S. at 339; accord supra this Opinion at 15-16, stating the facts examined in Dura), disclosure of Intelligroup's adjustment of the Archived Statements could not have affected the market's pricing tendencies since that disclosure addressed financial performance achieved *long in the past*, and upon which Intelligroup's *future* earnings did *not* depend. Therefore, no "artificial inflation" of Intelligroup's stock price ensuing from misstatements made in the Archived Statements could have been "lost" as a result of airing the part of Defendants' Press Release addressing the Archived Statements. Cf. Semerenko, 223 F.3d at 185 (a causal connection could be found only if the basis for "the artificial inflation was actually 'lost'" when the truth was disclosed and explaining that "an investor must . . . establish that the alleged misrepresentations proximately caused the decline in the security's value").

Finally, Defendants' disclosure of the truth about the misstatements made in Intelligroup's FY03 Statement could not have been a proximate cause of the decline of Intelligroup's stock price, since *no negative truth was disclosed* about the FY03.[31] The sole *true* statement about the FY03 contained in the Press Release neutrally informed the investing community that the FY03 would be restated and certain figures would be adjusted ("Curative Component"). See Press Release. By contrast, with respect to the net income item of FY03, the key parameter evaluated by the market, the First Announcement erroneously stated that "[a]djustments [were] expected to *reduce* . . . net income by approximately $0.9 million (or $0.05 per share) for the year ended December 31, 2003" ("Erroneous Component"). Id. (emphasis supplied). Had the First Announcement revealed the facts accurately, it would read "the Company['s] . . . review [would] result[] in a number of accounting adjustments[, and these a]djustments . . . are expected to *increase* . . . net income by approximately $5.34 million (or $0.30 per share) for the year ended December 31, 2003."[32] Since the negative

---

31

The bulk of Plaintiffs' factual allegations is dedicated to the *negative truth disclosed in the Restatement*. See Compl. ¶¶ 35, 47-49; 58-59. However, the information disclosed in the Restatement was not made part of the Press Release, since the Restatement was made only on October 24, 2005, more than one year after the Press Release (and caused *no* market reaction). See Compl. ¶ 8 and Ex. C. Plaintiffs cannot "borrow" the information disclosed in the Restatement to claim that the market reacted in September of 2004 to what remained unknown until late 2005. For instance, while dozens of pages in Plaintiffs' Complaint are dedicated to collectability of a promissory note issued by one of Intelligroup's subsidiaries, see id., ¶¶ 27, 32-33, 95, 98, it appears that the Press Release was *silent* as to the issue since the amount of the promissory note equal to $15.1 million and well-known to Defendants, see id., was not mentioned in the Press Release either directly or indirectly. See Press Release. Therefore, the market learned about--and could have reacted to--the problems associated with collection of debt secured by the note only upon the issuance of the Restatement in October of 2005, that is, one year after the Press Release.

32

The 30-cents-per-share increase is calculable as follows: at the time of the Press Release, Intelligroup had about 18,000,000 shares ($900,000 of expected overstatement of net income alleged in the First Announcement, divided by $0.05 reduction in terminal value, i.e., the value calculated for a liquidation scenario). Since the net income figure for FY03 was, in fact, understated by

reaction of the market, if any, could be reasonably traced solely to the Erroneous Component, which *did not* disclose the truth, Plaintiffs cannot rely on the effects of that disclosure.[33] See Dura, 544 U.S. at 341; Rolf, 637 F.2d at 81; Executive Telecard, 979 F. Supp. 1021; Entin, 412 F. Supp. at 514; DeMarco, 222 F.R.D. at 247, 249; WorldCom, Inc. Sec. Litig., 219 F.R.D. at 299 n.42; Rubenstein, 74 F.R.D. at 346; Oleck, 1979 U.S. Dist. LEXIS 11785; Gaming Lottery Sec. Litig., 2000 WL 193125. Since Plaintiffs, being obligated to plead a causal connection between their losses and the alleged disclosure of the truth about Defendants' wrongful conduct challenged by Plaintiffs (rather than between Plaintiffs' losses and any statement about Intelligroup that was not revealing the truth), failed to plead any facts so indicating, Plaintiffs' Complaint must be dismissed for failure to state a causal connection.

---

$5,344,000, see Compl. at 8, plugging in the correct figure yields a $0.30 per share increase of terminal value ($5,344,000 ÷ 18,000,000 = $0.3). It shall be noted that the First Announcement was silent as to any adjustments with respect to the figures contained in 1Q04, i.e., the Statement that followed FY03 and the last Statement filed during the Class Period. See generally, Press Release. However, even if the market implied--by analogy--an expected *reduction* in Intelligroup's net income figure contained in 1Q04, that implied reduction would be just as incorrect as the prediction with respect to FY03 actually made by Defendants in the Erroneous Component. See Compl. at 8 (clarifying the Intelligroup's net income was *increased* in the Restatement by $99,000). Therefore, the First Announcement could not even imply any truth with respect to 1Q04.

33

The Complaint, as drafted, provides this Court with no grounds to piece together any allegations resembling Plaintiffs' 10b-5 claim with respect to the Erroneous Component, since the Complaint (1) sets forth no fraud allegations related to the Erroneous Component; and (2) is bereft of the appropriate scienter pleadings. Since the First Announcement was set forth as a forward-looking statement, see Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16 (N.D. Cal. 2002) ("[A] prediction about future events is self-evidently a forward-looking statement"), Plaintiffs were required to plead scienter by stating facts indicating Defendants' *intentional* state of mind, in accordance with the standard applicable to future projections. See 15 U.S.C. § 78u-5(c). Plaintiffs, however, pled scienter as recklessness, see Compl. ¶¶ 30-59, in accordance with the standard sufficient to meet the pleading requirements only with respect to contemporaneous and reflective statements. See, e.g., Sharp v. Coopers & Lybrand, 649 F.2d 175 (3d Cir. 1981), cert. denied, 455 U.S. 938 (1982); Coleco Indus., Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977), cert. denied, 439 U.S. 830, reh'g denied, 439 U.S. 998 (1978).

### C. *Plaintiffs Unduly Ignore the Effects of the Second and Third Announcements*

Contrary to the Supreme Court's express guidance about the need to evaluate whether an investor's loss was a result of contemporaneous forces or events other than the alleged fraud, see Dura, 544 U.S. at 341, Plaintiffs' Complaint simply ignores the existence of the Second and Third Announcements made by Defendants, even though these Announcements were part of the very Press Release that contained the First Announcement. See id..

Specifically, the Second Announcement stated that the Company

> entered into a definitive agreement pursuant to which [two entities] will purchase an aggregate of 17,647,058 shares of the Company's common stock in a private placement at a purchase price of $0.85 per share for a total purchase price of $15,000,000. Following completion of the private placement, the purchasers will own approximately 50.3% of the Company's outstanding common stock. The agreement will also allow the purchasers to designate a majority of the Board of Directors of the Company. . . . The transaction will violate NASDAQ listing rules [since it is being undertaken without shareholders approval required by NASDAQ rules,] and, as a result, the Company might be delisted from the NASDAQ Stock Market.

Press Release.[34] Moreover, the Third Announcement stated that Intelligroup's

---

34

A rough assessment of the financial impact caused by the Second Announcement is as follows. For the purposes of the market's estimate of Intelligroup's going-concern value, the stream of future dividends per share was: (1) *reduced*, approximately by half, due to the doubling of the outstanding shares, see Eugene F. Brigham and Michael C. Ehrhardt, Financial Management: Theory and Practice ("Financial Management") 253-61 (2004), since a 17 C.F.R. § 230.506 private placement presumes issuance of new shares rather than sale of existing ones, see supra this Opinion, note 5; but (2) *increased*, to an unclear extent, by Intelligroup's access to $15,000,000 equity raised by the private placement and, thus, available for investment which could, on a long run, increase Intelligroup's operating income, see supra this Opinion, note 17; (3) affected, to an unclear extent, by potential delisting from NASDAQ and upcoming changes in corporate control. Therefore, with respect to terminal value, Intelligroup's price after the Second Announcement became about $1.20 per share, that is, if this Court were to accept Plaintiffs' claim that "the Company's shares were [not] overvalued by the open market" prior to the Press Release. Opposition at 57. Since the pre-Press-Release value was $1.65 per share, see Compl.¶ 6, with 17,593,582 shares outstanding (calculated as 49.7%, in comparison with 17,647,058 contemplated as 50.3% of 100% joint total on the basis

> cash availability under its $15 million revolving credit facility had become inadequate to fund ongoing operations [and] in addition, the Company [was] in default under its revolving credit facility as a result of the failure to file its [financial report for the second fiscal quarter of 2004] and expects it would be in default [for a period of time.] The Company is working ... to obtain waivers of such defaults [but] if the Company cannot obtain such waivers, the indebtedness ... under [the] revolving credit ... could be accelerated.

Id.[35]

Plaintiffs justify their ignorance of the Second and Third Announcement by maintaining that these Announcements could not have any impact on the causal aspect of Plaintiffs' claim. See Opposition at 55-60. Rather, Plaintiffs "borrow" the causal connection between Plaintiffs' losses

---

of information contained in the Second Announcement), the Company's pre-Press-Release terminal value was $29,029,410 ($1.65 x 17,593,582). After addition of $15,000,000 of newly injected capital, the total terminal value would reach $44,029,410 ($29,029,410 + $15,000,000), distributed among the total of 35,240,640 of post-Private-Placement shares (17,647,058 + 17,593,582), or $1.25 per share ($44,029,410, divided by 35,240,640). If this Court is to factor in the 5-cents-per-share reduction in terminal value predicted by the Erroneous Component of the First Announcement, see Press Release, it appears that the joint effect of the Second Announcement and the Erroneous Component would reduce Intelligroup's terminal value per share to $1.20.

35

The negative market impact of the Third Announcement is hard to overestimate. Intelligroup's loss of access to its revolving credit had to increase Company's future weighted average cost of capital ("WACC"). Since WACC equals to the sum of a few components, one of which has the interest rate paid by the Company as a multiplier, Intelligroup's loss of credit directly impacted Company's ability to borrow at a low rate on continuous basis and exposed Intelligroup to a higher interest rate and lack of guaranteed credit. See Financial Management at 10. Moreover, if Intelligroup's indebtedness accelerated, i.e., the entire balance of debt would become due having an immediate negative effect on Intelligroup's income and, consequently, future stream of dividends. Since the Third Announcement indicated that Intelligroup was facing a possibility of accelerated payment of $15,000,000, the market should have factored in a likely reduction in terminal value per share of $0.42 ($15,000,000, divided by 35,240,640), since Intelligroup would have the total of 35,240,640 post-Private-Placement shares outstanding. Coupled with the negative effects ensuing from the Erroneous Component and the Second Announcement, see supra this Opinion, note 34, the Third Announcement should have caused Intelligroup's value per share to drop down to $0.78 ($1.20 minus $0.42), far below the actual drop to $1.13 experienced by the Company on September 27, 2003. See Compl. ¶ 8. The difference favorable to Intelligroup might be explained by the dissimilar nature of the terminal and going-concern values, and the words of uncertainty embedded in the language of the Second and Third Announcements.

and these Second and Third Announcements to import this causal element into Plaintiffs' claim based on the errors made in Defendants' Statements by initially alleging that "the Company's 'short-term liquidity issues' (purportedly giving rise to the need for the private placement [and revolving credit problems]) were . . . a result of material weakness in the Company's internal control environment," and then drawing two connectors: (1) first asserting a causal connection between this "material weakness" and the errors in Defendants' Statements, and (2) by setting forth a causal connection between the "material weakness" and Plaintiffs' losses. See Opposition at 57 (citing to Compl. ¶ 57, quoting, in turn, Defendants' Restatement).

Plaintiffs' triangulated argument, however, has no merit. The fact that the errors in the Statements stemmed from the very same unfortunate managerial and/or accounting practices that eventually gave rise to Intelligroup's loss of revolving credit and/or decision to offer a private placement does not mean that Plaintiffs can "borrow" the highly probable causal relationship between the disclosure contained in the Second and Third Announcements and Plaintiffs' losses in order to suggest that a causal connection somehow existed between the errors in the Statements undisclosed in the Press Release and Plaintiffs' losses. If anything, Plaintiffs' argument lends support to the conclusion that the drop in Intelligroup's stock prices experienced by Plaintiffs upon Defendants' airing of the Press Release was mainly a result of Defendants' Second and Third Announcements.[36] Therefore, Plaintiffs' Complaint will be dismissed for failure to set forth an

---

36

Plaintiffs' Complaint does allege that either the Second or Third Statement contained fraudulent information. See generally, Compl. Moreover, Defendants' disclosure of "material weakness in [Intelligroup's] control environment" quoted in the Complaint was made on October 24, 2005, as part of the Restatement. See Compl. ¶ 8 and Ex. C. No statement about "material weakness in . . . control environment" was included in the Press Release. See Press Release. Moreover, it appears reasonable to presume that a rational reader inferred strength in Company's "control

actual causal connection between Plaintiffs' loss and the misrepresentations made in the Statements.

### D. *Plaintiffs Cannot Plead a Causal Connection in Terms of Discoverable Evidence*

Even though Plaintiffs' Complaint pleads a causal connection only between Plaintiffs' losses and the market's reaction to the Pre-existing Forces, Erroneous Component and Second and Third Announcements, and states no facts suggesting a reasonable causal connection between the disclosure of errors in the Statements and Plaintiffs' losses, Plaintiffs maintain that the facts alleged by Plaintiffs were sufficient because "determin[ation of] causation in securities cases involves complex event studies and testimony by expert witnesses, and is therefore a fact-intensive inquiry not suitable for disposition on a motion to dismiss." See Opposition at 56-58 (quoting Montoya v. Mamma.Com, Inc., 2006 U.S. Dist. LEXIS 13207, at *28 (S.D.N.Y. Mar. 28, 2006).

Plaintiffs err. A securities plaintiff cannot plead a causal connection in terms of plaintiffs' mere hope of eventually prevailing in a battle of experts. See H.R. Conf. Rep. 104-369, at 37. Federal Rule of Evidence 702, amended to codify the Supreme Court's decisions in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), is unambiguous in the sense that it: (1) provides that an expert should be *basing the expert's opinion on the facts* provided to the expert rather than *discovering those facts* in order to piece together elements of the litigant's claim, and thus (2) eliminates claims based on "phantom" injuries, i.e., cases involving actual harms, in a literal sense, but unwieldy in a legal sense for the lack of established scientific means to trace the injury to a specific action. See id.; accord Daubert, 509 U.S. 579.

---

environment" from the very fact that the errors were detected, taken notice of and duly investigated.

The requirement of loss causation seeks to achieve the same. Accord 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"). Under the PSLRA, the adequacy of allegations demonstrating loss causation does not turn on existence of "potentially discoverable" facts. See H.R. Conf. Rep. No. 104-369, at 37 (explaining that discovery stay is intended to weed out "fishing expeditions" disguised as legal claims). Rather, plaintiffs' allegations should state a valid causal nexus in terms of known facts. See id.; accord Prosser and Keeton on Torts ¶ 41 (5th ed. 1984) (observing that the doctrine of causation is based on the premise that, while the actual "consequences of an act go forward to eternity . . . , legal responsibility must be limited to those causes which are so closely connected with the result" that liability would be justifiable). The element of loss causation allows the courts to weed out claims based on "phantom losses," i.e., securities claims reflecting an actual unfavorable turn of the market but based on causal relationships so attenuated that the pleadings resemble "fishing expeditions." See Miller v. New Am. High Income Fund, 755 F. Supp. 1099, 1109 (D. Mass. 1991) (concluding that, although plaintiffs "cannot be blamed for seeking redress for the wrongs they have suffered," no causal nexus to the alleged fraud supported their claims), aff'd in part, rev'd in part on other grounds, Lucia v. Prospect St. High Income Portfolio, 36 F.3d 170 (1st Cir. 1994). Although the PSLRA does not pose a heightened pleading requirement with respect to causation, a securities plaintiff cannot meet the pleading requirement on the basis of irrelevant facts or murky relationships since both the letter and the spirit of the Reform Act aim to prevent "fishing expeditions" when plaintiffs "do not know what they are after at first." See Bruce Rubenstein, Fraud Failsafe or License to Lie: Big Decisions on Securities Reform Act Coming, Corp. Legal Times, at 1 (Nov. 1997)

(quoting Rep. Christopher Cox, R-Cal.); accord In Re Silicon Graphics Sec. Litig., 183 F.3d 970 (9th Cir. 1999) (observing that, without examination of the facts pled, the court has no way of distinguishing a sufficient complaint from a boiler-plate "fishing expedition" the PSLRA was intended to prevent); In re Theragenics Corp. Sec. Litig., 105 F. Supp. 2d 1342, 1357 (N.D. Ga. 2000) (noting that a statement of facts should not be problematic for plaintiffs if their claim is legitimate). In deciding Defendants' Motion, therefore, this Court has both a right and an obligation to screen Plaintiffs' Complaint for the adequacy of factual pleadings to eliminate the danger of unwarranted "abusive litigation." See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27, 32 (2d Cir. 2004) ("abusive litigation" force companies to "settle cases that were not meritorious in order to manage their risk levels"), cert. denied, Visnic v. Nortel Networks Corp., 543 U.S. 1050 (2005); accord Fruchter v. Florida Progress Corp., 2002 WL 1558220, at *10 (Fla. Cir. Ct. Mar. 20, 2002) (a meritless securities "class [action] litigation [is an] equivalent of the 'Squeegee boys' who used to frequent major urban intersections and who would run up to a stopped car, splash soapy water on its perfectly clean windshield and expect payment for the uninvited service of wiping it off").

The Supreme Court's decision in Dura exemplifies a preclusionary approach to such unarticulated claims. Because the plaintiffs in Dura said no more than "[plaintiffs] . . . paid artificially inflated prices for securities and the plaintiffs suffered 'damage[s]' thereby," Dura, 544 U.S. at 339-40, the Supreme Court had no need to address any aspect of loss causation other than insufficiency of purchase at an inflated price. See id. at 346 (the Supreme Court "need not, and d[id] not[] consider other proximate cause or loss-related questions"). The Court, however, stressed that a securities plaintiff must provide the defendant with some *currently known* causal connection and

cannot "fil[e a] lawsuit[] . . . with only a faint hope that the discovery process might lead eventually to some plausible cause of action." Id. 544 U.S. at 347 (quoting H.R. Conf. Rep. No. 104-369, p. 31 (1995)). This language indicates that plaintiff's pleadings setting forth nothing but plaintiff's faint hope that a certain causal connection might eventually be established or alleging that a certain connection exists between plaintiff's losses and activities other than those challenged by the plaintiff should be deemed as insufficient as plaintiff's plain failure to plead loss causation, i.e., the scenario examined in Dura.

Exploring the issue of unduly attenuated causal connections, the Second Circuit echoed the Dura theory in Lentell, 396 F.3d 161, the decision in which the Supreme Court denied certiorari half a year after the Dura ruling. See Lentell v. Merrill Lynch & Co., 126 S. Ct. 421 (2005). Noting that (1) the loss cannot be considered foreseeable unless it was caused by a disclosure that revealed some specific negative fact about the fraudulent conduct, and (2) the loss could not satisfy the requirements of loss causation unless the loss is foreseeable, the Lentell court concluded that, to validly plead loss causation, the plaintiffs must allege plaintiff's loss was caused by the particular fraudulent statement challenged by the plaintiff. See Lentell, 396 F.3d at 172 ("the damages suffered by plaintiff must be a foreseeable consequence of [the challenged] misrepresentation") (quoting Emergent Capital, 343 F.3d at 197 (2003), quoting, in turn, Castellano, 257 F.3d at 186).

> [Plaintiff has to plead] both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk. . . . [L]oss causation has to do with the relationship between . . . plaintiff's investment loss and the [very] information misstated. . . . by the defendant. . . . If that relationship is sufficiently direct, loss causation is established, . . . , but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements. . . and the harm actually suffered . . . , a fraud claim will not lie. . . . That is because the loss-causation requirement -- as with the foreseeability limitation in tort -- is intended to fix a legal limit on a person's responsibility, even for wrongful acts.

Id. at 173 (citations, quotations and parenthetical explanations omitted).

Specifically addressing the circumstances where there was an incoherence between the causal relationship alleged by the plaintiff and the causal links that could be raised from the actual facts pled by the plaintiff, the Lentell court found the pleadings defective. Id. The court concluded that a securities plaintiff is obligated to plead "(i) facts sufficient to support an inference that it was defendant's fraud -- rather than other . . . factors -- that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment. [If the] plaintiff[] ha[s] done neither, and thus offer[ed] no factual basis to support the allegation[s]," plaintiff's claim should be dismissed. Id.

In the case at bar, one-hundred-thirty-six pages of Plaintiffs' Complaint and Opposition offer a maze of numbers and financial and accounting terms, none of which indicates either that Intelligroup's September 27, 2004, drop in stock price could have been reasonably connected to those few words of truth about Defendants' Statements that were included in the Press Release or that Plaintiffs' losses associated with those few words of truth could be translated into quantifiable damages. As drafted, Plaintiffs' Complaint presents nothing but a "fishing expedition" driven by Plaintiffs' hope to eventually discover a causal relationship Plaintiffs need to support their claim. However, Plaintiffs' bare aspirations cannot meet even the lenient pleading requirements of Rule 8. Therefore, Plaintiffs' Complaint will be dismissed for failure to meet Plaintiffs' burden with respect to pleading requirements ensuing from Rule 8.

**E. *Plaintiffs Cannot Rely on the Sarbanes-Oxley Act to Avoid Pleading Requirements***

Although the purpose of Plaintiffs' references to Section 906 of the Sarbanes-Oxley Act ("SOX"), Pub. L. No. 107- 204, 116 Stat. 765 (2002) (codified, as amended, in various sections of Titles XI, XV and XVIII) is not entirely clear to this Court, it appears that Plaintiffs rely on SOX in order to diminish their burden with respect to Plaintiffs' pleading requirements. See Compl. ¶¶ 70-75; Opposition at 32-36 and notes 19, 20. Plaintiffs' reliance on SOX could be interpreted as an assertion that SOX created an alternative private cause of action under which Plaintiffs' pleading burden differs from that imposed by Rule 10b-5. See id. Plaintiffs' reliance on SOX could also be interpreted as a claim that SOX altered the currently existing 10b-5 pleading requirements by creating a presumption in favor of the plaintiff with respect to those cases where company financial disclosures were certified by company's executives in accordance with SOX requirements.[37] See id. These two interpretations of Plaintiffs' allegations would, however, change the form rather than the substance of Plaintiffs' claim since any "altered" rule different, with respect to the pleading requirements involved, from the existing Rule 10b-5 would, by definition, present an alternative cause of action, with its own elements and corresponding pleading burden.

Private rights of action to enforce federal law must be created by Congress. See Alexander v. Sandoval, 532 U.S. 275, 286 (2001). Since the express language of SOX does not provide for a right of private action, this Court shall focus solely on Congressional intent underlying SOX. See Boswell v. Skywest Airlines, Inc., 361 F.3d 1263, 1267 (10th Cir. 2004) (citing Transamerica

37

SOX added a number of new disclosure and certification requirements to the regulatory framework of the federal securities laws. Specifically, the chief executive and financial officers of the issuer must now certify that each periodic report "fairly presents, in all material respects, the financial condition and results of operations of the issuer." 15 U.S.C. § 78u-4(b)(3)(D)).

Mortgage Advisors v. Lewis, 444 U.S. 11, 15-16 (1979)); see also Alexander, 532 U.S. at 286-87. Moreover, the Court shall determine whether Congress intended to create not only a private right in favor of Plaintiffs, but also a private remedy. See Alexander, 532 U.S. at 286. In the absence of statutory intent to create a private remedy, a cause of action does not exist, and the Court may not create one "no matter how desirable that might be as a policy matter, or how compatible with the statute." Id. at 286-87. In determining Congressional intent under this standard, this Court shall examine SOX for "rights creating language" which explicitly confers a right directly on a class of persons that includes the Plaintiffs, and consider the relation between the provision at issue and the overall statutory scheme. See Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n. 13 (1979).

Section 906, 18 U.S.C. § 1350, relied upon by Plaintiffs, see Opposition at 18-19, 29-36, provides for criminal sanctions, but it *does not* contain a private right of action.[38] By contrast, Congress explicitly created a private right of action in § 306. See 15 U.S.C. § 7244. Where the legislature creates a private cause of action in one section of a provision but not in another section, the natural inference is that Congress did not intend to create a private right of action under the latter section since: "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." Touche Ross & Co. v. Redington, 442 U.S. 560, 572 (1979); cf. Neer v. Pelino, 389 F. Supp. 2d 648, 655 (E.D. Pa. 2005) (declining to infer a private right of action under § 304 of SOX); Kogan v. Robinson, 432 F. Supp. 2d 1075, 1082 (S.D. Cal. 2006) (same); In re Bisys Group Inc., 396 F. Supp. 2d 463 (S.D.N.Y. 2005) (same). Because neither the text of Section 906

[38] The fact that Congress and the SEC did not specifically prohibit private rights of action with respect to Section 906 (and two other sections) of SOX while specifically prohibiting private rights of action under all other sections of the Act is of no consequence. See Srebnik v. Dean, 2006 U.S. Dist. LEXIS 73836, at *17-18 (D. Colo. Sept. 26, 2006).

nor the structure of SOX demonstrates Congressional intent to create a private remedy in favor of Plaintiffs, this Court can neither infer a private right of action under this provision nor conclude that Defendants' certification of Intelligroup's statements created a presumption altering or automatically satisfying Plaintiffs' pleading requirements with respect to *any* element of Plaintiffs' 10b-5 claim. See Croker v. Carrier Access Corp., 2006 U.S. Dist. LEXIS 48603, at *30 (D. Colo. July 18, 2006) ("Sarbanes-Oxley certifications . . . constitute [only] one factor among many that courts may consider" evaluating plaintiff's pleadings); In re Hypercom Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 45482, at *16-17 (D. Ariz. July 5, 2006) (noting that an incorrect Sarbanes-Oxley certification of corporate internal control system does not, by itself, satisfy any pleading requirement and citing In re Invision Techs., Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 12166, *21 (N.D. Cal. 2006)); In re Watchguard Sec. Litig., 2006 U.S. Dist. LEXIS 27217, at *32-37 (W.D. Wash. Apr. 21, 2006) (same). Specifically, the Court concludes that Sarbanes-Oxley certification of Intelligroup's Statements by Defendants did not reduce Plaintiffs' pleading burden with respect to those elements of Plaintiffs' 10b-5 claim that are subject to Rule 8 pleading requirements, including the element of loss causation. See Dura, 544 U.S. at 346 (applying Rule 8 pleading requirements to a publicly traded company).

Therefore, this Court (1) grants Defendants' Motion and dismisses Plaintiffs' Complaint for failure to plead a causal connection between Plaintiffs' losses and Defendants' Statements; and (2) does not need to reach the issue of whether Plaintiffs sufficiently pled the remainder of their 10b-5 claim, even though the bulk of the parties' efforts were dedicated to the elements other than that of

causal connection.[39] See Lucas v. Florida Power & Light Co., 765 F.2d 1039, 1045 (11th Cir. 1985) (plaintiff must establish each element of 10b-5 claim).

## IV. Leave to Amend

Having thoroughly examined Plaintiffs' Complaint, this Court now turns to the question of whether Plaintiffs shall be allowed to replead their claims for the third time.

Ordinarily, the plaintiff may be granted "leave [to amend,] . . . when justice so requires." See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993). However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'" Chubb, 394 F.3d at 164 (quoting GSC Partners CDO Fund, 368 F.3d at 246); see Cybershop.com Sec. Litig., 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing Champion Enter., Inc., Sec. Litig., 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)). For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts may find that "[t]hree bites at the apple is enough," and conclude that it

---

[39] This Court notes that the Court's legal conclusion shall not be interpreted as an endorsement or condonation of Defendants' haphazard accounting practices which led to an investigation by the SEC, might trigger investigations by other government agencies and negatively impact Intelligroup's business ethics, corporate goodwill and internal morale. This Court's mandate, however, is limited to applying the rule of law to the facts at bar and encompasses neither legislative nor law enforcement or business consulting functions.

is proper to deny leave to replead. Salinger v. Projectavision, Inc., 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996); American Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994); and Fisher v. Offerman & Co., Inc., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)). Although the facts stated in Plaintiffs' Complaint fail to indicate a reasonable causal connection between the errors Defendants made in the Statements and Plaintiffs' losses, and although this action was initially filed in 2004, in view of multiple ambiguities apparent from the face of Plaintiffs' Complaint, this Court grants Plaintiffs leave to replead.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss will be GRANTED. Plaintiffs' Second Amended Consolidated Class Action Complaint will be DISMISSED without prejudice.

An appropriate Order accompanies this Opinion.

s/Garrett E. Brown, Jr.
**GARRETT E. BROWN, JR.**
**Chief Judge**
**United States District Court**

Dated: