# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

In Re INTELLIGROUP                      :
SECURITIES LITIGATION                   :        Civil Action No. 04-4980 (GEB)
                                        :
                                        :        **O P I N I O N**


**APPEARANCES:**


JOSEPH J. DEPALMA, Esq.,
      LITE, DEPALMA, GREENBERG & RIVAS, LLC
      Two Gateway Center, 12th Floor
      Newark, New Jersey 07102,
      and
GARY S. GRAIFMAN, Esq.,
      KANTROWITZ, GOLDHAMER & GRAIFMAN, ESQS.
      210 Summit Avenue
      Montvale, New Jersey 07645,
      and
LISA J. RODRIGUEZ, Esq.,
      TRUJILLO, RODRIGUEZ & RICHARDS, LLP
      8 Kings Highway West
      Haddonfield, New Jersey 08033,
      and
JEAN-MARC ZIMMERMAN, Esq.,
      ZIMMERMAN, LEVI & KORSINSKY LLP
      226 St. Paul Street
      Westfield, New Jersey 07090,
      and
STEVEN J. TOLL, Esq., DANIEL S. SOMMERS, Esq.,
JOSEPH HELM, Esq., and MATTHEW K. HANDLEY, Esq.,
      COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
      Suite 500 West
      1100 New York Avenue, NW
      Washington, DC 20005,
Attorneys for Plaintiffs LYDIA GARCIA, SENTHILNATHAN NARAYANAN, ROBERT
FARBER and the class of all others similarly situated, as well as Consolidated Plaintiffs VIJAYAN
BHADRAKSHAN, RON G. PECUNIA, JOSEPH ACKERMAN, RUDINA I. SIHWEIL, GEORGE
E. AMOS, ISA S. SIHWEIL  and the class of all others similarly situated.

DENNIS J. DRASCO, Esq. and KEVIN J. O'CONNOR, Esq.,
     LUM, DANZIS, DRASCO & POSITAN, LLC
     103 Eisenhower Parkway
     Roseland, New Jersey 07068,
     and
DARRYL W. SIMPKINS, Esq. and VICTORIA CURTIS BRAMSON, Esq.,
     SIMPKINS & SIMPKINS, LLC
     Mountain View Plaza
     856 Route 206, Building B
     Hillsborough, New Jersey 08844,
     and
DONALD A. ROBINSON, Esq.,
     ROBINSON & LIVELLI, ESQS.
     Two Penn Plaza East
     Suite 1100
     Newark, New Jersey 07105,
     and
J. ALLEN MAINES, Esq., SUMMER B. JOSEPH, Esq., and ALBERT M. MYERS, Esq.,
     PAUL, HASTINGS, JANOFSKY & WALKER, LLP
     600 Peachtree Street NE
     Suite 2400
     Atlanta, Georgia 30308,
     and
GRANT FONDO, Esq., WILLIAM S. FREEMAN, Esq., and RICHARD D. NORTH, Esq.,
     COOLEY GODWARD KRONISH, LLP
     Five Palo Square
     3000 El Camino Real
     Palo Alto, California 94306,
Attorneys for Defendants INTELLIGROUP, INC., ARJUN VALLURIPALLI (also known as ARJUN VALLURI), NICHOLAS VISCO, EDWARD CARR and DAVID J. DISTEL.


**BROWN, Chief Judge**

     This matter is before the Court on Defendants' motions (collectively "Motions") to dismiss the Plaintiffs' Third Amended Consolidated Class Action Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4, et seq. For the reasons discussed below, Defendants' Motions are GRANTED, and Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.

**TABLE OF CONTENTS**

I.      PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    JUDICIAL NOTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     PLEADING REQUIREMENTS OF A 10b-5 CLAIM. . . . . . . . . . . . . . . . . . . . . . . 12

        A.      Elements of a 10b-5 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                1.      Elements Subject to Heightened Pleading Requirements. . . . . . . . . . . . 13

                2.      Elements Subject to Rule 8 Pleading Requirements. . . . . . . . . . . . . . . 17

        B.      Pleading a Class 10b-5 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        C.      Pleading a Derivative Claim Against Controlling Persons. . . . . . . . . . . . . . . 22

V.      PLEADING SPECIFIC ELEMENTS OF A 10b-5 CLAIM. . . . . . . . . . . . . . . . . . . 23

        A.      Pleading the "False and Misleading Statement" Element. . . . . . . . . . . . . . . . 23

                1.      Pleading an Affirmative Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . 23

                2.      Pleading Misrepresentation Based on Failure to Disclose. . . . . . . . . . . . 24

        B.      Pleading the "Scienter" Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                1.      Pleading Intentional or Recklessness State of Mind. . . . . . . . . . . . . . . 26

                2.      Pleading Scienter by Inference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                        a.      Inferring Scienter from Defendant's "Motive and Opportunity". . 28

                        b.      Inferring Scienter from Circumstantial Evidence. . . . . . . . . . . . 30

                                i.      Inferring Scienter from GAAP Violations. . . . . . . . . . . . 30

                                ii.     Inferring Scienter from SOX Certifications. . . . . . . . . . . 34

       3.      Pleading Scienter by Relying on Confidential Information. . . . . . . . . . . 39

C.      Pleading the "Materiality" Element  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

D.      Pleading the "Reliance" Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

       1.      Two Methods to Plead Reliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       2.      Pleading Reliance on Inferred Technical Facts. . . . . . . . . . . . . . . . . 44

E.      Pleading the "Causation" Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VI.    DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

A.      Transactional Causation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

       1.      Deficiencies Contained in Plaintiffs' Second Complaint . . . . . . . . . . . . 52

       2.      "Fraud-on-the-market" Allegations Based on Intelligroup's Financials . .58

       3.      2001 Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

       4.      2004 Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

       5.      Periods Reflected in the Table. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

           a.      Plaintiffs' Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

           b.      Legal Precedents Examining Financial Matters. . . . . . . . . . . . 66

               i.     IPO Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

               ii.    *Basic v. Levinson.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

               iii.   Other District Court Cases. . . . . . . . . . . . . . . . . . . . . . . 73

           c.      Financial Theories and Calculations. . . . . . . . . . . . . . . . . . . . 75

       6.      Alternative Allegations of Reliance. . . . . . . . . . . . . . . . . . . . . . . . . . 83

B.      Loss Causation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

       1.      Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

        a.     Intelligroup's Publications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        b.     Chart of Intelligroup's Stock Price. . . . . . . . . . . . . . . . . . . . . . . . . 89

   2.     Deficiencies Contained in Plaintiffs' Second Complaint . . . . . . . . . . . . 92

   3.     Plaintiffs' Instant Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

        a.     Interrelation-Among-the-Press-Release-Announcements Claim . 94

        b.     Lack-of-Interrelation-Among-the-Announcements Claim. . . . 101

            i.     *Marsden v. Select Med. Corp.*. . . . . . . . . . . . . . . . . . . . 102

            ii.    Other District Court Cases. . . . . . . . . . . . . . . . . . . . . . . 104

        c.     Miscellaneous Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

            i.     Contentions About Implied Disclosure . . . . . . . . . . . . . 113

            ii.    Contentions About the Post-Release Recovery. . . . . . . . 118

C.   Scienter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

   1.     Motive and Opportunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

   2.     Circumstantial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

        a.     Resignations as Evidence of Scienter. . . . . . . . . . . . . . . . . . 128

            i.     Resignations of Defendants Valluri and Visco. . . . . . . . 129

            ii.    Resignation of Intelligroup's Auditor. . . . . . . . . . . . . . . 135

        b.     Violations of GAAP as Evidence of Scienter. . . . . . . . . . . . . 137

        c.     SOX Certifications as Evidence of Scienter . . . . . . . . . . . . . 142

            i.     Impact of the Statements Made in the Restatement. . . . . 143

            ii.    The Fact of SOX Certifications. . . . . . . . . . . . . . . . . . . 147

           iii.   The Language of SOX Certifications. . . . . . . . . . . . . . 150

d.      Undisclosed Witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        i.      UW-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

        ii.     UW-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

        iii.    UW-3  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

        iv.     UW-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

        v.      UW-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

        vi.     UW-6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

e.      Internet Posting by an Anonymous Witness. . . . . . . . . . . . . . . 168

3.      Totality of Evidence Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

4.      SeraNova Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

        a.      Allegations Based on Intelligroup's 10-K. . . . . . . . . . . . . . . 181

        b.      Allegations Based on the Fact of Non-collectability. . . . . . . . . . 183

D.      Derivative Liability of Visco and Valluri. . . . . . . . . . . . . . . . . . . . . . . . . 185

E.      Leave to Amend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

        1.      General Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

        2.      Entry of Binding Precedent Clarifying Applicable Pleading Standard. . 188

        3.      Repeated Failure to Cure Deficiencies and Futility of Amendment . . . . 193

VII.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

I.      PROCEDURAL  BACKGROUND

Plaintiffs, investors who purchased the common stock of Defendant Intelligroup ("Intelligroup" or "Company," or "Issuer") during forty months between May 1, 2001, through and including September 24, 2004 ("Class Period"), brought this securities fraud class action alleging that Defendants defrauded them by artificially inflating the value of the stock through false and misleading statements disseminated into the investing community.  See Compl. (Docket Entry No. 53) at 1.

The litigation was initiated on October 12, 2004, see Docket Entry No. 1, when the first of six class action complaints was filed with the Court.   On August 10, 2005, all six actions were consolidated into the instant action.  See Docket Entry No. 24.   On October 10, 2005, Plaintiffs filed their joint Amended Complaint ("Original Complaint") against the Issuer and four former officers of the Issuer, two of whom were Defendants Valluripalli ("Valluri") and Visco ("Visco").   See Docket Entry No. 31.   On December 5, 2005, certain Defendants filed their motion to dismiss Plaintiffs' Original Complaint.  See Docket Entry No. 3. On February 10, 2006, Plaintiffs' Second (Amended) Complaint ("Second Complaint") was filed against the Issuer and Defendants Valluri and Visco, with all claims against the other two officers being dismissed.  See Docket Entry No. 39. On March 27, 2006, Defendants filed their motions to dismiss the Second Complaint, see Docket Entries Nos. 40 and 42, and Plaintiffs filed their brief in Opposition to the Motions on May 11, 2006. See Docket Entry No. 43.  On November 2, 2006, this matter was transferred to the undersigned. See Docket Entry No. 50.

On December 20, 2006, this Court issued an Order and accompanying Opinion ("December Opinion") dismissing the Second Complaint without prejudice.  See Docket Entries Nos. 51 and 52.

On January 25, 2007, Plaintiffs filed the instant Third Amended Complaint.  See Docket Entry No.

53.  On March 5, 2007, Defendants filed their Motions to dismiss the Complaint.  See Docket Entries

Nos. 64 and 65.  On April 13, 2007, Plaintiffs filed their Opposition to Defendants' Motions

("Opposition").  See Docket Entry No. 68.   On May 3, 2007, Defendants filed their replies to

Plaintiffs' Opposition ("Replies"), see Docket Entries Nos. 69 and 70, and supplemented the Replies

by a letter filed on May 23, 2007 ("Letter").  See Docket Entry No. 71.

Except for the instant Motions, no other applications are currently pending in this action.


## II.    FACTUAL  BACKGROUND

Intelligroup is a publicly traded company incorporated in the State of New Jersey with its

principal office at 499 Thornall Street, Edison, New Jersey.  See Compl. ¶ 28.  "Intelligroup assists

a variety of companies with setting up and maintaining various kinds of software for e-commerce."

Id.  Much of Intelligroup's work is sent offshore to the Company's subsidiary in India.  See id.

Intelligroup's stock was traded on the National Association of Securities Dealers Automated

Quotation System ("NASDAQ").  See Opposition at 13.

Defendant Valluri served as the Company's CEO, President and Chairman of the Board

during the Class Period, and Defendant Visco served as the Company's CFO from November of

2000 to November of 2003.  See Compl. ¶ 5.

On September 24, 2004, Intelligroup issued a press release ("Press Release") announcing,

inter alia, that Intelligroup was expecting to restate its financial statements issued and filed with the

United States Securities and Exchange Commission ("SEC") during 2001, 2002, 2003 and the first

quarter of 2004 ("Statements").   See id. ¶ 5.  In the same Press Release, the Company made two

other announcements, one about Intelligroup's anticipated private placement and another about Intelligroup's default on--and potential loss of--revolving credit.  See Opposition at 30-31.  On September 27, 2004, the first day after the Press Release, the stock began falling and fell $0.52 per share.[1]  See Compl. ¶ 4.  The restatement of the Company's financials ("Restatement") was made on October 24, 2005, more than one year after the issuance of the Press Release.  See id.. ¶ 13.

Plaintiffs now assert that Defendants' issuance of the Statements containing a host of accounting errors inflated the market value of Intelligroup securities and amounted to a violation of (a) Section 10(b) of the Securities Exchange Act of 1934 ("'34 Act"), 15 U.S.C. §§ 78a-78kk (1994 & Supp. IV 1998), and (b) Rule 10b-5 ensuing from the '34 Act.  See id. ¶ 14.  In addition, Plaintiffs maintain Defendants Valluri and Visco are liable for Plaintiffs' injuries as controlling persons, since these Defendants knew about or recklessly disregarded the falsity of accounting data contained in Intelligroup's Statements.  Id. ¶ 129.


## III.    JUDICIAL NOTICE

Defendants' Motions are accompanied by Defendants' request for judicial notice of the following documents: (a) the Press Release; (b) Intelligroup's Form 8-K dated January 28, 2005, filed which was with the SEC and announced that the SEC had commenced a formal investigation into the matters related to the Restatement ("SEC Investigation Notice"); (c) a letter from SEC Assistant Director to Intelligroup's counsel, dated January 31, 2006, notifying the counsel that the investigation

---

[1]

On September 24, 2004, the last trading day before the Press Release, Intelligroup's stock closed at $1.65.  On September 27, the stock opened at $1.58 and fell $0.45 to $1.13.  Reading these figures in light most favorable to Plaintiffs, the Court deducts $1.13 from $1.65 rather than from $1.58.

by the SEC was terminated and no enforcement action was recommended by the SEC ("SEC No-action Letter"); (d) Plaintiffs' Original and Second Complaints; (e) transcript of Intelligroup's "Second Quarter 2004 Update" Conference Call of October 5, 2004 ("10/05/04 Transcript"); and (f) a financial stock chart published by Yahoo!Finance and showing the adjusted closing price of Intelligroup's stock during the Class Period ("Stock Chart"). See Docket Entries Nos. 65-3 and 65-5 to 65-6-12. Although Plaintiffs' Opposition to Defendants' Motions is effectuated through a memorandum of law titled "Lead Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss Third Amended Complaint and in Partial Opposition to Request for Judicial Notice," see Docket Entry No. 68, neither the Table of Contents nor the body of the Opposition clearly identify or even suggest the nature of Plaintiffs' partial opposition to Defendants' request for judicial notice. See generally, id.

> Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (finding that judicial notice was properly taken with respect to "three different categories of documents [which] included: (1) documents relied upon in the Complaint ([including] Company['s] press releases); (2) documents filed with the SEC; and (3) stock price data compiled by [a reliable financial] news service"). Since Plaintiffs' Complaint relies on the statements made in the Press Release, the 10/05/04 Transcript and Intelligroup's Restatement and 10-K 2004 Form, plus the SEC Investigation Notice was duly filed by Intelligroup with the SEC, and, in as much as the a stock price chart compiled by Yahoo!Finance

appears to provide this Court with stock price data compiled by a reliable financial news service, this Court takes judicial notice of items (a), (b), (e) and (f) listed supra, as well as of Intelligroup's Restatement and 10-K 2004 Form.   In addition, the Court takes limited judicial notice of the statements made by Plaintiffs in their Original and Second Complaint, that is, item (d) listed supra, solely for the purpose of examining whether Plaintiffs' factual assertions in the instant Complaint contradict those made in Plaintiffs' earlier pleadings.  See Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action' without converting the motion into one for summary judgment") (quoting Harris v. New York State Dep't of Health, 202 F. Supp.2d 143, 173 (S.D.N.Y. 2002), and citing Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)), compare Young v. Dreiblatt, 2000 U.S. App. LEXIS 21704, at *2 (9th Cir. Aug. 17, 2000) (amended complaint supersedes previous complaint in the sense that it constitutes waiver of claims in previous complaint).  Finally, since this Court may take judicial notice of a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Rule 201(b), the Court "'may take judicial notice of records and reports of administrative bodies,' such as notices and opinion letters."  Wible v. Aetna Life Ins. Co., 375 F. Supp.2d 956, 965 (C.D. Cal. 2005) (taking judicial notice of a notice and opinion letter issued by the Department of Justice and citing, inter alia, Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir. 1953)); see also Toth v. Automobile Club of California Long Term Disability Plan, 2005 U.S. Dist. LEXIS 40746 (C.D. Cal. 2005) (same).  Therefore, this Court takes judicial notice of the SEC No-action Letter for the limited purpose of acknowledging that the

SEC investigation of the matters related to Intelligroup's Restatement was terminated without any enforcement action by the Commission or by a government agency having the power to instigate a prosecutorial action against Intelligroup upon the SEC's referral.[2]

## IV.   PLEADING REQUIREMENTS OF A 10B-5 CLAIM

### A.   ELEMENTS OF A 10B-5 CLAIM

Congress passed the '34 Act, 15 U.S.C. §§ 78a-78kk, to assure the disclosure of full and fair information to the investing public.  See H.R. Rep. No. 73-1383, at 1-2 (1934) (describing the legislation's purposes).  In relevant part, Section 10(b) of the '34 Act proscribed the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).   The ensuing Rule 10b-5, 17 C.F.R. § 240.10b-5, emerged in 1943.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975).  Like Section 10(b), Rule 10b-5 prohibits "any act . . . which operates or would operate as a fraud or deceit upon any person" and makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under

---

[2]    The SEC No-action Letter reads, in its entirety, as follows: "This investigation has been terminated, and no enforcement action has been recommended by the Commission. [The SEC is] providing this information under the guidelines [contained] in the final paragraph of the Securities Act Release No. 5310 (copy [of which is] attached)."  This Court has no reason to believe that the SEC's Assistant Director presents sources whose accuracy should be questioned with respect to whether or not an investigation was terminated.  The Court, however, stresses that  this Court's notice of the SEC No-action Letter shall not be interpreted as the Court's determination that the SEC examined the very same matters  presented to this Court or that the SEC lacked agency discretion to terminate the investigation even if the SEC did find that Intelligroup violated securities provisions.

which they were made, not misleading . . . in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b-5(b).  Under this Rule, "the basic elements [of a private federal securities fraud

action] include: (1) a material misrepresentation . . . ; (2) scienter, i.e., [defendant's] wrongful state

of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . .

as 'transactional causation'; (5) economic loss; and (6) loss causation, i.e., a causal connection

between the material misrepresentation and the loss."  Dura Pharm., Inc. v. Broudo ("Dura"), 544

U.S. 336, 341 (2005) (citing 15 U.S.C. § 78u-4(b)(4); Basic Inc. v. Levinson, 485 U.S. 224, 231-232,

248-249 (1988); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 199 (1976); Blue Chip, 421 U.S.

at 730-731; Thomas Lee Hazen, Law of Securities Regulation, ¶¶ 12.11[1], [3] (5th ed. 2002)).

Plaintiff's pleading requirements, however, are different with respect to different elements of a 10b-5

claim.


### 1.    Elements Subject to Heightened Pleading Requirements

The general standard of review triggered by a defendant's motion to dismiss under Rule

12(b)(6) is well-settled, i.e., the court must accept all well-pleaded allegations in the complaint as

true and draw all reasonable inferences in favor of the non-moving party.   See Scheuer v. Rhodes,

416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982);

Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  The Rule

12(b)(6) standard of review is, however, altered by Rule 9(b), which imposes a heightened pleading

requirement of factual particularity with respect to allegations of fraud.  Rule 9(b) states: "In all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity."  Fed. R. Civ. P. 9(b).  "This particularity requirement has been rigorously applied in

securities fraud cases." Burlington Coat Fact. Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)

(citations omitted).  Therefore, a plaintiff averring securities fraud claims must specify "'the who,

what, when, where, and how: the first paragraph of any newspaper story.'" Advanta Corp. Sec. Litig.,

180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.

1990)).  The Court of Appeals for the Third Circuit clarified:

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such
> as date, location, and time, plaintiffs must use "alternative means of injecting
> precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting Nice Sys., Ltd. Sec.

Litig., 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).  Moreover, a "stringent" reading of the requirements

set forth in Rule 9(b) is expressly applicable to two elements of a securities fraud claim, i.e., scienter

and material misrepresentation, because of the analogous heightened pleading requirements

contained in the Reform Act.[3]  See 15 U.S.C. § 78u-4(b)(1) and (b)(2).

Therefore, when stating "falsity," i.e., "material misrepresentation" element of his/her 10b-5

claim, a securities fraud plaintiff must "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts on

---

[3]

"The purpose of the [Reform] Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys."  Advanta, 180 F.3d at 531 (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748). Consequently, the PSLRA imposed heightened pleading requirements on securities fraud claims under the '34 Act consistent with a "stringent" reading of Rule 9(b) of the Federal Rules of Civil Procedure.  See H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 740.

which that belief is formed."  15 U.S.C. § 78u-4(b)(1), (2).  Similarly, with respect to the scienter element of the plaintiff's 10b-5 claim, the Reform Act requires that "the complaint shall . . . state with particularity [all] facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); Winer Family Trust v. Queen, 2007 U.S. App. LEXIS 22620, at *13 (3d Cir. Sept. 24, 2007) (noting that "[t]he Supreme Court has mandated a uniform construction of the strong inference standard in light of the objectives of the PSLRA" and citing Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc., 2007 U.S. App. LEXIS 21392 (3d Cir. Sept. 6, 2007), and Globis Capital Partners, L.P. v. Stonepath Group, Inc., 2007 U.S. App. LEXIS 16353 (3d Cir. July 10, 2007), in support of the conclusion that "[the] scienter pleading requirement is a significant bar to litigation"); see also Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, at 756-57 (7th Cir. 2007).  In sum, Rule 9(b) and the Reform Act modified the traditional Rule 12(b)(6) analysis for the purposes of pleading "misrepresentation" and "scienter" elements.  See id.; see also Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) ("The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6)"); Rockefeller, 311 F.3d at 224 (noting that "'whereas under Rule 12(b)(6), [the court] must assume all factual allegations in the complaint are true, . . . under the Reform Act, [the court would] disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute," quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)); Advanta, 180 F.3d at 531 (unambiguously explaining that a securities plaintiff's failure to meet the heightened pleading requirements would result in dismissal of the complaint); accord Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss").

In its recent decision in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007), the Supreme Court elaborated on the issue of what factual allegations satisfy plaintiff's obligation to plead "strong inference" of fraud.  The majority opinion stated that, to qualify as a "strong" inference, the facts alleged "must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 2510.  Moreover, the Supreme Court expressly guided that the district court shall dismiss as insufficient those factual allegations "from which an inference of scienter [only] *could* be drawn." Id. (emphasis in original).  Rather, the court should consider *all* facts alleged and "must take into account [all] plausible opposing inferences." Id. at 2509-10.  Although a sufficient fraudulent inference need not be "irrefutable," nor need it be the "most plausible of competing inferences," it must be *at least as strong as any other inferences* that could be drawn in favor of defendants. Id. at 2510 (defining "strong" as "[p]ersuasive, effective, and cogent [and p]owerful to demonstrate or convince," and defining "inference" as "a conclusion [drawn] from known or assumed facts or statements" or "reasoning from something known or assumed to something else which follows from it") (citations omitted).  The Court of Appeals for the Third Circuit emphasized this requerement.  See Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22 and n.3 (collecting relevant decisions by various courts of appeals and citing Higginbotham, 495 F.3d at 755, for the proposition that a plaintiff's factual pleading of scienter must yield an inference at least as compelling as any competing inference, Cent. Laborers' Pension Fund v. Integrated Elec. Servs., 497 F.3d 546, 550 (5th Cir. 2007), in order to stress that the courts must consider both culpable and non-culpable explanations, ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 104 (2d Cir.

2007), to observe that , where a plausible non-culpable explanation is more likely than any guilty inference, the court must find that plaintiffs failed to establish scienter, and Belizan v. Hershon, 495 F.3d 686, 670 (D.C. Cir.2007), to state that a district court's failure to conduct a comparison of alleged culpable and plausible non-culpable explanation warrants remand of the case).

### 2.    Elements Subject to Rule 8 Pleading Requirements

It appears that the heightened pleading requirements of PSLRA are inapplicable to the remaining elements of a 10b-5 claim.  See Dura, 544 U.S. at 346 ("[The Court] assume[s], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss").   In view of the fact that only the first two Subsections of 15 U.S.C. § 78u-4(b) require investors to specify falsity and plead facts supporting a strong inference of scienter, while the remaining Subsections appear to apply only after the heightened pleading standards of 15 U.S.C. § 78u-4(b)(1) and (2) have been met, this Court presumes that the remaining elements of any 10b-5 claim are subject to ordinary notice-pleading standards set forth in Rule 8.  See 15 U.S.C. 78u-4(b)(3); accord Dura, 544 U.S. at 346 ("[T]he Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief'") (quoting Fed. R. Civ. P. 8(a)(2)).

> But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47  (1957). [The Court recognizes] that ordinary pleading rules are not meant to impose a great burden upon a plaintiff.  [See] Swierkiewicz v. Sorema N. A., 534 U.S. 506, 513-15 (2002).  But it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the [facts] that the plaintiff has in mind. . . . [A]llowing a plaintiff to forgo giving any indication of the [facts] that the plaintiff has in mind would bring about harm of the very sort the [Reform Act] seek[s] to avoid.  Cf. H.R. Conf. Rep. No. 104-369, p. 31 (1995) (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only

a faint hope that the discovery process might lead eventually to some plausible cause of action").  It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence."  Blue Chip, 421 U.S. at 741.  Such a rule would  tend to transform a private  securities action into a partial downside insurance policy.  See H. R. Conf. Rep. No. 104-369, at 31; see also Basic, 485 U.S. at 252 . . . .

Dura, 544 U.S. at 588-89; accord Burlington, 114 F.3d at 1429 (courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint); Nice, 135 F. Supp. 2d at 565 (legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness).

Recently, the Supreme Court further elaborated on the requirements associated with the relaxed notice-pleading standard of Rule 8.  See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007).  In this seven-to-two opinion, the Court explained that Rule 8 pleadings must provide "enough factual matter" to suggest that the alleged event took place.  See id. at 1965.  While the Supreme Court left it to the district courts to determine, on a case-by-case basis, how much factual matter is "enough," the Court unambiguously indicated that represented litigants alleging wrongs other that violations of their civil rights cannot satisfy Rule 8 pleading requirements by invoking the overly lenient regime of "pure notice" originated in Conley, 355 U.S. 41, a case decided half a century ago.[4]  In fact, the Court explicitly disavowed the oft-quoted statement in Conley of "'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears

---

[4]    The Supreme Court's decision in <u>Bell Atlantic</u> did not disturb the allowances traditionally provided by federal courts to civil rights litigants proceeding <u>pro se</u>.  See <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (reaffirming the traditional principal under which a plaintiff proceeding <u>pro se</u> may expect that his pleading would be liberally construed and his complaint, "however inartfully pleaded, [would] be held to less stringent standards than formal pleadings drafted by lawyers").

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'" stating that the "no set of facts" language "has earned retirement" and "is best forgotten."  Bell Atlantic, 127 S. Ct. at 1968-69 (quoting Conley, 355 U.S. at 45-46).

Moreover, the Court, using a variety of phrases, indicated that more than notice of a claim is needed to allege a commercial violation.  For example, the Court required "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged claim]," "facts that are suggestive enough to render [plaintiff's allegations] plausible," "allegations plausibly suggesting (not merely consistent with) [plaintiff's allegations]," a "plain statement" with "enough heft" to show entitlement to relief, and "enough facts to state a claim to relief that is plausible on its face."  Id. at 1969-74.  Finally, the Court refused to entertain a plaintiff's far-fetched flights of fancy by unambiguously stating that the line "between the factually neutral and the factually suggestive . . . must be crossed [by allegations made in plaintiff's pleadings] to enter the realm of plausible liability," id. at 1966 n.5, and stated that no "reassurances of plaintiffs' counsel" that discovery would soon flesh out plaintiff's claim, which is currently pled so that it is "just shy of a plausible entitlement," can prevent Rule 12(b)(6) dismissal.  Id. at 1967 and n.6 (referring to id. at 1975 (Stevens, J., dissenting)).  In sum, while a securities plaintiff setting forth allegations of those 10b-5 elements that are subject to Rule 8 pleading requirements need not state with particularity all facts giving rise to a strong inference that the elements are present, plaintiff's complaint will survive dismissal only if it contains "enough [factual] heft" rather than plaintiff's conjecture and self-serving interpretations of actual events.[5]  See Bell Atlantic, 127 S. Ct. at 1965-69; Dura, 544 U.S. at 588-89.

---

[5]

The insufficiency of "factually neutral" pleadings under Rule 8 articulated in <u>Bell Atlantic</u> appear to draw from the same concerns noted in <u>Dura</u>, 544 U.S. at 589 (rejecting "a rule [which]

B.     PLEADING A CLASS 10B-5 CLAIM

In order for Plaintiffs' action to remain viable as a class action, Plaintiffs must continuously

comply with the four prerequisites of Rule 23(a), that is, numerosity, commonality, typicality and

adequacy, and must also satisfy the requirements of Rule 23(b)(3).[6] See Baby Neal v. Casey, 43 F.3d

48 (3d Cir. 1994).   Commonality does not require an identity of claims or facts among class

---

would  . . . transform a private securities action into a . . . downside insurance policy"), and long
recognized in this Circuit with respect to the misrepresentation and scienter elements. See Advanta,
180 F.3d at 531.  Moreover, the clarifications provided in Bell Atlantic appear to reflect the Court's
realization of the facts that (a) securities class actions have averaged between 47% and 48% of all
class actions pending in federal court, necessarily consuming significant judicial resources; (b) the
business realities are such that the very fact of a pending securities action creates an incentive for the
sued issuer to settle the suit, regardless of whether or not the action is meritorious; (c) securities class
action settlements have averaged an annual aggregate amount of $ 1,906,333,333 exceeding the sum
of all public monetary sanctions taken together (without factoring in such public sanctions as
criminal penalties and SEC suspensions, expulsions, cease and desist orders, and other non-monetary
relief); and (d) a "secondary market" securities class action (i.e., the one brought against a public
corporation that has not sold or purchased its own securities) operates effectively as a wealth transfer
from those shareholders who purchased the issuer's securities outside the class period to those who
purchased during the class period, with a significant percentage of the transfer payment going to
lawyers and other agents. See John C. Coffee, Symposium: Litigation Reform Since the PSLRA: A
Ten-year Retrospective: Panel One: Private Securities Litigation Reform Act: Reforming the
Securities Class Action: An Essay on Deterrence and Its Implementation ("Retrospective"), 106
Colum. L. Rev. 1534, 1537-42 (2006) (citing Admin. Office of the U.S. Courts, Judicial Business
of the United States Courts 395-97 tbl.X-4 (2002), 393-97 tbl.X-4 (2003), and 400-03 tbl.X-4
(2004)); accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S. Ct. 1503, 1510 (2006)
(explaining that securities litigation presents "danger of vexatiousness different in degree and in kind
from that which accompanies litigation in general") (quoting Blue Chip, 421 U.S. at 739) (internal
quotation marks omitted).

[6]

Rule 23(a) states that certification will be available only if: (1) the class is so numerous that
joinder of all members is impracticable; (2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the
class; and (4) the representative parties will fairly and adequately protect the interests of the class.
Rule 23(b)(3) permits certification only where the court finds that the "common questions of law or
fact predominate over questions affecting only individual members and that a class action is the
superior method for fair and efficient adjudication of the controversy."  As more than one court has
pointed out, the several requirements of Rule 23 are not perfectly distinct from each other.  See, e.g.,
Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 389 (D.N.J. 1998).

members.  See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) (citing Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 310 (3d Cir. 1998), and Baby Neal, 43 F.3d at 56). "Commonality under Rule 23(a)(2) is met where, notwithstanding some factual differences, the class action claims are based on a 'common course of conduct' of misrepresentations, omissions, or other wrongdoing affecting all class members in the same manner."  Yadlosky v. Grant Thornton L.L.P., 197 F.R.D. 292, 298 ( E.D. Mich. 2000) (citing Computer Memories Sec. Litig., 111 F.R.D. 675, 684 (N.D. Calif. 1986)).  Within the setting of a securities action, a plaintiff alleging a certain source of stock price inflation has to allege that the source of inflation was common to every purchaser.  See Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 946 (1980).  By contrast, the pleading of such plaintiff are insufficient if the pleading  indicate that either the plaintiff or other members of the class purchased fairly priced or price-deflated stock, or bought stock inflated by another source.  Cf. Shamrock Assocs. v. Moraga Corp., 557 F. Supp. 198, 206 (D. Del. 1983).  Similarly, with respect to typicality, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members."  Newton, 259 F.3d at 183. However, within the realm of securities law, a plaintiff alleging that statements of defendants caused the market price of a corporation's stock to be inflated above its true value through a class action must state facts indicating that the price inflation was present at every point throughout period, see Aboudi v. Daroff, 65 F.R.D. 388, 391 (S.D.N.Y. 1974), and cannot satisfy the pleading requirements by alleging inflation of the stock price during only certain parts of the class period rather than the

entire span of time.[7]  See Richland v. Cheatham, 272 F. Supp. 148 (S.D.N.Y.1967).

## C.    PLEADING A DERIVATIVE CLAIM AGAINST CONTROLLING PERSONS

Section 20(a) of the 1934 Act, 15 U.S.C. § 78(a), states that "[e]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person."  15 U.S.C. § 78t(a).  Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws.  See Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005); Digital Island, 357 F.3d at 337;  Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. 1992).  To establish a prima facie case that the defendant was a controlling person, the plaintiff must show that: (1) the

---

[7]

In the instant action, Plaintiffs Senthilnathan Narayanan and Robert Farber ("Narayanan Group") were named as lead plaintiffs.  See Docket Entry No. 24.  The Narayanan Group purchased Intelligroup's stock on eleven occasions during the nine-month period running from  August 27, 2003, to May 4, 2004.  It appears that, after purchasing Intelligroup stock, Plaintiff Narayanan never sold his holdings.  See Docket Entry No. 15-5.  The purchasing pattern of Plaintiff Farber, however, was different.  Just one month after his two initial purchases, Plaintiff Farber made three sales disposing of his entire Intelligroup stock within one week (about eight and a half months prior to Intelligroup's Press Release qualified by Plaintiff as the disclosure event causing Plaintiffs' losses).  See id.  Yet, just ten weeks after his three sales, Plaintiff Farber made three re-purchases of Intelligroup stock, buying almost twice as much shares as he had originally purchased.  See id.
In addition to the Narayanan Group, the docket identifies a few other plaintiffs, including Plaintiffs Polos and Propst who jointly made eight purchases of Intelligroup stock during the nine months running from November 18, 2003, to August 18, 2004.   See Docket Entry No. 15-6. (Plaintiff Polos also made three sales of Intelligroup stock during the week running from August 11, 2004, to August 18, 2004, that is, five and a half weeks prior to Intelligroup's airing of the Press Release which, allegedly, caused Plaintiffs' losses.)  Thus, the joint purchasing period of the Narayanan Group, Polos and Propst was from August 27, 2003, to August 18, 2004, that is, less than one-third of the Class Period selected by Plaintiffs.  (The dates of purchases of all other plaintiffs, i.e., Anthony Curzio, Michael Juppe, and Philip Ritchie, see Docket Entry No. 19, and plaintiffs in pre-consolidated matters 04-4980, 04-5129, 04-5133, 04-5498, 04-5922, and 04-5923, see Docket Entry No. 24, are not immediately apparent from submissions made during this litigation.)

defendant had actual power or influence over the controlled person; and (2) the defendant actually

participated in the alleged illegal activity.[8]  See Kersh v. General Council of the Assemblies of God,

804 F.2d 546, 548 (9th Cir. 1986); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d Cir. 1975);

Mobile Media Secs. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998); Klein v. Boyd, 949 F. Supp. 280

(E.D. Pa. 1996), aff'd in part, rev's on other grounds, 1998 U.S. App. LEXIS 2004 (3d Cir. Feb. 12,

1998);  Gordon v. Diagnostek, Inc., 812 F. Supp. 57 (E.D. Pa. 1993).


## V.  PLEADING SPECIFIC ELEMENTS OF A 10B-5 CLAIM

### A.  PLEADING THE "FALSE AND MISLEADING STATEMENT" ELEMENT

#### 1.  Pleading an Affirmative Misrepresentation

When a securities plaintiff challenges a statement made by a defendant, plaintiff's mere usage

of catchwords or bold assertions that defendant's statement was false or misleading because the

defendant knew or must have known it to be false or misleading cannot lend support to plaintiff's

claim.  See, e.g., GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) ("[I]t

---

[8]

The group pleading doctrine allows plaintiffs in securities fraud cases to attribute corporate statements to "one or more individual defendants based solely on their corporate titles." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir. 2004).  The doctrine (alternatively referred to as the "group published" doctrine and the "group published information presumption," see id.; William O. Fisher, Don't Call Me a Securities Law Groupie: The Rise and Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991, 995 n.12 (2001)) favors plaintiffs by making it easier to satisfy Rule 9(b)'s particularity requirement since, under the doctrine, the plaintiffs can name corporate officers as defendants even though the plaintiffs did not know the roles such officers played in an alleged fraud.  The courts have held that the PSLRA forecloses the practice of group pleading in securities fraud cases.  See, e.g., Tyson Foods, Inc. Sec. Litig., 155 Fed. Appx. 53, 57 (3d Cir. 2005); Steiner v. MedQuist Inc., 2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006); Cambrex Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 25339 (D.N.J. Oct. 27, 2005); Bio-Tech. Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574 (D.N.J. 2005).

is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false"); accord Tellabs, 127 S. Ct. at 2509-10.  "[Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that . . . the public was likely to be misled. [Securities] 'law does not expect clairvoyance.'" IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d Cir. 2002) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)); see also DiLeo, 901 F.2d at 627) ("[P]roffer[ing a] different financial statement [is not sufficient.]  Investors must point to some facts suggesting that the difference is attributable to fraud"); Suprema Specialities, Inc. Sec. Litig. ("Suprema-District"), 334 F. Supp. 2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim") (citations omitted), rev'd on other grounds, Suprema Specialties, Inc. Sec. Litig. ("Suprema-Appellate"), 438 F.3d 256 (3d Cir. 2006).

### 2.     Pleading Misrepresentation Based on Failure to Disclose

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak [since a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." Chiarella v. United States, 445 U.S. 222, 235 (1980).  As the Third Circuit explained,

> "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic, 485 U.S. [at] 239 n.17 . . . ; see also Burlington, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information").  Such a duty to disclose may

> arise [only] when there is [an incident of] insider trading, [or presence of] a statute requiring disclosure, or [there was] an inaccurate, incomplete or misleading *prior* disclosure [requiring a corrective statement]. See Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992); Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc); General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1129 (D. Del. 1988).

Oran v. Stafford, 226 F.3d 275, 286-87 (3d Cir. 2000) (emphasis supplied); see also Galati v. Commerce Bancorp, Inc., 2007 U.S. App. LEXIS 7315 (3d Cir. Mar. 29, 2007) (reiterating the standard and dismissing plaintiffs' allegations that "[d]efendants made several . . .  false and misleading [statements] by virtue of their failure to speak fully and accurately about the illegal bid-rigging and kick-back scheme" in view of defendants lack of duty to disclose those facts, which plaintiffs qualified as indicators of "illegal schemes").  Explaining the rationale for the rule, the Court of Appeals for the Sixth Circuit noted that

> this set of requirements preserves the healthy limits on a public corporation's "duty to disclose all information . . ." because corporations might otherwise "face potential second-guessing in a subsequent disclosure suit," a regime that would threaten to "deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public."

City of Monroe Emples. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005) (quoting Digital Island, 357 F.3d at 329 n.10); see also, Burlington, 114 F.3d at 1432 ("[Management's] possession of material nonpublic information alone does not create a duty to disclose it") (quoting Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), and citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996), and Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987)); Milton v. Van Dorn Co., 961 F.2d 965 (1st Cir. 1992) (where plaintiffs bought the stock of a subsidiary company of the parent corporation and, after the sale was completed, another of the parent corporation's subsidiaries announced plans to produce a competing product, nondisclosure of the other subsidiary's production plans was immaterial).

Page 25 of  195

B.    PLEADING THE "SCIENTER" ELEMENT

1.    Pleading Intentional or Recklessness State of Mind

The term "scienter" means "a mental state [of] intent to deceive, manipulate or defraud."

(quoting Ernst, 425 U.S. at 193 n.12).  To successfully plead scienter, a securities plaintiff must

plead "conscious misbehavior or recklessness." GSC, 368 F.3d at 236; see also SEC v. Infinity

Group Co., 212 F.3d 180, 192 (3d Cir. 2000), cert. denied, 532 U.S. 905 (2001).  The requirement

to allege defendants' intentional state of mind, that is, defendants' "conscious misbehavior," sets

forth a very high pleading standard.  See IKON, 277 F.3d at 667.  Moreover, in securities matters,

the term "recklessness" is not interpreted lightly.  The Court of Appeals instructed that the term

"recklessness" means a

> "highly unreasonable (conduct), involving not merely simple, or even inexcusable
> negligence, but an extreme departure from the standards of ordinary care,. . . which
> presents a danger of misleading [the parties to the transaction] that is either known
> to the defendant or is so obvious that the actor must have been aware of it."

Id. (quoting Ernst, 425 U.S. at 193 n.12); see also Advanta, 180 F.3d at 535.  Therefore, when

assessing the sufficiency of plaintiff's pleading alleging a reckless violation of Rule 10b-5, courts

are expected to be mindful of the fact that, in securities matters,

> "recklessness is a lesser form of intent rather than a greater degree of negligence . .
> . .  Reckless conduct may be defined as a highly unreasonable omission, involving
> not merely simple, or even inexcusable negligence, but an extreme departure from
> the standards of ordinary care."

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990), cert. denied, 499 U.S. 976

(1991) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert.

denied, 434 U.S. 875 (1977)).

2.      **Pleading Scienter by Inference**

Since scienter is based on the defendant's state of mind and, as such, may be difficult to prove with direct evidence, courts are willing to permit an inference that the defendant acted with the requisite scienter.  See, e.g., Fine v. Am. Solar King Corp., 919 F.2d 290 (5th Cir. 1990), cert. dismissed, 502 U.S. 976 (1991).  However, such inferences are not to be made lightly.  See, e.g., Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ($1.6 million dollar profit from inside trading was not sufficiently unusual to provide an inference of scienter).  To withstand the scrutiny imposed by the Reform Act, the inference of scienter must be both strong and based on the facts with particularity.  See 15 U.S.C. § 78u-4(b)(1) and (2) (the plaintiff shall state "particular[] facts giving rise to a strong inference that the defendant acted with the required state of mind"); Tellabs, 127 S. Ct. at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged"); see also Higginbotham, 495 F.3d 753 (affirming dismissal of the complaint for failure to properly allege scienter with respect to restatement of a corporation's earnings during the preceding three years); Alpharma Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004); The End of the Unbearable Lightness of Pleading, 48 UCLA L. Rev. 973 (2001).

A plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior."  Advanta, 180 F.3d at 534; see also Burlington, 114 F.3d at 1418. Both methods are equally acceptable and, "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference," the Supreme Court has said that

"the absence of a motive allegation is not fatal."  Tellabs, 127 S. Ct. at 2511.

### a.   *Inferring Scienter from Defendant's "Motive and Opportunity"*

If the plaintiff desires to employ the "motive and opportunity" method, the plaintiff should demonstrate a logical connection between the alleged fraud and motive in order to establish a reasonable inference of fraud: plaintiffs' allegations as to defendants' motive to defraud investors with respect to a certain matter cannot be matched with plaintiffs' facts that defendants committed fraud with respect to another matter.  See Glickman v. Alexander & Alexander Servs., 1996 U.S. Dist. LEXIS 2325, at *36 (S.D.N.Y. Feb. 27, 1996) ("[There should be a] coherent nexus between the alleged fraudulent conduct and its alleged purpose"); cf. Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991) (pleading a "complaint is not a mix and match game").  Furthermore, there must be more than conclusory allegations of motive and opportunity, see, e.g., Mortensen v. AmeriCredit Corp., 123 F. Supp. 2d 1018 (N.D. Tex. 2000); Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194 (S.D.N.Y. 1999), or a mere set of assertions "from which an inference of [motive and opportunity] rationally *could* be drawn."  Tellabs, 127 S. Ct. at 2510 (emphasis in original).  Rather, a strong inference of motive and opportunity may arise only if the complaint sufficiently alleges that the defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000); see Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002) ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and

wrongful nondisclosures. . . . [M]otive and opportunity 'like all other allegations of scienter must now be supported by facts stated with particularity and must give rise to a strong inference of scienter'") (quoting Advanta, 180 F.3d at 535); Cybershop.com Sec. Litig., 189 F. Supp. 2d 214 (D.N.J. 2002).

Under this pleading standard, a plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations (or sought to engage in the industry practices) common to the law-abiding business community , since such goals or practices cannot amount to a valid motive for the purposes of showing scienter.  See  GSC, 368 F.3d at 237 ("'Motives that are generally possessed by most corporate directors and officers do not suffice'") (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)) (lack of capitalization restored); San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996) ("[A] company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because such motive could be imputed to any company.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (citation omitted); Nice, 135 F. Supp. 2d at 584 ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is . . . insufficient to demonstrate that [d]efendants had a motive to commit fraud");  Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1175 (W.D. Wash. 1998) ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA").

### b.      *Inferring Scienter from Circumstantial Evidence*

If the plaintiffs choose to use the other method of establishing scienter, that is, by asserting

circumstantial evidence of intent or recklessness, "the strength of the circumstantial allegations must

be [even] greater."  Kalnit, 264 F.3d at 142; see Oran, 226 F.3d at 288-89.  In that situation, the

plaintiffs must support their allegations by detailing, with particularity, "the who, what, when, where

and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect

to defendant's state of mind.  Burlington, 114 F.3d at 1422 (citing DiLeo, 901 F.2d at 627); see also

Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events

is insufficient circumstantial evidence).  Moreover, the totality of circumstantial facts alleged must

give rise to inference of scienter "at least as compelling as any opposing inference one could draw

from the facts."    Tellabs, from which an inference of at 2510.


### i.      *Inferring Scienter from GAAP Violations*

The seminal case addressing the issue of inferring scienter from violations of Generally

Accepted Accounting Principles ("GAAP") is the Third Circuit's decision examining so-called

"positive portrayals," that is, public statements that were alleged to have been inaccurate.    See

Advanta, 180 F.3d 525.    The complaint in Advanta alleged that defendants had publicly made

certain "positive portrayals" of the corporation that were materially misleading.  See id. at 538 (Since

Advanta's annual report included the following statement regarding the quality of the company's

credit portfolio: "While we added substantially to our account base, our credit quality remained

excellent," Advanta plaintiffs alleged that this and similar statements were materially false "because

they failed to disclose the deterioration in [Advanta's] credit" during the time when Advanta

"implemented policies relaxing its underwriting and monitoring procedures").  With respect to the

scienter element, plaintiffs made "conclusory assertions that the defendants acted 'knowingly' [or]

must have been aware of the [true facts] by virtue of their positions within the company."  Id. at 539.

Affirming the dismissal of the complaint, the Third Circuit explained that scienter must "not rest on

a bare inference that a defendant 'must have had' knowledge of the facts."  Id. (citing Maldonado v.

Dominguez, 137 F.3d 1, 10 (1st Cir. 1998); Greenstone v. Cambex Corp., 975 F.2d 22, 26 (1st Cir.

1992)).  In other words, knowledge of the falsity of publicly made statements generally will not be

imputed to defendants,  absent particular factual allegations supporting a strong inference that they

knew or must have known of the falsity of their statements at the time they were made.[9]

To explain its rationale, the Third Circuit distinguished Advanta from a district court case,

Ancor Communs., Inc. Sec. Litig., 22 F. Supp. 2d 999 (D. Minn. 1998), in which the company had

announced a $30 million supply contract for one of its products, resulting in a dramatic increase in

the price of its stock.  Later, the contract was cancelled due to product incompatibility, causing the

company's share price to plummet.  As in Advanta, the Ancor complaint alleged that defendants were

(or should have been) aware that the product would likely prove incompatible as of the time the

company entered into the supply contract at issue and, therefore, the public announcement was false

or misleading when made.  See Ancor, 22 F. Supp. 2d at 1004-05.  But, unlike in Advanta, two

salient facts permitted the "unusually strong inference" to be drawn in the Ancor case: (1) the

complaint alleged that the supply contract was by far the most significant contract in Ancor's history

---

[9]

This is true regardless of the defendant's position in the company.  See Advanta, 180 F.3d
at 539 (citing Rosenbloom v. Adams, Scott & Conway, Inc., 552 F.2d 1336, 1338-39 (7th Cir. 1977)
("a director, officer, or even the president of a corporation often has superior knowledge and
information, but neither the knowledge nor the information necessarily attaches to those positions")).

and, therefore,  Ancor defendants should have been intimately aware of its provisions, and (2) the complaint pointed to some other extrinsic evidence of the defendants' knowledge, such as discussions among officers regarding the incompatibility problem, and the fact that there was an escape clause in the contract governing possible incompatibility. See Advanta, 180 F.3d at 539.  As neither of these types of facts was alleged in Advanta, the Court of Appeals would not make the inferential leap that Advanta plaintiffs there invited, namely, that Advanta defendants "must have known" their statements were false when made.   The Court of Appeals ruled that, without some persuasive particulars to support this allegation, the Advanta complaint failed to allege a strong inference of the necessary scienter under the PSLRA.  See id. at 539.

The differences between Advanta and Ancor illustrate an important point about the substantive meaning of recklessness in the securities fraud context, namely, that--in a case involving inaccurate public statements--simply alleging that defendants "knew or should have known" is not enough and, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 309 (citing San Leandro, 75 F.3d at 805).

Since cases involving allegations that defendants violated GAAP present nothing but a sub-group of the inaccurate public statement category of securities cases, the courts have uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless plaintiffs' complaint alleges "more."  See Wyser-Pratte Mgt. Co. v. Telxon Corp., 413 F.3d 553, 563 (6th Cir. 2005); Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d 851, 855 (8th Cir. 2005); Saxton, Inc. Sec. Litig., 156 Fed. App. 917, 920 (9th Cir. 2005); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 694 (6th Cir. 2004); Kushner v. Beverly Enter., 317 F.3d 820, 831

(8th Cir. 2003); Pirraglia v. Novell, Inc., 339 F.3d 1182, 1192 (10th Cir. 2003); Abrams v. Baker

Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002); Navarre Corp. Sec. Litig., 299 F.3d 735, 745 (8th

Cir. 2002); DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002);

City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1261 (10th Cir. 2001); Ziemba v. Cascade Int'l,

Inc., 256 F.3d 1194, 1208 (11th Cir. 2001); Novak, 216 F.3d at 309; Greebel, 194 F.3d at 203-04;

Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999); Stevelman v. Alias Research, Inc., 174

F.3d 79, 84-85 (2d Cir. 1999); Carter-Wallace, Inc. v. Hoyt, 150 F.3d 153 (2d Cir. 1998); Chill v.

GE., 101 F.3d 263, 270 (2d Cir. 1996); Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir.

1994); Malone v. Microdyne Corp., 26 F.3d 471, 479 (4th Cir. 1994); Fine, 919 F.2d at 297.   The

decisions rendered in this Circuit are no exception.  See Alpharma, 372 F.3d 137; Advanta, 180 F.3d

525; Westinghouse Sec. Litig., 90 F.3d 696 (3d Cir. 1996).

     Although the decisions which held that GAAP violations or restated financials, without more,

do not create the requisite strong inference of scienter do not provide an exhaustive list of the

"more" that satisfies the pleading requirements (and have left the matter to be assessed on a case-by-

case basis), it appears that the "more" envisioned by the courts consists of the panoply of such facts

which could sufficiently indicate that defendants had clear reasons to doubt the validity of the

issuer's financials but, nonetheless, kept turning a blind eye to all such factual "red flags."  See

Rothman, 220 F.3d 81 (plaintiffs did not adequately plead scienter where the complaint alleged that

defendants' policy of expensing prepaid royalties was contrary to GAAP, resulting in nearly $ 74

million in royalties continuing to be reported as assets long after they should have been expensed);

Comshare, 183 F.3d at 553 (plaintiffs failed to plead scienter properly--although plaintiffs'

allegations combined both GAAP violations and claims of failure to adequately monitor relevant

information--since plaintiffs did not allege specific facts to show that defendants knew or could have known about the accounting errors, "or that their regular procedures should have alerted them to the errors sooner than they did"); compare Novak, 216 F.3d at 312 (discussing Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989), and Goldman v. Belden, 754 F.2d 1059 (2d Cir. 1985), two pre-PSLRA cases involving inaccurate public statements that the Novak court selected as examples of cases in which defendants "knew facts or had access to information suggesting that their public statements were not accurate."  In Cosmas, just as in Ancor, the plaintiffs alleged that the sales to China promised by defendants were not viable under the then-existing trade restrictions of which defendants were actually aware, and in Goldman plaintiffs alleged that defendants were actually informed about the facts making their statements untrue but elected to ignore the unfavorable information); accord Health Mgt. Sec. Litig., 970 F. Supp. 192 (E.D.N.Y. 1997) (a strong inference of recklessness is sufficiently pled where the complaint alleges that defendant was actually advised of but ignored "red flags").

### ii.    *Inferring Scienter from SOX Certifications*

Section 302 of the Sarbanes-Oxley Act ("SOX") required the SEC to implement rules under which principal executive and financial officers of public companies certify to the general truthfulness of the company's quarterly and annual reports.  See 15 U.S.C. § 78m, 78o(d); 17 C.F.R. § 240.13a-14(b)(2).  The certification requirement obligates officers to state that, based on their knowledge, the report does not contain any material misrepresentations or omit any material fact otherwise necessary to make the other disclosures not misleading.  See 116 Stat. at 777; 17 C.F.R. § 240.13a-14(b)(2).  Additionally, the report has to identify the officer's basis for making the

certification and each officer must certify that he or she and other officers are "responsible for establishing and maintaining" disclosure controls and procedures.  See 116 Stat. at 777; 17 C.F.R. § 240.13a-14(b)(4).  Moreover, the certifying officers must also certify to having "evaluated the effectiveness of the issuer's internal controls" and procedures within the previous ninety days and have "presented in the report their conclusions about the effectiveness" of the disclosure controls and procedures.  See id.

However, since neither Section 302 nor its implementing regulations make any reference to the creation of a private cause of action or indicate an intent to modify securities fraud pleading requirements under the PSLRA, including the requirement to plead strong inference of scienter, see Kogan v. Robinson, 432 F. Supp. 2d 1075, 1076 (S.D. Cal. 2006); Neer v. Pelino, 389 F. Supp. 2d 648, 657 (E.D. Pa. 2005); BiSys Group, Inc. Derivative Action, 396 F. Supp. 2d 463, 464 (S.D.N.Y. 2005); Whitehall Jewelers, Inc. S'holder Derivative Litig., No. 05-C-1050, 2006 WL 468012, at 7 (N.D. Ill. Feb. 27, 2006); Harold S. Bloomenthal, Sarbanes-Oxley Act in Perspective § 74 (2002), it appears that the test applicable to erroneous SOX certifications mirrors that coined for public statements in general and for GAAP violations in particular, i.e., (a) erroneous SOX certifications automatically encompassing all above-listed requirements cannot, without "more," create the requisite strong inference of scienter; and (b) plaintiffs must allege facts indicating that certifying defendants had clear reasons to doubt the validity of financials being certified but kept turning their blind eye to all "red flags."  See WatchGuard Sec. Litig. ("WatchGuard II"), 2006 U.S. Dist. LEXIS 74269 (W.D. Wash. Oct. 12, 2006); InVision Techs., Inc. Sec. Litig., 2006 WL 538752 (N.D. Cal. Feb. 27, 2006).  Both cases are quite instructive.

In WatchGuard, plaintiffs brought their 10b-5 claim in the wake of WatchGuard's financial restatement, which: (a) implicitly admitted errors in applying GAAP; (b) expressly admitted errors in income classification, revenue recognition and calculation of liabilities ensuing from customer-rebate obligations; and (c) revealed the falsity of all Sarbanes-Oxley certifications containing assurances that the stated financial results were adequate, and that the certifying officers had designed adequate financial controls, evaluated those controls, and disclosed any material weaknesses. See WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *3. Assessing plaintiffs' challenges based on violations of GAAP and erroneous SOX certifications, the WatchGuard court reminded plaintiffs of the "truism" that "[f]alse statements are an insufficient basis for a securities fraud claim, [and] culpability arises only when a defendant makes a false statement with scienter," and dismissed the complaint reasoning as follows:

> [p]laintiffs must show that the Sarbanes-Oxley certifications accompanying [the erroneous] results were culpably false. . . . The court assumes for present purposes that better "controls" would have revealed the ground-level problems at issue. This assumption is not without controversy. Although WatchGuard admitted to material weaknesses in its controls when it issued the . . . restatement, it did not reveal which controls were inadequate. Under these circumstances, it is not obvious what "controls" would have ameliorated the problems that [p]laintiffs identify. It appears that [d]efendants should have had better awareness of the sales practices and returns processing practices at issue, but there is no indication that "controls" would have provided that awareness. The court shelves those concerns, however, and assumes that better controls would have, at the very least, led WatchGuard to discover these problems sooner.
>
> Even under the assumption that WatchGuard's misstated earnings are the result of shoddy controls, the court finds no strong inference of scienter as to [d]efendants' inaccurate Sarbanes-Oxley certifications. For many of the reasons that the court has already discussed [in its previous opinion], there are no allegations that create a strong inference that [d]efendants knew WatchGuard's controls were inadequate, or were deliberately reckless regarding those controls. Plaintiffs' allegations suggest that WatchGuard took steps to assess its controls during the class period, and acted to improve its controls when it discovered those problems. They do not raise a strong inference that any [d]efendant acted culpably in designing those controls, assessing them, or certifying them under the Sarbanes-Oxley Act. That the

> controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim.

Id. at *32-33; see also WatchGuard Sec. Litig. ("WatchGuard I"), 2006 U.S. Dist. LEXIS 27217, at *29-31 (W.D. Wash. Apr. 21, 2006) (the opinion dismissing the original complaint of the WatchGuard plaintiffs, which noted that, in view of WatchGuard's previous errors necessitating the financial restatement, any SOX certification of WatchGuard's officers as to the correctness of original financial data or as to adequacy of reporting controls would be, by definition, untrue, since-- had these certifications been true--plaintiffs would have no case, but not every erroneous SOX certification is a culpable one).

The court in InVision reached the same conclusion.  In InVision, plaintiffs challenged InVision's merger announcement stating that "acquisition [was] subject to normal closing conditions including customary regulatory approval," even though InVision was undergoing investigations by the United States Department of Justice and the SEC with respect to InVision's possible violations of the Foreign Corrupt Practices Act.  See InVision, 2006 WL 538752, at *1.  The InVision plaintiffs alleged that defendants acted with requisite scienter in view of defendants' SOX certification stating that InVision's officers designed, established, maintained and evaluated the effectiveness of InVision's internal control over financial reporting and related control procedures.  See id. at *2. Dismissing plaintiffs' complaint, the court in InVision: (a) observed that defendants' certification merely stated that defendants crafted the control system defendants believed to be adequate and disclosed all weaknesses or lack thereof that defendants were aware of at the time of certification, (b) refused to interpret the sole fact that defendants' beliefs were erroneous or knowledge was limited as an indication that defendants were either aware of these shortcomings or intentionally overlooked them, and (c) directed plaintiffs to plead the facts indicating actual culpability--rather than mere

ignorance--on the part of defendants at the time of SOX certification.  See id. at *6-7.

Notably, both the WatchGuard and InVision courts contrasted the facts of their cases with the case where plaintiffs properly alleged SOX violation together with "more" evidence, i.e., that defendants improperly changed accounting journal entries in order to artificially inflate revenue and then executed a SOX certification while being well aware of the impropriety of the change.  See WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *32 (discussing Lattice Semiconductor Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006), a case presenting "markedly different circumstances" in view of the fact that the SOX certification in Lattice was made after the Lattice defendants "cooked the books"); InVision, 2006 WL 538752, at *7 n.3 (making the same observations as to the fact pattern in Lattice and making the distinctions analogous to the ones noted in WatchGuard).

In sum, while the issue of what impact a Sarbanes-Oxley certification has on a 10b-5 claim is a relatively novel question, the above-discussed holdings indicate that--as with allegations that defendants violated GAAP--allegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous.[10]

---

[10]

In addition, the language of SOX did not relax Plaintiff's pleading burden as to Rule 8 elements of their 10b-5 claim.  This issue was extensively treated in the Court's December Opinion, see Intelligroup Secs. Litig., 468 F. Supp. 2d 670, 706-07 (D.N.J. 2006), and Plaintiffs' instant Complaint provides this Court with no particular reason to reiterate the discussion here.

### 3.    Pleading Scienter by Relying on Confidential Information

Even though all allegations relating to the falsity of a defendant's statement must be pled with particularity, see 15 U.S.C. § 78u-4(b)(1) and (2), a plaintiff in securities fraud actions can support a complaint by reliance on information attributed to confidential sources.  See Novak, 216 F.3d at 313-14 (holding that, while the PSLRA "may compel revelation of confidential sources under certain circumstances," there was no per se requirement of disclosure if the plaintiff states sufficient facts to support plaintiff's allegations).  However, statements from undisclosed confidential sources can be used only in two situations: (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support a fraud allegation, see id. at 314; Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 509 (D.N.J. 2005) (finding sufficient corroboration in specific notes, memoranda, emails and presentation materials); compare Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (if the allegations are contradicted by the documents, the documents control), aff'd, 43 F.3d 1458 (2d Cir. 1994); or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged.  See Royal Dutch, 380 F. Supp. 2d 509.

Elaborating on the latter scenario, the Court of Appeals explained that the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information. See Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126,146 (3d Cir. 2004); Freed v. Universal Health Servs., 2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005); Portal Software, Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 20214, at *28 (N.D. Cal.

Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable").  Moreover, in Chubb, the Court of Appeals held that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail.  See id.; see also Northpoint Communs. Group, Inc., Sec. Litig., 184 F. Supp. 2d 991, 999-1000 (N.D. Cal. 2001); U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); Ramp Networks, Inc., 201 F. Supp. 2d 1051, 1067 (N.D. Cal. 2002).  Failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations.  See Chubb, 394 F.3d at 146.  "The sheer volume of confidential sources cited cannot compensate for these inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."  Id. at 155; see also Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 391-92 (E.D. Pa. 2005) (finding statements from five insufficiently identified confidential sources inadequate).


C.   PLEADING THE "MATERIALITY" ELEMENT

The test of materiality depends not upon the literal truth of statements but upon the ability of reasonable investors to become accurately informed.  See McMahan & Co. v. Warehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991).  This is sometimes referred to as the mosaic representation thesis.  See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Genentech, Inc. Sec. Litig., 1989 WL 137189 (C.D. Cal. 1989).  Thus, a finding of materiality is based on the total mix of information available, see Ieradi v. Mylan Labs.,

Inc., 230 F.3d 594 (3d Cir. 2000), and the concept of materiality cannot be distilled into a bright-line

test, see Basic, 485 U.S. 224, see also Shapiro, 964 F.2d at 281; Ganino v. Citizens Util. Co., 228

F.3d 154 (2d Cir. 2000), short of stating that an alleged misrepresentation cannot be deemed material

to an investor if the general public has access to correct information.  See Basic, 485 U.S. at 231-32;

Wallace v. Systems & Computer Tech. Corp., 1997 U.S. Dist. LEXIS 14677, at *42-44 (E.D. Pa.

Sept. 22, 1997).

    Since materiality is determined in context, a purchaser or seller of securities is not necessarily

entitled to all information relating to each of the circumstances surrounding the transaction.  See

Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) (deficiencies found by FDA inspectors at one

of many business locations were not material); Wilensky v. Digital Equip. Corp., 903 F. Supp. 173

(D. Mass. 1995), aff'd in part, rev'd in part on other grounds, 82 F.3d 1194 (1st Cir. 1996) (failure

to disclose details of new marketing strategy was immaterial); accord Press v. Quick & Reilly, Inc.,

218 F.3d 121 (2d Cir. 2000) (intermediary's conflict of interest is immaterial).  Therefore, it is not

sufficient to show that a shareholder might have found the information to be of interest: the plaintiff

has to establish importance of the particular piece of information to a reasonable investor in order

to plead a material misstatement.  See Burlington, 114 F.3d at 1432 ("[A] corporation is not required

to disclose a fact merely because a reasonable investor would very much like to know that fact")

(quotation omitted).

### D.  PLEADING THE "RELIANCE" ELEMENT

    A securities plaintiff must plead both "transactional" and "loss causation," where the former

is an assertion that the plaintiff relied on defendant's false or misleading statement to purchase the

stock in question.  See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).  The "transactional causation" requirement, also known as the "reliance" element, is a corollary of materiality.  See Semerenko v. Cendant Corp., 233 F.3d 165, 180 (3d Cir. 2000).  As under common law, the reliance requirement applies in securities fraud cases, and reliance is an element of a private claim under Rule 10b-5.  See List v. Fashion Park, Inc., 340 F.2d 457, 452 (2d Cir. 1965), cert. denied, 382 U.S. 811, reh'g denied, 382 U.S. 933 (1965).  Thus, if a duty to disclose is established, and the misrepresentation is deemed material, the plaintiff must still demonstrate reliance by showing a causal link between the misrepresentation and the plaintiff's entry into the transaction which eventually harmed the plaintiff.[11]  See Basic, 485 U.S. at 243.  "There is, however, more than one way to demonstrate the causal connection."  Id.

### 1.    Two Methods to Plead Reliance

"In face-to-face transactions, [an] inquiry into an investor's reliance . . . is [the inquiry] into the subjective pricing . . . by that investor."  Basic, 485 U.S. at 244 (quoting LTV Sec. Litig., 88 F. R. D. 134, 143 (N.D. Tex. 1980)).  In a face-to-face transaction, an investor has no reason to rely on the integrity of an offered price because the price may not reflect available information.  See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 367 (4th Cir. 2004) (citing Basic, 485 U.S. at 243-44).

> For face-to-face transactions, the reliance requirement serves to ensure that the plaintiffs who would not have acted differently if the true information were known cannot recover.  The requirement guarantees, in other words, that information that

---

[11]

Reliance is an element of a private claim under Rule 10b-5 but not in enforcement or criminal actions brought by government.  See United States v. Davis, 226 F.3d 346, 358 (5th Cir. 2000); United States v. Haddy, 134 F.3d 542 (3d Cir. 1998); SEC v. Rana Research, Inc., 8 F.3d 1358 (9th Cir. 1993).

does not affect a buyer's or seller's view of the merits of a transaction cannot form the basis of a cause of action.

Id. (citations omitted). Therefore, a securities plaintiff asserting individualized, that is, direct actual reliance is required to plead that the plaintiff was *actually aware of* and misled by an alleged misrepresentation. See Semerenko, 223 F.3d at 178 (citing Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986), for discussion of various theories of reliance).

Since proving reliance could be hard in view of the nature of modern securities markets, federal courts fashioned a "fraud-on-the-market" presumption for proving reliance based on the Efficient Capital Market Hypothesis, i.e., the premise that, if the market is efficient, the information disclosed by issuers, issuers' agents and analysts is both available to and swiftly absorbed by the market. See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992).

> The fraud on the market theory of reliance is, in essence, a theory of indirect actual reliance under which a plaintiff is entitled to three separate presumptions in attempting to establish the element of direct reliance. See Zlotnick v. Tie Communications, 836 F.2d 818, 822 (3d Cir. 1988). Under the fraud on the market theory of reliance, the court presumes (1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security. See id.

Semerenko, 223 F.3d at 178-79.

In Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), appeal dismissed, 993 F.2d 875 (3d Cir. 1993), the Court set out the following key terms for an efficient market that enables plaintiff's usage of the fraud on the market theory: (1) an open market is one in which anyone, or at least a large number of persons, can buy or sell; (2) a developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available, e.g., a secondary market in outstanding securities which usually has

continuity, liquidity and the ability to absorb a reasonable amount of trading with relatively small price changes; (3) an efficient market is one which rapidly reflects new information in price; and (4) these terms are cumulative in the sense that a developed market will almost always be an open one, and an efficient market will almost invariably be a developed one. Accord Enron Corp. Sec. Derivative & "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146, at *95 (S.D. Tex. June 5, 2006) (relying on Cammer).

## 2.      Pleading Reliance on Inferred Technical Facts

While it is correct that setting forth allegations of fraud-on-the market reliance provides a securities plaintiff with a presumption that there is a causal link between the misrepresentation and plaintiff's entry into the transaction,[12] see Basic, 485 U.S. at 243, the presumption that the market price "incorporated" the misrepresentations does not, by itself, indicate that the transaction was unfavorable to the plaintiff, since the market's "incorporation of the misrepresentation" may have affected the market price of the security either negatively or positively, depending on the content of misrepresentation, thus subjecting the plaintiff to an overcharge or availing him or her to a bargain. The issue of plaintiffs' reliance, therefore, could be relevant only if the plaintiff asserts facts indicating that the alleged misrepresentation affected the market price in a fashion unfavorable to the plaintiff at the time when plaintiffs entered into the transaction: a plaintiff who alleges facts indicating that, through the working of the issuer's alleged misrepresentation, the plaintiff obtained

---

[12]

The presumption that the plaintiff actually relied on the market's assessment of the value of security is rebuttable.  See Basic, 485 U.S. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance").

a favorable bargain has, by definition, no claim based on such misrepresentation.[13]   The issue of how

the market price of securities was affected by the alleged misrepresentation presents, however, a

technical financial question.  See generally, L. Elizabeth Chamblee, Between "Merit Inquiry" and

"Rigorous Analysis": Using *Daubert* to Navigate the Gray Areas of Federal Class Actions, 31 Fl.

St. U. L. Rev. 1041, 1051-54 (Summer 2004).

   Generally, a securities plaintiff cannot plead an element of plaintiff's claim in terms of

plaintiff's hope to prevail in a battle of technical experts, see H.R. Conf. Rep. 104-369, at 37, rather,

the plaintiff must plead actual facts.  Accord Burlington, 114 F.3d at 1429. However, plaintiff's

conclusions distilled from a mosaic of technical data could be transformed into valid factual

allegations, provided that the plaintiff effectuates such transformation by sifting the technical data

---

   [13]
      Plaintiff's pleading of facts indicating that the plaintiff obtained a bargain dissolves plaintiff's
claim of reliance in a way somewhat similar to the operations of the "truth on the market" theory (a
corollary to the "fraud-on-the-market" theory, see Assoc. Randall Bank v. Griffin, Kubik, Stephens,
& Thompson, Inc., 3 F.3d 208, 213-14 (7th Cir. 1993)), which dissolves plaintiff's claim by showing
that corrective information was "transmitted to the public" and "counter-balanced" the allegedly
misleading information by the time the plaintiff executed the challenged transaction. Winer Family
Trust v. Queen, 2004 U.S. Dist. LEXIS 19244, at *12-13 (E.D. Pa. Sept. 27, 2004); see also Wielgos
v. Commonwealth Edison Co., 892 F.2d 509, 516 (7th Cir. 1989) (incorporation of correct news into
stock price creates "truth on the market" defense).   While the truth-on-the-market defense is
"intensely fact-specific [and, thus] rarely an appropriate basis for dismissing a [10b-5] complaint,"
Ganino, 228 F.3d at 167, the issue of plaintiff's failure to properly plead reliance is appropriate for
resolution at the Rule 12(b)(6) stage if the facts alleged in plaintiff's complaint indicate that the
plaintiff executed the challenged transaction at a fair market price or obtained a bargain.  Accord
Worldcom, Inc. Sec. Litig., 308 F. Supp. 2d 214, 232 (S.D.N.Y. 2004) ("A party can 'plead himself
out of court by alleging facts which show that he has no claim'") (quoting Official Comm. of
Unsecured Creditors of Color Tile, Inc. v. Coopers and Lybrand, LLP., 322 F.3d 147, 167 (2d Cir.
2003)); Nathenson v. Zonagen Inc., 267 F.3d 400, 414 (S.D. Tex. 2003) ("It is clear that a
fraud-on-the-market theory may not be the basis for recovery in respect to an alleged
misrepresentation which does not affect the market price of the security in question"); see also Oscar
Private Equity Invs. v. Allegiance Telecom, Inc., 2007 U.S. App. LEXIS 11525, at *10 (5th Cir. May
16, 2007) (same).

through reliable scientific methods. Cf. Fed. R. Evid. 702 (plaintiff's expert may opine on plaintiff's

facts, so long as the expert uses "reliable principles and methods"); Holbrook v. Lykes Bros. S.S.

Co., 80 F.3d 777, 781 (3d Cir. 1996) (scientific, technical, or other specialized knowledge might be

needed to determine a technical fact). Two Supreme Court decisions, Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137

(1999), suggest the foundation for such conclusion. In Daubert, the Court required trial judges to

act as "gatekeepers" by excluding unreliable testimony, see 509 U.S. at 589, while in Kumho Tire,

526 U.S. at 147, the Court expanded the rule holding that judicial gatekeeping obligations apply to

all technical testimony. To aid the courts in their gatekeeping function, the Supreme Court provided

a non-exclusive checklist of five factors to use in assessing reliability of the technical testimony, with

the fifth factor being the inquiry into whether the method has been generally accepted in the

scientific community. See Kumho Tire, 526 U.S. at 149 (quoting Daubert, 509 U.S. at 592). The

Supreme Court's guidance, applied to a securities claim, indicates that plaintiff's conclusions with

respect to operations of financial markets (including the issue of whether or not the market price of

the security constituted an overcharge at the time when the plaintiff executed the challenged

transaction) can be transformed into a valid fact for the purposes of defendant's motion to dismiss

if the plaintiff reaches his or her conclusions by distilling the alleged technical data through a theory

generally accepted in the financial community. Conversely, financial conclusions unprovable under

a generally accepted methodology presents nothing more than bald assertions subject to dismissal

upon Rule 12(b)(6) motion. Cf. Burlington, 114 F.3d at 1429 (for the purposes of Rule 12(b)(6)

motion, courts are not required to credit bald assertions); Nice, 135 F. Supp. 2d at 565 (conclusions

draped in the guise of factual allegations cannot survive motion to dismiss); McNamara v. Bre-X

Minerals, Ltd., 2002 U.S. Dist. LEXIS 27473, at *20-22 (E.D. Tex. Sept. 30, 2002) (dismissing plaintiffs' conclusion that defendants' purportedly misleading statements were incorporated into a company's stock price where the conclusion was based on the "random walk" statistical analysis, that is, a financial model inapplicable to the type of financial inquiry posed by plaintiffs' claim); SEC v. Lipson, 46 F. Supp. 2d 758 (N.D. Ill. 1999) (striking financial testimony which did not use generally accepted financial principles but rather was tailored to support the litigant's position); Buffets Sec. Litig., 906 F. Supp. 1293, 1295-96 (D. Minn. 1995) (discussing the technicalities of pleadings and noting that insufficient early judicial scrutiny of unprovable claims results in "a cost to the system, because parties with fanciful or unprovable claims, if not encouraged, at least are not deterred from commencing litigation in hope of a recovery by way of settlement. If settlement may be compelled in 'strike suits,' it encourages more such suits, and [this cycle] invites disrespect for the judicial process") (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 371 (1966)).

## E.    PLEADING THE "CAUSATION" ELEMENT

The requirement of "loss causation," also known as the "causation" element, refers to plaintiff's burden to plead a "causal link between the disclosure of alleged fraud and the economic harm ultimately suffered by the plaintiff."[14]  Emergent Capital, 343 F.3d at 197.  In other words, the

---

[14]
Judge Posner of the Seventh Circuit noted that "what securities lawyers call 'loss causation' is the standard common law fraud rule . . . merely borrowed for use in federal securities fraud cases." Bastian, 892 F.2d at 683 (citation omitted) (emphasis removed).  The common law rule referred to by Judge Posner was first articulated in Pasley v. Freeman, 100 Eng. Rep. 450, 457 (K.B. 1789), the case stating that an action for "deceit lies when a man does any deceit to the damage of another." Thus, in cases of fraud, if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action." Id.  The holding of Pasley was expressly cited by the Supreme Court as the origin of the modern private securities fraud action.  See Dura, 544

plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud.[15]  See id. at 189; Bastian v. Petren Res. Corp., 892 F.2d 680 (7th Cir. 1990); Robbins v. Kroger Properties, Inc., 116 F.3d 1441 (11th Cir. 1997).

This proposition was expressly upheld by the Supreme Court in Dura.  See Dura, 544 U.S. 336.  Reversing the Ninth Circuit's holding that an inflated purchase price by itself sufficiently establishes loss causation, see Broudo v. Dura Pharm., Inc., 339 F.3d 933, 937 (9th Cir. 2003), the Supreme Court ruled that defrauded investors must plead that the *very misrepresentation at issue* proximately caused them an economic loss.  See Dura, 544 U.S. at 345.

In Dura, investors that purchased Dura Pharmaceuticals ("Dura") securities during the ten months of class period ("Dura Period") filed a suit alleging that Dura made misleading statements that fraudulently inflated the market value of Dura securities purchased by plaintiffs during the Dura Period.  See Dura, 544 U.S. at 339. According to the Dura plaintiffs, the statements were to the effect that Dura was developing a new key product which was highly likely to be approved for sale by the relevant government agency, and expected sales of this key product would yield enormous earnings. See id.  The Dura plaintiffs further alleged that, when Dura finally announced that a government

---

U.S. at 343-44 (citing, inter alia, L. Loss & J. Seligman, Fundamentals of Securities Regulation, 910-918 (5th ed. 2004), W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts ("Prosser and Keeton on Torts") ¶ 110 (5th ed. 1984)  (stating that plaintiff "must have suffered *substantial* damage," not simply *nominal* damages, before "the cause of action can arise") and Restatement (Second) of Torts ¶ 525 (1977)).

[15]

A "purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement," because such an allegation "amounts to nothing more than a paraphrased allegation of transaction causation," which may explain why the plaintiff bought (or bought at a particular price), "but not why [the plaintiff] lost money on the purchase, the very question that the loss causation allegation must answer."   Emergent Capital, 343 F.3d at 198.

agency refused approval of Dura's new key product, Dura's share price suffered a sharp decline (but almost fully recovered within one week). See id.  Since the pleadings of the Dura plaintiffs were void of any factual allegations that they suffered any economic loss as a result of Dura's misrepresentations, the presiding district court dismissed plaintiffs' complaint holding that plaintiffs had not sufficiently pled loss causation and economic loss despite plaintiff's pleading of decline in Dura's stock price.[16]  See Dura Pharms., Inc. Secs. Litig., 2000 U.S. Dist. LEXIS 15258 (S.D. Cal. July 11, 2000).  After plaintiffs appealed, the Court of Appeal for the Ninth Circuit reversed by finding that loss causation should have been deemed established "at the time of the transaction [since it] is at this time that damages are to be measured" by comparing the market price the investor paid in actuality to the hypothetical market price that would have existed had the truth been known at the time of the purchase.  Broudo, 339 F.3d at 938.  The Supreme Court granted certiorari and reversed the appellate decision explaining as follows:

> [A]n inflated purchase price [does] not . . . constitute or proximately cause the relevant economic loss.
>
> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale. [So,] if . . . the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. [Moreover, if] the purchaser sells . . . after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so [since] that lower price [at the time of sale] may reflect not [the result of truth leaking out about] the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.  . . . *Other things being equal, the longer the time*

---

[16]   "[I]mportantly, the complaint sa[id] the following (and nothing significantly more than the following) about economic losses attributable to the . . . misstatement[s]: 'In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby."  Dura, 544 U.S. at 339-40 (emphasis removed).

*between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.*

Given the tangle of factors affecting price, . . . the higher purchase price . . . may prove to be a necessary condition of [an economic] loss, . . . but, even if . . . so, it is [not sufficient in and by itself since it is] not [the] cause [of the economic] loss. [T]he Ninth Circuit's approach overlooks an important securities law objective. The securities statute[] . . . make[s private] actions available not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually* cause. . . . The statute . . . permit[s] . . . recovery where, but only where, plaintiffs *adequately allege and prove the traditional elements of causation and loss.* [Where] plaintiffs' lengthy complaint contains only one statement that . . . can [be] fairly read as describing the loss [and that] statement says that the plaintiffs "paid artificially inflated prices for [the issuer's] securities" and suffered "damages," [the] complaint contains nothing that suggests [either a loss causation or an actual economic loss].

Dura, 544 U.S. at 343-48 (emphasis supplied, citations omitted, original brackets removed).[17]

Hence, the holding of Dura makes it clear that, in order "[t]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission *concealed something from the market that, when disclosed, negatively affected the value of the security*."[18] Winstar Communs., 2006 U.S.

_____

[17]

The Third Circuit has always followed an approach largely similar to that spelled out by the Supreme Court in Dura.  See Dura, 544 U.S. at 340 (citing Semerenko, 223 F.3d 165). According to the Court of Appeals, a necessary corollary of the fraud-on-the-market theory is that the inflation associated with an alleged misrepresentation will be incorporated into the value of a security, not only at the time of purchase, but until the actual truth is disclosed.  See Semerenko, 223 F.3d at 185.

[18]

The truth may be revealed to the investing public through means other than defendant's corrective disclosure.  See Dura, 544 U.S. at 343 (speaking in terms of "truth leaking out").  For instance, in addition to formal disclosure by a defendant, "the market may learn of possible fraud [from] a number of sources: e.g., from whisteblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." Enron Corp. Sec. Derivative & "ERISA" Litig., 2005 U.S. Dist. LEXIS 41240, at *16 (S.D. Tex. Dec. 22, 2005) (citation omitted); Electronic Data Sys. Corp. Sec. & "ERISA" Litig., 298 F. Supp. 2d 544, 560-61 (E.D. Tx. 2004) (noting that defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion, since "defendants cannot escape liability for

Dist. LEXIS 7618, at *42 (S.D.N.Y. Feb. 24, 2006) (discussing Dura and quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (quoting, in turn, Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis supplied).

If the price of a security declines after the purchase for reasons unrelated to the fraud, or if the circumstances of the decline are such that the investor's economic loss is bound to be speculative, the investor has no right to recovery.  See H.R. Conf. Rep. No. 104-369, at 31 (1995) (noting that plaintiff's failure to trace a measurable loss to defendant's wrongful conduct should allow the defendant to obtain dismissal of claims that rest on speculative theories); Dura, 544 U.S. at 346; see also Huddleston v. Herman & MacLean, 640 F.2d 534, 549 n.25 (5th Cir. 1981).  Moreover, while a securities plaintiff need not plead facts indicating that disclosure of the alleged fraud "was the sole reason for the investment's decline in value," see, e.g., Daou Sys., 411 F.3d 1006, 1025 (9th Cir. Cal. 2005) (quoting Robbins, 116 F.3d at 1447 n. 5 (original lack of emphasis restored)), in order to survive defendants' motion to dismiss, the complaint must contain facts sufficient to indicate that disclosure of the alleged fraud "directly and proximately caused" the investment's decline in value or, at the very least, "substantially contribut[ed to] the damages sustained" by the plaintiff.  See McCabe v. Ernst & Young, LLP, 2006 U.S. Dist. LEXIS 524, at *25 (D.N.J. Jan. 6, 2006) (citing EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 871 (3d Cir. 2000) (citing, in turn, Semerenko, 223 F.3d at 186)).

---

fraud simply by not admitting the fraud").

## VI.    DISCUSSION

Although Plaintiffs re-shuffled some of their previous statements, the instant Complaint differs from its predecessors in form but not in substance, since it effectively recites the very same *facts* that had been set forth in Plaintiffs' Second Complaint; the difference between these two pleadings is limited to Plaintiffs' legal or financial *conclusions*.[19]  See Docket Entry No. 65-12 to 65-15 (Brief, Ex. A, redlining the language of Plaintiffs' instant Complaint against that of the Second Complaint).  However, in view of the consequences to Plaintiffs ensuing from the granting of the Motions, this Court will: (1) re-examine each of Plaintiffs' factual allegations; and (2) consider all Plaintiffs' legal conclusions de novo.  See Young, 2000 U.S. App. LEXIS 21704, at *2.


### A.    TRANSACTIONAL CAUSATION

### 1.    Deficiencies Contained in Plaintiffs' Second Complaint

In order to plead transactional causation, Plaintiffs have to assert facts indicating that they purchased Intelligroup securities at inflated prices.  See Dura, 544 U.S. at 343 ("the higher purchase price [is] a necessary condition of [establishing an economic] loss"); see also Basic, 485 U.S. at 243.  Invoking the fraud-on-the-market presumption, see Second Complaint (Docket Entry No. 39), ¶¶

---

[19]

In that respect, Plaintiffs' Complaint, read in the context of the Opposition, resembles more a motion for reconsideration rather than an amended pleading.  Cf. WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *5 n.1 ("Plaintiffs improperly use their opposition to [defendants'] motion [to dismiss plaintiffs' amended complaint] to move, sub silentio, for reconsideration of the court's prior order.  In that order, the court set forth the applicable pleading standards.  Plaintiffs' counsel ignores the order, providing a textbook example of what not to do when attempting to salvage a deficient complaint" since the amended complaint and plaintiffs' opposition concentrates on re-argument of applicable pleading standards and debates as to which substantive legal precedents should apply to the matter).

105-07, Plaintiffs alleged that Intelligroup's Statements filed with the SEC contained materially false and misleading information, which caused the stock market to overprice Intelligroup common stock. See id. ¶¶ 14; 107; 119.  Identifying such false information, Plaintiffs comprised technical data they deemed pertinent into a table consisting of twelve blocks, where each block: (a) represented a fiscal reporting period, either a quarterly or a yearly one, and (b) was subdivided into four columns that compared the figures originally reported by Intelligroup to those reported in the Restatement and six rows titled "Total Assets," "Total Liabilities" "Accumulated Deficit," "Shareholder Equity," "Revenues" and "Net Income (loss)."  See id. at 8.  While the Class Period spanned forty months, the data included into the table provided information covering only twenty seven months, see id., and the remainder of the Second Complaint did not fill this void.  See generally, Second Complaint.

The table indicated that, in seven out of the twelve Statements reflected in the table, Intelligroup *understated* its net income, that is, depicted the profitability of its business operation less favorably than it actually was, sometimes painting the picture more than sixty five times worse than the reality.  See id. at 8; see also December Opinion at 21-22 (Intelligroup, 468 F. Supp. 2d at 686-87).  In addition, the table indicated that, in these twelve Statements: (a) the assets reported by Intelligroup were invariably slightly overstated, (b) the liabilities reported were invariably slightly understated; (c) the revenues reported were either slightly overstated or understated; (d) the shareholders' equity was invariably overstated, usually about by one-third but sometimes even more than twice; and (e) the accumulated deficit was either overstated, sometimes by almost one third, or understated, sometimes twice, and contained transformations of figures inexplicable by any accounting practice.  See id.; see also December Opinion at 22 n.16 and at 25 n. 19 (Intelligroup, 468 F. Supp. 2d at 687-88).

Page 53 of  195

Evaluating Plaintiffs' factual allegations in the Second Complaint, this Court concluded in its December Opinion that the facts set forth by Plaintiffs did not lend support to Plaintiffs' claim that Intelligroup stock kept invariably trading at inflated prices, that is, throughout the Class Period.  See id. at 29-30 (Intelligroup, 468 F. Supp. 2d at 690-91).  The Court concluded that financial data provided in the table: (a) sufficiently indicated that Intelligroup stock was overpriced only with respect to five quarters out of the thirteen comprising the Class Period, and (b) either suggested that Intelligroup stock was underpriced, hence availing Plaintiffs to a bargain and suggesting that Plaintiffs had no factual grounds to claim transactional causation, or did not provide this Court with any facts, hence preventing this Court from intelligibly assessing whether the stock price was inflated.  See id. and n. 20 (Intelligroup, 468 F. Supp. 2d at 689-91).  Sifting out the dense strings of financial figures contained in the Second Complaint, the Court pointed out to Plaintiffs the following seven key shortcomings:

(1)     Plaintiffs' claims with respect to overstatements or understatements of Intelligroup's revenues were not useful in assessing Intelligroup's business success without Plaintiffs setting forth detailed allegations about Intelligroup's costs, since profitability of a business operation is defined as the difference between the revenues and the costs involved in the evaluated operation, and such difference cannot be determined if the list of variables included only the minuend, that is, the revenue, but omitted the subtrahend, i.e., the costs, because lower revenues could, nonetheless, indicate higher profitability, if such lower revenues are accompanied by even lower costs.  That is why the net income is the best indicator of business profitability.   See id. at 21 n. 15 (Intelligroup, 468 F. Supp. 2d at 686).

(2)    Plaintiffs' claims with respect to Intelligroup's misstatements of accumulated deficit could not lend support to Plaintiffs' claim that Intelligroup's securities were invariably overpriced since the facts alleged by Plaintiffs in support of such claim: (a) revealed that eight of Intelligroup's Statements were erroneously indicating an accumulated deficit while, in reality, Intelligroup was either enjoying budget surplus or experiencing a notably less burdensome deficit, i.e., actually had business prospects better than those depicted to the stock market by these eight Statements; and (b) contained errors apparent from the face of the Complaint and rendering Plaintiffs' allegations unreliable.  See id. at 22 n. 16 (Intelligroup, 468 F. Supp. 2d at 687).

(3)    There are two key models employed by the financial community for assessing the value of a stock.  See id. at 23 (Intelligroup, 468 F. Supp. 2d at 687).  One model ("Terminal Value Model") is pertinent during the very earliest or very latest stages of a public corporation's life; it basically determines the price of a stock by dividing the shareholders' equity (which is the difference in value between total corporate assets and total corporate liabilities) by the number of outstanding shares.  See id. at 23 and n. 17; see also id. at 29, n. 19 (Intelligroup, 468 F. Supp. 2d at 687-88).  The other model ("Dividend Model") is pertinent to securities traded on secondary markets; it (a) correlates, through a mathematical formula, corporate business profitability, as reflected in the corporation's reported earnings, to projected stream of dividends the company is likely to declare, and the projected stream of dividends to the price of the corporation's stock, see id. at 23-25 and n. 18 (Intelligroup, 468 F. Supp. 2d at 687-88), while (b) taking into consideration other assessments of profitability of the corporation's business, e.g., rate of return on common equity ("ROE").  See id. at 25, n. 18

(Intelligroup, 468 F. Supp. 2d at 688) (providing the formula for ROE).  In view of these financial models:

a. Plaintiffs' claims with respect to Intelligroup's overstatements of assets and understatements of liabilities could not lend support to Plaintiffs' claim that Intelligroup's securities were invariably overpriced by the stock market since the deviations in assets and liabilities were: (i) too slight to be material; and (ii) either had no bearing on assessment of Intelligroup's profitability under the Dividend Model or presented Intelligroup's ability to generate net profit per each dollar of actual assets less favorably than Intelligroup's actual ability, potentially giving the market a reason to underprice, rather than overprice, Intelligroup's stock.  See id. at 25, n. 19 (Intelligroup, 468 F. Supp. 2d at 688).

b. Under the Dividend Model, Plaintiffs' claims with respect to Intelligroup's misstated net income could lend support to Plaintiffs' claim that Intelligroup's securities were overpriced only if the Statements presented Intelligroup's earnings more favorably than the reality warranted.  Since Intelligroup's net income was understated, rather than overstated, in seven Statements, the market was likely to underprice Intelligroup's securities during the periods affected by these seven Statements, hence availing Plaintiffs of a bargain during substantial parts of the Class Period.  See id. at 26-29 (Intelligroup, 468 F. Supp. 2d at 689-90).

c. Intelligroup's understatements of net income during the periods other than those affected by these seven Statements could not be used to lend support to Plaintiffs' claim that Intelligroup's securities were invariably overpriced, since: (i) the working

of the Efficient Market Hypothesis precludes factoring any "residual effect" into stock pricing, and (ii) even if the Efficient Market Hypothesis did not so preclude, the cumulative residual effect of all Intelligroup's net income misstatements (be it calculated directly or through a regressive analysis) indicated that Plaintiffs kept purchasing Intelligroup stock at a bargain at least throughout two-thirds of the Class Period.  See id. at 22, n. 23 (Intelligroup, 468 F. Supp. 2d at 691).

d.      Under the Dividend Model, Plaintiffs' claims with respect to Intelligroup's misstatements of shareholders' equity could be related to profitability of Intelligroup's business and, thus, lend support to Plaintiffs' claim that Intelligroup's securities were overpriced, only if the analysis reflects on the future profitability of the business, e.g., if ROE analysis factoring in the actual shareholders' equity indicates that Intelligroup's business operations were less profitable than what was reported in the Statements.  See id. at 27-28, nn. 21 and 22 (Intelligroup, 468 F. Supp. 2d at 690).

e.      Under the Dividend Model, Plaintiffs' claims with respect to Intelligroup's misstatements that are not directly related to profitability of Intelligroup's business could not lend support to Plaintiffs' claim that Intelligroup's securities were invariably overpriced.  See id. at 29, n. 23 (Intelligroup, 468 F. Supp. 2d at 691).

In view of these shortcomings, the Court dismissed Plaintiffs' Second Complaint for failure to plead transactional causation.   See id. at 29-30 (Intelligroup, 468 F. Supp. 2d at 690-91).  The Court's discussion unambiguously indicated to Plaintiffs that, in the event Plaintiffs were to file an amended complaint, such amended pleading had to include: (a) facts enabling the Court to assess Plaintiffs' transactional causation claim with respect to the entire Class Period, rather than certain

phases of the Class Period, see id. at 19-30; and (b) if Plaintiffs' facts were to be distilled from Intelligroup's misstatements of financial data, Plaintiffs would have to accompany their financial conclusions with explanations enlightening this Court as to how Intelligroup's misstatements could have caused overpricing--rather than underpricing or fair pricing--of Intelligroup's securities by the stock market.  See id. at 20; at 22, n. 16; at 25, n. 19; at 26, n.20; at 29, n. 23, and at 29-30 (Intelligroup, 468 F. Supp. 2d at 684-91).

### 2.    "Fraud-on-the-market" Allegations Based on Intelligroup's Financials

The factual assertions in Plaintiffs' instant Complaint are reduced to a table ("Table") similar to that presented by Plaintiffs in their Second Complaint. Compare Compl. at 11 to Second Compl. at 8.  The Table differs from its predecessor in three respects: (a) it is executed in not-exactly-reader-friendly "Point-5" font; (b) it has twenty six financial figures previously designated as negatives transformed into positives, equal to the original ones in their absolute value;[20] and (c) it substitutes a few previously stated calculative figures with "n/a" entries.[21]  See id.  Just as its predecessor, the Table: (a) is silent as to what errors were contained in Intelligroup's Statements during each fiscal

---

[20]

Twenty-four of these "negative-switched-to-positive" figures reflect Intelligroup's accumulated deficit during various periods, with the other two being corrections of arithmetic errors with respect to percentile difference.  Compare Compl. at 11 to Second Compl. at 8.  The Court, however, finds it improper to consider Plaintiffs previous misstatements as binding admissions of facts disadvantaging Plaintiffs' current claims.  Cf. Ptasinski, 290 B.R. 16, 23 (W.D.N.Y. 2003) (examining honest or inadvertent mistakes).

[21]

It appears that Plaintiffs were uncertain about percentile calculations of the items originally reported by Intelligroup as positive figures but set, upon revisions, as negatives.  See Compl. at 11. (Plaintiffs' percentile calculations of these items provided in the Second Complaint appear correct).

quarter of 2001; and (b) verifies that Intelligroup did not file any financial statements after its first quarterly Statement in 2004 ("1Q04"), hence providing no information for two spans of time included in the Class Period, with one span running from May 1, 2001, to March 29, 2002, that is, the date of first filing reflected in the Table ("2001 Period"), and another span running from May 17, 2004, that is, the date of filing of 1Q04 ("2004 Period"), to September 24, 2004.  See Compl. at 11 and ¶ 70 (providing the dates of Intelligroup's filings).  The sum of these two spans of time totals a bit over fifteen months (out of the forty months comprising the entire Class Period) hence, leaving this Court without any financial data with respect to almost a third of Plaintiffs' transactional causation claim.

### 3.    2001 Period

Lack of financial data notwithstanding, Plaintiffs suggest that the Complaint adequately alleges Plaintiffs' transactional causation with respect to the Unaccounted Periods.  With respect to the 2001 Period, Plaintiffs prompt this Court to presume that Intelligroup's stock was invariably traded at inflated prices because (a) the Press Release issued in 2004--as well as Intelligroup's Restatement filed in 2005--included the phrase that Intelligroup's financial Statements "for the quarterly periods beginning January 1, 2001, . . . should no longer be relied upon," Compl. ¶¶ 7, 13; Opposition at 25, Press Release at 1; and (b) the Restatement of Intelligroup's financials reflecting the company's position at the end of the year 2001 indicates overstatement of assets, shareholders' equity and net income.  See Compl. ¶ 15; Opposition at 25.  Plaintiffs assert that lack of actual information about Intelligroup's financial position is irrelevant to the Court's inquiry about Plaintiffs' reliance so long as Intelligroup "conceded the falsity of prior financials."  See Opposition at 25-27

Page 59 of  195

(citing Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002); Sipex Corp. Sec. Litig., 2005 U.S.

Dist. LEXIS 30854 (N.D. Cal. Nov. 17, 2005); Fleming Cos. Secs. & Derivative Litig., 2004 U.S.

Dist. LEXIS 26488 (E.D. Tex. June 10, 2004); Tut Sys. Sec. Litig., 2002 U.S. Dist. LEXIS 27092

(N.D. Cal. Aug. 15, 2002)).  The Court disagrees.

　　　　While recognizing the general rule that an issuer's statement to the effect that the issuer's

previous financials should not be relied upon should not be treated lightly, the Court cannot ignore

the unique peculiarity of the facts presented by the instant case, namely, the fact that Intelligroup's

financials were habitually misstated in a way that likely caused *underpricing* of Intelligroup's

securities more often than overpricing.   Indeed, as the Restatement revealed, Intelligroup's notice

that Intelligroup's financial Statements "should no longer be relied upon" did not necessarily mean

bad news for all investors who purchased Intelligroup's stock relying on the "unreliable" Statements,

since Intelligroup's actual financial position was frequently better, in some key respects, than that

actually reported, and the investors probably obtained a bargain.  Granted Intelligroup's sporadic

"good-news-bad-news" record, this Court has no reason to believe that the phrase "financial

Statements 'should no longer be relied upon'" necessarily indicates that Intelligroup's actual financial

position during each quarter of 2001 was worse than that reported: it could have been better during

some quarters and worse during the others, thus supplying transactional causation to some investors

but not to others.

　　　　For this very reason, Plaintiffs' argument based on Intelligroup's restated filing for the year

2001 fares no better.  For instance, Intelligroup's restated net income for the year 2001 was 28.4%

less than originally reported.  See Compl. at 11, Opposition at 25.  However, the Restatement of

Intelligroup's financial for the four periods of 2002 indicates that the actual net income was

understated first by 3,390.9%, then understated by $9,473,000 (or by 1,106.5% in comparative difference), and then overstated by $1,779,000 (or by 13,685%), and finally overstated by $970,000 (or 1,796%). See Compl. at 11. Being presented with Plaintiffs' pleadings unambiguously indicating that Intelligroup managed to twice understate and twice overstate its key financial figure by thousands of times while filing merely four reports, and did it within the fiscal year that immediately followed Intelligroup's 2001 yearly filing, this Court has no reason to conclude that Intelligroup did not make a single understatement of its income--or another misrepresentation painting a financial picture more favorable than the reality--during the year 2001. Indeed, read in light of Plaintiffs' entire Table, the fact that Intelligroup's yearly net income for the year 2001 was overstated by 28.4% does not preclude this Court from hypothesizing that Intelligroup's net income was overstated during the first quarter of 2001 by 50% (imposing an overcharge on the investors), then understated during the second quarter by 21.6% (providing the investors with a bargain), and even that Intelligroup, accidently, got the correct figures during the third and forth quarters (not affecting investors either positively or negatively).[22]

---

[22]

The cases relied upon by Plaintiffs do not lend support to Plaintiffs' position. The quotation picked by Plaintiffs from the language of Sipex, 2005 U.S. Dist. LEXIS 30854, at *2, see Opposition at 26, "[Company's] public admission that its financial reports for the period in question should not be relied upon and would be 'restated' meant that the as-issued reports were materially inaccurate under [the standards set forth by] GAAP," goes to the issue of materiality rather than reliance, examines the question under the standards set forth by GAAP rather than law, and is accompanied by the Sipex court's caution that "[f]inancial reporting errors, even material ones, can result from innocent mistakes or mere negligence" thus preventing defendant's liability in view of the scienter requirement. Indeed, a careful reading of Sipex reveals that the Sipex court did not address the issue of transactional causation in one way or another. See generally, Sipex, 2005 U.S. Dist. LEXIS 30854.
    The same applies to the quotation from Fleming, 2004 U.S. Dist. LEXIS 26488, upon which Plaintiffs rely: the element of 10b-5 discussed by the Fleming court is not reliance but materiality. See Opposition at 26-27 ("the proposed restatement [is] a material one"). Moreover, the plaintiffs

In sum, Plaintiffs' pleadings based on the overstatements contained in Intelligroup's 2001 end-of-year report and the phrase "financial Statements 'should no longer be relied upon'" cannot suffice as factual allegations supporting Plaintiffs' claim that Intelligroup's stock was invariably overpriced during each quarter of 2001. See Bell Atlantic, 127 S. Ct. at 1965 (Rule 8 pleadings must provide "enough factual matter" to suggest that the alleged event took place). While Plaintiffs' theory is not inconsistent with the existing facts, it provides this Court with no facts "suggesting

---

in Fleming based their challenge on the fact that the corporate net income was overstated, not understated. See Fleming, 2004 U.S. Dist. LEXIS 26488, at *7.

Plaintiffs' reliance on Tut Sys., 2002 U.S. Dist. LEXIS 27092, is even more misplaced. In Tut, plaintiffs alleged that defendants failed to disclose recalls of defective products and executed revenue recognition not in accordance with GAAP. The Tut court examined plaintiffs' pleadings of only two elements, namely, false statement and scienter and, while sustaining some Rule 9(b) allegations, determined that the remaining allegations, including that based on GAAP violation, were inadequately pled. The sentence selected by Plaintiffs from the Tut decision, "[t]he fact that [the company] has never restated its financial results does not . . . weaken the inferences that may be drawn from the facts alleged," is expressly discussed for the purposes of establishing scienter, i.e., for the purpose of determining whether defendants acted with knowledge of the wrong. See id. at *43-44 and n. 10.

Plaintiffs' reference to Aldridge, 284 F.3d 72, suffers from the same error, since the case is dedicated to discussion of scienter, not reliance. The quotation from Aldridge upon which Plaintiffs rely makes this fact particularly clear. See id. at 83 ("[although t]he company argues that, because it has never restated any of its financials or otherwise indicated any error in the . . . financial statements, . . . no inference of accounting error, and . . . no inference of scienter can be drawn [but the court] disagree[s]"); compare Opposition at 26 (employing this quotation for the purposes of transactional causation argument). Moreover, for the purposes of Plaintiffs' allegations with respect to the reliance element, Plaintiffs' reliance on Aldridge is particularly surprising, since the only passing reference that the Aldridge court made to transactional causation aspect involved in that case was an acknowledgment that plaintiffs based their claim on the corporation's invariable overstatement of net income. See Aldridge, 284 F.3d at 78 ("[Plaintiffs'] core claim is that the reported revenues and earnings . . . were artificially inflated").

In view of the foregoing, it appears that Plaintiffs' argument tends to conflate elements of a 10b-5 claim and fails to appreciate the distinction between transactional causation, materiality, scienter and loss causation. See Opposition at 27, n. 12 (citing, for the purpose of alleging the element of transactional causation, the part of this Court's December Opinion that discussed the element of loss causation, and supporting their argument with a string of cases addressing the element of materiality).

([rather than] merely consistent with)" Plaintiff's allegations. Id. at 1969-74. The Court concludes that Plaintiffs' allegations failed to cross the necessary line "between the factually neutral and the factually suggestive," id. at 1966 n.5, and, instead of including in the Complaint "enough [factual] heft," offered this Court Plaintiff's conjecture and self-serving interpretations of actual events. See Bell Atlantic, 127 S. Ct. at 1965-69; Dura, 544 U.S. at 588-89.

### 4.    2004 Period

It appears that both Plaintiffs and Defendants misread the observation the Court made in its December Opinion with respect to insufficiency of Plaintiffs' pleadings made in the Second Complaint for the purpose of establishing market reliance of those investors who purchased Intelligroup's stock during the end of the Class Period, namely, the second and third quarter of 2004. See Docket Entry No. 65 (Intelligroup's Brief) (referring to this observation); accord Opposition at 28 (an "assertion that there can be no artificial inflation in the second and third quarters of 2004 because Intelligroup did not report its financials for those quarters . . . ignores Plaintiffs' core claim . . . that it was Intelligroup's false and misleading statement [released to the market] that . . . inflated the price of Intelligroup's stock"). However, this observation as to what Plaintiffs *did not* plead, i.e., that "Plaintiffs expressly acknowledge that Intelligroup's financial statements for the second and third quarter of 2004 (the last two quarters of the Class Period) were not filed--or otherwise disseminated into the market--during the Class Period,"December Opinion at 20 (Intelligroup, 468 F. Supp.2d at 685), should be considered in conjunction with this Court's evaluation of what Plaintiffs *did* plead. The latter read as follows:

> The last Statement filed by Defendants during the Class Period was [first quarterly report of 2004. That Statement] provided grounds for underpricing [of Intelligroup's

>securities, since that Statement understated Intelligroup's earnings by 35.5%, and these underpricing] tendencies lasted from the date of [the] filing [of that Statement] and throughout the remainder of the Class Period.

December Opinion at 29 (Intelligroup, 468 F. Supp. 2d at 690).

Indeed, the sole reason why Intelligroup's failure to file financial statements during the second and third quarter of 2004 is pertinent is because Intelligroup's *non*-dissemination of any financial information into the market could not serve as an intervening event capable of altering the market's pricing tendencies. See id. The Court agrees with Plaintiffs that, in all other respects, the fact of Intelligroup's lack of filings during the last two quarters of the Class Period is largely irrelevant. Accord Opposition at 28. Consequently, if the last Statement that Intelligroup publicized during the Class Period provided the market with grounds to underprice Intelligroup's securities, and Intelligroup did not later disseminate any intervening information that could alter the market tendency to underprice Intelligroup's securities, the underpricing would continue throughout the remainder of the Class Period. See December Opinion at 29 (Intelligroup, 468 F. Supp. 2d at 690). Therefore, the sufficiency of Plaintiffs' factual allegations with respect to Plaintiffs' disadvantageous reliance on the market's pricing of Intelligroup stock during the 2004 Period could be assessed only on the basis of the facts alleged by Plaintiffs with respect to Intelligroup's last Statement filed at the end of the first fiscal quarter of 2004.[23] See Compl. at 11.

---

[23]

Since the cases cited by Plaintiffs, i.e., Veeco Instrs., Inc., Sec. Litig., 235 F.R.D. 220, 234 (S.D.N.Y. 2006), and Iyer v. NTN Communs., Inc., 1999 U.S. Dist. LEXIS 8968 (S.D. Cal. May 21, 1999), hold that the market's pricing tendencies of a security continue until the market obtains new information capable of affecting such pricing tendencies, the Court sees little reason for a detailed discussion of case law supporting the Court's--as well as Plaintiffs'--point of view.

5.     **Periods Reflected in the Table**

a.     ***Plaintiffs' Allegations***

Intelligroup's financial position during the parts of the Class Period other than the 2001 and 2004 Periods discussed supra are reflected in Plaintiffs' Table.  See Compl. at 11.  Relying on the information in the Table, Plaintiffs--in a fashion similar to that they employed in their Second Complaint--allege that they purchased Intelligroup stock at inflated prices throughout the Table period because Intelligroup's (a) "accumulated deficit [was] materially overstated in all [fiscal] quarters," (b) "assets [were] materially overstated in all [fiscal] quarters," (c) "liabilities [were] materially overstated in all [fiscal] quarters," (d) "shareholder[s'] equity [was] materially overstated in all [fiscal] quarters," and (e) "net income [was] materially misstated in all [fiscal] quarters." Opposition at 20.  Apparently taking issue with this Court's finding that Intelligroup's stock could have been overpriced by the market only during the periods that followed Intelligroup's filing of financial Statements overstating Intelligroup's net income, see Opposition at 21 (referring to December Opinion at 21 (Intelligroup, 468 F. Supp. 2d at 687)), Plaintiffs allege that the finding is "simply . . . contrary to the law."  See Opposition at 21.   Plaintiffs discuss Cent. Laborers' Pension Fund v. Sirva, Inc., 2006 U.S. Dist. LEXIS 73375 (N.D. Ill. Sept. 22, 2006), and cite Basic, 485 U.S. 224, Kaltman v. Key Energy Servs., 447 F. Supp. 2d 648 (W.D. Tex. 2006), Parmalat Sec. Litig., 375 F. Supp. 2d 278 (S.D.N.Y. 2005), Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353 (S.D. Fla. 2001), Craftmatic Sec. Litig. v. Crafts, 890 F.2d 628 (3d Cir. 1989), and Ala Capital Assocs. v. Wagner, 532 F. Supp. 591 (S.D. Fla. 1982), aff'd in part, rev'd in part, 758 F.2d 562 (11th Cir. 1985). These legal citations and discussion appear to be provided in support of Plaintiffs' conclusion that Intelligroup's securities were priced by the market above their actual value even during the periods

when the market believed that the profitability of Intelligroup's business operations was much lower than what it was in reality because the market relied on overstatements of Intelligroup's assets and shareholders' equity and understatements of Intelligroup's liabilities and accumulated deficit.   See Opposition at 21 (citing Benjamin Graham, David L.  Dodd, Sidney Cottle, Security Analysis - Principles and Techniques 42-43 (1962)).   In addition, Plaintiffs seem to suggest that the issue of how the stock market prices a traded security is a question assessable not through the prism of established financial formulas but rather through that of Plaintiffs' opinion.  See  id. at 24 ("A jury could most certainly find that these misstatements [of assets, liabilities, shareholders' equity and accumulated deficit] are among the most important facts that investors rely upon when purchasing a stock").   Finally, Plaintiffs appear to rely on the above-listed case law in order to allege that Plaintiffs themselves overvalued Intelligroup's securities at the time when Plaintiffs executed the purchases.  See Compl. ¶ 113 ( "Defendants' materially false and misleading statements regarding such financial information as, inter alia, assets, liabilities and accumulated deficit . . . caused  . . . Plaintiffs . . . to purchase Intelligroup . . . stock . . . at artificially inflated prices").   The Court addresses each of these issues seriatum.

### b.    *Legal Precedents Examining Financial Matters*

The nature of Plaintiffs' claim that the Court's focus on understatements of Intelligroup's net income (for the purpose of determining whether Plaintiffs disadvantageously relied on the market's price of Intelligroup's securities) was "simply . . . contrary to the law" resembles a motion for

reconsideration.[24]  The law, however, has never devised any formulas to assess the market's pricing of a security, leaving this issue to the area of finance.  The legal decisions relied upon by Plaintiffs do not contain any statements altering this conclusion.

### i.    IPO Cases

The sole case extensively discussed by Plaintiffs is Sirva, 2006 U.S. Dist. LEXIS 73375.  See Opposition at 21-22.  From the language of Sirva, Plaintiffs select part of a sentence and quote it in support of their proposition that the issue of "whether 'cumulative net income is the only figure an investor would find important in making the decision to invest . . . is a factual question that cannot be resolved on a motion to dismiss.'"  See id. (quoting Sirva, 2006 U.S. Dist. LEXIS 73375, at *26).  Plaintiffs explain their conclusion that the holding of Sirva is relevant to the inquiry at bar by pointing out that the court in Sirva denied defendants' motion to dismiss, although net income of the Sirva defendants was overstated during 2001  but understated during 2002.  See id. (quoting Sirva, 2006 U.S. Dist. LEXIS 73375, at *26).   It appears that Plaintiffs misunderstand both the facts of Sirva and the reasoning of the Sirva court.

----

[24]

Reconsideration is limited to situations where "dispositive factual matters or controlling decisions of law" were presented to the court but were overlooked.  See Khair v. Campbell Soup Co., 893 F. Supp. 316, 337 (D.N.J. 1995); Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992).  Thus, a motion under Rule 7.1(i) may be granted if: (a) "an intervening change in the controlling law has occurred; (b) evidence not previously available has become available; or (c) it is necessary to correct a clear error of law or prevent manifest injustice."  Database Am., Inc. v. Bellsouth Advert. & Publ'g Corp., 825 F. Supp. 1216, 1220 (D.N.J. 1993); see also North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir 1995).  Because reconsideration is "an extraordinary remedy," it is "to be granted very sparingly."  See NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996); Maldonado v. Lucca, 636 F. Supp. 621, 630 (D.N.J. 1986).

In Sirva, Plaintiffs were a class of investors who purchased SIRVA stock between November 25, 2003, and January 31, 2005.  See Sirva, 04-7644, Docket Entry No. 39 ("Sirva Compl.") ¶ 1. The Sirva Defendants consisted of SIRVA (an issuer), the issuer's underwriters and the issuer's executives.  See id. ¶¶ 13–14, 18-19, 30, 91-92.  SIRVA, organized by its eventual underwriter in 1998, see id. at 31, sold its common shares to investors in an initial public offering ("IPO") on November 25, 2003, and in a second public offering ("SPO") on June 10, 2004.[25]  See id. ¶¶ 34-35. The Sirva plaintiffs alleged that they were defrauded by the statements made by the issuer and underwriters in SIRVA's IPO and SPO prospectuses disseminated in 2003 and 2004 because the prospectuses: (a) omitted discussion of the problems experienced by SIRVA's European divisions, (b) offered knowingly false projections with respect to SIRVA's net income in 2004, (c) understated

---

[25]

An IPO is the first sale of a corporation's common shares to investors on a public stock exchange. The monies paid by investors for the newly-issued shares go directly to the company (in contrast to a later trade of shares on the exchange, where the money passes between investors). An IPO therefore allows a company to raise capital for future growth.  See, e.g., Abby M. Alderman & Kenneth Y. Hao, The Initial Public Offering Process, in How to Prepare an Initial Public Offering (PLI Corporate Law & Practice Course Handbook Series No. B-904, 1995).  Any secondary public offering by an issuer pursues effectively the same goals.  In its December Opinion, this Court discussed the qualitative distinction between an IPO and a secondary market trades and the importance that corporate assets have at the outset of corporate life:

> At the very outset of a corporation's life, the value of shares are directly related to the value of equity [that is, the difference between corporate assets and debts] because, when the corporation first sells to investors, it uses the monies to buy machinery, physical plants and other "real" goods or resources.  See Smith, Investment Banking and the Capital Acquisition Process, 15 J. Fin. Econ. 3 (1986).  But, once issued, stock can neither depreciate nor be consumed.  Instead, it is sold and resold.  These subsequent sales are nothing more than the market's expectations for the corporation's prosperity since these sales do not add a penny to the corporation's coffers and do not affect the value of equity.  See Fox, Shelf Registration, Integrated Disclosure, and Underwriter Due Diligence, 70 Va. L. Rev. 1005, 1010 (1984).

December Opinion at 23, n. 17 (Intelligroup, 468 F. Supp. 2d at 687).

the insurance reserves needed to conduct SIRVA's future operations, and (d) provided false information about SIRVA's pre-IPO (and, obviously, pre-SPO) net-income.  See generally, id.

The Sirva defendants moved for dismissal of the Sirva Complaint arguing, inter alia, that contention (d), supra, made by the Sirva plaintiffs was without merit because overstatements of SIRVA's net income during 2001 could not have affected the market's assessment of SIRVA's part performance in view of the fact that SIRVA understated its net income in 2002, and the *cumulative* effect of both 2001 overstatement and 2002 understatement was a positive figure, which should have prompted--rather than dissuaded--the investors to purchase the stock during both the IPO and SPO. See Sirva, 04-7644, Docket Entry No. 105, at 28-29. The Sirva court disagreed explaining that:

> [t]he [u]nderwriters' argument assumes that *cumulative* net income is the only figure an investor would find important in making the decision to invest. Whether that is true is a factual question that cannot be resolved on a motion to dismiss.  Moreover, the increase in cumulative net income notwithstanding, the impact of the [errors in] SIRVA's financials was not wholly positive.  Though the [errors] effected [an] increase in SIRVA's net income for 2002, [they] effected a [higher] loss . . . in 2001.

Sirva, 2006 U.S. Dist. LEXIS 73375, at *26-27 (emphasis supplied, citations to pleadings omitted). Inexplicably omitting the term "cumulative" (pivotal to the Sirva's court's decision), Plaintiffs quote the second half of the Sirva's court's first sentence in support of their proposition that this Court should focus on misstatements of Intelligroup's assets and liabilities rather than on Intelligroup's net income.  Notably--even though the IPO fact pattern in Sirva was entirely different from that presented here--no party in Sirva suggested that the Sirva court should focus on a financial item other than net income when evaluating the impact of SIRVA's past financials.[26]

---

[26]

Lack of such suggestion is of little surprise, since SIRVA's financials indicated that overstatements of income were accompanied by overstatements of assets and understatements of liabilities, while understatements of net income were made together with understatements of assets

In view of the foregoing, Plaintiffs' reliance on Sirva is wholly misplaced.  It appears obvious that the Sirva court: (a) recognized that the valuation conducted by the stock market at the IPO stage involves analysis qualitatively different from that applicable to securities traded on a secondary market; (b) concluded that the market's valuation of an IPO calls, inter alia, for an examination of the issuer's entire history (since there is no secondary market in existence to provide the investors with on-going assessment), including the issue of stability of business performance; and (c) refused to ignore SIRVA's business history in the name of positive *cumulative* net income.[27]  In sum, the inquiry by the Sirva's court into the history of the issuer's performance for the purposes of determining the market's pricing of the issuer's IPO is inapposite to the pricing analysis of a security traded on a secondary market and assessable under the Efficient Capital Market Hypothesis.  See Gruber v. Price Waterhouse, 776 F. Supp. 1044, 1052 (E.D. Pa. 1991) ("[T]he 'fraud on the market' theory can not apply to initial public offerings.  In an initial public offering it cannot be assumed price reflects value because there is simply no open and developed market," which is a prerequisite to plaintiffs establishing reliance on the basis of the "fraud on the market"  theory).

Plaintiffs make the same error by relying on two other IPO case, Unicapital, 149 F. Supp. 2d 1353, and Craftmatic, 890 F.2d 628.  The circumstances of Unicapital present a set of facts even less applicable to the case at bar, since the case involved an IPO and later bankruptcy of a company

---

and overstatements of liabilities, i.e., all SIRVA's financials errors were *coherent* misrepresentations. See generally, Sirva, 04-7644, Docket.  Moreover, the language in Sirva appears to indicate that the litigants and the court were indeed concentrating on the issuer's net income–rather than other accounting data--for the purpose of assessing the issuer's profitability.

[27]

Since both overstatement and understatement of SIRVA's net income were included in SIRVA's IPO prospectus, these misstatements, by definition, occurred before any secondary market for SIRVA stock came in existence.

which had no business performance record prior to the public offering, see Unicapital, 00-2054, Docket Entry No. 25 (Complaint), at 2-3, and advertized its future business prospects to the investing community by overstating, inter alia, the assets that were to be used in UniCapital's operations. Evaluating such overstatement of assets, the Unicapital court determined that UniCapital's stock was introduced to the market at inflated prices since "it cannot be said that no reasonable investor would attach importance to a $ 100 million, or 8%, overstatement of the assets in Unicapital's [IPO] prospectus." Unicapital, 149 F. Supp. 2d at 1364 (emphasis supplied). While Plaintiffs quoted this determination of the Unicapital court , they failed to note that the Unicapital court neither addressed the issue of overstatement or understatement of UniCapital's net income nor could have addressed it simply because there was no net income to assess.[28]

In sum, Plaintiffs' reliance on Sirva, Unicapital and Craftmatic for the purpose of alleging that this Court should focus on Intelligroup's misstatements of assets and liabilities rather than net income for the purpose of determining whether Plaintiffs sufficiently pled reliance under the "fraud-on-the-market" theory is wholly misplaced, since IPO cases fall outside the presumption of reliance enunciated in Basic v. Levinson. See Gruber, 776 F. Supp. at 1052; Merritt B. Fox, Symposium: Robert Clark's Corporate Law: Twenty Years of Change: After *Dura*: Causation in Fraud-on-the-Market Actions ("After *Dura*"), 31 Iowa J. Corp. L. 829, 875 (2006) (IPO cases cannot be subject to the "fraud-on-the-market" theory due to lack of efficient markets).

_____

[28]

In Craftmatic, an IPO case examining false projections, the issue of overstatement of assets or understatement of liabilities was not examined at all. See ("The thrust of plaintiffs' action is [that] defendants[' forward-looking] statements concerning Craftmatic's marketing, expansion, and upgrading programs [were] false and misleading." Craftmatic, 890 F.2d at 632.

### ii.    *Basic v. Levinson*

In Basic v. Levinson, 485 U.S. at 243, the Supreme Court established a presumption of causal connection between a misstatement and an injury (in the form of the misstatement's effect on the market's price of a security) sustained by a plaintiff at the time when the plaintiff entered into the transaction.  The purpose of this "fraud-on-the-market" doctrine is to "recognize[ and] encompass the economic realities of modern securities markets," DeMarco v. Robertson Stephens Inc., 228 F.R.D. 468, 472 (S.D.N.Y. 2005), namely, the fact that "most publicly available information is reflected in market price." Id. (citing Basic, 845 U.S. at 247).  The Basic presumption, therefore, applies only to "suits by . . . purchasers in cases of falsely positive statements, and by . . . sellers in cases of falsely negative statements," see After *Dura*, 31 Iowa J. Corp. L. at 875, and the investors who fared better because of the misstatement cannot assert reliance through the working of the theory.

In view of the foregoing, the Court notes that, while Plaintiffs cite Basic for the proposition that "a statement is material if there is a 'substantial likelihood' that a 'reasonable investor' would view it as significantly altering 'the total mix of information made available,'" Opposition at 23 (citing Basic, 485 U.S. at 231-32), one must consider the two keys points of the Supreme Court's teaching: (a) different types of information affect the market's price to a different degree, and (b) the economic realities of modern securities markets are such that a "total mix" of information consisting of both a weak negative piece of news and a strong positive one yields a net effect equal to a positive influence, hence, causing an increase in the stock price.  Conversely, an issuer's simultaneous concealment of two pieces of information: (a) one, which is not commonly factored in by the stock market and--if factored–has the potential of causing only a slight negative price effect, and (b)

another one, which has the potential of causing a very strong positive price effect and, in addition, would necessarily be factored into the price by the stock market, presents the market with such "total mix" of information that causes an underpricing of the security, thus, making the "fraud-on-the-market" theory of reliance unavailable to a purchaser who obtained the security during the period of such concealment and resulting deflation of the price.  Since Plaintiffs plead facts unambiguously indicating that, during certain parts of the Class Period, Intelligroup's securities were traded at deflated prices, Plaintiffs can use the "fraud-on-the-market" theory of Basic v. Levinson to satisfy their pleading requirements only with respect to those parts of the Class Period when the price of the securities was inflated, but not with respect to the Class Period in its entirety.

### iii.    Other District Court Cases

The other district court cases relied upon by Plaintiffs similarly offer no support to Plaintiffs' proposition that, "under the law," this Court should find that Intelligroup's securities were traded at inflated prices during the periods when Intelligroup's liabilities were slightly understated, assets were slightly overstated, and net income was understated dramatically.  For instance, Plaintiffs cite Parmalat, 375 F. Supp. 2d 278, as a case "involving a drop in securities price after disclosure of a fraud that understated [issuer's] debt and overstated its assets," prompting the Court to "center[] around false and misleading statements of financial [entries] other than net income."  Opposition at 23.  However, contrary to Plaintiffs' interpretation of the case, the court in Parmalat focused on misstatements in issuer's net income figures.  See  Parmalat, 375 F. Supp. 2d at 307 and n. 189 (noting that the Parmalat plaintiffs "contend[ed] that [issuer's financial] statements . . . overstated . . . EBITDA of approximately . . . 948 million [euro] by at least 538 million" euro, that is, by 157%,

and explaining that "'EBITDA" stands for earnings before [deduction of] interest, taxes, depreciation and amortization," i.e., net income before deduction of costs associated with continuous business). Similarly, Plaintiffs' reliance on Ala, 532 F. Supp. 591, see Opposition at 24, is misplaced.[29]  As in Parmalat, the court in Ala concentrated on misstatements of issuer's net income.[30]  See Ala, 532 F. Supp. at 595 (discussing two consecutive drops of issuer's earnings-per-share).

In sum, Plaintiffs cited  no case (and this Court is aware of none) where the court  examining a security traded on secondary market focused on issuer's misstatements of assets and liabilities while sliding issuer's misstatements of net income to the periphery of its attention.  While the courts in Parmalat and Ala, and other courts, took notice of misstatements of items other than net income, it appears that all these courts were presented with a typical scenario where all financial entries were

---

[29]

Plaintiffs quote the Ala court's observation that "the very fact that false financial information had been published by [the issuer] is a material fact which a reasonable investor would have wanted to know."  See Opposition at 24 (quoting Ala, 532 F. Supp. at 599, relying, in turn, on Drake v. Thor Power Tool Co., 282 F. Supp. 94 (D.C. Ill.1967), a case that pre-dated Basic by more than twenty years and had nothing to do with the "fraud-on-the-market" theory).  Plaintiffs, however, take the statement of the Ala court out of context by conflating the elements of materiality and reliance, hence, transforming the language of Ala into an erroneous assumption that any misstatement by an issuer, be it minor or major, affecting the price positively or negatively, would automatically satisfy the transactional causation requirement.  Falsity, however, is a separate element of Rule 10b-5 pleadings, and it cannot be used as a substitute for any other element, including those of materiality and reliance.  See Dura, 544 U.S. at 341 (listing the elements).

[30]

The third district case cases relied upon by Plaintiffs, Kaltman, 447 F. Supp. 2d 648, also involved coherent overstatements in both assets and net income.  See Kaltman, 04-08, Docket Entry No. 51 (Amended Complaint), at 3.  Such coherent misstatements  typically result in coherent variance of the company's profit-per-dollar-of-investment (i.e., the ROE analysis, see December Opinion at 25, n. 18 (Intelligroup, 468 F. Supp. 2d at 688)), since reduction in assets and net income (or increase in liabilities and reduction in net income) affects both parts of the fraction in the same fashion.  Conversely, if the actual assets are lower than those stated (or liabilities are higher than stated) but income is higher than that stated, the analysis employing misstated data presents the company's per-dollar profitability less favorably than it is in actuality.  See December Opinion at 25, n. 19 (Intelligroup, 468 F. Supp. 2d at 688).

Page 74 of  195

misstated *coherently*, i.e., in a way sending same type of signal to the stock market because both assets and net income were invariably overstated, while liabilities were invariably understated. Neither the court in Parmalat nor that in Ala, nor any other tribunal of which this Court is aware, faced the situation where a purchaser buys a security at a distorted price after an issuer's financials sent *opposite signals of dramatically different importance* to the stock market. Since this very issue is presented by the case at bar, the Court is not persuaded by Plaintiffs' argument that concentration on dramatically misstated financial figures mainly used by the stock market to determine the price of a security is "simply contrary to the law."

### c. *Financial Theories and Calculations*

As noted above, the Court's December Opinion: (a) employed the Dividend Model for the purpose of determining whether Intelligroup's stock was likely to be overpriced throughout the Class Period in its entirety; and (b) reached the conclusion that frequent understatements of Intelligroup's net income that, most likely, provided the stock market with information causing frequent underpricing of Intelligroup's securities, which availed Plaintiffs of a bargain and eliminated factual support from Plaintiffs' reliance claim based on the "fraud-on-the-market" theory enunciated in Basic v. Levinson. See December Opinion at 19-30 (Intelligroup, 468 F. Supp. 2d at 687) (detailing the financial theories and mathematical calculations). Plaintiffs, however, contend that this Court erred and should have focused on Intelligroup's misstatement of items other than Intelligroup's income. See Opposition at 25-29. Moreover, Plaintiffs' Complaint is drafted with apparently distinct concentration on each of these items, i.e., Plaintiffs allege that Intelligroup's Statements misrepresented the corporate assets and liabilities and, in addition, misrepresented Intelligroup's

accumulated deficit and, moreover, misrepresented the corporation's shareholders' equity.   See Compl. at 11 (itemizing each type of errors); Opposition at 20 (itemizing each type of misstatement). Consequently, the Complaint leaves an unsophisticated reader with the impression that Intelligroup kept fabricating, anew, entry after entry. See Opposition at 1 ("[V]irtually every line of Intelligroup's financial statements . . . was false"). Such Plaintiffs' statements, read in light of Plaintiffs' argument that the Court should consider, separately, misstatements of Intelligroup's assets, liabilities, accumulated deficit and shareholders' equity, see id. at 21-24, appear to confuse the nature and interrelations of these basic accounting items. Therefore, the Court believes it would be useful to clarify the matter.

The term "asset" means an economic benefit; examples of assets include cash, equipment, buildings and land.   See Charles Horngren, Gary Sundem, John Elliott, Introduction to Financial Accounting ("Introduction") 50-51 (9th ed. 2002). A "liability" is an obligation which may result in the transfer or use of assets, provision of services or other yielding of economic benefits in the future; examples of liabilities include wages, taxes, accounts payables, accrued pensions and warranties, as well as obligations ensuing from issued bonds, signed notes and leases. See id. at 382-439. The so-called "accounting equation" creates the mathematical structure of the balance sheet and relates corporate assets, liabilities and shareholders' equity as follows: shareholders' equity equals the difference between total assets and total liabilities.[31]   See id. at 51-53.   Therefore, a misstatement of any liability item, by definition, results in a misstatement of total liabilities which,

_____

[31]

"Accumulated deficit" is an accounting comparison, i.e., a concept describing the situation when accumulated losses exceed retained earnings. An excess of retained earnings over accumulated liabilities is conceptualized as "budget surplus." See Introduction at 66.

in turn, results in a misstatement of shareholders' equity (same as any misstatement of corporate assets produces erroneous shareholders' equity).  In other words, a single accounting error by an issuer, by definition: (a) causes the issuer to misstate a multitude of other accounting items related to the original error through the mathematics governing the balance sheet, and (b) ensures that, in the event of issuer's restatement of financials, a multitude of lines, if not "virtually every line of [the issuer's] financial statements, [would have to be restated to correct the original] false" entry. Consequently, this Court will examine Plaintiffs' arguments based on Intelligroup's assets, accumulated deficit, liabilities and shareholders' equity by referring to shareholders' equity  since, as the foregoing illustrates, an error in shareholders' equity  reflects cumulative impact of errors made with respect to assets, liabilities and accumulated deficit.

Elaborating on their assertion that this Court erred in focusing on understatements of Intelligroup's net income rather than on overstatements of Intelligroup's shareholders' equity, Plaintiffs allege that "markets rely on assortment of factors to determine the price of a public company's shares."  Plaintiffs do not provide the Court with any specific financial theory correlating corporate assets to the market's price of a stock, so the Court could consider an alternative to the Dividend Model, which correlates the price of a stock to corporate earnings, i.e., net income, through assessment of the future stream of dividends.  Rather, Plaintiffs: (a) enter their own generic observation that "a variety of factors, including a company's assets, capital structure, possible and profitable changes in volume, price and costs, company's management and reputation and other factors are all considered by the market when establishing the price of a company's shares"; and (b) to support this proposition by citing to Benjamin Graham, David L. Dodd, Sidney Cottle, Security Analysis - Principles and Techniques 42-43 (4th ed., 1962) ("Securities Analysis").

Almost seventy years old--and having its forth edition (relied upon by Plaintiffs) published more than twenty-five years before the issuance of Basic v. Levinson, which enunciated the transactional causation theory that Plaintiffs aim to employ--Security Analysis still enjoys the status of a classic conservative treatise on finance and valuation.[32]  In Security Analysis, Graham and Dodd divided stockholders into two types.  On one side of the spectrum, they placed those who "play" on the market by looking for quick upsides; Graham and Dodd named such players "speculators."[33]  They contrasted speculators with "true investors" who look for safe income streams, and pointed out that investors do not operate on behavioral biases but rather rely on the intrinsic soundness of the investment.  Elaborating on how a prudent investor--and the market comprised of such investors-- should determine the intrinsic value of a stock, Graham and Dodd explained:

> The *most important single factor* determining a stock's value is now held to be the indicated average future earning power [of the stock], i.e., the estimated average earnings for a future span of years [in other words, the stream of future dividends]. Intrinsic value would then be found by first forecasting this earning power [of the stock] and then multiplying that prediction by an appropriate "capitalization factor" [that is, the financial formula enabling an investor to determine the present value of a known future capital.][34]

Security Analysis at 28 (emphasis supplied).

---

[32]

The first edition of the Security Analysis was published in 1939.  See, e.g., Dale Arthur Oesterle, Mergers and Acquisitions: Revisiting the Anti-takeover Fervor of the '80s Through the Letters of Warren Buffett 565 n.1, 19 Cardozo L. Rev. 565 (1997).

[33]

The group that Graham and Dodd designated as "speculators" resembles those currently known at the stock market as "noise traders."  See, e.g, Paul G. Mahoney, Is There a Cure for "Excessive" Trading?, 81 Va. L. Rev. 713, 718-21 (1995).

[34]

The intrinsic value theory eventually became the core financial theory employed by modern stock markets.  See, e.g, Henry T. C. Hu, Faith and Magic: Investor Beliefs and Government Neutrality, 78 Tex. L. Rev. 777, 786-89 (2000); see also December Opinion at 23-25 (Intelligroup, 468 F. Supp. 2d at 687-88) (analyzing financial sources).

Since this Court, in its December Opinion, relied on the Dividend Model basing such reliance upon the observation that "[t]he corporate finance theory unvaryingly holds that the . . . stock price reflects the market's estimation of the future stream of dividends, discounted back to its present value," December Opinion at 23 (Intelligroup, 468 F. Supp. 2d at 687), it appears that this Court and the financial source relied upon by Plaintiffs are in complete agreement as to the conclusion that the stock price depends on the future stream of dividends (which, in turn, is determined on the basis of the corporation's earnings). Therefore, this Court concludes that the Securities Analysis treatise verifies the propriety of this Court's reliance on the Dividend Model, but lends no support to Plaintiffs' claim that the market concentrates on corporate assets for the purpose of determining the price of the corporation's stock.[35] Since Plaintiffs offer no sound financial theory in support of their contentions, the Court can neither ignore actual financial considerations of the stock market nor shift the Court's attention from these considerations to the misstatement of Intelligroup's shareholders' equity solely because Intelligroup's misstatements of this accounting item yields a conclusion more favorable to Plaintiffs' position than that ensuing from the net income.

---

[35]

It appears that, in alternative to their reliance on <u>Security Analysis</u>, Plaintiffs suggest that the issue how the stock market values a stock should be left to a jury to decide on the basis of their daily experiences rather than actual financial considerations employed by the stock market . See Opposition at 24. The Court disagrees. The typically utilized semi-strong form of the Efficient Capital Market Hypothesis is based on the presumption that all public information is absorbed and reflected by the market on the basis of the market's calculative models. See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992); Stephen J. Choi, Eric L. Talley, Playing Favorites with Shareholders, 75 S. Cal. L. Rev. 271 (2002); Ronald J. Gilson & Reinier H. Kraakman, The Mechanisms of Market Efficiency, 70 Va. L. Rev. 549 (1984) (explaining how capital and information markets work together in creating efficient securities prices). Even though the Court is aware of the studies suggesting that a certain percentage of the investors buys and sells their stock on the basis of their subjective fears, hopes, speculations and other emotions not reducible to financial formulas, such emotions are of no import in a case based on the objective Efficient Market Hypothesis.

The Court cannot accept pleadings based on Plaintiffs' self-serving conjecture in view of the Supreme Court's guidance in Bell Atlantic and Dura.  Since Plaintiffs should plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged claim]" and set forth factual "allegations plausibly suggesting (not merely consistent with)" Plaintiffs' claims, Bell Atlantic, 127 S. Ct. at 1969-74; see also Dura, 544 U.S. at 588-89, this Court cannot conclude that an allegation consisting of technical data could be reduced to a conclusion if such conclusion defies actual financial considerations of the stock market, same as the Court cannot accept, as plausible, technical allegations proffered in support of a litigant's conclusion that the Earth is flat.  Cf. Kumho Tire, 526 U.S. at 149.  Therefore, this Court cannot deem plausible Plaintiffs' allegations that the market overpriced Intelligroup's securities on the basis of those overstatements of shareholders' equity that were made in conjunction with dramatic understatements of Intelligroup's net income, since no method generally accepted in the financial community supports such conclusion.  See id.

During certain parts of the Class Period, Intelligroup stock was overpriced by the market. By way of an example, during the last fiscal quarter of 2002, Intelligroup simultaneously overstated its shareholders' equity by 53% and its net income by 1,796%.  See Compl. at 11.  Both of these overstatements sent coherent signals to the stock market depicting Intelligroup's financial position more favorably than it was in actuality, hence causing an unwarranted inflation of Intelligroup's securities.  Accord December Opinion at 30 (Intelligroup, 468 F. Supp. 2d at 691) (similarly finding that Plaintiffs sufficiently alleged transactional causation with respect to four non-consecutive phases of the Class Period).  By contrast, during the third fiscal quarter of 2003, Intelligroup simultaneously overstated its shareholders' equity by 31% but understated its net income by a whopping 6,535%. Since "the most important single factor" in assessment of Intelligroup stock's value was a derivative

from Intelligroup's statement–in this case, understatement--of the corporation's net income, see

Security Analysis at 28, the facts offered by Plaintiffs do not plausibly suggest that Intelligroup stock

was overpriced during the period that followed such disclosure.[36]  See Bell Atlantic, 127 S. Ct. at

---

[36]

     If read against Plaintiff's quotation from Kaltman, 447 F. Supp. 2d at 659, the misstatements made by Intelligroup with respect to the third fiscal quarter of 2003 are particularly illustrative of this Court's reasoning.  See Opposition at 22-23 (citing and quoting Kaltman).

     Although the court in Kaltman did not address the issue of reliance, it noted--while examining the element of materiality--that "it is unfathomable to believe that any reasonable investor would view the disappearance of 22% of a company's value to be anything but material."  Kaltman, 447 F. Supp. 2d at 659; see Opposition at 23 (quoting the language).  However, since Intelligroup's misstatement of total assets in third quarter of 2003 was 4.7%, and misstatement of total liabilities was 6.9%, the finding in Kaltman appears to detract from–rather than support--Plaintiffs' position, since these misstatements were far less dramatic that the 22% error considered in Kaltman.  See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) (holding that a 2% overstatement of accounts was immaterial); Westinghouse, 90 F.3d at 715 (1.2% overstatement of total assets not material, despite alleged 60% drop in stock price); Glassman v. Computervision, 90 F.3d 617, 633 (1st Cir. 1996) (holding that a 3% to 9% difference in backlog as a percent of revenue was immaterial); Convergent Tech. Sec. Litig., 948 F.2d 507 (N.D. Ill. 2003) (holding a 1.5% difference between financial forecast and actual results was immaterial); accord December Opinion at 25 n. 19 (Intelligroup, 468 F. Supp. 2d at 688) (observing that errors in Intelligroup's Statements with respect to the corporation's assets and liabilities were quite minor).  The two most notable misstatements made by Intelligroup with respect to the third fiscal quarter of 2003 were those regarding net income and shareholders' equity, respectively, 6,535% and 31%, i.e., the understatement of net income was 210 times more than the overstatement of equity.  As this Court explained in its December Opinion, the market's assessment of a stock price concentrates on the issue of business profitability, thus factoring in metrics other than net income, e.g., corporation's return on equity ("ROE"), a creation of accounting relating the earnings and the ownership of shareholders.  See December Opinion at 24-25 n. 18 (Intelligroup, 468 F. Supp. 2d at 688) (detailing the mode of calculating ROE).  Without extensive calculations of applicable ROE (since this Court's December Opinion contained more than a fair share of mathematical exercises), one can eye-ball the direction and magnitude of the signal sent to the stock market by Intelligroup's simultaneous understatement in net income and overstatement in shareholders' equity by proportioning these misstatements.  Since the understatement in Intelligroup's net income provided the market with 210 times more incentive to underprice Intelligroup stock than the overstatement in shareholders' equity, the ROE analysis indicates that: (a) it would have been unfathomable for the market to overprice Intelligroup stock on the basis of these two simultaneous misstatements even if both shareholders' equity and net income metrics--rather than the net income itself--would be the key basis for determination of Intelligroup's stream of future dividends, i.e., the most important factor for pricing; and (b) "reasonable minds could not differ" about this conclusion.  Craftmatic, 890 F.2d at 642; compare Opposition at 24

---

1974.   In view of Plaintiffs' failure to plead facts indicating grounds for reliance during certain parts of the Class Period, this Court is constrained to find that Plaintiffs failed to meet their pleading burden as to the transactional causation element of their 10b-5 claim, notwithstanding apparent sufficiency of Plaintiffs' reliance pleading with respect to other parts of the Class Period.  Plaintiffs averred that the claims set forth in the Complaint are typical and common to all members of the class.[37]   See Docket Entry No. 17-2, at 8-11.   However, Plaintiffs' pleading of technical data indicating that certain members of Plaintiffs' class obtained Intelligroup stock at a bargain equals to Plaintiffs' failure to plead transactional causation with respect to the entire class.[38] See Richland, 272 F. Supp. at 148 (failure to assert the applicable element with respect to part of the class period nullifies the entire claim); accord Blackie, 524 F.2d 891; Yadlosky, 197 F.R.D. at 298; Shamrock, 557 F. Supp. at 206; Computer Memories, 111 F.R.D. at 684.

---

(relying on Craftmatic to allege that reasonable minds could differ on the issue whether such simultaneous misstatements by Intelligroup sending opposite signals to the stock market caused an overpricing or underpricing of Intelligroup's stock).

[37]

As explained supra, Plaintiffs' shortcomings are not limited to the periods reflected in the Table during which Intelligroup's income was understated; the shortcomings also encompass both the 2001 and 2004 Periods.  With respect to the 2004 Period, the Court notes, in passing, that this Period followed *two* consecutive rounds of understatement in Intelligroup's net income, specifically, the understatements made in Intelligroup's 2003 yearly Statement and the following Statement (reflecting Intelligroup's financial position at the end of the first fiscal quarter of 2004).  See Compl. at 11.  Since these two consecutive disseminations of information presenting Intelligroup's net earnings less favorably than what it was in actuality were the last two signals received by the market, it appears nearly certain that the market underpriced Intelligroup stock throughout the 2004 Period which continued to price the stock on the basis of this unduly unfavorable information.

[38]

The sole fact that the Court, during earliest stages of this litigation, certified Plaintiffs' class has no bearing on the instant inquiry, since the Court of Appeals endorses a liberal approach to class certification in securities actions noting that, "in a doubtful case . . . any error . . . should be committed in favor of allowing a class action." Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), cert. denied, 474 U.S. 946, 106 S. Ct. 342, 106 S. Ct. 343, 88 L. Ed. 2d 290 (1985).

### 6.      Alternative Allegations of Reliance

Although barely fleshed out, Plaintiffs make two other reliance-type allegations that appear to differ from Plaintiffs' core reliance claim, which is based directly on misstatements in Intelligroup's financial data and  the "fraud-on-the-market" presumption.

The first of these assertions is reduced to Plaintiffs' statement that "Defendants' materially false and misleading statements regarding such financial information as, inter alia, assets, liabilities and accumulated deficit . . . caused  . . . Plaintiffs . . . to purchase Intelligroup . . . stock . . . at artificially inflated prices."  Compl. ¶ 113.  Since this statement does not refer in any way to the market's assessment of Intelligroup's stock but rather concentrates on the information that Plaintiffs themselves seemingly considered pertinent to their decision to purchase Intelligroup's stock, the Court entertains this statement as Plaintiffs' attempt to plead individualized reliance.

As the Court pointed out supra, reliance may be established in either of two ways: by showing individualized reliance (sometimes referred to as "actual" or common law reliance) on the material in question, or by showing facts which justify the presumption of reliance.  To prove actual reliance, a securities plaintiff must assert facts showing that the disclosure materials the plaintiff read contained a material misrepresentation or failed to disclose a material fact upon which they relied. See, e.g., List, 340 F.2d 457; Globus v. Law Research Serv., Inc., 418 F.2d 1276 (2d Cir. 1969); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974), cert. denied, 421 U.S. 976 (1975); Huddleston, 640 F.2d at 549 (listing the cases in the order of doctrinal evolution).  In the instant case, however, the Complaint is silent as to Plaintiffs' familiarity  with the content of Intelligroup's Statements that Plaintiffs challenge.  See generally, Compl.  Such silence enables this Court to presume that not a single Plaintiff actually familiarized himself or herself with the content

of any of Intelligroup's Statements, moreover with the content of all Statements issued during the forty months of the Class Period.  Accord Gruber, 776 F. Supp. at 1046-48 (dismissing the complaint where plaintiffs tried but failed to allege common law reliance and reliance based on the "fraud-on-the-market" presumption).  Moreover, it is unclear from the face of the Complaint whether the Lead Plaintiffs know, with any degree of certainty, even the number of other Plaintiffs in the class.[39] Therefore, this Court has no reason to conclude that Plaintiffs properly plead actual reliance, regardless of Plaintiffs' assertion that they executed their purchases of Intelligroup stock while relying on misstatements of Intelligroup's assets, liabilities, accumulated deficit and equity.

The other reliance allegation could be gleaned from Plaintiffs' argument based on certifications of Intelligroup's executives with respect to Intelligroup's measures of internal reporting and control. (Being sporadically articulated by Plaintiffs, the nature of these allegations is not entirely clear in view of the fact that the claim is well developed by Plaintiffs with respect to their allegations of the scienter and loss causation elements but is entirely omitted from those paragraphs in the Complaint, and corresponding arguments in Plaintiffs' Opposition, which address the issue of transactional causation, i.e., the reliance element.)  The allegation ensues from the language of certifications entered by Intelligroup's executives into the Statements, pursuant to the SOX requirement for such a certification.  See Compl. ¶¶ 77-82; Opposition at 46.  The language employed in these certifications was either

---

[39]

Indeed, Lead Plaintiffs' submissions for certification of the class identified only the number of purchases made during certain periods of the class, but not the number of purchasers.  See Docket Entries Nos. 15-5 and 15-6.  Since certain Plaintiffs were purchasers of Intelligroup's stock time and again, See, .g., Docket Entry No. 15-5, Plaintiffs' submission is unclear even as to the number of those Plaintiffs who made their purchases during those parts of the Class Period where Plaintiffs are aware of the number of transactions, moreover as to the total number of Plaintiffs.

> [t]he information contained in the [Statement] fairly presents, in all material respects, the financial condition and results of operations of [Intelligroup,]

Compl. ¶¶ 77-79 (certifications issued on August 14, 2002; November 12, 2002; March 28, 2003;

May 15, 2003; August 14, 2003; and November 14, 2003; March 30, 2004, and May 17, 2004), or

> [Intelligroup's executives] are responsible for establishing and maintaining disclosure controls and procedures . . . and internal controls over financial reporting . . . for [Intelligroup,] and [they] have . . . designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial [S]tatements for [general public] in accordance with [GAAP, and] evaluated the effectiveness of [Intelligroup's] disclosure control and procedures.

Compl. ¶ 80; Opposition at 46 (emphasis removed) (certifications issued on March 30, 2004, and

May 14, 2004).

   Plaintiffs appear to allege that the investors purchased Intelligroup's securities because the

investors were relying on these certifications as assurances. See Compl. ¶1 ("[executives] of the

company . . . misled the investing public that the company's financial statements were accurate and

. . . the company had adequate internal control"); Opposition at 2-4 (quoting the language of

certifications and concluding that "[p]ublic investors, . . . relying on the illusory nature of

Intelligroup's financial results, purchased Intelligroup stock").  However, since Plaintiffs may

establish transactional causation only by asserting that they purchased Intelligroup stock at inflated

prices, the sole fact of misstatement is insufficient to plead reliance.  See Dura, 544 U.S. at 343 ("the

higher purchase price [is] a necessary condition of [establishing an economic] loss"); WatchGuard

II, 2006 U.S. Dist. LEXIS 74269, at *4 ("False statements are an insufficient basis for a securities

fraud claim.  This truism received substantial attention in the court's prior order dismissing Plaintiff's

original complaint").  Because inflation of the price requires  support in financial figures, the fact

of Intelligroup's SOX certifications cannot alter the outcome ensuing from Intelligroup's Statements,

i.e., the fact that, during certain parts of the Class Period, the market was likely to underprice rather than overprice Intelligroup's stock.

Moreover, this Court finds any assertion that SOX certifications were the component which provided Intelligroup's Statements with an aura of reliability counter-productive to Plaintiffs' cause since, taken to its logical conclusion, such assertion suggests that the Statements unaccompanied by SOX certifications were likely to be perceived by the public as unreliable. Consequently, for the purposes of establishing the reliance element of 10b-5, Plaintiffs' emphasis on SOX certifications read as an indication that Plaintiffs had less reasons--or no reason whatsoever--to rely on Intelligroup's Statements during the initial fifteen and a half months, since the Class Period selected by Plaintiffs began to run on May 1, 2001, but the first Intelligroup's Statement accompanied by SOX certification was issued only on August 14, 2002. See Compl. ¶ 77.

In sum, neither the facts provided by Plaintiffs in support of their core reliance allegation nor other forms of reliance arguments that this Court could fathom on the basis of the facts set forth in Plaintiffs' Complaint indicate that Intelligroup stock was invariably traded at inflated prices throughout the entire Class Period. Since the Complaint does not contain "enough [factual] heft"to amount to "allegations plausibly suggesting (not merely consistent with)" Plaintiffs' conclusions with respect to the reliance element, Bell Atlantic, 127 S. Ct. at 1969-74, accord Dura, 544 U.S. at 588-89, and this Court should not credit Plaintiffs' bald assertions and mere conclusions as facts, see Burlington, 114 F.3d at 1429; Nice, 135 F. Supp. 2d at 565, Plaintiffs' Complaint will be dismissed for failure to allege facts satisfying the transactional causation requirement.

B.     LOSS CAUSATION

While, as discussed supra, Plaintiffs' Complaint is deficient in view of Plaintiffs' failure to sufficiently plead transactional causation and, in spite of this Court's detailed guidance to the same effect with respect to Plaintiffs' Second Complaint, Plaintiffs elected not to amend their pleading so to exclude the parts of the Class Period during which Intelligroup stock was likely to be a bargain, the Court cannot ignore the possibility that Plaintiffs still may piece together a 10b-5 claim supported by sufficient facts to satisfy the reliance requirement, e.g., by moving for (a) re-certification of subclasses of plaintiffs who purchased Intelligroup's securities during those parts of the Class Period when Intelligroup stock price was inflated, and (b) re-designation of corresponding lead plaintiffs. Therefore--as with respect to Plaintiffs' Second Complaint--the Court does not limit its inquiry to the matters of transactional causation but rather proceeds with examination of Plaintiffs' pleading to determine whether Plaintiffs sufficiently plead the element of loss causation to support their claim. Accord December Opinion at 31 (Intelligroup, 468 F. Supp. 2d at 692) ("Even if Plaintiffs' Complaint contained valid pleadings as to Plaintiffs' purchases of Intelligroup stock at inflated prices during the entire Class Period . . . , Plaintiffs' Complaint would still have to be dismissed since Plaintiffs failed to assert any facts indicating [loss causation]").

1.     Relevant Facts

There are two groups of facts that appear to be pertinent to the inquiry into the sufficiency of Plaintiffs' pleading of loss causation.  One group of facts involves the publications made by Intelligroup, while another group consists of data reflecting the pricing of Intelligroup's securities.

a.    *Intelligroup's Publications*

Clearly, the most relevant publication is the Press Release that, on September 24, 2004,

disseminated the information which, allegedly, caused Plaintiffs' losses. The Press Release included,

inter alia, the following three announcements:

> [Intelligroup] has been undertaking a comprehensive review of its 2004 second
> quarter results [which] resulted in a number of accounting adjustments to prior
> period[s and the] financial statements [issued during 2001, 2002 and 2003]. . . .
> Adjustments identified to date are expected to reduce . . . net income by
> approximately $0.9 million (or $0.05 per share) for the year ended December 31,
> 2003. In addition, there are certain historical intercompany adjustments totaling
> approximately $1.2 million that affect periods prior to 2001. The impact of these
> historical adjustments are expected to increase the accumulated deficit account for
> the years . . . 2003, 2002 and 2001. There is also a remaining unreconciled difference
> of approximately $0.6 million in [Intelligroup's] intercompany accounting records
> that has yet to be fully investigated, which may result in additional adjustments. . .
> . Reconciliation of this difference [is] the primary reason for the . . . delay in filing
> [financial report for the second fiscal quarter of 2004]. ("First Announcement")
> . . . .
> [Intelligroup] entered into a definitive agreement pursuant to which [two entities]
> will purchase [Intelligroup's] common stock in a private placement . . . for a total
> purchase price of $15,000,000. . . . [Intelligroup's] determined, after evaluating
> alternatives that this transaction was necessary because [Intelligroup's] cash position
> and relative cash availability under its $15 million revolving credit facility had
> become inadequate to fund ongoing operations. . . . The transaction will violate [the
> stock market's] listing rules [since it is being undertaken without shareholders
> approval required by the stock market's rules,] and, as a result, [Intelligroup] might
> be delisted from the . . . Stock Market. ("Second Announcement")
> . . . .
>
> In addition, [Intelligroup] is in default under its revolving credit facility as a result
> of the failure to file its [financial report for the second fiscal quarter of 2004]. . . .
> Intelligroup is working . . . to obtain waivers of such defaults [but, if Intelligroup]
> cannot obtain such waivers, the indebtedness . . . under [the] revolving credit . . .
> could be accelerated. ("Third Announcement")

Press Release.

In addition, Intelligroup made two other publications. One publication was made on May

4, 2004, slightly more than five and a half months prior to Intelligroup's publication of the Press

Page 88 of 195

Release, and advised the investing community about Intelligroup's "earning shortfall" ("Earnings Announcement").  See Compl. ¶ 5.   The other publication was made a month and a half prior to Intelligroup's publication of the Press Release[40] and notified the investors that Intelligroup's external auditing firm resigned ("Auditor Announcement").[41]  See id. ¶ 6.


### b.    *Chart of Intelligroup's Stock Price*

Defendants' Exhibit G sets forth the actual prices at which Intelligroup's securities were traded during the period from March 1, 2004, to December 31, 2004.  See Stock Chart (Docket Entry No. 65-12).[42]  The data in the Stock Chart depicts the following twenty spans of the chart-line:

(1)    The stock price was at its highest on March 1, 2004, when the stock traded at $9.95 per share.

(2)    From this point on, the price declined, first modestly, then sharply, over two weeks, until it fell to $6.82 per share on March 16, 2004, losing $3.17 per share ("First Drop").

(3)    Over the next three weeks, the price slowly rose to $8.64 per share, which was reached on

---

[40]

This dissemination was made in two increments, one on May 11, 2004, and the other on May 17, 2004.

[41]

The Complaint specifies that the May 11, 2004, announcement stated that the auditing firm would continue being Intelligroup's auditor for a limited period in order to prepare Intelligroup's filing for the second fiscal quarter of 2004, but Intelligroup's May 17, 2004, announcement clarified that the auditor changed its mind and resigned without preparing the filing.  See Compl. ¶ 6.

[42]

The Stock Chart details the opening, closing, highest and lowest prices during each trading day, as well as the averaged closing price for each trading day.  See generally, Stock Chart. Following the custom of financial markets, this Court utilizes the latter and refers to it as "actual" price, which does not indicate that the opening, closing, highest and lowest prices were "not actual."

April 7, 2004, gaining back $1.82 per share ("First Recovery").

(4)    After that, the price steadily dropped and, on May 3, 2004, fell to $5.79 per share, thus losing $2.85 per share ("Second Drop").

(5)    On May 4, 2004, the day of the Earnings Announcement, the price plummeted from $5.79 to $3.90, losing $1.81 per share ("Earnings Drop").

(6)    For two weeks after the day of the Earnings Announcement, the price kept slowly sliding down until, on May 18, 2004, it reached $3.18 per share, thus losing another $0.72 per share ("Post-Earnings Drop").

(7)    After that dip, the price began to climb and did so rather steadily for about seven weeks, reaching $5.30 per share on July 2, 2004, thus gaining $2.12 per share ("Second Recovery").

(8)    Over the next five weeks, the price declined again and, by August 10, 2004, dropped to $2.78 per share, i.e., losing $2.52 per share ("Post-Second Recovery Drop").

(9)    On August 11, 2004, that is, the day of the first part of the Auditor Announcement, the price fell to $2.10 per share, thus, losing another sixty-eight-cents-per-share ("Auditor Drop").

(10)    The price continued falling and, on August 16, 2004, went down another dime to $2.00 per share.

(11)    On August 17, the day of the second part of the Auditor Announcement, the price went down another three cents to $1.97 per share.

(12)    Over the next ten days, the price kept fluctuating up and down, but finally dropped to $1.67 per share on August 27, 2004, losing another thirty-cents-per-share("Post-Auditor Drop").

(13)    From this point on, the price began a slow climb up and, on September 13, 2004, reached $2.32 per share, i.e., gaining $1.35 per share ("Post-Auditor Recovery").

(14)   The next ten days were marked by a steady decline and, on September 24, the day which

ended with Intelligroup's airing of the Press Release, fell to $1.65 per share, that is, suffering

another sixty-seven-cents-per-share decline ("Pre-Release Drop").

(15)   On September 27, the first trading day after the Press Release, the price dropped to $1.13 per

share, losing another fifty-two-cents-per-share ("Press Release Drop").

(16)   During the following week, the price began climbing and, on October 4, 2004, reached $1.79

per share, gaining back sixty-six-cents-per-share ("Post-Release Recovery").

(17)   Over the next three weeks, the price dropped and reached its lowest point on October 26,

2004, landing at $0.95 per share ("Post-Release Drop").

(18)   From that lowest point, the price began to rise and, two weeks later, reached $1.49 per share

on November 9, 2004, thus, achieving the gain of fifty-four-cents-per-share ("Second Post-

Release Recovery").

(19)   For the next eight weeks, the price declined while going through a relatively small up-and-

down fluctuation and, on December 30, 2004, dropped to $1.15 per share, i.e., losing thirty-

six-cents-per-share ("Final Drop").

(20)   The year 2004 ended with a minor rise to $1.20 per share, that is, a five-cents-per-share gain.

Thus, the image of the chart-line resulting from the data set forth in the Stock Chart could

be reduced to the following see-saw-like sequence: First Drop – First Recovery – Second Drop –

Earnings Drop – Post-Earnings Drop – Second Recovery – Post-Second Recovery Drop – Auditor

Drop – Post-Auditor Drop – Post-Auditor Recovery – Pre-Release Drop – Press Release Drop –

Post-Release Recovery – Post-Release Drop – Second Post-Release Recovery – Final Drop.

### 2.    Deficiencies Contained in Plaintiffs' Second Complaint

In their Second Complaint, Plaintiffs alleged, inter alia, that the Press-Release Drop and all followings drops (but not recoveries) were a direct result of the First Announcement, which-- according to Plaintiffs--disclosed to the investing public "the false . . . nature of Defendants' [S]tatements."[43]  See Second Complaint ¶¶ 105-08.  In support of this assertion, Plaintiffs: (a) relied on the temporal proximity between the Press Release and Press-Release Drop, (b) read the information disclosed by Intelligroup in its Restatement into the language of the First Announcement, and (c) alleged that the Post-Release Recovery should be ignored as a mere market "fluke."  See id.  In addition, Plaintiffs contended that, although the Second and Third Announcement did not cause the Press Release Drop, the very fact that Intelligroup made the Second and Third Announcements should be perceived as supporting Plaintiffs' assertion that the Press Release Drop was caused by the First Announcement, since the "material weakness in [Intelligroup's] control environment" yielded certain business hardships which, in turn, prompted Intelligroup to plan certain actions, some of which were itemized in the First Announcement, and the remaining ones were itemized in the Second and Third Announcements.  See Docket Entry No. 68 (Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Complaint), at 55-60.

Examining these allegations, the Court discussed certain misconceptions, which apparently affected Plaintiffs' pleadings.  The key points of the Court's explanation were as follows:

(1)    Since the concept of loss causation is analogized to the tort law concept of proximate cause,

---

[43]

The Court omits discussion of those claims in Plaintiffs' Second Complaint (and corresponding Court's discussions thereof) which are not reiterated, one way or another, in the instant Complaint.  See Young, 2000 U.S. App. LEXIS 21704, at *2 (amended complaint supersedes previous complaint in the sense that it constitutes waiver of claims in previous complaint).

a securities plaintiff must plead facts indicating that it was the disclosure of defendant's misrepresentation of true facts--rather than existence of other forces or defendant's misrepresentation of the information which, ab initio, was false--was the force that actually and--if not fully, then at least quantifiably–caused the decline in the price of defendant's securities.  See December Opinion at 31-34 (Intelligroup, 468 F. Supp. 2d at 692-94).

(2)     Plaintiffs improperly relied on the temporal proximity between the First Announcement and Press-Release Drop, because the temporal proximity appeared to be a result of pre-existing forces, which initiated a series of drops in stock price long before the Press Release was aired.  See December Opinion at 35-37 (Intelligroup, 468 F. Supp. 2d at 694-95).

(3)     The facts alleged by Plaintiffs indicated that, even if the pre-existing forces are factored out, the Press-Release Drop was most likely a result of disclosure of the information contained in the Second and Third Announcement, as well as of disclosure of the erroneous-- rather than true--information contained in the First Announcement, and Plaintiffs erred in supplementing the true information in the First Announcement by that not included in the Press Release but rather disclosed in the Restatement more than a year after the Press Release was aired.   See December Opinion at 37-38 (Intelligroup, 468 F. Supp. 2d at 695-96).

(4)     Plaintiffs unduly conflated the Press-Release Drop with all other declines that followed the Press-Release Drop into a single aftermath of the First Announcement since the post-Press Release price history of Intelligroup stock included intervening recoveries, which--under the Efficient Market Hypotheses--Plaintiffs should not discount by merely treating them as "market flukes." See December Opinion at 40-48 (Intelligroup, 468 F. Supp. 2d at 697-703).

3.      **Plaintiffs' Instant Allegations**

While providing factual information largely the same as that set forth in the Second Complaint, Plaintiffs now set forth three theories, each of which somewhat resembles but still differ, in certain respects, from the allegations articulated by Plaintiffs in the Second Complaint.

a.      ***Interrelation-Among-the-Press-Release-Announcements Claim***

The first theory appears to be related to the Court's previous observation that Plaintiffs' pleadings in the Second Complaint depict a scenario where the Press-Release Drop was a result of disclosure of the information contained in the Second and Third Announcement.  See Opposition at 30-35 (Part (a) of the arguments).  Plaintiffs now argue that the First Announcement (dealing with the issue of accounting errors) must be read as a statement directly connected to the Second and Third Announcements (dealing, respectively, with the private placement and default on revolving credit) and maintain that, since the content of (a) the Second and Third Announcement disclosed the errors in the Statements to the market, and (b) the Second and Third Announcements were related to the First Announcement, the disclosure of the First Announcement must be deemed as a cause of Plaintiffs' loss.  See id.  The Court finds this line of argument without merit for two reasons.

The Court disagrees.

The Second Announcement appears to be related to either Intelligroup's financial hardships or to its interest in maintaining fast-growing operations, or both, but does not seem to have anything in common with the content of either the First or the Third Announcements.  Describing the "interrelation" between the Second Announcement and the First and Third ones, Plaintiffs make three erroneous statements.  Specifically, Plaintiffs assert that each of the First, Second and Third

Announcements revealed Intelligroup's

> need to restate more than three years' worth of financials, which in turn caused a
> default in [Intelligroup's] credit facility, which in turn caused the need for a private
> placement [to provide Intelligroup with] cash availability. [It is improper, therefore,
> to] ignore these [chain-reaction-depicting aspects of the First, Second and Third
> Announcements] and instead focus on [the fact] that income was overstated for 2003.

Opposition at 34.

However, overstatements of Intelligroup's net income would not support but would detract

from Plaintiffs' transactional and loss causation claims.

Second, even if Plaintiffs had asserted that "income was understated for 2003," this allegation

would be factually incorrect because Plaintiffs' table indicates that Intelligroup's income was

understated thrice in 2002, thrice in 2003, and even the single Intelligroup's Statement filed in 2004

also contained an understatement of income.[44]  See Compl. at 11.

Third, Plaintiffs' chain-of-events allegations factually contradict the language of the Press

Release.  The Third and Second Announcement stated

> [Intelligroup] entered into a definitive agreement [to execute] in a private placement
> . . . for . . . $15,000,000 . . . because [Intelligroup's] cash availability under its $15
> million revolving credit facility had become inadequate to fund ongoing operations.
> . . .  [Although Intelligroup] is in default under its revolving credit facility . . .
> Intelligroup] is working  . . . to obtain waivers of such default[] . . . .

Press Release.

Therefore, at the time of the Press Release, Intelligroup did not know whether it would retain

or lose its credit, but had already entered into the private placement agreement.  Thus, Intelligroup's

---

[44]     The Court's focus on Intelligroup's yearly net income for 2003 was a result of the fact that
the sole error in the Statements addressed in the Press Release in terms of downscaling financial
approximation was the yearly net income for 2003, rather than any other figure.  See First
Announcement, Press Release.

credit problems could not have caused Intelligroup's private placement.  Revolving credit: (a) can be automatically renewed without additional negotiation with the bank; (b) is available up to a specified amount which remains constant during a given period of time; (c) obligated the borrower to pay a commitment fee for the unused amount of the credit facility (usually around 0.5%), in addition to the interest rate charges on the borrowed funds; (d) imposes a strict schedule of repayment; and, (e) expires within a maximum period of three years. See James J Mikesell, Are revolving loan funds a better way to finance development? (U.S. Dept. of Agric.,1996). Consequently, revolving credit is poorly suited for any long-term business development projects. See id.  By contrast,  private placement  funds are equity, see 17 C.F.R. § 230.506, which need not be repaid and, thus, are well suited for long-term investment into a developing business operation.

 In sum, the Court concludes that the plain language of the Second Announcement does not contain any indication that the Intelligroup's decision to execute a private placement was a direct or even indirect result of any accounting errors in the Statements.[45]

---

[45]

It is not entirely unclear to this Court why Plaintiffs interpret the language of the Second Announcement reading "[Intelligroup] entered into [the private placement] agreement . . . because [Intelligroup's] cash availability under its $15 million revolving credit facility had become inadequate to fund ongoing operations," as an announcement that Intelligriuop "uncover[ed] . . . gross accounting errors"). Compare Opposition at 31 (bolding out the pertinent language of the Second Announcement) to id. at 30 (providing the aforesaid reading of the Second Announcement). Similarly, the Court is not entirely clear as to the basis for Plaintiffs' interpretation of Intelligroup's October 5, 2004, conference call. See Opposition at 31. During the conference call, Intelligroup stated that

The foundation for the investment [by the private placement investors] is their belief that the strength of [Intelligroup's] reference-able customer base and [Intelligroup's] strategy positioning in the market place to leverage the increasing demand for onsite and offshore . . . implementation [of service programs] and support services. [The investors] have stressed their faith in the current management to lead [Intelligroup] into the next level of competitiveness and profitability. . . .  Intelligroup . . . evaluated

The second reason for the Court's disagreement with Plaintiffs' conclusion that the Second Announcement caused Plaintiffs' losses ensues from the lack of direct relationship between Plaintiffs' transactional causation and loss causation claims.   While the Court agrees with Plaintiffs that there was an interrelation between the First and the Third Announcement, that is, a connection in the sense that both Announcements made reference to Intelligroup's delay in filing its financial report for the second fiscal quarter of 2004,   see Opposition at 30 (bolding out the language of the Third Announcement related to the filing delay), the Court disagrees with Plaintiffs' conclusion that the sole fact of such connection lends any support to Plaintiffs' claim. It appears that Plaintiffs now employ the same erroneous reasoning with respect to the Third Announcement as they did in their Second Complaint with respect to the First Announcement.   Examining the content of the First Amendment, the Court concluded that it was unlikely to cause Plaintiffs' losses, since it did not

---

the alternatives and this investment was considered the best move for . . . [Intelligroup's] long-held goal of streightening [its] balance sheet.   In addition, [Intelligriuop] need[s] to solve immediate liquidity issues.   [Intelligroup] now ha[s] fresh funding to drive [its] operations and to build on the foundation [it has]. [The private placement funds] will allow [Intelligroup] to develop [its] core assets and continue to deliver the high-quality work[product] that [Intelligroup's] clients have come to expect.

10/05/04  Transcript.

Although this language indicates that Intelligroup was interested in the private placement in order to develop its business operations further and maintain such development, Plaintiffs select the four words "solve immediate liquidity issues" from the entire discussion and maintain that these four words disclosed to the market something that the market should have understood as an indication that Intelligroup's stock had been overpriced on the basis of the errors contained in the Statements. See Opposition at 31, n. 14.   However, the disclosed fact that Intelligroup was too cash-strapped to develop or maintain its operations was do not seem to be reflective of the fact that Intelligroup made accounting errors, since a period of financial hardship may occur to any business entity, regardless of whether or not the entity ever made any accounting errors.

disclose any negative information which was both true *and* relevant to Plaintiffs' claim based on the errors in Intelligroup's Statements.[46]  See December Opinion at 40-46 (Intelligroup, 468 F. Supp. 2d at 697-701).  A examination of the plain language of the Third Announcement reveals the error in Plaintiffs' reasoning.  The Third Announcement reads:

> [Intelligroup] is in default under its revolving credit facility as a result of the failure to file its [financial report for the second fiscal quarter of 2004]. . . .   Intelligroup] is working  . . . to obtain waivers of such defaults [but, if Intelligroup] cannot obtain such waivers, the indebtedness . . . under [the] revolving credit . . . could be accelerated.

Third Announcement, Press Release.

The language of the First Announcement clarified that "[r]econciliation of th[e] difference[s detected in intercompany financials and corrections of errors committed before commencement of the Class Period was] the primary reason for [Intelligroup's] delay in filing [its financial report for

---

[46]

    With respect to the First Announcement, the Court observed that: (a) information about Intelligroup's upcoming delisting or its planned adjustment of intercompany financials was largely irrelevant to Plaintiffs' claim, i.e., unlikely to be interpreted by the market as a signal that Intelligroup's overall position was represented in the Statements in an overly- favorable fashion, since intercompany adjustments typically do not affect the company's overall finance; (b) information about  upcoming correction of errors made before 2001 was irrelevant since the errors were committed before commencement of the Class Period and, in addition, was unlikely to have a substantial effect on the market's current pricing tendencies since the errors were almost four years old; (c) the disclosure of true information about the errors made in the Statements was limited to a neutral message lacking even approximate financial data and, thus, provided the market with no grounds to suspect that Intelligroup's financial position was worse rather than better than that depicted in the Statements; and (d) by contrast, the untrue information about the errors made in the Statements did include an approximation of financial data and, indeed, provided the market with valid grounds to suspect that Intelligroup's financial position was worse than that depicted in the Statements.  Since the entire panoply of information in the First Announcement consisted only of irrelevant information, relevant-true-but-neutral information, and relevant-negative-but-untrue information, the Court found that the Press-Release Drop could not have been caused by disclosure of relevant-true-negative information in the First Announcement, since the Announcement contained no such information.  See December Opinion at 40-46 (Intelligroup, 468 F. Supp. 2d at 697-701).

the second fiscal quarter of 2004]." First Announcement, Press Release.  Read in light of such clarification, the language of the Third Announcement could be subdivided into two distinct messages: (1) an express notice to the market that Intelligroup was in default under its revolving credit facility and might not only lose the credit but, in addition, face acceleration of the entire payment due ("Message One"); and (2) an implied recitation of the fact disclosed in the First Announcement, namely, that Intelligroup's intercompany accounts and financial statements executed prior to the Class Period contained accounting errors ("Message Two").[47]

However, the sole fact that "a" disclosure was made does not establish loss causation.  Only the disclosure of information, the concealment of which caused inflation of stock price at the time of buyer's purchase, i.e., the disclosure of the very misstatement that initially supplied the element of transactional causation, provides the basis for loss causation in the event that the stock price falls upon this specific disclosure.  See Winstar Communs., 2006 U.S. Dist. LEXIS 7618, at *42 ("To establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security") (discussing Dura, 125 S. Ct. at 1631-32, and quoting Lentell, 396 F.3d at 173 (quoting, in turn, Suez Equity, 250 F.3d at 95)); see also  Emergent Capital, 343 F.3d at 197; Robbins, 116 F.3d 1441; Bastian, 892 F.2d 680; accord Semerenko, 223 F.3d at 185( the inflation associated with an alleged misrepresentation will be incorporated into the value of a security until the actual truth is disclosed).

---

[47]

The interrelation between the First and Third Announcement relied upon by Plaintiffs was, therefore, limited to the notion that the implied facts in Message Two were the cause of the express facts and predictions in Message One.  See Press Release, accord Opposition at 30-31.

Upon application of this basic principle to the facts of the case at bar, it becomes apparent that the content of the Third Announcement (read on its own or jointly with the First Announcement) could qualify as a disclosure of the particular concealed information that caused inflation of Intelligroup's stock price only if the content of the Third Announcement actually discloses that very information. See id.

Message One (that Intelligroup was in default under its revolving credit facility and might lose the credit and face acceleration of the entire payment) in no way indicated that the errors in the Statements presented Intelligroup to the market in a light more favorable than what the reality warranted. Indeed, while potentially having a very substantial effect on the market's valuation of Intelligroup's future profitability, see December Opinion at 47 n. 35 (Intelligroup, 468 F. Supp. 2d at 702), Message One did not even address the issue of errors in Intelligroup's Statements. Message Two implicitly touched on the errors by making reference to the information contained in the First Announcement, but the reference was limited to Intelligroup's need to either correct the errors committed prior to the Class Period or to execute intercompany adjustments that were unlikely to alter the market's perception of profitability of Intelligroup's business operations. See December Opinion at 41-43 (Intelligroup, 468 F. Supp. 2d at 698) (explaining that intercompany adjustments do not affect the company's overall financial parameters). Consequently, Message Two, while addressing the issue of errors in the Statements, did not disclose any information about particular errors which caused the market to inflate Intelligroup's stock price.[48] It follows that, while the Third

---

[48] For the purposes of the instant discussion, the Court concentrates only on the errors in Intelligroup's Statements made during those parts of the Class Period when Intelligroup misrepresented its financial data in a coherent fashion, i.e., the spans of time designated in the December Opinion as Phases I, II, III and IV. See December Opinion at 29 (Intelligroup, 468 F.

Announcement (as with the Second Announcement) was likely to be a major cause of the decline in Intelligroup's stock price reflected by the Press-Release Drop, the content of the Third Announcement (as with that of the Second Announcement) was highly unlikely to be the cause of the particular injury alleged by Plaintiffs, see Dura, 125 S. Ct. at 1631-32; Lentell, 396 F.3d at 173; Suez Equity, 250 F.3d at 95; Emergent Capital, 343 F.3d at 197; Semerenko, 223 F.3d at 185; Winstar Communs., 2006 U.S. Dist. LEXIS 7618, at *42, and Plaintiffs' conflation of the issues involved in the analysis only "muddies the waters" of this technical but clear matter.


### b.    *Lack-of-Interrelation-Among-the-Press-Release-Announcements Claim*

In their second theory, Plaintiffs allege, in alternative to their claim based on "interrelation" of the First, Second and Third Announcements, that

> even if all the [A]nnouncements . . . were not [inter]related, . . . [P]laintiffs need not plead that disclosure of the fraud was the sole cause of the decline in the value of their investment.

Opposition at 31 (Part (b) of the arguments).

So alleging, Plaintiffs omit to enlighten this Court as to which particular part of the Press Release alerted the market to the fact that the market was overpricing Intelligroup stock on the basis of the errors contained in the Statements and, having found that the contents of neither First nor Second, nor Third Announcement directly alerted the market about the Statements-based reasons to overprice Intelligroup's securities, the Court is confined to interpret Plaintiffs' above-quoted allegation as a request to ignore the key reasons for the Press-Release Drop (i.e., erroneous prediction that the determination of actual net income would produce a result lower than that provided in the

_____

Supp. 2d at 691).

Statements, dramatic dilution of stock ensuing from the private placement and potential loss of credit which might lead to higher cost of capital, see December Opinion at 40-47 (Intelligroup, 468 F. Supp. 2d at 697-703)) and, instead, concentrate on "interrelation" amongst the parts of the Press Release and the nebulous connection of this "interrelation" to Intelligroup's poor accounting practices.  In support of this proposition, Plaintiffs provide a string-cite of cases, while ignoring this Court's guidance in the December Opinion that, "in order to survive defendant's motion to dismiss, a plaintiff's complaint should plead facts indicating the presence of an actual and quantifiable relationship between the alleged fraud and the decline of the stock price" rather than some far-fetched association. See December Opinion at 32-34 (Intelligroup, 468 F. Supp. 2d at 698).  So explaining, the Court drew Plaintiffs' attention to Dura, 544 U.S. at 341; Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 81 (2d Cir. 1978); DeMarco, 222 F.R.D. 243, 247, 249 (S.D.N.Y. 2004); WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 299 n.42 (S.D.N.Y. 2003); Gaming Lottery Sec. Litig., 2000 WL 193125, at *1 (S.D.N.Y. Feb. 16, 2000); Oleck v. Fischer, 1979 U.S. Dist. LEXIS 11785 (S.D.N.Y. 1979), aff'd on other grounds, 623 F.2d 791 (2d Cir. 1980); Rubenstein v. Republic Nat'l Life Ins. Co., 74 F.R.D. 337, 346 (N.D. Tex. 1976); Entin v. Barg, 412 F. Supp. 508, 514 (E.D. Pa. 1976). See id. (citing these decisions).  The four cases cited by Plaintiffs could be added to the case law cited by the Court in its December Opinion since Plaintiffs' cases offer additional support to this Court's guidance.

### i.      Marsden v. Select Med. Corp.

Plaintiffs cite Marsden v. Select Med. Corp. ("Marsden I"), 2006 U.S. Dist. LEXIS 16795 (E.D. Pa. Apr. 6, 2006), in support of their contention that this Court should ignore lack of any actual

links between Plaintiffs' transactional and loss causation claims.   In Marsden, the shareholders alleged two theories of liability.   The first theory largely resembled the claim brought by Plaintiffs in the instant case, i.e., that the corporation's accounting practices concealed its poor financial condition.   The second theory was based on the contention that the corporation knew of likely changes to federal regulations, which could negatively affect its business but did not alert investors of these changes. See Marsden v. Select Med. Corp. ("Marsden II"), 2007 U.S. Dist. LEXIS 9893, at *12-13 (E.D. Pa. Feb. 6, 2007).   In its Marsden I decision, the court stated:

> Plaintiffs allege both that [d]efendants artificially boosted stock prices by omitting or misstating material information and that the revelation of the "truth" -- that [the issuer's] outlook was far from rosy because many of its most profitable practices would be forbidden -- caused a dramatic drop in stock prices.  Defendants argue that [p]laintiffs do not sufficiently connect the allegations of improper revenue and inadequate controls with the resulting drop in stock prices.  Dura, Defendants argue, held that merely alleging that a particular act or omission "touches upon" a later loss is insufficient. . . . Defendants suggest that [p]laintiffs have not articulated a sufficient connection between the alleged inadequate controls . . . and either the losses allegedly suffered or the discovery of the truth . . . . *That other factors may contribute to a price drop should not, however, preclude plaintiffs from pursuing claims based on those other factors*.

Marsden I, 2006 U.S. Dist. LEXIS 16795, at *40 (italics supplied).

Plaintiffs in the instant case quote the italicized statement in support of their claim that this Court should read the claimed association that Plaintiffs assert between Intelligroup's Statements and the Press-Release Drop and the following declines as a sufficient factual allegation of loss causation. See Opposition at 31-32.  The decisions of the Marsden court, however, suggests the opposite.

Ten months after issuing Marsden I, the court concluded that its Marsden I opinion contained a clear error of law and sua sponte reconsidered its Marsden I decision.  See Marsden II, 2007 U.S. Dist. LEXIS 9893.  Having examined the decisions of other courts addressing loss causation issue since the Supreme Court's ruling in Dura, as well as those district court decisions that were issued

in anticipation of Dura, the Marsden court noted that a typical pleading error of securities plaintiffs was their failure to adequately allege that the market ever learned about the "truth" of a defendant's misrepresentation, i.e., failure to allege an actual link.  See id. at *16-20.  The Marsden court concluded  that the "missing link" was exactly the deficiency in the Marsden plaintiffs' first theory, i.e., the theory premised on improper accounting practices.  See id.  Determining, as this Court did in the present case, that the corporation's press release disclosed other issues, the Marsden court (a) ruled that the press release did not cause the losses that the Marsden plaintiffs alleged were a result of the Marsden defendants' accounting practices and internal control measures, and (b) granted the Marsden defendants' motion to dismiss plaintiffs' complaint as to the first theory  based on such practices and measures.  See id.  Moreover, briefly revising this issue in its next decision, the Marsden court cited a number of decisions, including this Court's December Opinion, in order to reiterate that, in Marsden, "[p]laintiffs' . . . [c]omplaint contain[ed] not a single allegation that the 'relevant truth' about [the issuer's] improper [accounting] practices and inadequate internal controls . . . was . . . made known to the market by way of [the challenged press release]."  See Marsden v. Select Med. Corp. ("Marsden III"), 2007 U.S. Dist. LEXIS 42924, at *11-12 and n.5 (E.D. Pa. June 12, 2007).  In view of the foregoing, this Court adds the decisions of the Marsden court to the case law relied upon by the Court in its December Opinion.  See December Opinion at 32-34 (Intelligroup, 468 F. Supp. 2d at 698).

### ii.      *Other District Court Cases*

The Court now turns to Geopharma, Inc. Sec. Litig., 399 F. Supp. 2d 432 (S.D.N.Y. 2005), the case upon which Plaintiffs rely to assert that "[P]laintiffs [are] not required to 'exclude all

possible causes of the artificial inflation.'"  Opposition at 32 (quoting Geopharma, 399 F. Supp. 2d at 453).  While the Geopharma court employed the eight words cited by Plaintiffs in its loss causation discussion, a reading of the entire sentence written by the Geopharma court makes is apparent that the Geopharma court referred to three elements of 10b-5 claim, i.e., material misrepresentation, reliance and loss causation, and used the eight words selected by Plaintiffs to refer to transactional causation, the element of 10b-5 claim concerned with establishing a purchase at an inflated price.  See Geopharma, 399 F. Supp. 2d at 453 ("Defendants overstate the nature of plaintiffs' burden at this stage of the proceedings when they argue that plaintiffs must exclude all other possible causes of the artificial inflation, . . . [p]laintiffs must only allege a false or misleading statement,  which caused an artificial inflation of the stock,  followed by a dissipation of that inflation after corrective disclosures were made").  Hence, for the purposes of a loss causation discussion, Plaintiffs' citation to Geopharma makes no sense.

In Geopharma, the investors alleged that (a) defendants issued a deliberately misleading press release that caused investors to believe that the Food and Drug Administration ("FDA") had granted the company approval for a new lucrative drug, when in fact the FDA merely approved a much less lucrative medical device; and (b) the press release caused artificial inflation of the company stock. See Geopharma, 399 F. Supp. 2d at 435, 451.  "The corrective disclosure in [Geopharma actually] involved the correction of the misapprehension," i.e., the company's statement that the FDA approved a questionably-profitable device rather than a lucrative drug which caused decline in stock price.  See id. at 453; see also Geopharma, Inc. Sec. Litig., 04-9463, Docket Entry No. 35, at 21-24 (plaintiffs' complaint, detailing the corrective disclosure and ensuing drop in stock price).  The court in  Geopharma was not even presented with the issue at bar, and the case supports the proposition

that allegations of public disclosure of the very misstatement which caused artificial price inflation satisfied the pleading requirement as to the loss causation element of 10b-5.

Another case relied upon by Plaintiffs, eSpeed, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 16875 (S.D.N.Y. 2006), stands for the same proposition as in Geopharma.  In eSpeed, defendants, seeking to "reinvigorate [the company's] growth rate, . . . developed Price Improvement ('PI'), a new trading option . . . designed to help bidders get better trade executions," eSpeed, 2006 U.S. Dist. LEXIS 16875, at *7, and offered the investors rosy earnings projections claiming that "customers would embrace" PI.  See  eSpeed, 05-2091, Docket Entry No. 24, at 2 (plaintiffs' complaint).  Although defendants' claim was entirely baseless since defendants' own survey indicated that the "customers' response to PI was uniformly hostile" ab initio, defendants kept insisting on their rosy predictions alleging that the customers' "initial reaction was due to ignorance, . . . and . . . with [due] education and exposure to [PI, the] customers would embrace it."  Id.; see also eSpeed, 2006 U.S. Dist. LEXIS 16875, at *7-10.  Defendants' rosy earnings predictions, however, failed to materialize causing the investors to file a 10b-5 action.  "Under the heading 'The Truth Is Disclosed,' [eSpeed] plaintiffs allege[d] that [the market learned the eSpeed defendants' predictions were false when the defendant] issued a press release in which [they] finally disclosed that [the company's] business was not progressing as previously anticipated," and a business magazine article was published connecting the company's poor financial performance to a number of matters, including customers' resentment of PI.   Id. at *88-90.  Although the press release acknowledged merely "a material decline in [company's] financial performance" and contained company's denial that PI was "detested by its customers," the eSpeed court read the language of the press release jointly with that of the business article and concluded that, together, these two sources sufficiently advised the market about both the

company's declining profitability and the fact that PI was contributing to such decline.  Id. at *90-92.

Specifically, the eSpeed court noted that, "[a]lthough the [business] article discusses other possible

causes for the stock decline aside from PI, *a plaintiff is not required to plead that her economic loss*

*was caused solely by the alleged fraudulent scheme*" (italics supplied).  Severing the  italicized

language from the context, Plaintiffs in the instant case rely on eSpeed for the proposition that an

allegation of an attenuated association between the disclosure and the actual misrepresentation

satisfied the pleading requirement with respect to the loss causation element, flatly ignoring that, in

eSpeed, the market was expressly advised by the business article about the connection between the

company's decline in profitability and the company's continuous manufacturing of PI.  As this Court

explained,

> [t]he truth may be revealed to the investing public through means other than
> defendant's corrective disclosure.  See Dura, 544 U.S. at 343 (speaking in terms of
> "truth leaking out").  For instance, in addition to formal disclosure by a defendant,
> "the market may learn of possible fraud [from] a number of sources: e.g., from
> whistleblowers, analysts questioning financial results, resignation of CFOs or
> auditors, announcements by the company of changes in accounting treatment going
> forward, newspapers and journals, etc." Enron, 2005 U.S. Dist. LEXIS 41240, at *16
> (citation omitted); Electronic Data Sys. Corp. Sec. & "ERISA" Litig., 298 F. Supp.
> 2d 544, 560-61 (E.D. Tx. 2004) . . . .

See December Opinion at 18 n. 11 (Intelligroup, 468 F. Supp. 2d at 684).

Thus, the eSpeed decision, like Geopharma, indicates that allegations of actual disclosure of

misrepresented truth are necessary to plead the element of loss causation.

The last opinion relied upon by Plaintiffs in support of their claim that this Court should

ignore lack of actual disclosure of misrepresented truth that caused artificial inflation of Intelligroup

stock is Sekuk Global Enters. v. KVH Indus., 2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005),

a case largely similar to eSpeed.[49]  In Sekuk, the defendant corporation derived its revenue from three

principal sources: (1) military navigation products; (2) legacy navigation products; and (3) satellite

products for automobiles, as well as for recreational vehicles ("RVs").  See id. at *3.  The Sekuk

plaintiffs alleged that, after the corporation unveiled a new product (a mobile satellite television

antenna ("A5")) and "heralded the A5 and its anticipated impact on the company's fortunes,"

defendants went on to record fictitious revenue from fictitious sales of A5s in order to rely on such

inflated revenue figures during a secondary public offering that followed the introduction of A5 to

the market. Id. at *3-7.  Later on, defendants altered their rosy business predictions and made an

announcement that the anticipated earnings would decline in comparison with the company's

previous performance.  See id. at *7-8.  In an accompanying press release, one of the corporate

---

[49]

It appears that the court in Sekuk might have applied an unduly lenient standard to the Sekuk plaintiffs' pleadings, since the Sekuk court: (a) employed the standard of review based on the language from Rosenberg v. City of Everett, 328 F.3d 12, 15 (1st Cir. 2003) (stating that "[d]ismissal is appropriate only if it appears that the plaintiff cannot recover on any viable theory, based on the facts alleged"), which largely resembles the language in Conley (stating that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") that "has earned retirement" and "is best forgotten," Bell Atlantic, 127 S. Ct. at 1968-69; and (b) misread the Supreme Court's guidance in Dura, since the Sekuk court quoted Dura in order to conclude that, "[t]o survive a motion to dismiss, a . . . plaintiff must allege that the value of the security declined as a result of the misrepresentation . . . . However, 'it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'"  Sekuk, 2005 U.S. Dist. LEXIS 16628, at *48 (citing and quoting Dura at 1633-44) (emphasis supplied).  Since (a) the element of loss causation is established by allegations that the value of the security declined as a result of a disclosure of the misrepresentation, rather than "as a result of the misrepresentation," and (b) the Sekuk court's usage of the word "however" in the second sentence indicates that the Sekuk court might have misread the Dura line "'it *should not prove burdensome for a plaintiff* who has suffered an economic loss to provide a defendant with some indication of . . . the causal connection" (emphasis supplied), as standing for the proposition that "*plaintiffs should not be burdened* by the obligation to provide an indication of the causal connection," it appears that the complaint in Sekuk was examined extra-leniently. However, this possible extra lenience of the Sekuk court does not affect this Court's instant analysis.

Page 108 of 195

executives "attributed this drop in revenue to lower than expected sales [of] military navigation products and mobile satellite [products,]" while another executive "stated that the company's disappointing financial results were due to an unusual convergence of factors [including] a channel inventory adjustment by one of [the company's] major RV customers." Id. at *8 (internal quotations omitted). The press release closed with the corporation stating that it would lower the suggested retail price for A5 by about one-third, that is, "from $ 3,495 to $ 2,295 per unit." Id. at *49. Pleading their 10b-r claim, Plaintiffs' asserted that the press release constituted a disclosure that the previously concealed fact revenue from A5s were less than that originally predicted, which originally caused inflation of the corporation's stock price. See id. at *8-9, 48. The Sekuk defendants

> argue[d] that the press release and the resulting drop in the price of . . . common stock fail[ed] to establish loss causation because the press release [did] not [expressly] attribute the declining revenue to the sales of the A5. [Although the statements made in the press release by one executive expressly] assigned a portion of the blame for the drop in revenue to the lower than expected sales of . . . satellite [products, d]efendants claim[ed] that[the statements made in the press release by another executive] limited the scope of those lower sales [of satellite products] to [the corporation's] major RV customers . . . . [Although recognizing that] A5 was a . . . satellite [product], defendants note[d that A5] was designed for use in automobiles, not RVs [and, therefore, reading the statements of both executives together,] defendants' proposed [an] interpretation [of] the press release [suggesting that the press release] could not have revealed any misrepresentations regarding the A5 . . . sales.

Id. at *49.

Rejecting defendants' claim that the Sekuk plaintiffs failed to plead facts of loss causation, the Sekuk court noted that, even if the defendants' reading of the press release is adopted, i.e., if press release were to be read as disclosing lower than expected sales of satellite products to major RV customers, the press release did disclose to the market the fact that the sales of A5s would be lower than initially promised because the Sekuk plaintiffs duly alleged that the corporation was

marketing and selling A5 to its major RV customers.   See id. at *49-50 ("[d]efendants fail to recognize the allegation in the complaint that KVH began marketing the A5 in the RV market").   The defendants' sole contention that the Sekuk court refused to embrace was that, since A5 was initially "designed for use in automobiles, not RVs," the Sekuk court had to ignore the fact that A5 was sold to the RV market and the Sekuk plaintiffs' pleading of public knowledge of the same, and conclude that this design-based distinction, somehow, specifically excluded any information about the sale of A5 satellite product from the overall disclosure (made through the announcement and accompanying press release) of the company's lower-than-promised sales of satellite products.

Consequently, the holding of Sekuk appears to stand for the proposition that, once publicized to the market, the information disclosed cannot be taken back by the issuer under the claim that the issuer intended to make a narrower disclosure than that actually made.   The finding of the Sekuk court, however, in no way disturbs the premise that allegations of an actual disclosure of the very misrepresentation  that cause original inflation of stock price are required in order to plead the loss causation element.   Accord Semerenko, 223 F.3d at 185 (an alleged misrepresentation will be incorporated into the value of a security until the actual truth is disclosed).   To the contrary, the case, the same as all other cases cited by Plaintiffs, suggests the same basic principle, i.e., that the loss causation allegations must consist of facts indicating that the corrective disclosure was the "direct[] and proximate[] cause[], or a substantial contributing cause of, the damages sustained."  McCabe, 2006 U.S. Dist. LEXIS 524, at *24 n. 9 (D.N.J. Jan. 6, 2006) (citing EP MedSystems, 235 F.3d at 884, citing, in turn, Semerenko, 223 F.3d at 186); see also Veeco, 235 F.R.D. 220, 234 (S.D.N.Y. 2006) (same).  In sum, having examined all of Plaintiffs' arguments alleging that the Press Release contained data that actually disclosed to the stock market those misrepresentations in the Statements

which were likely to cause inflation of Intelligroup's stock price, the Court comes to the same conclusion it reached before, i.e., that the Press Release both truly and falsely advised the market of Intelligroup's numerous errors, upcoming dilution of corporate equity and potential dire credit hardships, but it did not disclose to the market any true information about the particular errors in Intelligroup's Statements, which were likely to cause inflation of Intelligroup's stock price during certain parts of the Class Period. See December Opinion at 31-57 (Intelligroup, 468 F. Supp. 2d at 692-707); accord Payne v. DeLuca, 433 F. Supp. 2d 547, 608 (W.D. Pa. 2006) ("[b]ecause the previous misrepresentations about the fraudulent scheme were not disclosed in the press release, there could have been no proximate cause between revelation of the truth and the decline in the stock price. Instead, it is reasonable to infer that the price fell because the market reacted to [other negative information disclosed in the press release]"); Tellium, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 26332 (D.N.J. Aug. 26, 2005) (since the investors did not allege facts indicating that the concealed scheme that formed the basis of their complaint was ever disclosed to the market, they failed to allege requisite loss causation).[50]

---

[50]

As the Court detailed in its December Opinion, the single piece of news contained in the Press Release and relevant to Plaintiffs' claim (based on the errors made in the Statements) was Intelligroup's announcement that its yearly net income for 2003 was overstated by $0.9 million (warranting a loss of $0.05 per share). See December Opinion at 44 (Intelligroup, 468 F. Supp. 2d at 700). While there is little doubt that the market reacted to the news and stock price dropped in response to this statement, the news was not only incorrect, it was completely opposite to the truth, since, in reality, Intelligroup's yearly net income for 2003 was understated by $5.34 million (warranting a gain of $0.30 per share). See December Opinion at 44 n. 32 (Intelligroup, 468 F. Supp. 2d at 701). Recognizing that Intelligroup's estimate (of what the company's restated yearly net income for 2003 would be) was more than $6 million off and provided the market with unwarranted bad news where good news was actually well-warranted, the Court (a) examined Plaintiffs' Second Complaint to establish whether it could be read as alleging that Defendants intentionally disseminated the bad rather than good news, and (b) concluded as follows:

c.    *Miscellaneous Claims*

Plaintiffs' third theory consists of a mix of statements, see Opposition at 35-37 (Part (c) of Plaintiffs' loss causation argument) ("Part C").[51]  Although it is hard to distill clear allegations from Plaintiffs' statements set forth in Part C, it appears that Plaintiffs aim to set forth two contentions:(1) that the airing of the Press Release amounted to an indirect disclosure of the Statements' errors because the Press Release implied that Intelligroup "lack[ed] . . . any effective internal and financial control" and such lack of internal control must have been the cause of those errors in the Statements

---

[the Second] Complaint, as drafted, provides this Court with no grounds to piece together any allegations resembling [a] claim with respect to [this dissemination of the bad rather than good news], since the Complaint (1) sets forth no fraud allegations related to [such dissemination]; and (2) is bereft of the appropriate scienter pleadings . . . indicating Defendants' intentional state of mind.

December Opinion at 45 n. 33 (Intelligroup, 468 F. Supp. 2d at 701) (citations omitted).

The Court's above-quoted observation clearly indicated to Plaintiffs that they may, if they so wish, set forth a claim based on intentional dissemination of the bad rather than good news in their instant Complaint, that is, if Plaintiffs had facts to support such allegations.  See id.  Plaintiffs responded to the Court's guidance with the comment that, "[t]his Court misconstrues the applicability of . . . the Exchange Act," and asserted that "[t]he Press Release is [perceived by Plaintiffs merely as a] curative disclosure."  Opposition at 34-35, n. 15.  The Court, thus, reads this statement as Plaintiffs' conclusive waiver of any claim based on Intelligroup's dissemination of the bad rather than good news, or as Plaintiffs' admission that Plaintiffs have no facts to support such a claim, and notes the distortion of its December Opinion.  Cf. Marsden v. Select Med. Corp., 2007 U.S. Dist. LEXIS 42924, at *13, n. 7.

[51]

Part C starts with the same error that Plaintiffs made with respect to the Geopharma opinion, i.e., by Plaintiffs quoting the language of Montoya v. Mamma.Com, Inc., 2006 U.S. Dist. LEXIS 13207, at *28 (S.D.N.Y. Mar. 28, 2006), which clearly deals with the element of transactional causation, that is, reliance, rather than loss causation.  See Opposition at 35 (quoting the Montoya court's observation that "[P]laintiffs *need not allege that the only factor* affecting the stock during the class period was the concealment and ultimate disclosure of [the alleged fraud] . . . .  Plaintiffs will ultimately prevail if they can prove that defendants' alleged fraud *caused some artificial inflation* of the share price that later dissipated when the concealed facts were revealed") (Plaintiffs' original bracketing and emphasis preserved, since the Court is not clear as to the reasons for these measures).

that resulted in artificial inflation of Intelligroup's stock price," see id. at 34-36; and (2) that the Post-Release Recovery should not be read as an indication that the disclosure of the information contained in the Press Release was not the cause of all Intelligroup's stock price declines that took place after the Press Release was publicized.  See id. at 36-37.

### i.      Contentions About Implied Disclosure

Vaguely articulated, Plaintiffs' first contention appears to suggest that, although the Press Release did not disclose to the market any specific true information about those errors in Intelligroup's Statements that caused inflation of Intelligroup's stock price, the Press Release put the market on notice that Intelligroup's internal control system was weak, and the disclosure of that news caused the decline in Intelligroup's stock price.  See Opposition at 34-36.

If Plaintiffs' Part C intends to so assert, that contention has no merit for a multitude of reasons.  First, Plaintiffs fail to observe that, in order to be correctively disclosed--and, thus, provide the basis for the loss causation element--the information needs to be initially misrepresented in order to provide the basis for the transactional causation element.  See Dura, 544 U.S. at 588-89.  Consequently, even if this Court is to presume that Intelligroup's Press Release did, somehow, correctively disclose Intelligroup's lack of internal control, Plaintiffs' pleadings fail to assert that the market kept overpricing Intelligroup's securities during the entire Class Period on the basis of Intelligroup's misrepresentation that it actually had proper internal control measures, since, even if this Court is to read the SOX certifications of Intelligroup's officers (that is, the only language in the Statements that addressed the matter of internal control) as such misrepresentations, the SOX certifications supply Plaintiffs with the proper "transactional causation-loss causation" connection

during less than two-thirds of the Class Period, since Intelligroup's Statements during the initial

fifteen and a half months of the Class Period were not accompanied by SOX certifications, see

Compl. ¶ 77, and, thus, provided the market with no misrepresentations, the truth about which could

have been correctively disclosed by the Press Release.

The second--and more important--reason is that, under the guidance of Bell Atlantic,

Plaintiffs are obligated to plead the facts suggesting, rather than merely consistent with, Plaintiffs'

allegations. See Bell Atlantic, 127 S. Ct. at 1966 n.5.  By contrast, vague self-serving inferences by

a litigant cannot supply "enough [factual] heft."  Id. at 1965-69; see also Dura, 544 U.S. at 588-89.

In the case at bar, the Press Release provided the market with the following information:

> the expected [R]estatement is based on preliminary results of an ongoing review
> conducted by [Intelligroup] management. . . .  As a result of recent implementation of
> an upgraded financial system, and the recent turnover in key positions in
> [Intelligroup's] finance department, [Intelligroup] has been undertaking a
> comprehensive review of its 2004 second quarter results, [as well as prior financial
> Statements and detected past errors, some depicting Intelligroup's financial position
> better than reported before, and some depicting the position worse than reported].

Press Release.

Plaintiffs appear to suggest that this language must necessarily indicate that Intelligroup's

internal control was weak during the Class Period.  See Opposition at 34-36.  The Court disagrees.

If one is to focus on the plain meaning of the Press Release language, i.e., employ the very approach

expressly advocated by Plaintiffs, see id. at 30, the Press Release language must be read as stating

no more and no less than what it actually states, namely, that, after upgrading its financial systems,

hiring fresh talent and conducting additional internal audits, Intelligroup detected a series of past

financial mistakes.  It is obvious that each upgrading of financial systems and each hire of new

talented and diligent employees and auditors offers a business entity better levels of internal and

financial control.  However, it would be anomalous to legally transform any corporate announcement about upgrading its financial system, new hire or detection of a past error into an automatic admission that the corporation's previous control systems were either "weak" or "inadequate," since such legal transformation: (a) would, by definition, take any incentive from both technological upgrading of and putting any effort into determining and correcting previous mistakes; and, most importantly (b) would reduce the loss causation requirement emphasized by the Supreme Court in Dura to a check-mark automatically satisfied by a securities plaintiff's pleading a "catch-all" claim consisting of mere three buzz words "insufficient internal control."  Indeed, a principle under which a corporate announcement that the corporation obtained better facilities and improved its previous methods could be automatically transformed into an actionable statement that the previous facilities and methods were necessarily inadequate is contrary to the Supreme Court and Court of Appeals' guidance that, in  order to plead that a corporation's statement disclosed to the market a previously misrepresented fact that the corporation's systems of internal or financial control were inadequate, a securities plaintiff should point to the fact of actual disclosure rather than to the corporation's neutral language, which the plaintiff baldly interprets as a disclosure serving the plaintiff's legal goal. See  Bell Atlantic, 127 S. Ct. at 1969-74; Dura, 544 U.S. at 588-89; Burlington, 114 F.3d at 1429; compare Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) (disclosure of "*complete lack* of internal controls" indicates that previous facilities were inadequate).

The third reason for rejecting Plaintiffs' claim based on Intelligroup's implied disclosure of its internal control weakness ensues from Plaintiffs' arguments with respect to the fluctuation of Intelligroup's stock price.

As noted supra, during the period from March 1, 2004, to December 31, 2004, Intelligroup's stock price suffered numerous declines, i.e., First Drop, Second Drop, Earnings Drop, Post-Earnings Drop, Post-Second Recovery Drop, Auditor Drop, Post-Auditor Drop, Pre-Release Drop, Press Release Drop, Post-Release Drop and Final Drop, as well as a few recoveries, i.e., First Recovery, Second Recovery, Post-Auditor Recovery, Post-Release Recovery and Second Post-Release Recovery. See Stock Chart. In a word, Intelligroup's stock price was fluctuating, while keeping a distinct and, unfortunately, quite stable downward direction. See id. Since the Press Release of September 24, 2004, was publicized after the seven-tenth of the period encompassing these downward price movements, the Court concluded that the other market forces that pre-existed Intelligroup's airing of the Press Release and drove the stock price down for seven months starting March 1, 2004, were also responsible for the three months of declines that took place after the swift Post-Release Recovery (which occurred within one week after the Press Release and brought the stock price up to $0.15 above the level where the stock was before the Press Release), especially in view of the fact that the pace of the three-months-long decline that followed the Post-Release Recovery was strikingly similar to that of the declines suffered by the stock during the first seven months of the period.[52]

Apparently responding to the Court's observation about the fluctuation and the general downward tendencies of Intelligroup's stock price during the Stock Chart period, Plaintiffs alleged

---

[52]

In that respect, the Court notes that the visual graph presented by Plaintiffs as Plaintiffs' Exhibit C to Plaintiffs' Second Complaint is particularly depictive of the pace of Intelligroup's stock price decline before and after the Press Release. See December Opinion at 10, 36-38 (Intelligroup, 468 F. Supp. 2d at 679, 695-97) (describing the graph, i.e., Plaintiffs' Exhibit C, and setting forth the Court's observations and conclusions).

as follows:

> Prior to the Press Release, two negative disclosures caused Intelligroup shares to fall. First, on May 4, 2004, Intelligroup announced an earnings shortfall, resulting in a decline of $1.89 per share (or 33%) [i.e., the Earnings Drop. Plaintiffs] allege[] that the earning shortfall was directly related to and caused by the lack of any effective internal and financial controls at [Intelligroup]. . . . Second, on August 11, 2004, Intelligroup's independent auditor Deloitte resigned as a result of the growing accounting scandal [presumably, also directly related to and caused by the lack of any effective internal and financial controls at Intelligroup].  Deloitte's resignation resulted in a decline of $0.68 per share (or 24%) [i.e., the Auditor Drop].

Opposition at 36 (quotation marks and citations to the Complaint omitted).

In view of the above-quoted Plaintiffs' allegations, Plaintiffs' claim that Intelligroup's Press Release "implied" to the market the fact of Intelligroup's "lack of any effective internal and financial controls" makes little sense.  The Court of Appeals expressly guided that the inflation associated with an alleged misrepresentation will be incorporated into the value of a security until the actual truth is disclosed.  See Semerenko, 223 F.3d at 185.  Therefore, if (a) the stock market overpriced Intelligroup's securities relying, for instance, on Intelligroup's SOX certification, which--solely for the purposes of this argument--the Court presumes to operate as a misrepresentation of the fact that Intelligroup lacked effective internal and financial controls, and such misrepresentation was, hypothetically, capable of causing an artificial price inflation, then (b) the May 4, 2004, announcement "implied" the truth to the market (causing the Earnings Drop) and, under the holding of Semerenko, removed the artificial inflation, and (c) the August 11, 2004, announcement "re-implied" the truth one more time (causing the Auditor Drop), and removing whatever artificial price inflation was remaining, if any "residual" price inflation is possible.[53]  Consequently, Plaintiffs'

---

[53]

It appears that no "re-implication of the truth" and no "re-removal" of artificial price inflation is possible under the holding of <u>Semerenko</u>, since the market either knows the truth or it does not.

allegations that two of Intelligroup's announcements put the market on notice that Intelligroup's Statements were not reliable because Intelligroup "lack[ed] . . . any effective internal and financial controls," Opposition at 36, indicate that the Press Release could not "re-imply," the third time around, the very same truth which the market already learned more than five and a half months ago.

To summarize, it appears that Plaintiffs' allegations based on "implied" disclosure indicate that the Press Release Drop of $0.52 per share was a result of Intelligroup's publication of new facts, correct and erroneous, i.e., the statements that Intelligroup was about to dilute its equity, that it was in default, could lose its credit and become de-listed, and that its net income for the previous fiscal year was almost $1 million less than that previously reported.  However, as the Court pointed out time and again, Plaintiffs' allegations fail to tie these disclosures to the facts which Plaintiffs assert as the basis for their transactional causation element.

### ii.    Contentions About the Post-Release Recovery

While elaborating on the causes of the Earnings, Auditor and Post-Release Drops, Plaintiffs do not enlighten the Court as to the causes of the other nine Drops, leaving the nature of all downward forces that pre-existed and followed Intelligroup's airing of the Press Release to this Court's imagination.  See generally, Compl., Opposition.  Moreover, Plaintiffs' submissions are equally silent as to the causes for Second Post-Release Recovery, even though Plaintiffs attempt to tie the Press Release to all losses that followed the airing of the Press Release.

---

The issue of "partial corrective disclosure" was addressed in Buca Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 75224, at *25-28 (D. Minn. Oct. 16, 2006), a case very similar to that at bar, which dismissed for failure to plead loss causation on the grounds nearly identical to the ones of this Court.

Plaintiffs, however, do provide the Court with Plaintiffs' opinion as to the causes for the first Post-Release Recovery.  See Opposition at 37.  Responding, apparently, to this Court's observation that the Post-Release Recovery cannot be discounted to a mere market fluke,[54] Plaintiffs came up with the following explanation for the Post-Release Recovery:

[The Post-Release Recovery was a result of] the completion of [the private placement

_____

[54]

Assessing Plaintiffs' explanation for the Post-Release Recovery set forth in the Second Complaint, the Court noted that

Plaintiffs' assertion that the disclosure contained in the Press Release was the cause of the long depression of Intelligroup's stock price [i.e., the cause of the stock price decline that continued for almost ten months after the Press Release was aired,] unduly ignores the presence of the [Post-Release] Recovery period.  Plaintiffs, effectively, maintain that the [Post-Release] Recovery period was but a market "fluke," indicating nothing but the general fact that "Intelligroup's stock price was quite volatile." . . . Plaintiffs err.  The Efficient Market Hypothesis, upon which Plaintiffs rely, is premised on the belief that individuals are rational, self-governing actors who are able to process the information wisely, and they do so promptly.  Since Plaintiffs rely on the Efficient Market Hypothesis, . . . Plaintiffs' allegation that the Recovery was a "fluke" that could not reflect the investors' assessment of Intelligroup's financial conditions directly contradicts Plaintiffs' claim that the Post-Release Drop was a result of the Press Release.  Plaintiffs simply cannot have it both ways, i.e., rejecting all upward movements of Intelligroup's stock as inconsequential signs of volatility, while simultaneously maintaining a direct causal connection between the downward movements (specifically, the Post-Release Drop and [the drops that occurred during the next ten months]) and Defendants' alleged fraud.  Claiming a temporal-proximity-based causal connection between the latter, Plaintiffs cannot avoid admitting the same with respect to the former.

December Opinion at 37-38 (Intelligroup, 468 F. Supp. 2d at 696) (citations omitted).

Plaintiffs' error in the Second Complaint was identical to that committed by the Dura plaintiffs who also tried to connect the alleged disclosure of the Dura defendants' fraud to all following declines of the company stock, while ignoring that the stock price swiftly rebounded to its pre-disclosure level after the alleged disclosure and potentially suggesting that the decline following such rebound was not related to the disclosure but rather a result of (a) either the forces pre-existing the disclosure, or (b) post-disclosure events that warranted a price decline, or (c) the combination of both.  See Dura, 544 U.S. at 339.

Page 119 of 195

> that] provided at least some comfort to investors that [Intelligroup] would retain sufficient cas[h] to remain a going concern [i.e., stay in business rather than go bankrupt].

Opposition at 37.

Plaintiffs' explanation, however, contradicts Plaintiffs' own claims. Just a few pages prior to making the statement quoted above, Plaintiffs assert that their losses ensued from Intelligroup's airing of the Press Release because "[t]he Press Release revealed the following true *negative* information about [Intelligroup]: . . . [Intelligroup] would seek to privately place $15,000,000 in Intelligroup stock . . . ." Id. at 32-33 (emphasis supplied). Moreover, Plaintiffs' elaborate on the negativity of the private placement news by alleging that this statement was "part and parcel of the revelation of Intelligroup's concealed financial condition [because] the need for a private placement [ensued from] the lack of cash availability and liquidity" Id. at 34. Basing their conclusion on the foregoing allegations, Plaintiffs deduce that they "adequately allege[d that] the disclosure of true negative information" caused decline of Intelligroup's stock price and resulted in Plaintiffs' losses. Id. Yet, just three pages later, Plaintiffs assert that the fact of Intelligroup's private placement "provided [so much] comfort to investors" as to cause the stock price to rise $0.14 above the level it was at on the day prior to the Press Release. See Opposition at 37; accord Stock Chart.

Plaintiffs' allegations depict the market vastly different from that envisioned by the Supreme Court in Basic, 485 U.S. at 245-47. The Basic market, premised on the Efficient Market Hypothesis, consists of rational individuals who are able to process the information wisely and do so promptly. The market defined by Plaintiffs, however, consists of investors operating with little rhyme and reason since, upon learning the news about Intelligroup's upcoming private placement, such market initially interpreted it as information so negative to have caused Intelligroup's stock price to drop

from $1.65 to $1.13.  See Stock Chart.  However, according to Plaintiffs, the market changed its mind about the negativity of the private placement the very next day because the "comfort[ing aspect of the news that Intelligroup] would retain sufficient cash to remain a going concern" began, somehow, to dawn upon this market, and caused the stock price to rise to $1.17.  See id.; Opposition at 37.  Apparently, this market kept progressively rejoicing over the comforting aspect of the news, causing the stock price to rise continuously to $1.22, then to $1.37.  See id.  On October 1, the day when Intelligroup finally publicized the even more comforting news, i.e., that the private placement did actually take place, the market brought Intelligroup's stock price to $1.78.  See Compl. ¶ 10; Stock Chart.  Over the following weekend that followed the news about consummation of the private placement, the degree of comfort apparently increased, since on Monday, October 4, 2004, the market increased the stock price to $1.79.  See Stock Chart.  Yet, by Tuesday, the market somehow lost its sense of comfort, and the stock price dropped to $1.66.  Moreover, this market's loss of comfort was just as swift as its discovery of this comfort, since the stock price neither stayed at $1.66 nor rose, but rather it began a steady decline and, just two weeks later, reached its absolute lowest level at $0.90, see id., perhaps because this peculiar market once again changed its mind and decided, once and for all, that the private placement was negative rather than positive news.[55]

---

[55]

　　Plaintiffs assert that the market might have lost its "comfort" as a result of Intelligroup's "continued delay [in] restat[ing] its financials . . . over the next several months."  Compl. ¶ 11.  This allegation suggests the same conclusion as reached by the Court, i.e., that all declines in Intelligroup's stock price were results of unfolding events rather that the market's response to the disclosure made in the Press Release.  Indeed, the Press Release expressly notified the market that Intelligroup's filing of second-quarter-of-2004 financials was not forthcoming for months, and neither was the Restatement.  See Press Release (putting the market on notice that "reconciliation of [accounting] difference [is] the primary reason for further delay in filing [of the second-quarter-of-2004 financials, and that--because of this delay--Intelligroup] is in default [on] its . . . credit [and] is working . . . to obtain waivers for such defaults."  At no point did the language of the Press Release

In sum, Plaintiffs' factual allegations suggest that the Press-Release Drop and the following declines were caused by a combination of (a) pre-existing forces, (b) the Press Release disclosure of such factors as upcoming dilution of corporate equity, potential delisting, possible dire credit hardships and the erroneous prediction that Intelligroup's net income for the year preceding the Press Release was notably lower than what was originally reported (that is, the factors unrelated to the actual errors in the Statements, which could have caused artificial inflation of Intelligroup's stock price during certain parts of the Class Period); and (c) Intelligroup's later financial hardships, e.g., materialization of Intelligroup's fears as to delisting from the stock market.  Accord Ray v. Citigroup Global Mkts., Inc., 2007 U.S. App. LEXIS 8369 (7th Cir. Apr. 12, 2007) (examining plaintiffs' claim alleging *relative* decline and finding that the loss causation requirement was unsatisfied); Collier v. Aksys Ltd., 2005 U.S. Dist. LEXIS 20300 (D. Conn. Aug. 15, 2005), aff'd 179 Fed. Appx. 770 (2d Cir. 2006) (same).  Plaintiffs' allegations with respect to the transactional causation elements and the facts offered by Plaintiffs in support of the loss causation elements provide two sets of facts that cannot be matched since they present pieces of two entirely different puzzles, and Plaintiffs' bald assertions that their facts should be perceived as matching cannot salvage their claim.   See  Bell Atlantic, 127 S. Ct. at 1969-74; Dura, 544 U.S. at 588-89; Burlington, 114 F.3d at 1429.

---

suggest that, instead of seeking waivers, Intelligroup had any hopes to cure the default by a speedy filing of its second-quarter-of-2004 financials, and the time-line or deadline for Restatement was not even remotely addressed: the only information disclosed was that the Restatement was "expected" to be made, and that the Restatement would involve a very extensive accounting review). Consequently, Plaintiffs' assertion that the stock price kept declining after the Post-Release Recovery because of Intelligroup's failure to file its second-quarter-of-2004 financials (and financial consequences of such failure) actually severs the connection between Plaintiffs' reliance on the misrepresented news and the disclosure of truth about this news, since an effective market should absorb news upon disclosure and speedily adjust the stock price rather then keep "re-adjusting" the price for months and months, all on the basis of the same initial disclosure.

### C.  SCIENTER

Even if Plaintiffs' Complaint did not suffer from the deficiencies discussed above, the Complaint would still have to be dismissed for Plaintiffs' failure to properly plead the scienter element.  Although the issue of scienter took the bulk of the parties' efforts during the Court's assessment of Plaintiffs' First and Second Complaints, this Court did not address the issue in its December Opinion in view of Plaintiffs' insufficient pleadings of both transactional and loss causation elements.  See December Opinion at 56-57 (Intelligroup, 468 F. Supp. 2d at 707) (the Court "does not need to reach the issue of whether Plaintiffs sufficiently pled the remainder of their 10b-5 claim, even though the bulk of the parties' efforts were dedicated to the elements other than that of causal connection) (citing Lucas v. Florida Power & Light Co., 765 F.2d 1039, 1045 (11th Cir. 1985)).  In its review this matter, the Court will examine the scienter allegations.

As the Court noted supra, a plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a motive and an opportunity to commit fraud," or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior."[56]  Advanta, 180 F.3d at 534; see also Burlington, 114 F.3d at 1418.

---

[56]

Obviously, since Intelligroup, a juridical entity, could have neither motives nor opportunities to commit fraud, or the ability to act consciously or recklessly, the Court examines the acts of Intelligroup's duly authorized officials, i.e., natural entities named as Defendants in this action, and for the purposes of its scienter inquiry, the Court excludes Intelligroup from the Court's reference to collective Defendants but attributes the acts of the natural entities who operated as Intelligroup's officials to Intelligroup.

### 1.    Motive and Opportunity

Plaintiffs allege that

"in this case, [D]efendants' opportunity to commit fraud is clear; each [D]efendant was a senior corporate officer who controlled public dissemination of information about the company."  Accordingly, the only question is whether Plaintiffs have identified a compelling motive for Defendants' fraud.

Opposition at 66 (quoting Unisys Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 13500, at *17 (E.D. Pa. Sept. 21, 2000)).

The Court agrees.  Therefore, the Court will limit its "motive-and-opportunity" examination of Plaintiffs' pleading to the inquiry whether Plaintiffs sufficiently pled Defendants' motive to commit fraud by alleging facts showing that Defendants "benefitted in a concrete and personal way from the purported fraud."  See  Wilson, 195 F. Supp. 2d at 633 ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures") (citing Advanta, 180 F.3d at 535); see also Cybershop, 189 F. Supp. 2d 214.

In the case at bar, Plaintiffs allege that Defendants were motivated by their desire to avoid writing off a substantial promissory note (executed in favor of Intelligroup) which eventually proved to be uncollectible and was written off in its entirety.[57]  See Compl. ¶¶ 40-42; opposition at 66. Plaintiffs clarify that Defendants: (a) were aware of the unlikely collectability of the note but kept misrepresenting the issue by not writing the note off (that is, presumably, by adding the stated value of the note to Intelligroup's assets reported in the Statements); and (b) kept misrepresenting the issue in fear that the write-off might trigger the "material adverse effect" clause in the loan agreement

---

[57]    See infra, this Opinion, at 177-84, for a detailed discussion of facts associated with the note.

existing between Intelligroup and one of Intelligroup's main lenders, thus trying to assure that the lender would not demand that Intelligroup repay the loan fully and immediately on the basis of the clause.  See id.

Since it is well established that the fact of a defendant having certain goals or aspirations common to the law-abiding business community cannot amount to a valid motive for the purposes of showing scienter, see GSC, 368 F.3d at 237 ("Motives that are generally possessed by most corporate directors and officers do not suffice"); San Leandro, 75 F.3d at 814 ("[A] company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because "such motive could be imputed to any company"); Nice, 135 F. Supp. 2d at 584 ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is . . . insufficient to demonstrate that [d]efendants had a motive to commit fraud");  Boeing, 40 F. Supp. 2d at 1175 ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter"), Defendants point out that Plaintiffs' allegations as to Defendants' motive to "maintain a favorable credit status is the sort of generalized motive that courts have rejected as . . . a motive to commit fraud."  Opposition at 67 (presumably, referring to Defs.' Brief at 18-21).  In response, Plaintiffs allege that the case at bar "stands in stark contrast" to the case law refusing to qualify a common business goal as a motive to commit fraud since Plaintiffs maintain that "Defendants had a very specific [credit] risk they sought to avoid."  Opposition at 68.  The Court disagrees.  The law is uniform as to the issue that common business goals, including the goal of maintaining good corporate credit, cannot be read as an indication that an interest in achieving these goals would provide a concrete and personal motive to commit fraud. See PR Diamonds, 364 F.3d at 690 (observing that courts "distinguish motives common to corporations and executives generally

from motives to commit fraud"); Kushner, 317 F.3d at 830 ( allegations with regard to motive generally possessed by all corporations, such as profitability, do not give rise to a strong inference of scienter); Kalnit, 264 F.3d at 140 ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers"); Chill, 101 F.3d at 268 n.5 (refusing to accept general allegations of scienter that would lead to the presumption of motive for any publicly-held corporation that desires its stock to be priced highly by the market); SEC v. Cohen, 2007 U.S. Dist. LEXIS 28934, at *52 (E.D. Mo. Apr. 19, 2007) (same); Patterson Cos., 479 F. Supp. 2d 1014, 1053 (D. Minn. 2007) (same); Pet Quarters, Inc. v. Badian, 2006 U.S. Dist. LEXIS 21941, at *12 (E.D. Ark. Mar. 29, 2006) (same).  The law treats the desire of corporate officials to assure good credit of their companies no differently that any other business goal, see San Leandro, 75 F.3d at 814; City of Philadelphia, 264 F.3d 1269; Interpool, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 18112, at *33 (D.N.J. Aug. 17, 2005), and makes no exception for a plaintiff's pleading asserting that the corporate credit at issue was "really-really important."[58]  Indeed, Plaintiffs cite not a single case suggesting otherwise.  See generally, Opposition.  Since Plaintiffs' Complaint is completely void of any facts indicating that Defendants executed a single stock sale or obtained any other personal benefit, the Court concludes that Plaintiffs failed to allege any cognizable motive from which this Court could infer that Defendants disseminated the Statements into the market while acting with the culpable state of mind.

---

[58]    The Court notes, in passing, that even if the law supported Plaintiffs' position, Plaintiffs' allegation would still be insufficient, since Intelligroup actually disclosed the fact of non-collectability of the note in (and such disclosure did not affect Intelligroup's credit facilities). Therefore, Intelligroup's alleged motive dissipated, partly, in 2002 and, fully, in 2003, see Compl. ¶¶ 37, 104, that is, about a year before expiration of the Class Period, hence eliminating any scienter element during one-fourth of the Class Period.

2.        **Circumstantial Evidence**

As explained supra, the courts have uniformly held that a securities plaintiff may sufficiently plead inference of scienter from a defendant's GAAP violations or SOX certifications only if these facts are employed as a "supplement" to other facts indicating that the defendants had known about the invalidity of company's financials (or had reasons to doubt the validity of the financials but kept turning a blind eye to all "red flags").  See Advanta, 180 F.3d at 539; Wyser-Pratte, 413 F.3d at 563; Ferris, Baker Watts, 395 F.3d at 855; Alpharma, 372 F.3d 137; Rothman, 220 F.3d 81; Comshare, 183 F.3d at 553; WatchGuard II, 2006 U.S. Dist. LEXIS 74269; InVision, 2006 WL 538752.  A similar "valid-as-a-supplement-only" rule applies to pleadings based on statements made by confidential sources who are not described by the plaintiff with particularity sufficient to indicate that the confidential source has the firsthand knowledge about the fact alleged.  See Royal Dutch, 380 F. Supp. 2d 509; Barnum, 850 F. Supp. at 1232-33.  While the degree of such "supplementation" is left to judicial case-by-case assessment, the Supreme Court's recent decision in Tellabs, 127 S. Ct. 2499, unambiguously indicated that the plaintiff's total factual allegations should create an inference against the defendant "at least as compelling as any opposing inference one could draw from the facts alleged," that is, while factoring in all facts, regardless whether these facts favor the plaintiff or the defendant.  Id. at *2509-10; Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22..

Plaintiffs subdivided their circumstantial evidence allegations into four group based on: (1) the fact of Intelligroup's issuance of the Restatement and the GAAP violations in the Statements; (2) Defendants' SOX certifications; (3) statements from confidential sources; and (4) the fact that Plaintiffs designate as "additional" and dedicate to discussion of Defendants' resignations from Intelligroup.  See Opposition 41-68.  This Court, therefore, will: (a) start with an examination of

Plaintiffs' pleadings provided in the last, i.e., "additional," group in order to determine whether the facts stated in that group per se meet the pleading requirement or, if not, what degree of supplement these facts could offer to those set forth in each of the first three groups, and (b) in the latter scenario, will proceed with an examination of the first three groups of allegations in order to establish whether the facts set forth therein--read in conjunction with those stated in the last group--meet the pleading requirement or, with respect to the allegations based on the statements of undisclosed witnesses, whether these facts meet the pleading requirement on their own.

### a.   *Resignations as Evidence of Scienter*

Plaintiffs' entire argument based on the resignations of the named Defendants is summarized by Plaintiffs as follows:

> The Complaint . . . pleads additional specific facts which support a strong inference that Defendants either knew or recklessly disregarded that Intelligroup's financial [S]tatements were false and misleading when issued. For example, the . . . eventual removal of Defendant Valluri[] from his position as CEO contribute[s] to a strong inference of the Defendants' knowledge of fraud, or at a minimum, their severe recklessness. The most logical and plausible inference to be drawn from [this] "resignation[]" is that Valluri[ and another officer] were committing . . . the massive internal control deficiency and were therefore terminated. . . . Indeed, the fact that [Intelligroup's] board and new auditor investigated the fraud and . . . Valluri[] then resigned (or lost) [his] job speaks volumes.[59]

---

[59]

The actual language of the Opposition (replicated in this excerpt) is thickly peppered with references to David Distel ("Distel") who was named as a Defendant in the original complaint, but dismissed in the Second Complaint, see Docket Entry No. 39, and is not named as a Defendant in the instant Complaint. See Compl. ¶¶ 26-29 (Plaintiffs designation of "Parties" to this action). Notwithstanding the fact that Distel is not named as Defendant in this action, Plaintiffs assert that Distel acted with a culpable state of mind. See Opposition at 63-64 ("[T]he timing of the "resignation" of former CFO David Distel . . . contribute[s] to a strong inference [of other Defendants' scienter since] the most logical and plausible inference to be drawn from [this] 'resignation[]' is that . . . Distel [was] at least aware of or recklessly disregard[ed] the massive

Opposition at 63-64 (legal citations omitted).  Plaintiffs' Complaint, and even Plaintiff's Opposition, are entirely void of any allegations referring to the state of mind of the other named Defendant, Visco, who was Intelligroup's Vice President.  See generally, Compl., Opposition.

### i.     *Resignations of Defendants Valluri and Visco*

While Plaintiffs neither explain why resignations of Valluri and Visco "speak volumes" nor clarify why the most logical and plausible inference to be drawn from these resignations is that these officers were terminated because they were deemed committing massive fraud, see Opposition at 63-64, see generally Compl., the two cases cited by Plaintiffs appear to suggest that Plaintiffs' conclusion is based on what Plaintiffs perceive as temporal proximity between Intelligroup's airing

---

internal control deficiency and was therefore terminated. . . . Indeed, the fact that [Intelligroup's] board and new auditor investigated the fraud and Distel . . . then resigned (or lost) [his] job speaks volumes"); see also Compl. at 31-33 (stating allegations against Distel).  In addition, Plaintiffs' allegations with respect to Distel are supplemented with the following notation: "Distel even went so far as to later reveal in his resume that he had uncovered years of accounting irregularities before he left [Intelligroup]."  Opposition at 64, n. 35.  This Court is not entirely clear as to the reason for Plaintiffs' allegations with respect to the state of mind of an entity who is not a party to this suit.  Had Plaintiffs' alleged any facts indicating that Distel shared his alleged awareness about the accounting irregularities with the named Defendants, the Court would be able to see at least a certain connection between Defendants' alleged scienter and Plaintiffs' assertions with respect to Distel.  However, the Complaint is void of any such allegations.  Moreover, the logic ensuing from Plaintiffs' comment (about the alleged content of Distel's resume) suggests that  Distel was unaware of Intelligroup's accounting irregularities until shortly prior to his resignation.  See id.  If so, Distel, who left Intelligroup well after the expiration of the Class Period, see Docket Entry No. 1 (original complaint), ¶ 8(d), clearly could not advise Defendants during the Class Period about what Distel, Intelligroup's CFO, did not discover yet.  Since the circumstances of Distel's resignation, whatever they were, could not be qualified as "red flags" that Defendants were presented with during the class period (and which, therefore, Defendants could not intentionally or recklessly ignore), the Court does not find Distel's resignation indicative of Defendants' culpable state of mind for the purposes of the errors contained in Intelligroup's Statements.  See Tellabs, 127 S. Ct. at 2509-10 (plaintiff's total factual allegations should create an inference against the defendant "at least as compelling as any opposing inference one could draw from the facts alleged" factoring in all facts, including those favoring the defendant).

of the Press Release and the resignations of Visco and Valluri.[60]  See Opposition at 64.  Neither one

---

[60]

    Two other cases cited by Plaintiffs appear to be misplaced, as they both address the mode of inferring scienter from one's motive and opportunity, rather than from circumstantial evidence.  See Opposition at 64 (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001), and Cendant Corp. Sec. Litig., 109 F. Supp. 2d 225, 233 (D.N.J. 2000)).  Neither citation is helpful in the present context.

    Referring to Helwig, Plaintiffs quote the phrase "self-interested motivation of defendants in the form of saving their salaries or jobs," alleging that Defendants were motivated to commit fraud because of their desire to remained employed.  See id.  Plaintiffs fail to observe that, in Helwig, the Court of Appeals for the Sixth Circuit adopted a list of nine factors indicative of scienter, the ninth of which is "the self-interested motivation of defendants in the form of saving their salaries or jobs." The Court of Appeals for Third Circuit, however, has not directed district courts in this Circuit to apply such an analysis.  Conversely, the Court of Appeals recently guided the district courts that,

> [i]n every corporate transaction . . . officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a "strong inference" of fraudulent intent. See Burlington, 114 F.3d at 1424; see also Phillips v. LCI Int'l, Inc., 190 F.3d 609, 623 (4th Cir. 1999) (". . . allowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company [undertakes a business action]"); . . . Tuchman, 14 F.3d [at] 1068 . . . ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated"); . . . Leventhal v. Tow, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) ("[T]he allegation that the defendants artificially inflated [corporate] stock price in order to 'protect and enhance their executive positions' . . . fail[s] to give rise to a strong inference of scienter. This motive has been rejected routinely").

GSC, 368 F.3d at 237.  Plaintiffs' reliance on Cendant, 109 F. Supp. 2d at 233, is even more misplaced.  Plaintiffs quote the Cendant court's quotation from Phar-Mor, Inc. Securities Litig., 900 F. Supp. 784, 787 (W.D. Pa. 1995), a case examining the issue of whether, in an action by corporation against former auditors, the wrongful actions of corporate former officers were intended to benefit the corporation.  Examining this issue, the Phar-Mor court entered the observation that was quoted in Cendant with respect to a similar inquiry which is now quoted by Plaintiffs in their Opposition:

> As for those individuals whose culpable participation is admitted, . . . [t]he possibility of adverse interests between [these admittedly] guilty employees and the corporation remains open. . . . [Another court, in] Phar-Mor, [addressed this issue and noted that] "[i]ndeed, a reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, emoluments, and

of these two cases, however, offers support to Plaintiffs' claim.  The first case relied upon by

Plaintiffs is Adaptive Broadband Sec. Litig., 2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002).

Discussing the scienter aspect of plaintiffs' claim, the court in Adaptive noticed:

> As [the corporation's] financial difficulties were coming to light, three of the named individual defendants either left the company or were moved to new positions. [Specifically, two] defendants . . . resigned [within two months prior to the corporation's public admission that it actual gross earnings was $4 million less than previously stated.  Less than a month after this announcement, the third] defendant . . . was replaced as CFO and reassigned.  In addition, [within two months after the announcement], severance payments to defendants [who resigned] were suspended. Plaintiffs suggest that these changes provide further support for an inference of scienter.   As with the restatement of [the corporation's] financials, these [employment] changes, taken alone, would not support scienter.  But because the changes occurred as [the corporation's] financials were being restated and as [the corporation] *was conducting its own internal investigation* . . . , they add one more piece to the scienter puzzle. [*T*]*he fact that the CFO was moved and* [*the resigned*] *executives' severance payments were discontinued is highly suspicious* . . . .

Adaptive, 2002 U.S. Dist. LEXIS 5887, at *42-43 (emphasis supplied).

Ignoring the Adaptive court's unambiguous conclusion that (a) resignations in Adaptive were

suspicious because they took place during internal investigation and were accompanied by such

extraordinary corporate  measures as re-assignment of the company's CEO and denials of severance

payments, and (b) such suspiciousness added "one more piece to the scienter puzzle," id., Plaintiffs

transform the holding of Adaptive into a proposition that "resignation or demotion of three of the

named individual defendants while the company's financial difficulties were coming to light

support[] a strong inference of scienter," Opposition at 64, even though the Adaptive court said

---

reputations, as well as their liberty, at the expense of [the corporation's] well-being."

Cendant, 109 F. Supp. 2d at 233 (quoting Phar-Mor).  Since the instant case neither concerns a claim by a corporation against its employees nor involves any employees that admitted their guilt or that were facing a criminal penalty, this Court finds the Cendant decision inapposite to the case at bar for all purposes, including inference of scienter from one's motive and opportunity to commit fraud.

nothing of the kind.  Moreover, Plaintiffs cite another case, McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248 (N.D. Cal. 2000), alleging that the holding of this case, too, stands for the same proposition.

Plaintiffs' misreading of the McKesson decision seems to be even more substantial than Plaintiffs' misgivings about the holding of Adaptive.  It appears that, while familiarizing themselves with the opinion of the Adaptive court, Plaintiffs' did not take notice of the following observation:

> In . . . McKesson, . . . the court inferred that the corporation had a factual basis for *firing* employees for cause because they "knew or should have known" of accounting improprieties. [The circumstances in Adaptive] do not rise to such a level [of strong scienter evidence, since] no one was publicly fired . . . .

Adaptive, 2002 U.S. Dist. LEXIS 5887, at *43 (emphasis supplied).

The distinction underscored by the Adaptive court was well-warranted since the circumstances in McKesson were indeed quite unique in view of the fact that

> [the McKesson] plaintiffs . . . allege[d] . . . *direct* [*rather than circumstantial*] *evidence* of scienter.  According to the Wall Street Journal excerpts provided in the complaint, [the company's internal] investigators concluded that [fired] executives *intentionally* overstated revenue.  The complaint also detail[ed] the facts that led [the] investigators to this conclusion, such as the segregation of [the] letters [containing true information] from [the auditors executing due diligence for the merger challenged in McKesson] and the deletion of critical computer files. [After the firing, the corporation] issued harsh statements about the executives, [specifically]:
> - [The corporation] announced in a press release that it had removed [its] Chairman of the Board and that he had been "dismissed as an employee";
> - [Four executives were publically] "*dismissed immediately for cause*." [The corporation] later revealed  that these four were *barred from the company's premises*;
> - [All] terminated executives were [publically] criticized by the company's new chairman for their "*participation . . . in such improprieties*";
> - The new chairman stated that the perpetrators of the scheme had processed [fictitious] shipments "to generate the appearance of revenue."  The company's spokesperson told an industry publication: "One must assume that the intent of this entire episode was to inflate revenues.  The responsible individuals have been *fired for cause* . . . ."
> - The Company's CEO stated that the four officials [were] *fired* "*for cause*."

> Finally, the complaint also provides several allegations of "*red flags*" being waved [in front of individual defendants] by others in the company about the improper accounting practices. . . . These allegations fall squarely within the class period, and are powerful evidence [of scienter].

McKesson, 126 F. Supp. 2d at 1273-74 (emphasis supplied).

In fact, the circumstances in McKesson were so unique, that the very court that issued the McKesson decision, i.e., the District Court for the Northern District of California, habitually refers to the McKesson decision in order to distinguish the facts of McKesson from those presented by typical 10b-5 cases addressing the issue of resignation. See, e.g., CornerStone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) ("[I]n McKesson, the officials were terminated on the publicly-stated grounds that they "should have known, or did know, of the accounting problems." In the present action, by contrast, there is no evidence that defendants' termination was based on fraud); Network Assocs. Sec. Litig., 2003 U.S. Dist. LEXIS 14442, at *50 n. 26 (N.D. Cal. Mar. 25, 2003) ("In McKesson, plaintiff's scienter allegations regarding the former executives passed muster. . . because the complaint alleged admissions by the company that the former executives had knowingly participated in the improper astonishing of revenues"); Aggregates, 235 F. Supp. 2d at 1073 (plaintiffs err by citing to McKesson, the case where "specific allegations [were set forth indicating] that the defendants had actual knowledge of relevant facts from which scienter could be inferred").

Read jointly, the holdings of Adaptive and McKesson appear to provide the following guidance: (a) a strong inference of a defendant's scienter could be made from the employee's public and immediate firing for such cause as intentional ignorance of "red flags" about undergoing wrongdoings, and if such firing is accompanied by an astonishing corporate protective measure, e.g., banishment of the defendant from corporate premises, see McKesson, 126 F. Supp. 2d at 1273-74;

and (b) a defendant's resignation could constitute a "piece to the scienter puzzle" if the resignation
both takes place within a couple of months of the announcement of the errors committed and is
accompanied by an extraordinary corporate punishment measure, e.g., denial of severance payment.
See Adaptive, 2002 U.S. Dist. LEXIS 5887, at *43.   Consequently, it appears that evidence
qualitatively or quantitatively less than that presented in the latter scenario cannot amount to even
a "piece to the scienter puzzle," and the existing nationwide case law supports such conclusion.  See,
e.g., BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) ("[p]laintiffs . . . alleged no facts
linking the resignation of [individual defendants] to the accounting improprieties at [the company].
In reality, there are any number of reasons that an executive might resign, most of which are not
related to fraud"); Sportsline.Com Sec. Litig., 366 F. Supp. 2d 1159, 1172 (S.D. Fla. 2004) (plaintiffs
failed to allege facts indicating that defendants resigned because they knew about or approved of any
misconduct on the part of other employee); Abrams, 292 F.3d at 434 (resignation of key employees
in conjunction with a number of other allegations was insufficient to demonstrate a strong inference
of scienter); Corrpro Sec. Litig., 2003 U.S. Dist. LEXIS 22869,  at *15-16 (N.D. Ohio 2003) (no
inference of scienter created by departure of four CFOs when complaint did not establish any
connection between the job turnover and the Company's problems); see also CornerStone, 355 F.
Supp. 2d at 1093; Interpool, 2005 U.S. Dist. LEXIS 18112, at *3-4; Network Assocs., 2003 U.S.
Dist. LEXIS 14442, at *50 n. 26; Aggregates, 235 F. Supp. 2d at 1073.   The case at bar presents a
scenario where the facts alleged cannot amount even to a piece of the scienter puzzle.

> [Plaintiffs do not allege] that there has []ever been any announcement [by
> Intelligroup or its present or past officials] suggest[ing any] deliberate wrongdoing
> [by either Defendant Visco or Defendant Valluri. Plaintiffs' acknowledge that]
> Defendant Visco resigned . . . nearly a year prior to [the airing of the Press Release,
> while] Defendant Valluri[] did not leave Intelligroup until a year and a half after
> [Defendant] Visco and seven months after [the Press Release was published.

> Moreover,] there are no allegations [by Plaintiffs suggesting] that Intelligroup [imposed upon Defendants Visco or Valluri any corporate punishment or other extraordinary measure, such as] revok[ing] any Defendants' severance packages.

Reply at 16 (citing information stated in Compl.¶ 29 and addressing Plaintiffs' Complaint in toto).

In sum, Plaintiffs' allegations are limited to the sole facts that Defendants Visco and Valluri did actually resign many months--or a year--before or after the airing of the Press Release, and clearly in the fashion that cannot possibly suggest a "joint resignation."  The sole fact of Defendants Visco and Valluri resignations is indeed insufficient to provide a strong inference of scienter. Moreover, such bare allegations cannot operate even as a meaningful piece of additional evidence, i.e., a piece to the scienter puzzle, for the purposes of this Court's overall assessment of scienter-related evidence.[61]  In view of the foregoing, the Court may assign, at best, de minims weight to Plaintiffs' allegations based on resignations of Defendants Visco and Valluri. Accord The Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. Appx. 465 (3d Cir. 2004)(finding that resignations of key officers are insufficient to show that they acted with the requisite scienter).

### ii.      Resignation of Intelligroup's Auditor

Plaintiffs also maintain that "[t]he sudden resignation of [Intelligroup's] auditor[] Deloitte & Touche, also contributes to an inference of scienter with respect to Defendants."  Opposition at

---

[61]      The Court notes, in passing, that--in view of Plaintiffs' allegations suggesting that there were certain frictions between Defendant Valluri and some of his colleagues, Valluri's decision to leave Intelligroup appears particularly logical and unrelated to any issue of fraud.  See Compl. ¶ 65 (indicating, for example, that Defendant Valluri did not enjoy good working relationship with one of Intelligroup's Vice Presidents of Sales who perceived Valluri as "tyrant" and believed that Valluri was "a pretty ruthless guy with the employees").  Similarly, Defendant Visco's departure almost a year prior to Intelligroup's airing of the Press Release removes any logic from Plaintiffs' claim that Visco was committing fraud in order to prolong or retain his employ at Intelligroup.

65.  Plaintiffs, however, do not explain how resignation of Deloitte after Intelligroup's airing of the Press Release (or Deloitte's initial-and-later-reconsidered decision to resign after preparing one round of financials of which Deloitte notified Intelligroup shortly prior to the Press Release) sheds any light of Defendants' mental state during the period that began to run about three and a half years prior to Deloitte's decision and ended on May 17, 2004, that is, the day when Intelligroup published its last financial Statement that contained accounting errors.[62]  See Compl. ¶ 70.  Instead, Plaintiffs limit their entire discussion of this issue to a single citation, Gelfer v. Pegasystems, Inc., 96 F. Supp. 2d 10 (D. Mass. 2000), a case addressing facts completely different from those presented by the instant matter.[63]  In Gelfer, the defendants issued erroneous financial statements on at least four different occasions.  See id. at 13.  Three of these occasions took place *after* improper accounting methods

---

[62]

    In view of the totality of elements required to be plead to set forth a 10b-5 claim, which include, as the first requirement, a false or misleading statement, see Dura, 544 U.S. at 341, Defendants' state of mind after the publication of the last Statement containing accounting errors is of no relevance, since--even if Defendants developed a culpable state of mind after this Statement was publicized--they did not act upon it during the last four months of the Class Period.

[63]

    The remainder of Plaintiffs' page-long discussion of Deloitte's resignation is dedicated to the issue of whether Deloitte's "clean" audit of all Intelligroup's Statements negates inference of scienter and, if so, to what degree.  See Opposition at 65-66.  The Court notices, in passing, the correctness of Defendants' observation that a "clean" outside audit provides certain grounds for Defendants' placid state of mind and advocates against inference of scienter.  See Docket Entry No. 69, at 8 and n. 4 (properly noting that Plaintiffs' reliance on NextCard, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 16156 (N.D. Cal. Mar. 20, 2006), and Hamilton Bankcorp, Inc., 194 F. Supp. 2d 1353 (S.D. Fla. 2002), is misplaced since the former presented a claim alleging that the wrongdoings were committed jointly by both the auditor and the issuer, and the latter examined a claim against an outside auditor who did not perform a due audit relying on another outside auditor).  Plaintiffs' third case, Marksman Partners v. Chantal Pharm Corp., 927 F. Supp. 1297 (C.D. Cal. 1996), unaddressed by defendants, is inapposite to the case at bar because, in Marksman, the court, relying on the facts "other [than the auditor's resignation concluded] that 'the allegedly misleading financial and other public statements bore defendants' imprimatur.'"  Coble v. Broadvision Inc., 2002 U.S. Dist. LEXIS 17495, at *10 (N.D. Cal. Sept. 11, 2002) (discussing the holding of Marksman and drawing this particular distinction).

were actually brought to the Gelfer defendants' attention by the issuer's accountants (who discovered the errors upon the very first occasion). See id. at 14-15.  Since the Gelfer defendants, so notified by the accountants: (a) elected to continue employing the improper accounting methods (while disputing the accountants' conclusion, and accountants' disagreement with the defendants was the express reason for accountants' resignation, see id. at 16-17), and (b) went ahead with issuance of erroneous financial statements on three following occasions, it is not surprising that the Gelfer court concluded that the defendants operated with a culpable state of mind, i.e., while being on notice about the impropriety of their methods.  See id. at 18.  However, the fact-specific holding of Gelfer cannot possibly be read as suggesting that the fact of Deloitte's resignation "contribute[s] to an inference of scienter," Opposition at 64, since this fact neither adds to nor detracts from Plaintiffs' claim.[64]

### b.    *Violations of GAAP as Evidence of Scienter*

Plaintiffs' allegations with respect to inference of Defendants' scienter from GAAP violations (and Intelligroup's Restatement that cured the errors) present a sporadic see-saw of arguments.  See

---

[64]

Moreover, Plaintiffs' focus on Deloitte's resignation is directly undercut by the fact that, in recent years, significant numbers of companies have changed auditors.  During the period 2003 to 2005, roughly 4000 public companies changed accounting firms in the United States.  See Mark Grothe, Jay Saban, Ann Pham, Mum's the Word 5 (Glass, Lewis & Co. 2006), available at <<www.soxfirst.com/50226711/Auditor%20Turnover.pdf>>.  That represents about 33% of all public companies.  See id.  In 2005 alone, 1430 public companies (about 11%) changed auditors.  See id. at 4-5.  About 60% of the time, companies initiated the change by dismissing their auditors.  See id. at 5.  The other 40% of the time, the auditors resigned.  See id. at 5.  Moreover, of those companies switching auditors in 2004, 85% posted $ 100 million or less in revenues that year, i.e., comprised a group to which Intelligroup belongs.  See Diya Gullapalli, Moving the Market: Number of Firms That Switched Auditors Jumped 78% in 2004, Wall St. J. (Feb. 17, 2005); accord Compl. at 11 (Plfs.' Table).  Therefore, the fact that Deloitte resigned, and Intelligroup hired another outside auditor, does not seem to depict an extraordinary event.

Opposition at 41-45.  Initially, Plaintiffs' assert that "[m]any courts have held that pervasive and repeated GAAP violations, as well as large-scale restatements, [do actually] give rise to an inference of scienter."  Id. at 41.  However, attempting to show case law support to this proposition, Plaintiffs quote the language of five case, three of which made the following observations:

> P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 142 F. Supp. 2d 589, 608 (D.N.J. 2001) ("*when combined with other circumstances suggesting fraudulent intent*, allegations of improper accounting may support a strong inference of scienter"); . . . Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998) ("[w]hile *alleging a misapplication of* [*GAAP*] *standing alone is insufficient*, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter [and] the totality and magnitude of . . . accounting violations constitute strong circumstantial evidence of reckless or conscious misbehavior"); Lewin v. Lipper Convertibles, L.P., 2004 U.S. Dist. LEXIS 8484 (S.D.N.Y. May 12, 2004) ("*While mere allegations of a failure to proceed in accordance with GAAP . . . are not sufficient to allege scienter*, here, the accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of recklessness").

Opposition at 41-42 (emphasis supplied).

These observations appear to be: (a) in perfect accord with the general rule noted by the Court supra, i.e., that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless plaintiffs' complaint alleges "more,"  but (b) lend no support to Plaintiffs' initial assertion that "more violations" of GAAP create the requisite strong inference.[65] Cf.

---

[65]

Defendants correctly observed that these three cases are factually inapposite to the case at bar, since they presented "a very different question of whether a company's *auditor* can be liable for repeatedly performing deficient audits." Reply at 13 (emphasis in original).  While the language selected by Plaintiffs from these cases is well in line with the general rule and, thus, does not warrant this Court's attention to the factual differences for the purposes of evaluating Plaintiffs' pleading, a short overview of the facts and reasoning of Carley, 27 F. Supp. 2d 1324, is appropriate in view of the post-Carley decisions citing to Carley.  In Carley, the defendant accounting firm provided accounting and business consulting services for a company and committed a multitude of accounting errors in order to cater to financial interests of the audited issuer.  See Carley, 27 F. Supp. 2d 1324. Pointing out that (a) the defendant-accountant was hired by the issuer in order to assure--and, thus,

Chubb, 394 F.3d at 146 ("The sheer volume of [analogous allegations] cannot compensate for these

inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those

allegations particularized"); compare Opposition at 41, 43 (alleging that a pleading of "more

violations" meets the requirement and providing a list Intelligroup's GAAP violations); see also

Compl. ¶¶ 43-58. It appears that, after entering the above-quoted initial bald contention, Plaintiffs

scale down their allegations and concede that pleading of other, GAAP-unrelated facts, is required

to satisfy their requirement with respect to the scienter element.   See Opposition at 43

(acknowledging that the cases in this and other Circuits "support the general proposition that GAAP

violations and restatements, in and of themselves, do not give rise to a strong inference of scienter

[and multiple] violations of GAAP [are just a] consideration in determinating whether there is [a

requisite showing of] scienter").

It appears that Plaintiffs' confusion ensues from their misreading of two other cases,

MicroStrategy Inc. Secs. Litig., 115 F. Supp. 2d 620 (E.D. Va. 2000), and Baan Co. Sec. Litig., 103

F. Supp. 2d 1 (D.D.C. 2000), upon which Plaintiffs rely.  They select the language, which suggests

that the aspect of *sheer volume* of defendants' GAAP violations might be considered as a separate

---

had the duty to monitor--the propriety of accounting reports and, (b) being a certified accounting
firm, was by definition well-familiar with the provisions of GAAP, the Carley court concluded that,
in this particular scenario, the issue of magnitude of GAAP violations was a separate and additional
consideration reflecting on the defendant-accountant's state of mind.  See id. This particular wrinkle
to the general rule was adopted by some, but not all, courts that addressed the issue.  See Takara
Trust v. Molex Inc., 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) (indicating that GAAP violation by
an auditor may support inference of scienter depending on magnitude of accounting error committed
by the auditor); Lewin, 2004 WL 1077930, at *2 (holding that accounting violations on repeated and
pervasive scale could provide evidence of recklessness on the part of an auditor); but see Fidel v.
Farley, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter based on the
magnitude of fraud would eviscerate the principle that accounting errors alone cannot justify a
finding of scienter," even in those cases that examine allegations of fraud by an auditor).

"piece to the scienter puzzle."   See Opposition at 41-42 (quoting the observation made in MicroStrategy that "some violations of GAAP and some restatements of financials are so significant that they, at the very least, support the inference [of] conscious fraud or recklessness," as well as a remark of the Baan court that "the magnitude of the [GAAP] error can play a role [in inferring scienter]").

The court in Baan started its analysis by noting the general rule that "[a] violation of GAAP, *combined with other circumstances suggesting fraud*, may create a strong inference of scienter." Baan, 103 F. Supp. 2d at 21 (citations omitted, emphasis supplied).  Moreover, the court noted that (a) "if the violation [is a result of the issuer's] failure to detect an inaccuracy," the evidentiary value of issuer's GAAP violation is very low; but (b) if the violation is such that it offends basic common sense of any businessperson, for instance, if the "violations involv[e] premature . . . recognition of revenue [e.g, designating the seller's potential proceeds from sales that did not yet take place or that were revoked, or could be revoked by the purchaser, these type of violations] suggest a conscious choice to [act] in a manner alleged to be improper, and may therefore support a stronger inference of scienter," especially if it is committed time and again on a great scale  Id. (citations omitted).

Turning to the facts of Baan, the court analogized the case before it to the case where

the defendants . . . recognized revenue [from the proceeds of a sale of the defendants' product] that  they knew [to be] not compatible with the buyer's components, and [were on notice that the] buyer could return the products [because] it was impossible [for the buyer] to integrate the [defendants' product and the buyer's other components].  The court found that this alleged GAAP violation showed the defendants' scienter, and relied on a strong inference that a company and its key officers would be aware of facts critical to important transactions.

Id. (discussing Ancor, 22 F. Supp. 2d 999).

After drawing such analogy, the Baan court: (a) concluded that the issuer's recognition of proceeds from "contingent" sales, i.e., potential sales that the Baan defendants actually knew might never materialize, was such an error that, numerously repeated, provided a separate and additional piece to the scienter puzzle; and (b) entered the observation quoted by Plaintiffs that "the magnitude of the [GAAP] error can play a role" in a court's scienter inquiry.  See id. at 21-23.

The court in MicroStrategy, 115 F. Supp. 2d 620, made effectively the same analysis as the Baan court.  Discussing the applicable standard for assessing defendant's scienter, the MicroStrategy court relied on the Baan decision and observed, inter alia, that,

> "while alleging a misapplication of [GAAP] standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter. . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." Carley, 27 F. Supp. 2d [at] 1339-40;[66] see also, e.g., Baan, 103 F. Supp. 2d [at] 21 ("The magnitude of the [GAAP] error can play a role" in inferring scienter). . . . [In sum,] while a misapplication of GAAP may only support a weak inference of scienter . . . , it cannot be said that a misapplication of GAAP . . . supports no inference of scienter whatever.

MicroStrategy, 115 F. Supp. 2d at 636 and n. 34.  Applying this standard to the facts presented in MicroStrategy, the court found additional evidence of scienter in the fact that the defendants declared proceeds of sales from contracts that were only negotiated but neither executed nor performed .  See id. at 637-38.  The MicroStrategy court explained that this fact was indicative of the defendants' culpable state of mind because,

---

[66]

    In view of the difference between GAAP-based contentions against such GAAP-savvy entities as accountants and auditors and GAAP-related allegations against GAAP-unacquainted corporate managers, this Court is not clear as to the reasons for quoting the Carley language in MicroStrategy.

in essence, [the defendants violated] the *simple principle* that "revenue cannot be recognized for unexecuted contracts and/or where there are significant obligations and/or contingencies relating to such contracts."

Id. Thus, the holdings of both MicroStrategy and Baan decisions indicate that, in cases examining alleged wrongs by an issuer rather than an accountant, GAAP violations might be given additional significance only where the provisions of GAAP so coincide with conclusions obvious to any business person and present recitals of knowledge so common to the business--rather than accounting--community, that a violation of this type of GAAP provision equates to a self-evident business nonsensicality which cannot be made by a defendant with a non-culpable state of mind. The matter at bar, however, is not one of those cases. While Plaintiffs' submissions offer a long list of GAAP violations in Intelligroup's Statements, Plaintiffs' pleadings are void of any allegations that the violations involved errors so obvious to a business--rather than accounting-- mind that Defendants must have been aware of the wrongs. While acknowledging that the Statements contain a multitude of GAAP violations, the Court allocates de minimis significance to this fact for the purposes of this inquiry into whether Defendants committed the misrepresentations with the requisite scienter and finds Plaintiffs' allegations that the errors were multiple and infested all Statements non-indicative of Defendants' state of mind, since the errors in the Statements were not of the kind that transform accounting errors into a separate fact affecting the inquiry.

c.       ***SOX Certifications as Evidence of Scienter***

Plaintiffs revisit the issue of Defendants' SOX certifications alleging that "Defendants' [SOX] certifications . . . strongly suggest that Intelligroup's financials were knowingly or recklessly misstated" by individual Defendants.  Opposition at 46.  It appears that Plaintiffs pursue three

interrelated lines of argument in support of their conclusion: (1) by alleging that the statements made by Intelligroup in its Restatement issued more than a year after the Press Release (and a similar Intelligroup statement made one week after the Press Release and four and a half months after Intelligroup's filing of its last erroneous Statement) indicate Defendants' scienter; and (2) and (3) by maintaining that the mere fact of Defendants' SOX certification or, alternatively, the language employed in these SOX certifications, should provide a strong inference of Defendants' culpable state of mind.  See id. at 46-51.  The Court examines all three Plaintiffs' allegations in turn.

### i.    Impact of the Statements Made in the Restatement

It seems that the conclusion of Plaintiffs' first line of argument is as follows:

> [In view of the statements made in the Restatement,] one of two things happened: (1) either the [i]ndividual Defendants undertook the design and evaluation of [Intelligroup's] control, as they certified, in which case they were well-aware of the severe control deficiencies enumerated in the [R]estatement; or (2) they did not design and evaluate the internal controls as they [certified] they did, in which case they were severely reckless as to the reliability of [Intelligroup's] financials.

Opposition at 49.

However, there is a third alternative, namely, that Defendants undertook the design and evaluation of Intelligroup's control, as they certified, and designed the system which, at the point of design and implementation, appeared to be adequate but, eventually, proved to be insufficient.  Since Plaintiffs' above-quoted argument implies that Defendants, being either "well-aware of the severe control deficiencies" or "severely reckless" about these deficiencies, acted with scienter when they affixed their signatures under SOX certifications, id. at 47, it follows that the certifications cannot be indicative of Defendants' scienter if the facts alleged by Plaintiffs fail to point to the reasons for Defendants' knowledge about--or ignorance of "red flags" with respect to--the defects of their design.

Page 143 of  195

All of Plaintiffs' facts are derived from Intelligroup's Restatement.  The Restatement disclosed that, during the Class Period, Intelligroup was: (a) suffering from "deficiencies in [accounting] analysis," "ineffective control over [financial] reporting," "inadequate documentation regarding . . . application of [GAAP]," "insufficient training of its finance and accounting personnel," and "inadequate record retention policies," and (b) "inadequately staffed [and, therefore, had an insufficient] internal audit department," "insufficient resources to perform the accounting and financial reporting functions." Compl. ¶ 57.  When Intelligroup began implementing a new financial software,

> [t]he *combination* of the *new* financial system, *new* finance team, and *insufficient* training . . . led to a rapid *deterioration* in [Intelligroup's] control environment and [diminution of] reliability of the financial systems.
> . . . .
>
> [A]s of the *end* of the [Class Period, Intelligroup's] disclosure controls and procedures were not effective to ensure that information required to be disclosed in the [Statements was recorded, processed, summarized, and reported within the time periods [allocated by law].
> . . .
>
> [After the airing of the Press Release, Intelligroup] began to centralize and *re*organize its finance organization . . . . , *re*design[] and *more fully* document its business processes . . . , *strengthen*[] senior level oversight [over] financial reporting . . . , *re*allocate[] resources and *add*[] personnel to [its] finance and accounting staff . . .

Compl. ¶¶ 58, 66-67 (quoting the Restatement) (emphasis supplied).

These statements perfectly correspond to the information disclosed in the Press Release, which indicated that, as a result of

> *recent* . . . upgrad[ing of] financial system, and the *recent* turnover in key positions in its finance department, [Intelligroup] *has been undertaking* a comprehensive review [which] resulted in . . . September 22, 2004, [internal] Audit Committee['s] . . . conclusion that the financial [S]tatements and the related independent audit reports for the [Class Period contained accounting errors].

Press Release.

Reading these facts against the language of Defendants' SOX certification stating that Defendants were "responsible for establishing and maintaining disclosure controls and procedures," "designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of [Intelligroup's] financial [S]tatements" and "evaluated the effectiveness of [such] disclosure controls and procedures," Plaintiffs conclude that Defendants were somehow aware, at the time of Statements being filed, that the controls they designed and evaluated were ineffective or, at the very least, recklessly ignored signs of such ineffectiveness. Opposition at 46. However, nothing in the facts provided in the Restatement or Press Release indicate that Defendants were either aware of the deficiencies of their design or evaluated their design ignoring the "red flags" then existing. To the contrary, the language of the Restatement indicates that certain controls were indeed designed, implemented and evaluated, since the Restatement discusses "deficiencies," "inadequateness" and "insufficiencies" of Intelligroup's controls during the Class Period, rather than complete want or total lack of functionality of such controls, and notifies the market about re-organizational, strengthening and supplemental control measures, rather than about discarding the previous controls or creating them from scratch. See Compl. ¶¶ 57, 67. Moreover, both the Restatement and Press Release make it obvious that any "red flags" that could have been interpreted as signals of shortcomings of the then-existing control systems were discovered shortly prior to the issuance of the Press Release and after the last erroneous Statement was filed. See id. ¶ 66; Press Release. Therefore, none of the facts provided in the Restatement indicates that Defendants misrepresented the fact that they created a control system. See generally, Restatement. Rather, it appears that Defendants designed a system which was insufficient to meet Intelligroup's needs. See

id.; Press Release.

Plaintiffs seem to suggest that Defendants could not, in good faith, evaluate the controls they designed and certify that the controls were effective.  See Opposition at 46-47.  However, the two facts that Plaintiffs offer in support of their conclusion are: (1) a repeat of the fact that the Restatement disclosed that the controls were ineffective; and (2) Plaintiffs' observation that the features which eventually proved to be insufficient were "*absolutely crucial* to [Intelligroup's] ability to report timely and accurate financial information."  Id. at 47 (emphasis in the Opposition).  However, Plaintiffs offer no legal support to their apparent claim that a person could not, in good faith, be mistaken about a "really-really important" feature, and this Court is aware of no decision so stating.

As to Plaintiffs' continuous reference to the language of the Restatement indicating that the controls existing during the Class Period were eventually deemed insufficient, such reference offers no support to their claim that during the period when the Statements were filed, i.e., from May 14, 2001, to May 17, 2004, Defendants were either aware about the deficiencies of the controls they designed or ignored any "red flags" indicating such deficiencies.  Plaintiffs' argument is nothing more than the impermissible "pleading by hindsight" uniformly rejected by the courts.  See, e.g., GSC, 368 F.3d at 239 ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false"); IKON, 277 F.3d at 673 ("[Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that . . . the public was likely

to be misled. [Securities] law does not expect clairvoyance"); see also DiLeo, 901 F.2d at 627) ("[P]roffer[ing a] different financial statement [is not sufficient.] Investors must point to some facts suggesting that the difference is attributable to fraud"). Since Plaintiffs' facts indicate that Defendants designed a control system insufficient to meet Intelligroup's needs but remained ignorant about these insufficiencies until well after the last erroneous Statement was filed, the Court finds that the statements made in the Restatement do not provide support to Plaintiffs' claim that Defendants caused the Statements to be filed operating with a culpable state of mind.

### ii.        The Fact of SOX Certifications

As the Court noted supra, a plaintiff's allegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous. See WatchGuard II, 2006 U.S. Dist. LEXIS 74269;  InVision, 2006 WL 538752.  Plaintiffs, however, appear to challenge this conclusion by relying on two cases, one of which, Lattice, 2006 U.S. Dist. LEXIS 262, was discussed by both the WatchGuard and InVision courts and qualified as presenting "markedly different circumstances" where the defendants knowingly "cooked the books."  See WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *3;  InVision, 2006 WL 538752, at *7 n. 3. Indeed, the factual pattern in Lattice was quite unique, since the Lattice plaintiffs pleaded that one of the defendants had *actually manually altered accounting journals* in order to artificially inflate revenue, and did so with authorizations from the issuer's upper management, which the issuer admitted to be the case. Id. at *48-51.  Yet, even having this *direct* evidence of scienter, the Lattice

court concluded that a SOX certification gave rise to a mere inference of scienter, but did not alone establish a strong inference of scienter, explaining as follows:

> The [SOX] certifications, in combination with plaintiffs' allegations of regular finance meetings, extensive access to databases, periodic reports and special reports, and the allegations that they were micromanagers, are sufficient to create a strong inference of actual knowledge or of deliberate recklessness.

Lattice, 2006 U.S. Dist. LEXIS at *50-51.

Not surprisingly, the courts that addressed the Lattice decision concluded that, without aggravating circumstances of actual knowledge about the misrepresentation, a SOX certification gives no inference of scienter.  See Hypercom Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 45482, at * 36-37 (D. Ariz. July 5, 2006) (expressly discussing Lattice in the context of alleged misrepresentation as to the company's internal control measures made under a SOX certification); Zucco Partners, LLC v. Digimarc Corp., 445 F. Supp. 2d 1201, 1209 (D. Or. 2006) (similarly examining the issue of internal controls and similarly noting that the crucial distinction in Lattice was that the issuer admitted its CFO "overrode the internal controls to make incorrect and misleading journal entries"); see also WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *3;  InVision, 2006 WL 538752, at *7 n. 3.  Since, in the case at bar, Plaintiffs did not allege a single fact indicating Defendants' personal knowledge about the errors made in the Statements or even that Defendants were in privy with any signs of wrongdoing, the holding of Lattice is simply inapposite, and it certainly cannot be read as a blanket proposition that a SOX certification automatically supplies the requisite degree of scienter.  Accord Tellabs, 127 S. Ct. at 2510 (the facts alleged "must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

The other case relied upon by Plaintiffs, SEC v. Penthouse Int'l, Inc., 390 F. Supp. 2d 344 (S.D.N.Y. 2005), is equally inapposite. The Penthouse court, however, did not address the issue of SOX certification in the context of scienter, but rather examined it primarily for the purpose of (a) establishing materiality of misrepresentation, and (b) determining one of the defendants "aiding and abetting" liability. See id. After listing the elements of the test for aiding and abetting (one of which is "'substantial assistance' by the aider and abettor in the achievement of the primary violation", the Penthouse court noted, in passing, as follows:

> [The "abetting defendant"] fil[ed] the false and misleading [financial statement accompanied by *another person's* SOX] certification . . . . The complaint . . . alleged that [this defendant] acted with the requisite scienter [because he] rendered "substantial assistance" in accomplishing [the issuer's] reporting violations. . . . [Since the abetting defendant affixed the *unauthorized electronic signature of the other official under the SOX certification* at issue, the Penthouse court found that the] aiding and abetting allegations [were] adequately alleged.

Id. While the applicability of the Penthouse decision to the case at bar is uncertain in view of substantial differences between the inquiry conducted by the Penthouse court and the one currently at bar, this Court: (a) sees certain analogies between the facts of Penthouse and those addressed in Lattice, and (b) concludes that both cases provide nothing more and nothing less than two examples illustrating the general rule that allegations based on SOX certifications can establish the requisite strong inference of scienter only if the complaint asserts facts indicating that, at the time of certification, defendants actually knew--or, at the very least, turned a "blind eye" to the information indicating--that their SOX certification was erroneous. However, neither one of these cases stands for the proposition that a SOX certification automatically supplies the requisite degree of scienter, and the body of law thus far accumulated with respect to this issue invariably indicates the same. See, e.g., Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66 (11th Cir. 2006) (a SOX

certification is probative of scienter only if plaintiffs plead facts indicating that the person signing

the certification was severely reckless in certifying accuracy of financial statements); Silicon Storage

Tech., Inc., Sec. Litig., 2007 U.S. Dist. LEXIS 21953 (N.D. Cal. Mar. 9, 2007) ("this court has not

located--nor have plaintiffs cited--any case holding that a statement in a [SOX] certification . . . is

independently actionable"); CP Ships Ltd., Secs. Litig., 2007 U.S. Dist. LEXIS 25754, at *20-21

(M.D. Fla. Apr. 5, 2007) ("[p]laintiffs . . . argue[] that the [d]efendants' certification . . . demonstrates

scienter. . . . This requirement [however,] is met [only] when the person has reason to know, or

should have suspected, due to the presence of 'red flags' that the financial statements contained

material misstatements or omissions"); Roth v. OfficeMax, Inc., 2006 U.S. Dist. LEXIS 68913, at

*20-21 (N.D. Ill. Sept. 12, 2006) (dismissing plaintiffs' complaint where the plaintiffs alleged that

the CFO signed a SOX certification providing erroneous assurances as to internal control but failed

to provide any facts indicating either that the CFO knew of the improper accounting practices or that

the incorrect reporting was so obvious that the CFO should have known about the insufficient

control); Ley v. Visteon Corp., 2006 U.S. Dist. LEXIS 65326, at *27 ( E.D. Mich. Aug. 31, 2006)

("the court declines to interpret the signed certifications as evidence of scienter, as doing so would

be to hold company executives strictly liable for [any] accounting mistake[]").

### iii.    The Language of SOX Certifications

Finally, Plaintiffs' allege that the specific language employed in Intelligroup's SOX

certifications "strongly suggests the [individual Defendants'] scienter."   See Opposition at 51.

Plaintiffs derive this conclusion from Plaintiffs' belief that "Defendants did not merely sign SEC

filing containing 'boilerplate' – they certified [Intelligroup's] financials with personal endorsement."

Id. at 51.  This Plaintiffs' sentence appears to be entered in response to the following observation made in Interpool:

> Plaintiffs . . . contend that the individual [d]efendants were, at the very least, acting with severe recklessness, given that each of them signed [a financial statement filed with the SEC].  However, as the [Court of Appeals] recognized in . . . The Great Atl. & Pac. Tea, 103 Fed. Appx. 465, the fact that [d]efendants signed financial disclosures . . . does not imply that they made misstatements with scienter. Specifically, the [Court of Appeals] found that each of [defendant's] financial disclosures contained boilerplate language [offering assurances to the market as to accounting practices employed.  H]owever, this language does not show that [defendant] knew that its procedures violated [general accounting practices] prior to [the issuance of] its restatement.

Interpool, 2005 U.S. Dist. LEXIS 18112.

Plaintiffs assert that "the Interpool decision merely stands for the unremarkable proposition that the signing of an SEC filing containing misleading disclosures does not in itself rise to an inference of scienter."  Opposition at 51.  In addition, Plaintiffs maintain that Interpool "is distinguishable on its facts" because "[c]ertification pursuant to [SOX Section] 302, as opposed to § 906, [was] not at issue in Interpool."  Id. at 50-51.  This Court disagrees.

While the issue of whether a "non-boilerplate" certification could create an inference of scienter has not been significantly addressed by the courts, the principle sketched out in The Great Atl. & Pac. Tea appears to be both logical and applicable to all forms of certifications.  The Court of Appeals guided the district courts that, if the complaint merely alleges that the issuer knew that certain accounting entries were recorded in a specific manner, such allegations should not be read as allegations that the issuer knew that the procedures used violated the general accounting principles, even if each of the issuer's financial disclosures contained boilerplate language that the procedures used in the reports conformed with the principles, because a securities plaintiffs cannot merely point to a boilerplate language as proof that the issuer's officers acted with fraudulent intent.

Page 151 of  195

See The Great Atl. & Pac. Tea, 103 Fed. Appx. at 470.

This guidance does not appear to be based on the fact that the issue examined in The Great Atl. & Pac. Tea was that of GAAP violation. Rather, the Court of Appeals made a distinction between a boilerplate language signed on the basis of generalized perceptions held by corporate officials and a "personal endorsement," the entry of which could be made only as a result of a special scrutiny by the officer, i.e., such scrutiny which would bestow upon the officer not only personal but also sufficiently detailed knowledge about data (or the correctness or incorrectness of data) discussed through the means of that specific language. See id.; accord Opposition at 51 (making a similar distinction between a boilerplate language and personal endorsement). Since the term "boilerplate" means "standardized text" or "formulaic or hackneyed language," see <<http://www.m-w.com/dictionary/boilerplate>> (Merriam-Webster's Online Dictionary), the inquiry should logically focus on the uniqueness, or lack thereof, of the language used. In the case at bar, Plaintiffs assert that all Defendants' SOX certifications were either "identical in all material respects" or "substantially similar." See Compl. ¶¶ 78-81. If so, and if this Court is to assume that the rule sketched out by the Court of Appeals in The Great Atl. & Pac. Tea applies to SOX certifications, Plaintiffs' facts indicate that Intelligroup's certifications were, qualitatively, boilerplate statements not indicative of Defendants' personal knowledge about the errors in the Statement and, thus, of Defendants' scienter.

In view of the foregoing, the Court takes notice of Defendants' filings of their Statement bearing SOX certifications (during the period from August 14, 2002, to May 17, 2004, see Compl. ¶ 77), but--for the purposes of the Court's inquiry as to whether Defendants acted with the requisite scienter while the Intelligroup compiled and filed the Statements during the aforesaid period--

allocates de minimis weight to these certifications.[67]  See WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *33 (certifications "do not raise a strong inference that any Defendant acted culpably in designing those controls, assessing them, or certifying them under the Sarbanes-Oxley Act").

### d. *Undisclosed Witnesses*

This Court's evaluation of Plaintiffs' pleadings with respect to Plaintiffs' confidential, i.e., undisclosed witnesses ("UW") is twofold, since statements from undisclosed witnesses can be used in two situations: (1) as supplemental evidence, see Novak, 216 F.3d at 313-14; Royal Dutch, 380 F. Supp. 2d 509; and (2) as evidence self-sufficient to meet the requisite pleading requirement, if the description of UWs and information obtained from them includes the time period that the confidential source worked at the defendant-company, the dates on which the relevant information was acquired, the facts detailing how the source obtained access to the information, specific details regarding the basis for the source's personal knowledge and detailed descriptions of the alleged events, see Chubb, 394 F.3d at 146; Freed, 2005 U.S. Dist. LEXIS 7789; Portal Software, 2005 U.S. Dist. LEXIS 20214; Northpoint, 184 F. Supp. 2d at 999-1000; Aggregates, 235 F. Supp. 2d at 1074; Ramp Networks, 201 F. Supp. 2d at 1067, and "[t]he sheer volume of confidential sources cited cannot compensate for . . . inadequacies [of pleadings.]" Chubb, 394 F.3d at155; see also Am. Bus. Fin. Servs., 413 F. Supp. 2d at 391-92.

---

[67]

Obviously, the Court allocates no evidentiary value whatsoever to the fact of these certifications for the purposes of establishing Defendants' scienter during the parts of the Class Period when Intelligroup's Statement were filed without SOX certifications.

In support of their contentions, Plaintiffs offer statements obtained the following six UWs:

(1)  UW-1, who "was [Intelligroup's] Vice-President of Sales . . . from November 2001 until November 2002," Compl. ¶ 31.

(2)  UW-2, who "was a Vice President of the SAP Practice[68] from December 1997 until August 2003," id. ¶ 32,

(3)  UW-3, who "was a financial consultant for the Company from January 2002 until May 2004, and was an investor in SeraNova, Intelligroup's [subsidiary] spun-off in 2000," id. ¶ 33,

(4)  UW-4, who "was [Intelligroup's] Senior Manager for Business Development . . . from October 2002 until August 2004," id. ¶ 34,

(5)  UW-5, who "was [Intelligroup's] Vice-President of Sales and Marketing . . . from April 2002 until April 2004," id. ¶ 35,

(6)  UW-6, who "was the managing director of Intelligroup's Asia Pacific operations until March 2001."  Id. ¶ 36.[69]


### i.     UW-1

According to Plaintiffs,

[UW-1] . . . knew Intelligroup was running into problems with certain financial transactions, stating that [Defendant] "Visco seemed to be over his head in dealing with a company the size of Intelligroup."  . . . UW-1 characterized Valluri as a "tyrant.". . . [UW-1] added that Valluri[] "managed the India operations himself

---

[68]

     Plaintiffs do not clarify the meaning of the term "SAP."  In view of the industry Intelligroup is part of, the Court presumes that "SAP" stands for "Systems Applications and Products."

[69]

     Since the Complaint details the exact periods of employ of each UW, this requirement is expressly deemed met with respect to all UWs and will not be addressed by the Court.

> [and] wouldn't let anybody touch it, [so,] nobody really had a window into that. "He
> was a pretty ruthless guy with the employees. He would threaten to send them back
> to India. He was very autocratic. I was at meetings where he would throw things at
> me."

Compl. ¶¶ 52, 62, 65 (quotation marks in original) (this last statement is also repeated by Plaintiffs

in a less preclusive form, i.e., "few employees other than Valluri[] knew what was going on in

India").

Plaintiffs maintain that these statements "directly relate to the utter lack of internal controls

and its impact on the inaccuracy of the financial statement." Opposition at 55, n. 31. The Court

disagrees. These statement cannot amount to a piece of evidence sufficient to meet the pleading

burden on its own, since the statements lack any dates on which the relevant information was

acquired, there are no facts detailing how UW-1 obtained access to the information that "Intelligroup

was running into problems with certain financial transaction." See Chubb, 394 F.3d at 146.

Similarly, [UW-1's] observations that "[Defendant] Visco seemed to be over his head" or

"[Defendant Valluri] was very autocratic" present not facts but personal opinions void of specific

details regarding the basis for [UW's] personal knowledge, and the detailed descriptions of the

alleged events is limited to meetings during which Defendant Valluri threw something at UW-1. See

id.

Moreover, UW-1's personal opinions about Defendant Visco being "over his head" or about

Defendant Valluri having an autocratic approach and very poor social skills, even if true, add nothing

to indicate that either Defendant either intentionally caused errors in the Statements (or intentionally

created a business environment that was necessarily bound to produce such errors) or turned a "blind

eye" to "red flags" to obvious signs indicating that the errors were being made. Conversely, UW-1's

allegations about Defendant Valluri's "autocratic" managerial style is likely to indicate that

Page 155 of 195

Defendant Valluri was likely to enforce the then-existing control systems upon Intelligroup, although perhaps through means uncommon in the modern management. Finally, a generic observation that "Intelligroup was running into problems with certain financial transactions" provides this Court neither with facts nor with even a remote indication that Defendants operated with the requisite strong scienter.  Consequently, UW-1's statements have no bearing upon this Court's analysis at hand.  Accord Career Educ. Corp. Secs. Litig. ("Career Educ. I"), 2006 U.S. Dist. LEXIS 25252, at *10 (N.D. Ill. Mar. 28, 2006) ("statements made by . . . confidential witnesses . . . suffer from fatal defects . . . : they do not allege with sufficient specificity when the allegedly improper activities occurred, how the witnesses learned of these activities or had access to this information, or, even ignoring these other deficiencies, how these activities affected [defendants' allegedly fraudulent] statements"); Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1142 (W.D. Wash. 2006) (vague and conclusory statements by confidential sources do not support inference of scienter); WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *9 ("allegations [that are] generalized [are] of trivial value in strengthening the inference that [the defendant] acted with scienter. Although [the confidential source] describes [the defendant] as "very controlling" [the witness] does not allege a single act of [the defendant] that would illuminate [how] his controlling nature [is of] relevance [to the issues presented in] this lawsuit");  S. Ferry LP # 2 v. Killinger, 399 F. Supp. 2d 1121, 1140 (W.D. Wash. 2005) ("Plaintiffs provide no background information regarding how [the confidential witness] knew that [the alleged wrongdoing] was 'widely known'" at the company).

*ii.*      *UW-2*

Plaintiffs assert that "[UW-2] reported that it was common knowledge within [Intelligroup] that 'the guys in India were cooking the books' and that 'Valluri[] was always playing fast and loose with the numbers and that Visco kept his job only by being willing to 'play along.'" Compl. ¶ 53. However, this allegation lacks any imprimatur of reliability, since UW-2 did not explain what statements or events made these conclusions "common knowledge," how such knowledge was disseminated and by whom, as well as the exact means through which UW-2 acquired such "common knowledge."  In sum, the statement made by UW-2 are nothing but rumor that cannot amount to either direct or supplemental evidence and, therefore, is of no value for the purposes of the Court's inquiry.  Accord Career Educ. Corp. Secs. Litig. ("Career Educ. II"), 2007 U.S. Dist. LEXIS 23635, at *13  (N.D. Ill. Mar. 29, 2007) (rejecting "confidential witness' statements that plaintiffs cite [because the statements] have. . . not been shown to be reliable. Plaintiffs have not shown that the witnesses have any basis for their knowledge for some of the statements, and for others, the witnesses are only relaying rumors and second-hand information"); Zucco, 445 F. Supp. 2d at 1205-08 (explaining that confidential witness' "hearsay rather than personal knowledge [has no weight since it is] not probative" and confidential witness' "opinions as to why [defendants] took certain actions during the class period . . . are speculative" and should be rejected); Metawave Communs. Corp. Secs. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("'The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating a gossip'") (quoting Commtouch Software Ltd. Sec. Litig., 2002 U.S. Dist. LEXIS 13742, at *10, No 01-719 (N D. Cal. July 24, 2002)).

### iii.    UW-3

Plaintiffs also allege that

> [UW-3] . . . confirmed . . . skepticism regarding Intelligroup's representations about its Indian subsidiary. [UW-3] described transactions regarding the Indian subsidiary as a "big black box," further confirming the absence of internal financial controls over Intelligroup's Indian subsidiary.  Describing Intelligroup's business, [UW-3] added "there was outright fraud and there was outright incompetence." . . . [UW-3] added that during Defendant Visco's entire tenure at Intelligroup, [Defendant] Visco had only made one visit to the Indian offices, and described Intelligroup's Indian operation as "one big black box."

Compl. ¶¶ 51, 63.

Statements made by UW-3 fair no better than those attributed to UW-1 and UW-2.  It is apparent from the language quoted by Plaintiffs that UW-3, who operated in such terms as "skepticism," was not providing firsthand information; at best, UW-3 was repeating the definition of Intelligroup's Indian operation that UW-3 heard from Defendant Visco.  Moreover, even if UW-3 actually quoted Defendant Visco's language, Defendant Visco's reference to a "big black box" conveyed, at most, his lack of clarity as to the structure of Intelligroup's operations in India, see American Heritage Dictionary Online,  <<http://www.ask.com/reference/dictionary/ahdict/58243/black+box>> (defining "black box" as "[a] device or theoretical construct with known or specified performance characteristics but unknown or unspecified constituents and means of operation" or "something that is mysterious, especially as to function"), but in no way indicates either a culpable state of mind on the part of Defendants Visco or Valluri.

Moreover, UW-3's allegation that Defendant Visco visited Intelligroup's operation in India only once is not indicative of either scienter or even a managerial laxness, since vice-presidents (or other senior managers) of global enterprises could be extremely diligent and effective without visiting every--or even any--locale.  Finally (a) UW-3's statement that "there was outright fraud and

there was outright incompetence" appears to be just a bald declaration (of UW-3's personal belief that Intelligroup's affairs were executed in a wrongful fashion) void of any factual basic, since the statement fails to identify the specific nature of the alleged "outright fraud," or connect it to Defendants' general activities, moreover to Defendants' scienter as to the content of Intelligroup's Statements,[70] accord Zack v. Allied Waste Indus., 2005 U.S. Dist. LEXIS 35323, at *21 (D. Ariz. Dec. 15, 2005) ("confidential witnesses' conclusory allegations of what senior management 'knew,' without particularity or specificity" indicate that the witnesses' "knowledge is not averred"); cf. Chubb, 394 F.3d at 149 (noting that the court should not be "left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor"), and (b) UW-3's reference to "outright incompetence" suggests, at most, that Defendants--even if they were to be presumed involved in the wrongful actions--acted negligently and, thus, lacked the requisite culpable state of mind.   See IKON, 277 F.3d at 667 (explaining that the requisite scienter must be more egregious than that associated with "highly unreasonable (conduct), involving . . . simple, or even inexcusable negligence"); WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *10 ("That the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim").   Consequently, UW-3's statements can neither amount to strong evidence of scienter on their own nor even add a credible circumstantial "piece to the scienter puzzle."

---

[70]

The Court notes that the statement made by UW-3 is especially in need of factual specificity, since Plaintiffs clarify that UW-3 was an investor in SeraNova, Intelligroup's spun-off subsidiary that eventually went bankrupt, see Compl. ¶ 33; Intelligroup's 10-K, at 126, and such fact, read together with fact-free generality of UW's conclusions, detracts from UW-3's credibility--and renders his statement more susceptible to doubt--in view of UW-3's potential bias against Intelligroup and/or individual Defendants.

### iv.    UW-4

Plaintiffs' reliance on UW-4 appears to be the most extensive, since Plaintiffs' quotations of UW-4's statements exceed Plaintiffs' references to all other (identifiable) confidential sources.  It appears that UW-4's statements addressed three subjects: (1) Intelligroup's billing practices; (2) Intelligroup's earning projections; and (3) the degree of automation in Intelligroup's accounting system.  With respect to the first subject, Plaintiffs maintain that

> [UW-4] . . . stated that [UW-4] had doubts about [Intelligroup's] accounting operation, noting that Intelligroup went through "three or four CFO's" in a short amount of time, making [UW-4] unsure "they had consistency or ongoing continuity in their accounting practices." [UW-4] further explained that some of Intelligroup's clients "had issues with billing problems." One example was BearingPoint, which [UW-4] stated had subcontracted consulting work to Intelligroup. [UW-4] stated that on one occasion, an invoice intended for BearingPoint was sent by mistake to BearingPoint's client, which allowed BearingPoint's client to determine how much mark-up BearingPoint was making on the work. [UW-4] explained "that happened in more than one case" and that, accordingly, "there were a lot of receivables that were difficult to collect." Describing Valluri[] as a "hands-on" CEO, [UW-4] further confirmed that Defendants knew about these billing problems because the problems "were highly embarrassing for the Company and were widely broadcast across the sales floors."

Compl. ¶¶ 44-45.

Clearly, UW-4's personal "doubts" or UW's feeling "unsure" cannot amount to factual evidence and, therefore, are not useful for the purposes of the Court's inquiry.[71]  See Career Educ. I, 2006 U.S. Dist. LEXIS 25252, at *10; Limantour, 432 F. Supp. 2d at 1142; WatchGuard II, 2006

---

[71]

UW-4's "doubts" are also doubtful, since UW-4, who worked at Intelligroup from November of 2002 to August 2004, referred to "'three or four CFO's' in a short amount of time," while, in reality, Intelligroup had only two CFOs, Defendant Visco, who performed these duties from November 2000 to November 2003, see Compl. ¶ 29, and David Distel, who performed the duties from the time when Defendant Visco left Intelligroup and until August of 2004, i.e., the time when Distel left Intelligroup, which was exactly the time when UW-4 himself/herself stopped being an Intelligroup's employee.  See Docket Entry No. 1, ¶ 8 (Plfs.' original Complaint).

U.S. Dist. LEXIS 74269 , at *9.  But even if the Court is to ignore this shortcoming and focus on the alleged (undated) incident with BearingPoint and read the incident as an indication of Intelligroup's problems with proper addressation or timely issuance of invoices, the fact that Intelligroup was inadvertently breaking its clients confidences or lagging on collection of receivables, even if true, neither indicates that Intelligroup unduly glorified its financial situation in the Statements (to the contrary, UW-4's reference to delayed receivables explains Intelligroup's Restatement of its net income in terms better than those originally reported), nor suggests that Defendants, somehow, caused the oversights or delays described by UW-4,  or that Defendants turn a "blind eye" to the issue.  Although UW-4 states that "Defendants knew about these billing problems because the problems 'were highly embarrassing for the Company and were widely broadcast across the sales floor,'" UW-4's conclusion does not appear to be reliable, since UW-4 does not indicate how the fact that the information "broadcast[ed] across the sales floor" indicates that Defendants must have known about it.  Indeed, since Defendant Valuri was a CEO of a business entity having global presence, see Compl. ¶¶ 3, 29, and Defendant Visco was the Senior Vice President of Finance and Administration, id. ¶ 29, and there is no allegation that either one of these Defendants was spending his workdays on sales floor.  Finally, while UW-4 suggests that Defendant Valluri was a "hands-on" CEO, UW-4 does not provide a single fact in support of UW-4's conclusion, and the circumstances of the case suggest to the contrary.  In that respect, the case at bar can be contrasted to the recent Court of Appeal's decision Suprema-Appellate, 438 F.3d 256.

In Suprema-Appellate, the business of the issuer "was divided between two product lines: 'hard cheese,' which included imported and domestically produced [cheeses], and 'soft-cheese,' which included domestically produced [cheeses]." Id. at 264.  The issuer's business progressed as follows:

[since] in 2000 and 2001, [the issuer] reported dramatic growth in sales and receivables [i.e.,] 400% growth in revenue [while the] industry-wide growth . . . was only approximately 9% . . . FORBES MAGAZINE ranked it as the twenty-second best small company, [and the issuer's] average share price more than doubled.  State and federal investigations subsequently revealed that [the issuer's] explosive growth was . . . the product of a fraudulent scheme . . . . [In reality, the issuer remained a very small enterprise] where a very small senior management team . . . boasted [about the team's] "hands-on" relationship with key accounts and customers, [who, eventually] pled guilty to fraud charges in connection [the issuer's] scheme . . . . [The operation was so small, that the issuer's Vice-President, who was also its CEO, as well as its Chairman of the Board, together with the issuer's CFO, who was also its Secretary, as well as a member of the Board, personally]  signed millions of dollars in company checks during the class period, payable [to the clients who were co-conspirators in the scheme.  Moreover, [the CFO/Secretary/member of the Board actually] controlled all . . .  bookkeeping connected with [co-conspirator's] accounts and he and [the Vice-President/CEO/Chairman expressly] prevented [the issuer's] accounting staff from having any contact with [these] accounts [specifically] instruct[ing other] employees not to be involved in the . . . portion of the business [affected by the fraud] and . . . prevented [the]  employees from having contact with [the issuer's auditor with respect to the matters] concerning the[se] accounts.

Id. at 278-79.

Evaluating the Suprema-Appellate plaintiffs' pleading of the aforesaid business circumstances, the Court of Appeals "conclude[d] that plaintiffs' allegations against the [Vice-President/CEO/Chairman and CFO/Secretary/member of the Board were] detailed" enough to indicate the Suprema-Appellate defendants' knowledge of all business aspects of the issuer and refused to entertain the defendants' claim that they were not "hands-on" managers.  Id. at 279.  The circumstances of the case at bar stand in stark contrast to those presented in Suprema-Appellate. Intelligroup was and is a business entity enjoying global presence.  See Compl. ¶ 3.  It has its headquarters in the United States, its biggest subsidiary in India, plus a number of other subsidiaries and overseas operations.[72]  See Compl. ¶¶ 3, 28, 33, 36 (discussing Intelligroup's Asia-Pacific

---

[72]

Intelligroup's current Internet site lists four locations in the United States, one in Puerto Rico,

operations and sale of the SeraNova subsidiary); Opposition at 54, n. 30 (noting that "Intelligroup's 'key' subsidiary . . . still is [in] India").  The sheer volume of Intelligroup's operation distinguishes it from the issuer depicted in Suprema-Appellate.   Moreover, Plaintiffs' Complaint and the statements of UW-4 are void of any facts indicating that Defendants personally processed any accounts, signed Intelligroup's checks or usurped any financial or accounting functions.  In view of the foregoing, the Court concludes that UW-4's designation of Valluri as "hand-on" CEO is not indicative of Valluri's knowledge about Intelligroup's accounting glitches which reached the "sales floor" through the corporate grapevine.  Therefore, the above-quoted part of UW-4's statements neither provides direct evidence of scienter nor adds to this Court's evaluation of circumstantial evidence of Defendants' state of mind.   See WatchGuard II, 2006 U.S. Dist. LEXIS 74269, at *20- 21 (confidential source's "allegations are silent as to the knowledge or conduct of any d]efendant. For example, [the source] alleges that "throughout [the source's] tenure [the source] had thought that all of [the issuer's accounting practices were]'crooked' . . . .  [The source] does not allege, however, that [the source] has any basis for assigning culpability for the 'crooked' practices to any [d]efendant"); Heywood v. Cell Therapeutics, Inc., 2006 U.S. Dist. LEXIS 28684, at *18  (W.D. Wash. May 4, 2006) (allocating no value to the statement by a confidential source who asserted that "[the defendant] knew everything" about the issuer's problems because the defendant "had people who reported to him"); Goldstein v. MCI Worldcom, 340 F.3d 238, 251 (5th Cir. 2003).

Plaintiffs also provide another account by UW-4, noting that

[UW-4] also explained that [UW-4] doubted Valluri[]'s veracity during the periodic conference calls with financial analysts. [UW-4] stated that "Quarter by quarter, I

_____

four in India, two in Europe and one in Japan, that is, after divestiture of Intelligroup's Asia-Pacific operations.  See <<http://www.intelligroup.com/globallocations.html>>; Opposition at 54-55.

listened to the announcements" and "there were times I wondered about the numbers." Specifically, [UW-4] explained that [UW-4] had doubts about the numbers reported about the revenue from consulting work. [UW-4] stated that revenue from consulting work [was] estimated by multiplying the number of billable employees by the average utilization rate and then multiplying that figure by the average billing rate. [UW-4] further stated that Valluri[] exaggerated the utilization rate and the bill rate, explaining: "When I did deals, my bill rate wasn't as high as he Valluri[] was indicating as average."  For example, [UW-4] explained that BearingPoint was charged $18 per hour, yet Valluri[] would tell analysts that Intelligroup's average rate was in the $25-$30 per hour range. [UW-4] stated that Intelligroup was not charging clients $25-$30 per hour. . . . [UW-4] also explained that [UW-4] believed that Intelligroup overstated the number of billable employees that the Company claimed to have. [UW-4] said that although Intelligroup claimed to have a total of 900-1100 employees in its two offices in Hyderabad, India, [UW-4] doubted that the Company actually employed that many people in India, stating "the numbers of people Arjun stated Intelligroup had working offshore was too big." [UW-4] explained that during the time period that Defendants were claiming to have 900 to 1100 employees working offshore, there were only 5 projects the Company was currently working on offshore. [UW-4] further explained that as the periodic reports from these projects stated, each of these projects employed only 30 to 40 people. [UW-4] added that, even giving Defendants the benefit of the doubt that perhaps there were a few more employees than stated in the reports, there "could not have been more than 300 or 400 offshore employees." [UW-4] also confirmed that Defendants knew they were overstating the numbers of offshore employees because Defendants received the very same reports that [UW-4] received detailing the actual number of employees assigned to each of the Company's offshore projects.  By overstating the numbers of people Intelligroup employed offshore, the Company was misstating its expected revenue, since the Company's consultant-generated revenue was proportional to the numbers of consultants actually working for Intelligroup's clients.

Compl. ¶¶ 47, 49-50, 59.

The above-replicated excerpt is less than of exemplar clarity.  However, it appears that the

excerpt opens with UW-4's discussion of Defendant Valluri's conference calls with external stock

market analysts assessing Intelligroup's business prospects. Furthermore, it appears that the gist of

UW-4's statements is that Valluri was misleading the analysts by unduly exaggerating Intelligroup's

future successes by (a) amplifying the service rate that UW-4 both believed to be the going rate of

Intelligroup and offered to those Intelligroup's clients who purchased Intelligroup's services through

UW-4 personally, and (b) stating that the amount of Intelligroup's staff was notably more than what UW-4 could presume on the basis of Intelligroup's internal reports listing the staff assigned to offshore operations.  See id.  UW-4's knowledge as to the rates offered by UW-4 to the clients who negotiated their Intelligroup contracts personally with UW-4, and UW-4's beliefs as to the going rate might be irrelevant of Intelligroup's average rates (since other sales persons at Intelligroup could be more successful in selling higher-priced services or same services at a higher rate).  Moreover, the entire issue of Intelligroup's average service rates, and the actual amount of Intelligroup's staff, are of no relevance to Plaintiffs' claim, since (a) UW-4 unambiguously limited his conclusion to "missta[tements of Intelligroup'spredictions of ] *expected* revenue," rather than errors in financial data stated *after* Intelligroup actually rendered its services and collected (or became entitled to) the proceeds.  See id.  Therefore, statements of UW-4 related to alleged erroneous projections by Defendant Valluri shed no light on the issue of Defendants' state of mind for the purpose of assessing the errors made in the Statements.[73]

Finally, Plaintiffs allege that

[UW-4] confirmed [another UW's] description of Intelligroup's internal accounting and control procedures, explaining that even as late at April 2004, Intelligroup still relied on a system of spreadsheets that was in disarray and that these problems rendered Intelligroup "unable to count revenue."

Compl. ¶ 59.

---

[73]

Moreover, since Plaintiffs' Table indicates that Intelligroup actually understated its net income more often than overstated, see Compl. at 11, the validity of UW-4's conclusion that Intelligroup was exaggerating the profitability of its operations "quarter by quarter" is highly questionable, if read in light of the correct financial data set forth in the Restatement, since if Intelligroup's erroneous Statements were matching Defendant Valluri's allegedly erroneous predictions, it appears that Defendant Valluri was, at least half time, too modest in his assessments of Intelligroup's business prospects.

The Court finds UW-4's observation as to unreliability of spreadsheets and Intelligroup's inability to count revenue wholly unreliable, since UW-4's statement does not explain how UW-4, Intelligroup's Senior Manager for Business Development, see Compl. ¶ 34, came to know this purely accounting information.   There is no indication that UW-4, not being part of Intelligroup's accounting department, obtained personal knowledge about such matters as the nature of Intelligroup's accounting methods, the reliability of these methods or the ability of Intelligroup's accountants to determine corporate revenue.   Therefore, the above-quoted statement by UW-4 does not carry indicia of reliability.   See Novak, 216 F.3d at 314 (a plaintiff must plead "probability that a person in the position occupied by the source would possess the information alleged").

In sum, all UW-4's extensive observations provide the Court with neither direct evidence of Defendants' scienter nor even with circumstantial evidence for the purposes of this Court's inquiry with regard to the errors made in Intelligroup's Statements and Defendants' scienter.

### v.      UW-5

According to Plaintiffs,

[UW-5] said that, at least as far back as 1999, Intelligroup's internal accounting and control procedures were in "complete disarray, consisting only of a system of spreadsheets." . . . [W-5] explained that it was not until 2004 that Intelligroup decided to upgrade its financial accounting system, choosing to install a SAP software system, the very same type of system that Intelligroup installed for many of its clients. The installation of SAP did not go well [presumably, according to UW-5. UW-5] compared Intelligroup's disastrous implementation of the SAP system . . . to the proverbial shoemaker's son who goes barefoot. . . . [UW-5] added that [UW-5] believed that [Defendant] Visco was ultimately pushed out of [Intelligroup] when [Defendant] Visco finally began questioning [Defendant] Valluri[]'s decisions, explaining that "[Defendant Valluri] didn't understand that he didn't own the company anymore" and "didn't understand the ramifications" of [Intelligroup] being publicly as opposed to privately owned.

Compl. ¶¶ 59-60, 62, 65.

The statements made by UW-5, however, have no negative bearing on the issue of Defendants' scienter.  Leaving aside the observation that UW-5, hired by Intelligroup in 2002, see Compl. ¶ 35, could not have obtained firsthand knowledge about Intelligroup's accounting procedures in 1999 and for the following three years, it is not clear to this Court how the degree of Intelligroup's automation could be indicative of Defendants' culpable state of mind.  Similarly, the "growing pains" of Intelligroup, even if true, cannot suggest that Defendants' acted with intent to defraud, or recklessly; to the contrary, such "growing pains" appear to suggest that Defendants indeed designed and kept upgrading Intelligroup's control measures, but the procedures were having problems at the "grassroots" level.  Finally, UW-5's description of the alleged frictions between Defendants Visco and Valluri similarly does not include facts suggesting that the frictions were fraud-related; rather, the conflict described appears to be: (a) an unfortunate yet quite typical internal corporate power struggle, and (b) suggests that the resignation of Defendant Visco was entirely based on Defendants Visco and Valluri's differences in management style.  In sum, even if the statement of UW-5 included more specifics, e.g., dates of the events and facts verifying firsthand knowledge, none of UW-5's statements would support a strong or even a weak inference of Defendants' scienter, since the very substance of UW-5's observations neither suffice as direct evidence of fraud or extreme recklessness nor amplify Plaintiffs' other scienter-related allegations.

### vi.    UW-6

Finally, Plaintiffs state that "[UW-6] added [that] Intelligroup 'was not well run and their controls were not good.'"  Compl. ¶ 62.  Responding to this allegation, Defendants point out that

UW-6 statement is "laughably vague," see Docket Entry No. 65, at 30, and this Court tends to agree. In fact, the Court 's extensive search revealed not a single case where a securities plaintiff offered an observation by a confidential source that the issuer's business was "not well run" (or that the internal models "were not good") and relied upon such statement as evidence of the defendant's intentional fraud or such high degree of recklessness, that it equates to "a lesser form of intent rather than a greater degree of negligence." Hollinger, 914 F.2d at 1569, see also Advanta, 180 F.3d at 535. Therefore, this Court omits discussion of shortcomings of UW-6's statement since it appears self-evident that the observation of UW-6 is of no relevance to this Court's inquiry.

In sum, the statements made by all six Plaintiffs' UWs

> do not. . . allege that Defendants . . . actually knew that misstatements were being made.  Neither do they allege that Defendants . . . received any warning that [the issuer's] internal accounting practices were in anyway suspect such that Defendants' failure to investigate further marked severe recklessness.

Sportsline, 366 F. Supp. 2d at 1173.


###    e.    *Internet Posting by an Anonymous Witness*

In addition to the foregoing, Plaintiffs also offer, as evidence, the following unusual contention:

> Intelligroup's lack of internal controls were not limited to its India Operations. [Plaintiffs conclude so in view of a] message posted to the Yahoo!Message [an Internet blog-like site.  The message was titled] Re: [Intelligroup's] Board [of Directors and Valluri] dug themselves a big hol[e.  The message was posted by Yahoo! Message user] congirl4889 [and dated] 08/25/04 01:39 pm. [The number of this particular message was] Msg: 53997 of 56753. [The message read:]
>
>> The rumors regarding fraud from [Defendant Valluri]  were also wrapped in [Defendant] Visco's departure.  The story was that [Defendant] Visco refused to allow [Defendant Valluri] to siphon off $750,000 for a "news" venture unrelated to [Intelligroup's operations] in India.  [Defendant] Visco refused

[to do so] unless [Defendant Valluri] sought [the B]oard['s] approval, and was subsequently dismissed.[74]

[Apparently after posting Msg: 53997 of 56753, but on an unstated date, the same username posted another message numbered Msg: 54309 of 56753, and reading:]

> It's even worse than has been confessed. I wondered during the [conference call] last week why [the CFO] went into detail about how every transaction was being validated for the [second fiscal quarter of 2004]?  Well, the story I get is that the implementation failure was so bad that no TRUE systems professional could believe that it would happen to a SAP integrator.  The story I got from inside went like this: 1. No experienced SAP resources (actually done an implementation) were assigned to the in-house project.  All team members were in India with little communication done in the US.  2. [Defendant] Visco was originally in charge. After he left it was unclear who stepped up as executive sponsor, but it was NOT either [one of two Intelligroup's employees unrelated to this legal action] prior to their departure. 3. The conversion of the old data from the old version of SAP went so badly that everything disappeared. No contracts. No timesheets. Nothing. Therefore, all transactions are being entered manually, but no-one knows if all the data can be reconstructed. 4. The data migration fiasco is why [Intelligroup's auditing firm] resigned.  They would not attest to the accuracy of the manual input with a qualified opinion on the quarterly financials.  This was unacceptable to [Intelligroup's] management.  No compromise could be reached, so [Intelligroup's auditing firm] quit politely.  It is factually TRUE that there was no "documented" disagreement.  The qualified opinion was never "officially" written and submitted to [Intelligroup's] management. 5. No backups were made to the SAP data . . . prior to the attempted migration.

Compl. ¶¶ 61, 64.

Plaintiffs' Complaint is silent as to the identity, employ, and any other facts about the

username "congirl4889."  See generally, Compl.  Indeed, in view of Court of Appeal's express

---

[74]     This account is qualitatively identical to that provided by UW-5 and defines a power struggle between Defendants Visco and Valluri.  Accord Compl. ¶¶ 59-60, 62, 65. Same as the account given by UW-5, the discussion of the conflict between Defendants Visco and Valluri provided by the username "congirl4889" is void of any fraud-related connotations since the term "siphon," as used with respect to monies, appears to imply a spendthrift--rather than fraudulent--expenditure (that could be related to accounting errors only through assertion of facts suggesting that the expenditure was unduly concealed, which the posting does not indicate was the case).

guidance, the information obtained from a securities plaintiff's undisclosed source may be introduced only if the plaintiff specifies the time period that the source worked at the defendant-company, the dates on which the relevant information was acquired, the facts detailing how the source obtained access to the information, details regarding the basis for the source's personal knowledge and detailed descriptions of the alleged events, see Chubb, 394 F.3d at 146, Plaintiffs' reference to anonymous messages posted by unidentified and, perhaps, unidentifiable "congirl4889" cannot pass muster.  The Court, therefore, cannot draw any inferences adverse to Defendants from Plaintiffs' statements based on congirl4889's postings.  However, the same does not necessarily apply to Plaintiffs, since, as a general legal principle, "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts. . . . Allegations in a complaint are binding admissions . . . and admissions can of course admit the admitter to the exit from the federal courthouse."[75]  Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997) (quoting Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995)).

Having taken notice of this basic principle, the Court notes that, while statements posted by the username "congirl4889" certainly indicate that the information is, at best, secondhand and, thus, presents nothing more than the poster's beliefs based on potentially exponential layers of hearsay, see Compl. ¶ 61, 64 (employing such terms and phrases as "rumors," "the story was," "the story I got"), the fact that the postings: (a) were made less than a months prior to the Press Release, or later, and more than three months after the last erroneous Statements were filed by Intelligroup, see id., ¶¶ 61, 64, 70; (b) depicts a scenario of a *sudden* corporate confusion and disorder that resulted from

---

[75]

In fact, Plaintiffs ardently maintain that statements made by the username "congirl4889" should be deemed both correct and highly reliable.  See Opposition at 63, n. 34.

a massive software corruption; and (c) indicates that the resignation of Intelligroup's auditing firm was an inadvertent result of loss of computerized data, suggests that: (a) Intelligroup's control systems were sufficiently operable prior to implementation of the computer program that caused massive data migration and seeded havoc in Intelligroup, and (b) that Defendants neither intentionally cause the deficiencies nor could have anticipated them.  See id.  Moreover, read jointly with the statements made by W-5, who "explained that it was not until 2004 that Intelligroup decided to upgrade its financial accounting system, choosing to install a SAP software system [causing] disastrous" problems, Compl. ¶¶ 59-60, 62, 65, the statements made by the username "congirl4889" suggest that, during the time when Intelligroup executed filing of the Statement, Intelligroup's financial accounting system, although perhaps poorly automated and somewhat archaic, did not provide Defendants with any "red flags" about the errors in their Statements.  Moreover, in view of the posting by username "congirl4889," it appears highly plausible that the massive software corruption ---because of which "everything disappeared, [including all Intelligroup's previous] contracts, [all billable] timesheets [and the entire business] data [had to be]  reconstructed [from scratch, apparently during or around the summer of 2004, since] no backups were made [of the computerized data reflecting Intelligroup's previous business transactions,]" id. --- was actually the sole cause for the extensive reconstruction and accompanying review of Intelligroup's financials which, eventually, caused Intelligroup's Audit Committee to discover the errors in the Statements.  Accord Press Release (stating that, as a result of "recent upgrad[ing of] financial system . . . , [Intelligroup] has been undertaking a comprehensive review [which] resulted in . . . September 22, 2004, . . . Audit Committee['s] . . . conclusion that the financial [S]tatements and the related independent audit reports [contained accounting errors]"); Opposition at 63-65, nn. 34, 53 (where

Plaintiffs (a) quote the Restatement, which noted that "lack of familiarity with the new [automated] system and loss of [computerized data]" around the time of the Press Release, and draw analogies between the Restatement language and the posting language, which discussed Intelligroup's problem with implementation of the new system and noted that Intelligroup's personnel capable of swifter resolution of implementation problems was assigned to and worked on Intelligroup's projects in India, and (b) indicate that Intelligroup's financial errors were discovered by Intelligroup's then-CFO around the same period.   Since Defendants' ignorance about potential pitfalls and perils associated with a massive upgrading of Intelligroup's automation system (or automation of financial system) that materialized during the summer of 2004 could not be indicative of either Defendants' intent to defraud or of their conscious ignorance of "red flags" with respect to the errors in the product created months or even many years prior through the use of what appeared to be a sufficiently functioning system, the Court concludes that Plaintiffs' proffering of the posting by the username "congirl4889" suggests lack of Defendants' scienter and, hence, detracts, to some degree, from Plaintiffs' allegations that Defendants acted with culpable state of mind.[76]   Accord Tellabs, 127 S. Ct. at 2509-10 (when determining the sufficiency of a securities plaintiff's scienter pleadings for the purposes of defendant's motion to dismiss, the district court is obligated to make all inferences plausible in view

---

[76]

       It appears that Plaintiffs implicitly recognize this point, see Opposition at 63-65, nn. 34-35, but maintain that Defendants were reckless in (a) creating Intelligroup's internal control environment in the fashion unable to withstand the massive problems associated with adoption of the new automated financial system, and (b) not maintaining sufficient personnel at Intelligroup's United States facilities to prevent the consequences defined by UW-5 as "disastrous."  However, if so, these allegations have no relevance to either the errors that infested Intelligroup's Statements years before the events of summer 2004 or Defendants' state of mind that existed at the time when the Statements were publicized.

of the facts alleged, regardless of whether these inferences are favoring the plaintiff or the defendant); Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22 (same).

### 3.    Totality of Evidence Analysis

According to the Supreme Court, a securities plaintiff's mere allegations "from which an inference of scienter rationally *could* be drawn" are insufficient as a matter of law.  Tellabs, 127 S. Ct. at 2510 (emphasis in original).  Rather, to qualify as a "strong" inference, the facts alleged "must be cogent and compelling . . . in light of other explanations."  Id..  Therefore, this Court should now (a) summarize--and draw all plausible inferences from--the entirety of Plaintiffs' facts; and (b) determine whether Plaintiffs' factual pleadings provide the basis for at least as strong an inference of Defendants' scienter as that which could be drawn from those facts which suggest that Defendants did not act with the requisite culpable state of mind.  Id. at 2509-10; Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22.

In the case at bar, the facts and inferences related to Defendants' scienter appear to be as follows:

(1)    Defendants, due to their senior management positions had an opportunity to commit the alleged fraud.  However, Plaintiffs failed to allege any facts that Defendants had any motive to commit the wrongs, since the Complaint provides no indication that Defendants benefitted in a concrete and personal way from the purported fraud.  Since it appears that Defendants neither sold a single stock to benefit from the allegedly artificially inflated price of

Intelligroup's securities, nor benefitted in any other way, this fact suggests an inference that Defendants did not operate with scienter.[77]

(2)    The fact that Defendants Visco left Intelligroup's employ almost a year prior to the Press Release, while Defendant Valluri remained employed by Intelligroup for seven months after the Press Release, coupled with the facts that Intelligroup neither asserted, at any point, that resignations of Defendants Visco and Valluri were related to fraud nor took any measures of corporate punishment against these Defendants and, seemingly, preserved their severance packages, negates any inference of scienter that might be drawn from the mere facts of Defendants Visco and Valluri's resignations.  Therefore, for the purposes of its scienter inquiry, the Court allocates no weight to Plaintiffs' allegations based on resignations of these Defendants.

(3)    Similarly, the Court finds no significance in the fact of resignation of Intelligroup's auditor, since the Complaint is void of any facts indicating that the audit firm resigned because Defendants continued issuing erroneous Statements after the auditors determined that Intelligroup's Statements were fraudulent and notified Defendants of such fraud.  Reading Plaintiffs' allegations with respect to the auditors' resignation in light of Plaintiffs' allegations based on the posting of the username "congirl4889," the Court concludes that the auditors' resignation was caused solely by: (a) Intelligroup's massive loss of its historic computerized

---

[77]

Moreover, executive incentives based on earnings do not provide  grounds for inference of scienter, see, e.g., Tuchman, 14 F.3d at 1068 , the Court also notes that, if Intelligroup had such an incentive system, the fact that Intelligroup's net income was understated more often than overstated during the periods reflected in Plaintiffs' Table, see Compl. at 11, indicates that Defendants' alleged fraud could cause (or actually caused) pecuniary loss to Defendants.

data, and (b) the auditor's decision not to audit Intelligroup's future financial statements in data-void vacuum.

(4)    While recognizing that Intelligroup's Statements were executed not in accordance with GAAP, the Court gives this evidence no weight , since the Complaint does not allege any fact suggesting that Defendants knew about GAAP violations or recklessly disregarded any "red flags" indicating such violations.  In addition, the Court does not draw any inferences of Defendants' scienter from the amount of GAAP violations, since the bulk of errors resulted from the workings of the balance sheet, which is so structured that a change of even a single entry automatically entails a multitude of changes.  Finally, in view of the fact that these GAAP violations resulted in more-often-than-not understatements of Intelligroup's net earnings, the Court concludes that the violations of GAAP were not indicative of Defendants' knowledge of the fraud or even extreme recklessness about the possibility of misstatements.

(5)    In addition, the Court does not draw any inferences of Defendants' scienter from their SOX certifications, not merely in view of the fact that these certifications accompanied about a third of the challenged Statements, but mainly because the Complaint does not include any factual allegations indicating that Defendants affixed their signatures under SOX certifications in order to offer the market any additional assurances about the reliability of the Statement and, thus, entice investors into purchasing Intelligroup's securities.

(6)    Finally, after examining the statements of Plaintiffs' undisclosed (as well as unidentifiable) witnesses, the Court concludes that the insights provided by the witnesses indicate that the discovery of errors in Intelligroup's Statements was incidental to Intelligroup's full review of its financial history, which took place during the summer of 2004 and was caused by

massive automation failure and loss of data.  These statements indicate that, at the time of

Intelligroup's filing of the Statements, Defendants neither knew of nor turned their "blind

eye" to the signs of errors in the Statement, and supports an inference that Defendants did

not act with a culpable state of mind.[78]  The Court allocates no importance whatsoever to

those statements that either addressed the financial issues unrelated to the matter at bar or

described social, intellectual or character shortcomings of Defendants Valluri and Visco, or

to the fact that Plaintiffs provide six different undisclosed witnesses paraphrasing the same.

See Chubb, 394 F.3d at 146 ("The sheer volume of confidential sources cited cannot

compensate for these inadequacies").

Summarizing the foregoing, the Court concludes that the totality of factual evidence provided

in the Complaint indicates that Defendants did not act with the requisite degree of scienter.  Tellabs,

-------

[78]

The Court of Appeals for the Seventh Circuit recently suggested that, under the Supreme
Court's holding in Tellabs, no statement allegedly made to a securities plaintiffs by undisclosed
witnesses could be properly considered for the purpose of establishing defendant's scienter.  The
Seventh Circuit clarified as follows:

The Supreme Court's opinion, Tellabs, . . . , establishes two propositions . . . . First,
"[a] complaint will survive [a motion to dismiss] only if a reasonable person would
deem the inference of scienter cogent and at least as compelling as any opposing
inference one could draw from the facts alleged.". . . Second, in applying this
standard, "the court must take into account plausible opposing inferences."  [The]
upshot of the approach that Tellabs announced is that [the court] must discount
allegations that the  complaint attributes to . . . "confidential witnesses" [since it] is
hard to see how information from anonymous sources could be deemed "compelling"
or how [the court] could take account of plausible opposing inferences [considering
one-sided statement of witnesses proffered by an interested party] . Perhaps these
confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't
even exist.

Higginbotham, 495 F.3d at 756-57.

127 S. Ct. at 2509-10; Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22; compare In

re Syncor Int'l Corp. Sec. Litig., 2007 U.S. App. LEXIS 14257, at *3 n.2 (conducting comparative

analysis and concluding that inferences of culpable state of mind dominated those suggesting non-

culpable state of mind).  While it appears that Defendants could have been negligent, the Complaint

provides this Court with no basis to draw strong inference of Defendants' scienter.  See IKON, 277

F.3d at 667.  Plaintiffs' extensive bald assertions otherwise do not alter the Court's analysis.  See

Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *13; Burlington, 114 F.3d at 1429.


### 4.    SeraNova Allegations

In addition to the allegations based on Defendants' alleged affirmative misrepresentations and

discussed supra, Plaintiffs also make the following assertion:

> Intelligroup spun-off SeraNova, [Intelligroup's subsidiary] in July 2000, retaining a
> $15.1 [million] unsecured promissory note dated May 31, 2000. . . .  As of the end
> of the fiscal year 2000, Intelligroup knew or recklessly disregarded that it was
> probable it would not be able [to] collect on this promissory note yet failed to record
> an impairment charge to write this asset off in 2000, and accordingly, delayed
> recording  an impairment charge until 2002 and 2003.
> . . .
> In connection with the [R]estatement . . . , [Intelligroup] reversed . . . the charges recorded
> in 2002 and 2003, . . . and moved such charges to 2000.
> . . .
> As a result [of such re-recording, it appears that] Intelligroup overstated [its] assets [and]
> understated [its losses and net income] in 2000 and 2001.  Also, as a result, Intelligroup
> overstated its [losses and understated its net income] in 2002 and 2003.

Compl. ¶¶ 37, 104.

Plaintiffs do not specify how these alleged misstatements negatively affected Plaintiffs, and

the Court cannot detect any financial fact alleging an injurious action with respect to those Plaintiffs

who purchased Intelligroup's securities during the years 2002 and 2003.[79]  If anything, Plaintiffs' SeraNova allegations harm Plaintiffs' case by eliminating the transactional causation element from the claims based on the Statements issued during 2002 and 2003, since the alleged substantiality of the SeraNova note suggests that during all fiscal periods reflected in Plaintiffs' Table, see Compl. at 11, Intelligroup's financial position was, actually, notably better that what the market was led to believe (because of the inclusion of SeraNova write-off in these 2002-2003 Statements) and, therefore, the market substantially underpriced Intelligroup's securities over these two years, thus providing Plaintiffs with a bargain.[80]  However, while it appears that Intelligroup's securities should have been even more attractive to the investors during these years, the Court will not reach the issue of transactional causation with respect to Plaintiffs' SeraNova allegations, since the element of reliance was expressly eliminated from the list of 10b-5 elements by the Supreme Court's decision in Affiliated Ute Citizens  v. United States, 406 U.S. 128 (1972).

In Affiliated Ute, a bank and its employees bought stock from a group of unsophisticated security holders with whom the bank had an ongoing business relationship.  The bank purchased the stock at a price below market value without disclosing that it was a market maker for the securities

---

[79]

Needless to say, any understatements of Intelligroup's loss or overstatements of assets in the year 2000 are: (a) irrelevant, in view of the fact that the Class Period started to run on May 1, 2001, see Compl. at 1, and (b) a factual impossibility since Plaintiffs themselves assert that, at least until "the end of fiscal year 2000," Intelligroup did not know about non-collectability of the SeraNova note.

[80]

Although not being presented with Plaintiffs allegations specifying when or how Defendants initially advised the market about the SeraNova note being collectable, the Court presumes, hypothetically, that Intelligroup expressly offered--or expressly repeated--such assurances at some point during the Class Period, hence triggering the threshold duty to enter a corrective statement if the situation changed as to the collectability.  See Oran, 226 F.3d at 286-87.

and was reselling the stock to other investors at a substantially higher price.  The trial court found, inter alia, that the bank had breached its duty to disclose material information concerning its activity as a market maker for the stock.   See id. at 153.  The United States Court of Appeals for the Tenth Circuit reversed, holding that the plaintiff could not recover damages under rule 10b-5 because they failed to show reliance on material misstatements.         See Reyos v. United States, 431 F.2d 1337 (10th Cir. 1970).    The Supreme Court however, rejected this restrictive reading of the rule and distinguished between the prohibition against false or misleading statements in clause (b) of the rule and the broader proscriptions in clauses (a) and (c).  See Affiliated Ute, 406 U.S. at 151.  Finding that the defendants' behavior could be characterized as a deceptive scheme or course of business actionable under clauses (a) or (c), the Court concluded that the lower court's requirement of actual reliance was misplaced.  See id. at 153.  Noting that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes,'" id. at 151, the Supreme Court held that,

> [u]nder the circumstances of [the] case [which] involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision . . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

Id. at 153-54 (quoting Mills v. Electric Auto-Light Co., 396 U.S. 375 (1970), and SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom., Coates v. SEC, 394 U.S. 976 (1979)).

Courts frequently apply Affiliated Ute in actions brought pursuant to rule 10b-5(b) for omissions and misrepresentations.   See, e.g., Rifkin v. Crow, 574 F.2d 256 (5th Cir. 1978) (Affiliated Ute creates a presumption of reliance on alleged material omissions); Bell v. Cameron,

669 F.2d 1278 (9th Cir. 1982); Vervaecke v. Chiles, Heider & Co., 578 F.2d 713, 717 (8th Cir. 1978); Blackie, 524 F.2d 891. In addition, although Affiliated Ute involved a face-to-face transaction, courts have universally extended its coverage to market transactions. See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 238, 240 (2d Cir. 1974); Schlick, 507 F.2d 374.

In Newton, 259 F.3d at 175, the Third Circuit stated that "the courts in this Circuit have held that the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance and recogniz[ed] that the Affiliated Ute presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible." Therefore, to satisfy the recklessness standard in a case alleging non-disclosure, a securities plaintiff must demonstrate that the defendant: (1) knew of the potentially material fact, and (2) acted with scienter by failing to disclose the fact. See Wilson, 195 F. Supp. 2d at 639 (explaining that, with regard to the latter prong, the relevant inquiry is "not merely whether the defendant had knowledge of the undisclosed facts; rather it's the 'danger of misleading that must be actually known or so obvious that any reasonable man would be legally bound as knowing'") (quoting Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989)) (original brackets removed).

While a $15.1 million note is, no doubt, a substantial asset, it does not necessarily mean that non-collectability on the note is a material fact. To make such an inquiry, the Court of Appeals

> fashioned a special rule for measuring materiality in the context of an efficient securities market. . . . In such an efficient market, "information important to reasonable investors . . . is immediately incorporated into the stock price." Burlington, 114 F.3d at 1425. As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price

of the firm's stock. Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," if a company's disclosure of information has no effect on stock prices, "it follows that the information disclosed . . . was immaterial as a matter of law." Burlington, 114 F.3d at 1425. . . . [Therefore, in a case where the allegedly material undisclosed information] is actually disclosed . . . , [the court should] apply Burlington and look to the movement in the price of [issuer's] stock following disclosure to determine if the information was material.

Oran, 226 F.3d at 282.

Since Plaintiffs' complaint contains no allegations that, as a result of Intelligroup's recording of impairment charges (associated with the SeraNova note) in 2002 and 2003, Intelligroup's stock price experienced any notable downward fluctuation, see generally, Compl., the Court concludes that Plaintiffs failed to plead that information about the collectability of the SeraNova note was material.

However, even if the Complaint did allege this information, the Court must also consider whether the Complaint sets forth any facts supporting the second prong of the Affiliated Ute inquiry, i.e., whether Defendants acted with the requisite state of mind when they did not address the issue of the note collectability during the year 2001. Plaintiffs' allegations in that respect include two assertions: (1) that "Intelligroup's 2004 [yearly filing with the SEC, namely, Intelligroup's 10-K form ("10-K")] acknowledges[] the fact that the . . . note from SeraNova . . . would never be paid was apparent in 2000," id. see Compl. ¶ 38; and (2) that "it was probable [Intelligroup] would not be able [to] collect on [the SeraNova] promissory note" because the note eventually proved to be uncollectible. See id. ¶ 104.

### a.    Allegations Based on Intelligroup's 10-K

Although Plaintiffs' assertions with respect to Intelligroup's 10-K lacks any pin-citation to this document, leaving the Court to guess what particular statement Plaintiffs had in mind, see

Compl. ¶¶ 38-39, Plaintiffs' allegation is factually unsubstantiated in view of the fact that the document *did not include any statement* that could be read as Intelligroup's acknowledgment of the fact that Intelligroup was aware of non-collectability of the SeraNova note in 2000 or even 2001.

All references to the SeraNova note in the 10-K filed by Intelligroup are limited to the listings of the dollar value of the charge and related financial figures; discussion of an inter-company adjustments, the history of Intelligroup and creation and sale of SeraNova, Intelligroup-SeraNova tax-sharing, space-sharing and leasing agreements, the circumstances of SeraNova bankruptcy, and similar type of statements, none of which offers support to Plaintiffs' claim that "Intelligroup's 2004 10-K acknowledge[d] the fact that the . . . note from SeraNova . . . would never be paid was apparent in 2000" or touches on the issue of what became apparent to Intelligroup's officers and when.  See <<http://www.sec.gov/Archives/edgar/data/1016439/000112528205005480/b409203_10k.htm>>, at 5, 8, 11, 19, 27, 34, 37, 39, 49, 59-60, 62-63, 95-96, 112, 115, 127, 135-36, 13-41, 155, 158-78.[81] Moreover, the 10-K provides the following highly pertinent insight:

> On May 31, 2000, SeraNova and [Intelligroup] formalized [the] promissory note [at issue] ("Note") . . . .  SeraNova failed to make final payment of all amounts due under the Note to [Intelligroup] as of July 31, 2001.  On August 16, 2001, [Intelligroup] filed a complaint against SeraNova and [two companies] which acquired SeraNova [("Purchasers")] in March 2001. . . . On September 25, 2001, [the Purchasers] filed a joint Answer to [Intelligroup]'s complaint. . . . After completion of the discovery process, [Intelligroup] moved for summary judgment.  On April 17, 2003, the Court granted partial summary judgment.  . . .  On August 8, 2003, SeraNova and [the Purchasers] filed for Chapter 7 Bankruptcy, thereby staying this action . . . .  There has been no notice that [the Purchasers were] insolvent.  Shortly thereafter, counsel for [SeraNova and the Purchasers] asked the Court and was

---

[81]

The Court considers Intelligroup's 10-K incorporated in the Complaint by reference and, thus, takes judicial notice of the entire content of this document, as filed by Intelligroup with the SEC. See TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1180 (10th Cir. 2007) (taking similar notice on the basis of Tellabs, 127 S. Ct. at 2509).

> granted permission to be relieved as counsel.  On September 22, 2003, [Intelligroup] moved for entry of default against [the Purchasers]. On May 24, 2004, the . . . [c]ourt entered final judgment against [the Purchasers] in the amount of $11,472,000 ("Judgment"). [As of the date of its 10-K filing, October 24, 2005, Intelligroup] believes that collecting such Judgment from [the Purchasers] is not probable.

10-K, at 126.

This disclosure by Intelligroup unambiguously indicates that Intelligroup was actually expecting to collect on the SeraNova note and aggressively pursued such collection.  See id. Furthermore, since the collection process involved a litigation initiated in the second half of 2001 and was further obstructed by unanticipated insolvency of SeraNova and its Purchasers in 2003, it appears very reasonable that Intelligroup postponed writing-off the SeraNova note until the collection became progressively litigious and increasingly doubtful, i.e., until 2002 and 2003. Therefore, the Court concludes that the content of Intelligroup's 10-K indicates that Defendants' did not act with scienter when they elected to delay write-offs of the SeraNova note, and Plaintiffs' conclusion to the contrary is nothing but an impermissible bald assertion.  See Burlington, 114 F.3d at 1429; Nice, 135 F. Supp. 2d at 565.

### b.    Allegations Based on the Fact of Non-collectability

Plaintiffs' second allegation that "it was probable it would not be able [to] collect on [the SeraNova] promissory note" because the note eventually proved to be uncollectible, see Compl. ¶ 104, provides this Court with nothing but an impermissible "fraud-by-hindsight" claim.  Indeed,

> the courts have been very reluctant to permit [p]laintiffs to proceed on a "theory of fraud by hindsight" because corporate officials "are only responsible for revealing those material facts reasonably available to them" at the time of the alleged false or misleading statement or omission.

Wilson, 195 F. Supp. 2d at 639 (citing Novak, 216 F.3d at 309); see also Denny, 576 F.2d at 470; City of Philadelphia, 264 F.3d at 1260; Carter-Wallace, 150 F.3d 153.  Moreover, the Court of Appeals expressly stated that "[a plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that . . . the public was likely to be misled. [Securities] 'law does not expect clairvoyance.'" IKON, 277 F.3d at 673.

In the case at bar, Plaintiffs offer not a shred of data as to why Defendants should have been aware of non-collectability of the SeraNova note.  Rather, Plaintiffs rely solely on Intelligroup's *accounting* decision to re-record the loss.  However, accounting decisions involving discretion as to the time of allocation are made for financial reasons, e.g., to legitimately reduce applicable income taxation.  Thus, Intelligroup's pure accounting decision made one or two years after individual Defendants left Intelligroup cannot be interpreted as an indication of Defendants' culpable state of mind.  Accord 10-K (indicating that "[i]n connection with the restatement and re-audit process, [Intelligroup] reversed . . . the [SeraNova note] charges recorded in 2002 and 2003 . . . and moved such charges to 2000, the [more appropriate] period [accounting-wise] in which SeraNova was spun off [and the ensuing income was recorded.  Intelligroup, however,] left the portion of such charges related to the legal fees [against SeraNova and the Purchasers] and other costs incurred in trying to recover payment from SeraNova in the respective periods in which such costs were incurred").

In view of the foregoing, this Court finds that Plaintiffs' allegations related to the SeraNova note are void of any factual support as to the materiality element of the alleged non-disclosure, as well as to the scienter element.  Moreover, Plaintiffs' facts strongly suggest propriety of Defendants'

actions with respect to both the timing of SeraNova write-offs and re-recordation of these write-offs to the periods more proper accounting-wise.

### D.   DERIVATIVE LIABILITY OF VISCO AND VALLURI

A controlling person may be liable for securities fraud only if it is determined that the person over whom control was exercised committed a primary violation of the securities laws.  See Merck, 432 F.3d 261; Digital Island, 357 F.3d at 337; Shapiro, 964 F.2d at 279.

In the case at bar, Plaintiffs asserted two types of 10b-5 claim, one based on affirmative misrepresentation (entailing the obligation to plead, in addition to such obvious matters as purchase of a security and plaintiff's economic loss, four other elements jointly comprising the offence, i.e., materiality, scienter, transactional causation, economic loss and loss causation, see Dura, 544 U.S. at 341) and the other one based on non-disclosure (requiring pleading of materiality and scienter). See Affiliated Ute, 406 U.S. at 151; Newton, 259 F.3d at 175; Wilson, 195 F. Supp. 2d at 639).[82]

Here, Plaintiffs failed to plead (a) three out of four elements of their affirmative misrepresentation claim by alleging insufficient facts to show either Defendants' scienter, or Plaintiffs' transactional or loss causation, and (b) both elements of Plaintiffs' claim based on

---

[82]

Since reliance is not an element of 10b-5 enforcement actions by the SEC or a criminal prosecution, see Davis, 226 F.3d at 358; Rana Research, Inc., 8 F.3d 1358, Plaintiffs' failure meet their pleading burden would not mean that Defendants wrongful actions, if any, would necessarily go unpunished if Plaintiffs' instant "private attorney general" action fails. Compare Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 270 (1992) (the society has "the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as  private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely") (citation omitted).  However, the SEC's investigation of Intelligroup's errors made in the misstatements was terminated without any enforcement action.  See No-action Letter.

Defendants' alleged failure to disclose.  In view of these shortcomings, Plaintiffs' Complaint will be dismissed, as against Intelligroup, the issuer, for failure to state a claim asserting a primary violation of the securities laws.  Given the foregoing, Plaintiffs' Complaint will also be dismissed, as against Defendants Visco and Valluri, in their capacities as controlling persons of Intelligroup.[83]

### E.   LEAVE TO AMEND

Having thoroughly examined Plaintiffs' instant (Third Amended) Complaint and determined that Plaintiffs have still failed to set forth a viable 10b-5 claim asserting a primary violation of the securities laws and, consequently, to plead derivative claims under Section 20(a), this Court now turns to the question of whether Plaintiffs should be allowed to replead their claims for yet a fourth time.  (The Court excludes from its count Plaintiffs' original Complaint, see Docket Entry No. 1, and limits the count to Plaintiffs' First, Second and Third Amended Complaints.  See Docket Entries Nos. 31, 39 and 53.

---

[83]

The Court notes, in passing, that the totality of Plaintiffs' claims and arguments suggests that Plaintiffs relied on the apparently common opinion of Intelligroup's employees that Defendant Valluri had an unpleasantly controlling personality.  See generally, Compl.; Opposition.  However, the "controlling person" provision set forth in 15 U.S.C. § 78(a) utilizes the phrase as a term of art and has no relevance to the defendant's personality.  As to Defendant Visco, the Court is not entirely clear as to Plaintiffs' reasons for naming him as a Defendant in this action, since (a) Plaintiffs' scarce allegations against Defendant Visco are effectively limited to vague discussions of Defendant Visco's mild personality, see generally, Compl.; Opposition; thus, (b) even if Defendants Intelligroup and Valluri were deemed potentially liable, Defendant Visco could not be liable, since the group pleading doctrine is not permitted in this Circuit.  See Tyson, 155 Fed. Appx. at 57.

### 1.   General Rule

Ordinarily, the plaintiff may be granted "leave [to amend,] . . . when justice so requires."  See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept  the principle that the purpose of pleading is to facilitate a proper decision on the merits."  Foman, 371 U.S. at 182-83.  However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'"  Chubb, 394 F.3d at 164 (quoting GSC, 368 F.3d at 246); see Cybershop, 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing Champion Enter., Inc., Sec. Litig., 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)).  For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts may find that "[t]hree bites at the apple is enough," and conclude that it is proper to deny leave to replead.  Salinger v. Projectavision, Inc., 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996); Career Educ. II, 2007 U.S. Dist. LEXIS 23635, at *36 (where "plaintiffs have had ample opportunities to research and plead their claims " but failed to compose a sufficient pleading, the complaint is dismissed with prejudice);  American Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994); and Fisher v. Offerman & Co., Inc., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)).

## 2.    Entry of Binding Precedent Clarifying Applicable Pleading Standard

Federal Rule of Civil Procedure 15(a) provides that, "[after] a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, *repeated failure to cure deficiencies by amendments previously allowed*, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

Foman, 371 U.S. at 182 (emphasis supplied); see also Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 425 (3d Cir. 1981), cert. denied, 455 U.S. 1018 (1982).

Thus, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of course has passed," Charles Alan Wright et al., Federal Practice and Procedure: Civil 2d § 1486 (2d ed. 1990), the Rule 15(a) "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in Foman. See Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 891 (5th Cir. 1987). The Foman list of factors, however, appears to be non-exhaustive, i.e., leaving it for the district court to consider, on a case-by-case basis, whether consideration of additional factors would be appropriate in order to assure that plaintiff is granted leave "when justice so requires." Fed. R. Civ. P. 15(a). Therefore, the Court finds it proper to examine the issue of whether the legal developments, which

took place while Defendants' Motions were pending, warrant consideration of any factors besides those stated in Foman.

Here, Plaintiffs filed the instant Complaint on January 25, 2007. On May 21 and June 27, 2007, while this case was still pending but after Plaintiffs' filing of the Complaint, the Supreme Court issued its decisions in Bell Atlantic, 127 S. Ct. 1955, and Tellabs, 127 S. Ct. 2499, clarifying the pleading requirements under Rule 8 and Rule 9, respectively. In view of the Supreme Court's clarifications, this Court finds it proper to conduct an assessment of a factor additional to those stated in Foman, namely, whether the subsequent Supreme Court precedents clarifying both pleading standards applicable to Plaintiffs' 10b-5 claims supply basis for granting Plaintiffs another leave to amend. Therefore, the Court turns for guidance to the case law conducting similar inquiries within the context of another procedural provision, Rule 59(e).

"Rule 59(e) permits motions to amend or alter a judgment and may be granted to submit new, previously undiscovered evidence or to correct a clear error of law or prevent manifest injustice." Gutierrez v. Gonzales, 125 Fed. Appx. 406, 416 (3d Cir. 2005) (citing North River, 52 F.3d at 1218, and Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). Relief under Rule 59(e) is also appropriate when there has been an intervening change in the controlling law. See Buffa v. N.J. State Dep't of Judiciary, 56 Fed. Appx. 571, 574 (3d Cir. 2003) (citing Rule 59 (e) and New Jersey Local Rule of Civil Procedure 7.1(i)). Since a few federal courts addressed plaintiffs' Rule 59(e) motions within the context of a securities litigation for the purposes of establishing whether the precedent entered during the pendency of the case constituted an intervening change in the controlling law, this Court turns for guidance to a decision the Court finds most pertinent to the

particular circumstances at hand, Schiller v. Physicians Res. Group, Inc. ("Schiller-Appellate"), 342 F.3d 563 (5th Cir. 2003).

The opinion of the Court of Appeals for the Fifth Circuit in Schiller-Appellate was entered in response to the appeal taken by plaintiffs from the decision entered by the District Court for the Northern District of Texas in Schiller v. Physicians Res. Group, Inc. ("Schiller-District"), 2002 U.S. Dist. LEXIS 3240 (N.D. Tex. Feb. 26, 2002).  In Schiller-District, the plaintiffs claimed that the defendants made false and misleading statements to investors concerning the issuer's integration of practices that it had acquired across the nation and other issuer's business operations in order to inflate stock prices.  See Schiller-Appellate, 342 F.3d at 565.  The Schiller plaintiffs filed their complaint in December 1997 and amended their complaint numerous times from July 1998 to December 2000.  See id.  On February 5, 2001, the defendants moved to dismiss the then-pending Third Amended Complaint under Rule 12(b)(6).  See id.  In response--and instead of requesting to amend their then-pending Third Amended Complaint for a fourth time to correct any deficiencies, and attaching a copy of their proposed amended complaint– the plaintiffs stood by their Third Amended Complaint and requested the court to grant a further amendment only if the Third Amended Complaint failed to state a claim.  See id.  The district court granted the defendants' motion to dismiss and refused to give the plaintiffs "four bites at the apple" by allowing them to further amend their complaint.  See id. at 565-66.  On appeal, the plaintiffs

> argue[d] that leave to amend [was] warranted because [the] decision [issued by the Fifth Circuit, that is, the court whose decisions are binding upon the District Court] in Nathenson, 267 F.3d 400, represents an intervening change in the law. [The Fifth Circuit] reject[ed the plaintiffs'] argument for two reasons.  First, Nathenson was decided on September 25, 2001, approximately five months before the district court granted the motions to dismiss, and thus cannot constitute an intervening change in the law.  Second, [the Fifth Circuit] conclude[d] that Nathenson did not change the law with respect to the pleading requirements in securities fraud cases.  Nathenson

held that the enactment of the Private Securities Litigation and Reform Act ("PSLRA") did not generally alter the substantive scienter pleading requirements for § 10(b) and Rule 10(b)(5) securities fraud claims. See Goldstein, 340 F.3d 238. The Court in Nathenson merely confirmed that scienter . . . remained a valid basis for liability under § 10(b) and Rule 10(b)(5) in light of the plain language of the PSLRA. Id.; see also Nathenson, 267 F.3d at 410. [The Fifth Circuit] likewise reject[ed the plaintiffs'] argument that ABC [Arbitrage] Plaintiffs Group v. Tchuruk, 291 F.3d 336 (5th Cir. 2002), and Abrams, 292 F.3d 424, represent[ed] an intervening change in the law. [The plaintiffs were] well aware of the pleading standards, but simply failed to meet them.

Schiller-Appellate, 342 F.3d at 568, n. 3; see also Capstead Mortg. Corp. Secs. Litig., 2003 U.S. Dist. LEXIS 16525 (N.D. Tex. Sept. 19, 2003) (conducting the same inquiry).

Therefore, it appears that an entry of a binding precedent, which: (a) is issued while the matter is still pending, and (b) clarifies--rather than alters the existing legal regime--cannot qualify as an intervening change in the law. If so, the Supreme Court's decisions in Bell Atlantic, 127 S. Ct. 1955, and Tellabs, 127 S. Ct. 2499, do not provide this Court with grounds to grant Plaintiffs yet another leave to amend, since both Supreme Court's decisions clarified--rather than altered--the applicable pleading standards, which existed at the time of Plaintiffs' filing of all Plaintiffs' complaints, including the instant Complaint.[84]  See Tellabs, 127 S. Ct. 2499; Bell Atlantic, 127 S.

_____

[84]

The Court notes, in passing, its awareness of the recent decision by the Court of Appeals for the Fifth Circuit in Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp, 2007 U.S. App. LEXIS 22281 (5th Cir. Sept. 18, 2007) ("Flaherty-Appellate"), remanding the case to the district court for reconsideration of that matter under the standard articulated in Tellabs. However, the circumstances of the Flaherty-Appellate decision are qualitatively different from those at bar (and those in Schiller-Appellate).

On September 6, 2005, the Flaherty plaintiffs commenced their action by filing Plaintiffs' Original Class Action Complaint. See Flaherty & Crumrine Preferred Income Fund v. TXU Corp., 2006 U.S. Dist. LEXIS 67264, at *2 (N.D. Tex. Aug. 30, 2006) ("Flaherty-District"). On November 28, 2005, prior to defendants response, the plaintiffs amended the complaint by filing their First Amended Class Action Complaint. See id. The First Amended Complaint alleged that defendants violated Sections 10(b) and SEC Rule 10b-5 by making material misrepresentations and omissions of fact in connection with a self-tender offer to purchase certain convertible securities. See Flaherty-

Ct. 1955.  In sum, the Plaintiffs simply failed to meet their pleading standards.  Accord Schiller-

Appellate, 342 F.3d at 568, n. 3.

_____

Appellate, 2007 U.S. App. LEXIS 22281, at *2.  On December 15, 2005, the defendants filed their motion to dismiss the First Amended Complaint.  See Flaherty-District, 2006 U.S. Dist. LEXIS 67264, at *2.

> The district court granted the defendants' . . . motion [on the grounds that the plaintiffs] fail[ed] to satisfy the Private Securities Litigation Reform Act's . . . requirement [to] plead, with particularity, facts raising a "strong inference" of scienter. While the case was on appeal, the United States Supreme Court issued an opinion in Tellabs, . . . in which the Court clarified the appropriate standard for determining whether a securities fraud complaint gives rise to a "strong inference" of scienter, within the meaning of the PSLRA. . . . At oral argument, the plaintiffs indicated that remand to the district court would be appropriate because they did not have the benefit of Tellabs in drafting their complaint.

Flaherty-Appellate, 2007 U.S. App. LEXIS 22281, at *3-4.

Concluding that the district court . . . did not have the opportunity to consider whether the plaintiffs' allegations meet the PSLRA's pleading requirements in light of the clarifications articulated in Tellabs, the Fifth Circuit remanded the matter for reconsideration under the standard articulated in Tellabs (but without granting the plaintiffs an opportunity to replead).  See Flaherty-Appellate, 2007 U.S. App. LEXIS 22281, at *4.

In the case at bar, the Court assessed Plaintiffs' pleadings in light of the clarifications offered by the Supreme Court in Tellabs and Bell Atlantic, thus availing Plaintiffs to a review under the latest clarifications available with respect to the applicable statute and rules of Federal Civil Procedure, including comparative analysis (of inferences that could be drawn in favor of Plaintiffs' contentions and competing inferences) emphasized by the Third Circuit in Winer Family Trust, 2007 U.S. App. LEXIS 22620, at *21-22.  Accord Schiller-Appellate, 342 F.3d at 568.

The fact that Plaintiffs were not aware of these clarifications at the time of their drafting of the Third Amended Complaint is of no import, since Plaintiffs, having been provided with three opportunities to replead after twice failing to meet the applicable standards were obligated to marshal all their available facts and arguments in their instant Third Amended Complaint and, presumably, did so.  Consequently, granting Plaintiff yet another leave to amend on the grounds of issuance of new clarifying decisions would: (a) create an anomalous precedent preventing any conclusive litigation by enabling securities plaintiffs to perpetually seek leave to amend their insufficient complaints through a mere act of citing those judicial decisions, which were issued after these plaintiff filed their complaints, and (b) therefore, frustrate the whole purpose of both Rule 15(a) and PSLRA.  See Foman, 371 U.S. at 182 (discussing the filtering aspect of Rule 15(a)); Chubb, 394 F.3d at 164 (discussing the filtering aspect of PSLRA); Cybershop, 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges . . . granted leave to amend on a limitless basis").

### 3.    Repeated Failure to Cure Deficiencies and Futility of Amendment

In a securities class action lawsuit, it is proper for a district court to deny the plaintiffs leave to amend their complaint if: (a) the plaintiffs have been given three opportunities to state a claim upon which relief could be granted, but (b) in spite of the court's prior directives and the court giving the plaintiffs a detailed roadmap for curing deficiencies in their claims, failed to cure those deficiencies. See Chubb, 394 F.3d at 165-66; see also Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571 (E.D. Va. 2006) (in a federal securities fraud class action, plaintiffs should not be permitted to further amend its complaint pursuant to Fed. R. Civ. P. 15(a) because plaintiffs already had two full opportunities to state claim and failed to do so); Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir. 1987) (the court could reasonably conclude that further amendment would be futile where the district court's written order identified defects in the previous amended complaint, and the court permitted plaintiff to amend its complaint once again, and yet the instant amended complaint did not cure deficiencies).

In the case at bar, Plaintiffs had three full opportunities to state a claim and failed to do so.[85] In spite of: (a) this Court providing Plaintiffs with a detailed roadmap in its previous opinion, extensively detailing the law and reviewing in detail the financial figures that Plaintiffs offered as evidence, see generally December Opinion (Intelligroup, 468 F. Supp. 2d 670) (extensively

---

[85]    This case has been pending with the Court since October 12, 2004, that is, for over three years, and it is still at the stage of Rule 12(b)(6) motions. Its litigation history and volumes of parties' submissions (heavily laden with accounting and financial data and laced with long excerpts from GAAP) support the conclusion that "securities class actions disproportionately claim judicial time and attention [because] they take longer to resolve than most other class actions." See Retrospective, 106 Colum. L. Rev. at 1540 and n.13 (citing Admin. Office of the U.S. Courts, Judicial Business of the United States Courts 395-97 tbl.X-4 (2002), 393-400 tbl.X-4 (2003), and 400-07 tbl.X-4 (2004).

discussing the transactional and loss causation elements of 10b-5 claim), and (b) voluminous discussions of Plaintiffs' pleading shortcomings provided by Defendants in their motions seeking dismissal of the instant and previous Complaint, see id. at 56 (Intelligroup, 468 F. Supp. 2d at 707) ("the bulk of the parties' efforts were dedicated to the element[]" of scienter), Plaintiffs instant Complaint suffers from the same deficiencies as its predecessors.[86]

Although Plaintiffs have had three bites at the apple and have deposed a good number of Intelligroup's senior officials, the content of their pleadings still fails to meet the pleading burden. See NDCHealth, 2005 U.S. Dist. LEXIS 43860, at * 59 ("Plaintiffs['] counsel is experienced in securities class actions and has had significant time to carefully draft the Complaint. [Moreover,] Plaintiff[s apparently have] had unusual . . . access to senior officials [who worked for the issuer and] whose identities have been kept confidential, and Plaintiff[s have] still failed to meet [the] pleading burden").  "Therefore, the Court does not find fault with the drafting of [the instant] Complaint, but rather with the legal sufficiency of the facts alleged."  Sportsline, 366 F. Supp. 2d at 1174.  The Court concludes that the key deficiency of Plaintiffs' pleadings, i.e., that Plaintiffs offer the reader the degree of factual precision equal to that of the famous line "Something is rotten in the state of Denmark," paraphrased into hundreds pages of legalese, cf. Kaplan v. United States Office

---

[86]

During the last amendment, Plaintiffs' curative measures were reduced to mere paraphrasing of Plaintiffs' original allegations into the language resembling that used by the Court in its December Opinion, often causing incongruous results.  See, e.g., Compl. ¶ 113 (responding, apparently, to this Court's observation that the market's pricing of a stock traded on a secondary market is primarily geared to the issuer's net income rather than assets and liabilities figures, Plaintiffs' altered their allegations pertaining to the reliance element of 10b-5 by paraphrasing them so to include an assertion of Plaintiffs' express reliance on Intelligroup's assets and liabilities figures, even though Plaintiffs kept maintaining that their reliance should be presumed under the fraud-on-the-market theory, which has no connection with Plaintiffs' actual reliance).

of Thrift Supervision, 104 F.3d 417, 423 (U.S. App. D.C. 1997) (finding plaintiff's allegations that the defendant should have, somehow, surmised that "something was rotten in the state of Denmark" insufficient evidence of the defendant's liability), is rooted in Plaintiffs' simple lack of facts sufficient to state a claim.

Therefore, the Court concludes that granting Plaintiffs another leave to amend will be futile and not in the interest of justice, and dismisses Plaintiffs' Third Amended Complaint with prejudice.


**VII.    CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss will be GRANTED.  Plaintiffs' Third Amended Consolidated Class Action Complaint will be DISMISSED WITH PREJUDICE.

An appropriate Order accompanies this Opinion.



s/Garrett E. Brown, Jr.
**GARRETT E. BROWN, JR.**
**Chief Judge, United States District Court**

Dated: 11/13/2007